**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Esther Wilder,<br><br>                Plaintiff,<br><br>        v.<br><br>Sarah Hoiland,<br><br>                Defendant. | Civ. Action No. 1:22-cv-01254-PKC |

## <u>PLAINTIFF'S RULE 56.1 STATEMENT OF MATERIAL FACTS</u>

## <u>TABLE OF CONTENTS</u>

I.     Plaintiff Authored the Copyrighted Work During Her Work on the NICHE Project .........1

II.    Defendant Had Access to the Copyrighted Work During the NICE Project .....................3

III.    Defendant Copied the Copyrighted Work into Her Infringing CCLA PowerPoint............8

    A.    Defendant Applied to Present at the CCLA Presentation Without Plaintiff's Knowledge ........................................................................8

    B.    Defendant's Presentation Infringed Plaintiff's Copyrighted Work ........................9

    C.    The PowerPoint Copied Other Works Authored by Plaintiff and Professor Rodriguez ..............................................................................13

    D.    Plaintiff Objected to Defendant's Unauthorized Use of the Copyrighted Work as Soon as She Learned of It ...............................................14

    E.    Defendant Benefitted From Her Unlawful Use of Plaintiff's Copyrighted Work .................................................................................15

IV.    Academic Norms for Use of Another Author's Work in a Presentation or Publication....16

Pursuant to Local Rule 56.1, Plaintiff Esther Wilder, by and through her attorneys, and in support of Plaintiff's Motion for Summary Judgment, sets forth the following statements of material fact as to which Plaintiff contends there is no genuine issue to be tried.

**I.      Plaintiff Authored the Copyrighted Work During Her Work on the NICHE Project**

1.      Plaintiff Esther Wilder ("Plaintiff") is a tenured professor in the Department of Sociology at Lehman College, City University of New York ("CUNY"). (Declaration of Esther Wilder, "Wilder Decl.," ¶ 2.)

2.      A major focus of Plaintiff's research for the past 15 years has been developing methods for faculty to teach quantitative reasoning ("QR") effectively to college students, and many of her scholarly papers and other publications, projects, and presentations have been related to that research. (*Id.* at ¶ 9.)

3.      In 2011, Plaintiff was the recipient of a National Science Foundation ("NSF") grant of $600,000 for a project known as "NICHE," which is an abbreviation for "Numeracy Infusion Course for Higher Education."  (Wilder Decl. ¶ 10; Ex. 6 at P156–230 at P181.)[1]

4.      The NICHE program, an online faculty development program, was designed to teach faculty at CUNY about the best practices for infusing quantitative reasoning into their courses, and the assessment of that instruction. (Wilder Decl. ¶ 11.)

5.      Plaintiff served as Principal Investigator ("PI") on the NICHE project from 2011 through 2016. (Wilder Decl. ¶ 12.)

6.      The faculty enrolled in the NICHE program received instruction on teaching QR in three core areas, (1) identifying learning goals, (2) creating instructional materials, and (3) doing QR assessment.  (Wilder Decl. ¶¶ 13–14.)

---

[1] Exhibits 1–15 are attached to the Declaration of Esther Wilder submitted herewith.

7.      As the PI on NICHE, Plaintiff developed and created most of the instructional material and guidelines used in NICHE. (Wilder Decl. ¶ 15.)

8.      Each of the NICHE instructional videos included a statement that unauthorized use of the NICHE course materials is strictly prohibited and that any questions regarding the authorization of use of the NICHE materials should be directed to Plaintiff. (Wilder Decl. ¶ 16, Ex. 5, P665.)

9.      In 2013, Plaintiff authored the original instructional material for a key component of NICHE, Unit 7 (Unit 7H) on QR assessment.  (Wilder Decl. ¶ 18.)

10.     Unit 7H provided instructions to faculty on preparing a QR assessment plan and instruction in accordance with the learning goals. (Wilder Decl. ¶ 19; Ex. 1.)

11.     Plaintiff created the NICHE instructional materials drawing on her extensive experience researching QR instruction and teaching QR literacy in her courses. (Wilder Decl. ¶ 24.)

12.     In creating the text of Unit 7H, Plaintiff selected the guidelines and strategies that she found effective in explaining assessment of QR instruction to an audience of non-specialists. (Wilder Decl. ¶ 25.)

13.     Plaintiff registered the copyright in the assessment unit, Unit 7H, with the Copyright Office in about April 2021 (the "Copyrighted Work"). (Wilder Decl. ¶ 20; Ex. 1.)

14.     The Copyright Office Certificate of Registration for the Copyrighted Work states that Plaintiff is the author and copyright claimant of the Copyrighted Work. (Ex. 2, P677.)

15.     Access to the Copyrighted Work and the other NICHE core instructional materials was limited, available online in Blackboard, a content management program, only to the CUNY faculty that enrolled in NICHE and the administrators of the program. (Wilder Decl. ¶ 27.)

16.     The Copyrighted Work was not available to faculty outside of CUNY and was only available to CUNY faculty enrolled in the NICHE program. (Wilder Decl. ¶ 26.)

## II.     Defendant Had Access to the Copyrighted Work During the NICE Project

17.     In 2016, when presenting on NICHE at an NSF Conference, Plaintiff was approached about doing an extension of her NICHE grant, adapted to be an in-person (and online) faculty development program to train faculty at the three Bronx-based Hispanic Serving Institutions (HSIs), specifically CUNY's Lehman College, Hostos Community College and Bronx Community College, on QR literacy. (Ex. 20, Hoiland Tr. 20:12–16;[2] Wilder Decl. ¶¶ 30–31.)

18.     The extension project, Numeracy Infusion for College Educators ("NICE") required that one of the PIs be from an HSI community college. (Wilder Decl. ¶ 32.)

19.     After learning of Defendant Sarah Hoiland's ("Defendant") interest in teaching QR literacy from a colleague of hers, Plaintiff contacted Defendant, then an assistant professor at Hostos Community College, about being a PI on the project. (Ex. 20, Hoiland Tr. 19:12–20:16, 25:10–13; Wilder Decl. ¶ 33.)

20.     At the time she contacted Defendant about NICE, Plaintiff had never met Defendant. (Wilder Decl. ¶ 34.)

21.     Defendant had not been involved in NICHE, neither as an investigator or faculty participant, before Plaintiff approached her about being involved in NICE. (Ex. 20, Hoiland Tr. 25:7–9; Wilder Decl. ¶ 35.)

22.     Defendant agreed to be a PI on NICE, with Plaintiff being the other PI. (Wilder Decl. ¶ 36.)

---

[2] Exhibits 16–20 are attached to the Declaration of Janet B. Linn submitted herewith.

23.     Plaintiff took the lead drafting the NSF grant proposal for NICE, and Defendant suggested some edits. (Ex. 20, Hoiland Tr. 25:10–26:2, 88:6–10; Wilder Decl. ¶ 37.).)

24.     The NSF NICE proposal was submitted on about May 31, 2016. (Ex. 6, P156–230 at P163; Wilder Decl. ¶ 38.)

25.     The NSF grant proposal said the NICE Program "will build on the strengths of the Numeracy Infusion Course for Higher Education (NICHE) (DUE #1121844), a CUNY-wide initiative that sought to infuse QR across the curriculum through an online faculty development program. Specifically, the NICE Program will refine and update NICHE in accordance with the assessment data gathered for the project [62] and adapt it into a face-to-face faculty development program suitable at CUNY's three Bronx based HSIs." (Ex. 6, P156–230 at P176, P185; *see also* Wilder Decl. ¶ 39.)

26.     "[62]" refers to a panel presentation by Plaintiff and her colleagues. (Ex. 6, P156–230 at P185.)

27.     At the time the NSF NICE proposal was submitted, Defendant was scheduled to do a workshop the following year at ASA on "Teaching Quantitative Literacy and Reasoning in the Social Sciences", but she had no other presentations or activities on the subject apart from NICE. (Ex. 6, P156–230 at P186; Wilder Decl. ¶ 41.)

28.     An objective of NICE was to provide instruction in best practices for teaching QR to faculty at HSIs in the Bronx on the unique needs of Hispanics and under-represented minorities. (Wilder Decl. ¶ 42.)

29.     Other objectives included development of instructional materials that make use of effective strategies for teaching QR, increase faculty interest and comfort in teaching QR, and

establish a network of Bronx (CUNY) faculty committed to improving student's QR abilities. (Ex. 6, P156–230 at P177; Wilder Decl. ¶ 43.)

30.     Both NICHE and NICE involved instructional materials created for the NICHE project. (Ex. 20, Hoiland Tr. 23:6–17; Wilder Decl. ¶ 44.)

31.     Upon completion of the instructional units, the faculty participating in NICE (like in NICHE) were required to develop instructional and assessment materials to incorporate into their teaching. (Ex. 6, P156–230 at P177; Wilder Decl. ¶ 47.)

32.     The PIs of NICE were to evaluate the effectiveness of the program by examining the assessment data that faculty gathered in their QR infused courses and analyze that data. (Ex. 6, P156–230 at P179, 181; Wilder Decl. ¶ 48.)

33.     Defendant was to work collaboratively with Plaintiff to develop and refine NICE and the NICE assessment instruments, recruit Hostos faculty for the program, and promote the NICE project at Hostos and other CUNY schools in the Bronx. (Ex. 20, Hoiland Tr. 23:18–24:18; Ex. 6, P156–230 at P199; Wilder Decl. ¶ 49.)

34.     As co-director of the NICE project, Plaintiff was to assume primary responsibility for recruitment and admission into the NICE program and direct research activities on the quantitative assessment data gathered. Plaintiff was also to work with other members of the NICE leadership team to recruit faculty and publicize NICE throughout the CUNY schools in the Bronx. (Ex. 6, P156–230 at P205; Wilder Decl. ¶ 50.)

35.     Both Defendant and Plaintiff were to disseminate their research results at conferences, publications in journals and other relevant outlets. (Ex. 6, P156–230 at P180–181, P199; Wilder Decl. ¶ 51.)

36.     The NICE grant was approved in 2016 and funded in 2017. (Ex. 20, Hoiland Tr. 25:25–28:3; Wilder Decl. ¶ 52.)

37.     The NICE project ran from about January 2017 to about December 2019. (Ex. 19; Ex. 6, P156–230 at P201, 207; Wilder Decl. ¶ 53.)

38.     To help train Defendant for her duties on the NICE project, Plaintiff enrolled Defendant as a faculty participant in NICHE. (Ex. 20, Hoiland Tr. 37:13–39:6; Wilder Decl. ¶ 54.)

39.     Enrolled in NICHE, Defendant reviewed the NICHE instructional materials. (Ex. 20, Hoiland Tr. 106:6–14; Wilder Decl. ¶ 54.)

40.     The NICHE instructional materials which Defendant reviewed included the Copyrighted Work, and the videos for each unit that specifically stated that they were subject to copyright and not to be used without Plaintiff's express authorization. (Ex. 5, P665.)

41.     During the first year of NICE, Defendant was also enrolled as a faculty participant in NICE. (Hoiland Tr. 34:6–36:4; Wilder Decl. ¶ 60.)

42.     The NICE instructional materials carried the same statement, that they were not to be used without Plaintiff's express authorization. (Wilder Decl. ¶ 59.)

43.     At no time did Defendant request permission to use the NICHE/NICE instructional materials in a presentation. (Ex. 20, Hoiland Tr. 108:4–8.)

44.     Like the NICHE instructional materials, the NICE instructional materials were hosted on Blackboard. (Ex. 20, Hoiland Tr. 78:19–24.)

45.     Defendant understood the instructional materials used in NICE came from NICHE. (Ex. 20, Hoiland Tr. 79:14–18.)

46.     While a goal of NICE program was to adapt the prior NICHE instructional materials for NICE to the HSI faculty, the adaptation did not happen and the NICHE instructional materials

were instead essentially incorporated whole into NICE unchanged other than the references changed from NICHE to NICE. (Ex. 20, Hoiland Tr. 78:25–79:18; Wilder Decl. ¶¶ 46, 56.)

47.     As with the NICHE project, the accessibility of the NICE instructional materials, including the Copyrighted Work was limited, available only to the faculty enrolled in NICE and the administrators of the NICE program on Blackboard (Wilder Decl. ¶ 57.)

48.     Along with her responsibilities guiding the other faculty in NICE in preparing instructional and assessment materials, Defendant created instructional materials for her students, and assessed the effectiveness of those materials. (Wilder Decl. ¶ 61.)

49.     Prior to Defendant's presentation in February 2019, Defendant and Plaintiff had presented together at national conferences twice about the NICE project, at the National Numeracy Network annual meeting and at the Mathematical Association of America Metropolitan New York section meeting. (Ex. 20, Hoiland Tr. 43:5–17; Wilder Decl. ¶ 65.)

50.     At these conferences, Plaintiff and Defendant presented an overview of the NICHE and NICE programs, shared research results,  and highlighted plans to adapt NICHE to NICE. (Ex. 20, Hoiland Tr. 42:24–43:4, 44:7–46:4; Wilder Decl. ¶ 66; Ex. 16, D504–529.)

51.     At the NNN conference, Defendant and another colleague presented the instructional and assessment materials they created as participants in NICE. (Ex. 20, Hoiland Tr. 44:7–48:19; Wilder Decl. ¶ 67.)

52.     At none of these conferences were sections of the NICHE/NICE instructional and assignment materials shared with the conference attendees. (Wilder Decl. ¶ 68.)

**III.    Defendant Copied the Copyrighted Work into Her Infringing CCLA PowerPoint**

**A.    Defendant Applied to Present at the CCLA Presentation Without Plaintiff's Knowledge**

53.    In about June 2018, Defendant applied to speak at a community college conference at Valencia College, entitled the Community College Conference on Learning Assessment (the "CCLA Conference"). (Ex. 17, D01–03.)

54.    Defendant's presentation proposal for the CCLA Conference stated that she would be presenting alone. (Ex. 17, D01–03 at D03.)

55.    In her presentation proposal, Defendant acknowledged that her "presentation materials will be available on a private website for attendees to download." (Ex. 17, D01–03 at D02; Ex. 20, Hoiland Tr. 108:10–110:6.)

56.    In about July 2018, the organizers of the CCLA Conference informed Defendant by email that her presentation proposal was accepted. (Ex. 12, P428–429 at P428.)

57.    The acceptance email advised that Defendant's PowerPoint for the presentation "will be placed on a password-protected website for conference attendees to download prior to the conference." (Ex. 12, P428–429 at P428.)

58.    In response to the acceptance email, Defendant signed and submitted an "Intellectual Property License and Photo Release" to the organizers of the CCLA Conference. (Ex. 8, D04; Ex. 20, Hoiland Tr. 111:13–112:13; *see also* Ex. 12, P428–429 at P428.)

59.    The "Intellectual Property License and Photo Release" states that Defendant gave the Board of Trustees of Valencia College "and its designees and assignees" a "nonexclusive license to use, copy and distribute, by whatever means appropriate and convenient, outlines, PowerPoint and other presentations . . .  identified or created by me in connection with" the CCLA Conference, including "posting these materials online for downloading on the Conference website

and mobile application for Conference participants."  (Ex. 8, D04; Ex. 20, Hoiland Tr. 111:13–112:13.)

60.     The "Intellectual Property License and Photo Release" also states that Defendant is "responsible for obtaining the written consent of the owner of the copyrighted materials," and that Defendant "warrant[ed] that the materials for which [she] was providing a license do not violate the copyright, trade secrets, trademark or any intellectual or proprietary rights of any third party . . . ." (Ex. 8, D04; Ex. 20, Hoiland Tr. 112:17–114:6.)

61.     Defendant first informed Plaintiff about Defendant's application to the CCLA Conference after Defendant received the acceptance email from the organizers of the CCLA Conference, and at that time Defendant asked Plaintiff if she wanted to co-present. (Ex. 12, P428–429 at P428; Ex. 20, Hoiland Tr. 187:2–18.)

62.     When she asked Plaintiff if she wanted to co-present at the CCLA Conference, Defendant did not provide Plaintiff a copy of the proposal, the abstract, or any other information describing the substance of the presentation. (Ex. 20, Hoiland Tr. 189:18–20.)

63.     Having had no input into the submission and having other commitments, Plaintiff declined Defendant's invitation to co-present. (Wilder Decl. ¶ 69.)

64.     Plaintiff assumed that Defendant would present Defendant's NICE research results at the CCLA Conference, in accordance with the NICE proposal and her prior presentations with Plaintiff. (Wilder Decl. ¶ 70.)

**B.     Defendant's Presentation Infringed Plaintiff's Copyrighted Work**

65.     Defendant presented at the CCLA Conference at Valencia College in February 2019. (Ex. 20, Hoiland Tr. 79:19–24.)

66.     Defendant prepared a PowerPoint for her presentation at the CCLA Conference, which she submitted to the organizers of the CCLA Conference and displayed during her oral

presentation at the CCLA Conference ("the CCLA PowerPoint"). (Ex. 3; Ex. 20, Hoiland Tr. 82:12–84:12.)

67.     Defendant's CCLA PowerPoint was also available to all CCLA Conference attendees on the CCLA Conference website. (Ex. 17, D01–03 at D02; Ex. 12, P428–429 at P428; Ex. 20, Hoiland Tr. 108:10–110:6.)

68.     The only individual's name appearing anywhere in the CCLA PowerPoint is Defendant's name. (Ex. 3, D234–256 at D234.)

69.     Slides 9 through 13 copied almost verbatim the majority of the Copyrighted Work. (*Compare* Ex. 3, D234–256 at D242–246, *with* Ex. 1; *see also* Ex. 4.)

70.     Plaintiff is the author of the portions of the Copyrighted Work appearing on Slides 9 through 13. (Wilder Decl. ¶¶ 72–75.)

71.     Defendant did not give Plaintiff written credit as the author of Slides 9 through 13. (*See generally* Ex. 3, D234–256 at D234.)

72.     Defendant did not give Plaintiff oral credit as the author of Slides 9 through 13. (Ex. 20, Hoiland Tr. 136:3–20.)

73.     Defendant copied the text on Slides 9 through 13 almost verbatim from the NICE instructional materials on Blackboard. (Ex. 20, Hoiland Tr. 92:22–95:2, 210:13–211:7.)

74.     Defendant copied the text on Slides 9 through 13 from the NICE instructional materials on Blackboard either by taking a screenshot of the text, or copying and pasting the text into the slides. (Ex. 20, Hoiland Tr. 210:13–211:7.)

75.     Both Slide 9 of the CCLA PowerPoint and the Copyrighted Work include the following text authored by Plaintiff, including the same typo as Plaintiff's Copyrighted Work ("You assessment"):

> QR Assessment Instrument
> Please restate your revised QR learning goals that you developed in this blog along with your QR assessment instrument. We ask that your QR assessment be simple and consist of 3 questions (. . .) that directly correspond to the 3 learning goals you have articulated (if you are undertaking a pre-test/post-test design, you may want to develop two versions of the instrument . . . ).
> PLEASE KEEP YOUR ASSESSMENT INSTRUMENT SIMPLE and include only 3 questions/problems with scoring rubrics, etc.!
> You assessment instrument should be designed to measure whether or not (or the extent to which) your QR lesson/assignment succeeded in teaching students the 3 learning goals you put forward. The assessment should be designed to give feedback to you as an instructor! Please indicate when and how you plan to administer your assessment instrument . . . !

(*Compare* Ex. 3, D234–256 at D242, *with* Ex. 1; *see also* Ex. 4; Ex. 20, Hoiland Tr. 92:22–93:8, 210:13–211:10.)

76.      Both Slide 10 of the CCLA PowerPoint and the Copyrighted Work include the following text authored by Plaintiff:

> QR Assessment Instrument
> Please note that there are examples of course-specific assessment instruments on our instructional materials from NICHE. . . webpage.
> Assessments can take a huge variety of forms and we encourage you to assess in a way that makes sense for your course and for your learning objectives. However, we also strongly encourage you to assess narrowly, specifically focusing on your QR . . . , rather than the course as a whole or the college experience as a whole. . . . Since you have articulated 3 learning goals [in each of three areas, e.g., (a) [k]nowledge and conceptual understanding; (b) thinking and other skills; and (c) attitudes, values, dispositions and habits of mind], we ask you to develop a simple 3-question assessment instrument that . . . 3 learning goals. . .

(*Compare* Ex. 3, D234–256 at D243, *with* Ex. 1; *see also* Ex. 4; Ex. 20, Hoiland Tr. 93:9–21.)

77.      Both Slide 11 of the CCLA PowerPoint and the Copyrighted Work include the following text authored by Plaintiff:

> Guidelines for Developing and Providing Feedback on QR Assessment Instrument
> (1) Does the assessment instrument (or instruments if there are two versions) include 3 questions (or scoring rubrics, etc.) that are clear and straightforward?

(2) Can (and how will) the results of the assessment plan and instrument be used to evaluate whether the instructor effectively taught specific QR skills and/or achieved his or her QR learning goals? How do the skills assessed in the instrument correspond to the QR learning goals articulated by the instructor as well as those taught in the QR lesson plan in terms of (a) knowledge and conceptual understanding; (b) thinking and other skills; and (c) attitudes, values, dispositions and habits of mind?

(*Compare* Ex. 3, D234–256 at D244, *with* Ex. 1; *see also* Ex. 4; Ex. 20, Hoiland Tr. 93:22–94:8.)

78.    Both Slide 12 of the CCLA PowerPoint and the Copyrighted Work include the following text authored by Plaintiff:

Guidelines for Developing and Providing Feedback on QR Assessment Instrument
. . .
(3) What are the strengths and weaknesses of the QR assessment plan and instrument? Please indicate at least one way in which the assessment instrument could be improved. In responding to this question, please consider the following:
(a) . . . the assessment . . . be . . . to evaluate the effectiveness of the QR lesson plan (including assignments, readings, etc.)? For example, does the instructor plan to use a pre-test/post-test design, is there a comparison group, etc.
(b) Does the QR assessment instrument extend beyond just being a math skills test and emphasize the ability to reason with quantitative information?
(c) Is the assessment instrument valid (i.e., does it get at what the instructor is trying to measure)?
(d) Is the instrument sound? For example, if the instrument relies on multiple choice questions, are the response options mutually exclusive and is the correct answer clearly identifiable? If the assessment instrument (or a specific question) relies on a rubric, do the scoring criteria make sense and will the exercise authoritatively assess a QR skill (or skills)?

(*Compare* Ex. 3, D234–256 at D245, *with* Ex. 1; *see also* Ex. 4; Ex. 20, Hoiland Tr. 94:9–94:16.)

79.    Both Slide 13 of the CCLA PowerPoint and the Copyrighted Work include the following text authored by Plaintiff:

Guidelines for Developing and Providing Feedback on QR Assessment Instrument
. . .
(4) Is the assessment instrument independent of the course QR . . .assignment(s)? In other words, can it be used to evaluate the effectiveness of the QR . . .assignment(s)?

(*Compare* Ex. 3, D234–256 at D246, *with* Ex. 1; *see also* Ex. 4; Ex. 20, Hoiland Tr. 94:17–95:2.)

80.     Defendant did not intend that the CCLA PowerPoint be the focus of her oral presentation at the CCLA Conference, and instead intended them to be displayed to the audience as a quick visual. (Ex. 20, Hoiland Tr. 136:11–138:12, 200:2– 202:10.)

81.     Defendant did not intend to and did not discuss the Copyrighted Work on Slides 9 through 13 in any detail during her oral presentation at the CCLA Conference, nor did she intend for the audience to read those slides during her oral presentation (because they had a lot of text). (Ex. 20, Hoiland Tr. 193:10–194:4, 200:2– 202:10.)

82.     The attendees of the CCLA Conference were interested in the procedures for recruiting faculty and interactions between the institutions, not the instructional materials comprising the Copyrighted Work. (Ex. 20, Hoiland Tr .137:14–138:12.)

**C.     The PowerPoint Copied Other Works Authored by Plaintiff and Professor Rodriguez**

83.     In addition to Slides 9 through 13, other slides within Defendant's CCLA PowerPoint included text that was not authored by Defendant, including Slides 14 through 19. (Ex. 20, Hoiland Tr. 95:3–97:9.)

84.     Slides 14 through 19 were copies of instructional assessment materials developed by a faculty member enrolled in the NICE program, Professor Crystal Rodriguez. (Wilder Decl. ¶ 79.)

85.     Professor Rodriguez had not given her consent to Defendant to copy and distribute her work. (Ex. 14, P553–558 at P554; Ex. 20, Hoiland Tr. 145:21–146:6.)

86.     Before incorporating Professor Rodriguez's work into the CCLA PowerPoint, Defendant knew that Professor Rodriguez signed an Institutional Review Board (IRB) consent

form stating that she wanted written credit any time her work was used. (Ex. 20, Hoiland Tr. 126:7–13, 139:10–141:2; Ex. 7, P231–233 at P233.)

87.     Although Defendant could have used her own instructional assessment materials in place of the materials that Professor Rodriguez created, Defendant chose not to do so. (Ex. 20, Hoiland Tr. 196:12–22.)

**D.     Plaintiff Objected to Defendant's Unauthorized Use of the Copyrighted Work as Soon as She Learned of It**

88.     About six months after Defendant's presentation at the CCLA Conference, Defendant showed Plaintiff an abstract for another conference presentation that she was planning which she said would be like her presentation at the CCLA Conference.  (Wilder Decl. ¶ 71.)

89.     Defendant then provided Plaintiff with a copy of the PowerPoint that Defendant had submitted to the organizers of the CCLA Conference and that had displayed during her oral presentation at the CCLA Conference ("the CCLA PowerPoint"). (Wilder Decl. ¶ 72.)

90.     Prior to Defendant sending Plaintiff the CCLA PowerPoint in approximately August 2019, Plaintiff had not previously seen a copy of the CCLA PowerPoint. (Wilder Decl. ¶ 72.)

91.     Plaintiff first learned that Defendant had copied her Copyrighted Work into the CCLA Presentation when Plaintiff reviewed Defendant's CCLA PowerPoint in about August 2019. (Wilder Decl. ¶¶ 72, 75.)

92.     Plaintiff immediately advised Defendant that Plaintiff did not consent to the use of the materials she authored for NICHE in Defendant's CCLA PowerPoint. (Wilder Decl. ¶¶ 76–78.)

93.     Plaintiff asked Defendant to contact the organizers of the CCLA Conference to add Plaintiff's name as a co-author to mitigate the damage done to her. (Wilder Decl. ¶ 78.)

94.     Plaintiff subsequently realized that assessment materials developed by Professor Rodriguez for the NICE project were also copied by Defendant into the CCLA PowerPoint. (Wilder Decl. ¶ 79; Ex. 13, P480–484 at P480.)

95.     Plaintiff then asked Defendant to add attribution to Professor Rodriguez in the CCLA PowerPoint as well. (Wilder Decl. ¶ 82; Ex. 13, P480–484 at P480–481.)

96.     When it appeared to Plaintiff after several weeks that no correction had been made to the CCLA PowerPoint, Plaintiff contacted the organizers of the CCLA Conference directly. (Wilder Decl. ¶ 83; Ex. 13, P480–484 at P483; Ex. 15, P475–477 at P475–476.)

97.     At that point, it was too late to change the CCLA PowerPoint, but Plaintiff's and Professor Rodriguez's names were added as co-presenters on the CCLA Conference website. (Wilder Decl. ¶ 84; Ex. 13, P480–484 at P481; Ex. 15, P475–477 at P475.)

98.     After contacting Valencia College, Plaintiff pursued her complaint concerning Defendant's use of her Copyrighted Work and Professor Rodriguez's work informally at CUNY. (Wilder Decl. ¶ 96.)

99.     After informal efforts to resolve the matter were unsuccessful, Plaintiff filed a formal complaint for research misconduct against Defendant with the Research Integrity Officer (RIO) at CUNY. (Wilder Decl. ¶ 97.)

**E.     Defendant Benefitted From Her Unlawful Use of Plaintiff's Copyrighted Work**

100.    In academia, a credit as a single author of a presentation at a national conference is beneficial to a person's career. (Wilder Decl. ¶ 101.)

101.    Defendant's presentation at the CCLA Conference added such an authorship credit to her resume. (Ex. 20, Hoiland Tr. at 27; 81:9–12, 234:18–235:24, 236:19–237:6; *see also id.* at 169:20–170:3; Ex. 18, D88–103 at D0094.)

102.     In each of Defendant's subsequent applications for grants and a professional award, Defendant listed the CCLA presentation. (Ex. 20, Hoiland Tr. 234:18–235:24, 236:19–237:6.)

103.     Defendant's presentation of the Copyrighted Work under her name impaired Plaintiff's ability to publish and present her work, having had a section of it appear under Defendant's name. (Wilder Decl. ¶ 102.)

104.     Plaintiff has considered commercializing the NICHE program of study, including the Copyrighted Work, in a textbook. (Wilder Decl. ¶ 103.)

105.     Defendant's presentation could adversely affect Plaintiff's ability to commercialize the NICHE materials. (Wilder Decl. ¶ 104.)

106.     Defendant's presentation of the Copyrighted Work under her name hinders Plaintiff's ability to publish and present her work, because it would seem the Plaintiff was copying and plagiarizing Defendant's work. (Wilder Decl. ¶ 105.)

## IV.   Academic Norms for Use of Another Author's Work in a Presentation or Publication

107.     Academic and professional norms require authorization and the crediting of other's work of authorship when duplicated in a publication or presentation. (Ex. 20, Hoiland Tr. 180:2–181:8, 183:20–184:9, 184:12–185:16, 185:22–186:16; Ex. 10, P649–654 at P649–650; Ex. 11, P294–298 at P297; Ex. 9, P273–293 at P288–289; Wilder Decl. ¶¶ 88, 95.)

108.     Both Plaintiff and Defendant work in the field of sociology. (Ex. 20, Hoiland Tr. 14:4–15:14, 47:24–48:9, 209:17; Wilder Decl. ¶¶ 2–7.)

109.     Both Plaintiff and Defendant are members of the American Sociological Association ("ASA") and have pledged to uphold the ASA's code of ethics. (Ex. 20, Hoiland Tr. 183:12–19; Wilder Decl. ¶ 89.)

110.    Sociologists are expected not to present others' work as their own, whether in published form, unpublished form or electronically available form. (Ex. 20, Hoiland Tr. 184:4–9; Ex. 9, P273–293 at P288.)

111.    In presentations, sociologists explicitly identify, credit and reference the author(s) when they take data or material verbatim from their own or another person's written work, whether it is published, unpublished or electronically available. (Ex. 9, P273–293 at P288; Ex. 20, Hoiland Tr. 183:20–184:9.)

112.    Sociologists take responsibility and assume credit, including authorship credit, only for work they actually performed or to which they have made a substantial contribution. (Ex. 9, P273–293 at P289.)

113.    Both Plaintiff and Defendant are on the faculty of colleges in the CUNY system and are familiar with CUNY's Academic Integrity Policy. (Ex. 20, Hoiland Tr. 179:14–22; Wilder Decl. ¶ 91.)

114.    CUNY's Academic Integrity Policy prohibits plagiarism. (Ex. 10, P649–654 at P649–650; Ex. 20, Hoiland Tr. 180:2–181:8.)

115.    Academics, including sociologists like Defendant, are expected not to plagiarize. (Ex. 20, Hoiland Tr. 179:14–22, 180:2–181:8, 183:12–19; Ex. 10, P649–654 at P649–650.)

116.    Plagiarism is the act of presenting another person's ideas, research or writings as your own. (Ex. 10, P649–654 at P650; Ex. 11, P294–298 at P297; Ex. 20, Hoiland Tr. 180:2–181:8, 185:22–186:4.)

117.    Plagiarism includes copying another person's words without the use of quotation marks and citations attributing the words to their source. (Ex. 10, P649–654 at P650; Ex. 20, Hoiland Tr. 180:2–181:8, 184:12–185:16; Ex. 11, P294–298 at P297.)

118.    Plagiarism also includes cutting and pasting from various sources without proper attribution. (Ex. 20, Hoiland Tr. 184:12–185:16, 186:6–16; Ex. 11, P294–298 at P297.)

119.    Plaintiff would not have agreed to the duplication and publication of a large section of the NICHE/NICE assessment materials comprising the Copyrighted Work to a national conference. (Wilder Decl. ¶ 98.)

120.    Plaintiff would not have consented to the duplication of the Copyrighted Work, a unit of the NICHE and NICE programs out of context, leading to a misleading impression of the programs. (Wilder Decl. ¶ 99.)

121.    Plaintiff would not have agreed to the use of materials that she authored without attribution. (Wilder Decl. ¶ 100.)


Dated: March 28, 2023                    By: *s/ Janet B. Linn*
                                             Janet B. Linn
                                             Sandra A. Hudak
                                             TARTER KRINSKY & DROGIN LLP
                                             1350 Broadway
                                             New York, NY 10018
                                             Tel.:    (212) 216-8000
                                             Fax:     (212) 216-8001
                                             E-mail: jlinn@tarterkrinsky.com
                                                     shudak@tarterkrinsky.com

                                             ***Attorneys for Plaintiff Esther Wilder***