**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Esther Wilder,<br><br>                     Plaintiff,<br><br>          v.<br><br>Sarah Hoiland,<br><br>                     Defendant. | Civ. Action No. 1:22-cv-01254-PKC |

**DECLARATION OF PROFESSOR ESTHER WILDER**
**IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

I, Esther Wilder, pursuant to 28 USC Section 1746, declare under penalties of perjury:

1.      I am the plaintiff in the above-referenced action and I have personal knowledge of the facts set forth below.

2.      I am a tenured full professor in the Department of Sociology at Lehman College, City University of New York ("CUNY").

3.      I received my PhD in Sociology from Brown University in 1997.

4.      I joined Lehman College as an Assistant Professor in Sociology in 2002, after employment as an instructor at the University of Rhode Island and as an Assistant Professor at Wellesley College and the University of Oklahoma.

5.      I became an Associate Professor at Lehman College in 2006 and a full Professor at Lehman College in 2012.

6.      I frequently publish in academic journals and textbooks, and I am a frequent speaker on topics related to Sociology and my research in the field.

7.      During my academic career, I have been the recipient of several National Science Foundation grants and awards for my scholarship in Sociology.

8.      As part of my work in academia, I have successfully collaborated with and mentored many junior colleagues.

9.      A major focus of my academic research for the past 15 years has been the development of methods for faculty to teach quantitative reasoning ("QR") effectively to college students, and many of my scholarly papers and other publications, projects and presentations have been related to this research.

10.      In 2011, I was the recipient of a National Science Foundation ("NSF") grant of $600,000 for a project known as "NICHE," an abbreviation for "Numeracy Infusion Course for Higher Education."

11.      The NICHE program, an online faculty development program, was designed to teach faculty at CUNY about the best practices for infusing quantitative reasoning into their courses, and the assessment of that instruction.

12.      I served as Principal Investigator ("PI") on the program from 2011 through 2016.

13.      The faculty enrolled in the NICHE program received instruction on teaching QR in three core areas, (1) learning goals, (2) creating instructional materials, and (3) QR assessment.

14.      The three core components were taught to the faculty in 8 instructional units or modules.

15.      As the PI on NICHE, I developed and created most of the instructional material and guidelines in the NICHE program.

16.    Each of the NICHE instructional videos included a statement that unauthorized use of the NICHE course materials is strictly prohibited and that any questions regarding the authorization of use of the NICHE materials should be directed to me.

17.    A true and correct copy of a screenshot of one of the NICHE instructional videos showing the above-referenced statement is attached hereto as **Exhibit 5**.  I understand that a copy of this screenshot was produced in this Action as P000665 and marked as Exhibit 6 to Defendant's deposition in this Action.

18.    As part of the 8 instructional units of NICHE, in 2013, I authored the original instructional material for a key component of NICHE, Unit 7 (Unit 7H) on QR assessment.

19.    Unit 7H provided instructions to faculty on preparing a QR assessment plan and instrument in accordance with the articulated learning goals. It represents the instructional materials for three key tasks of the program: learning goals, instructional materials and assessment instrument.

20.    As the author of Unit 7H, I registered the copyright in the QR assessment unit, Unit 7H, with the Copyright Office in about April 2021 (the "Copyrighted Work").

21.    A true and correct copy of Unit 7H that was submitted to the Copyright Office is attached hereto as **Exhibit 1**.  I understand that a copy of this unit was attached as Exhibit 1 to the Complaint in this Action (ECF No. 1-3).

22.    The Copyright Office Certificate of Registration for the Copyrighted Work identifies me as the sole author and copyright claimant of the Copyrighted Work.

23.    A true and correct copy of Certificate of Registration for the Copyrighted Work is attached hereto as **Exhibit 2**.  I understand that a copy of this registration was attached as Exhibit

2 to the Complaint in this Action (ECF No. 1-4) and was also produced in this Action as P000677.

24.     I created the NICHE instructional materials drawing on my extensive experience researching QR instruction and teaching QR literacy in my courses.

25.     When I created the Copyrighted Work, I selected the guidelines and strategies that I found effective in explaining assessment of QR instruction to an audience of non-specialists.

26.     The NICHE program was only available to CUNY faculty and was not available to faculty outside CUNY.

27.     Access to the Copyrighted Work and the other core instructional materials was limited, available online in Blackboard, a content management program, only to the CUNY faculty that enrolled in NICHE and the administrators of the program.

28.     By the end of the program, more 40 CUNY faculty finished the NICHE program, having created instructional and assessment instruments for use in their courses, and gathering data for assessment purposes.

29.     Drawing on the NICHE results, I published several papers on the information learned from the NICHE assessment data and presented the results of the NICHE program at academic conferences.

30.     In 2016, when presenting on NICHE at an NSF conference. I was approached about doing an extension of my NICHE grant, to expand the reach of NICHE to enroll additional faculty.

31.     This extension would be adapted to be an in-person (and online) faculty development program to train faculty at Bronx-based Hispanic Serving Institutions (HSIs),

specifically CUNY's Lehman College, Hostos Community College and Bronx Community College on QR literacy.

32.     The extension project, Numeracy Infusion for College Educators ("NICE") required that one of the Principal Investigators be from an HSI community college.

33.     After learning of Defendant Sarah Hoiland's interest in teaching QR literacy from a colleague of hers, I contacted Defendant, then an assistant professor at Hostos Community College, about being a PI on the project.

34.     I had never met Defendant before I contacted her about being a PI on the NICE project.

35.     Defendant had not been involved in NICHE, neither as an investigator or faculty participant, before I approached her about being involved in NICE.

36.     Defendant agreed to be a PI on the NICE proposal, with me as the other PI.

37.     I drafted the NSF grant proposal for NICE.

38.     The NSF NICE proposal was submitted on about May 31, 2016.

39.     The NSF NICE proposal said the NICE Program "will build on the strengths of the Numeracy Infusion Course for Higher Education (NICHE) (DUE #1121844), a CUNY-wide initiative that sought to infuse QR across the curriculum through an online faculty development program. Specifically, the NICE Program will refine and update NICE in accordance with the assessment data gathered for the project [62] and adapt it into a . . . faculty development program suitable at CUNY's three Bronx based HSIs." "[62]" refers to a panel presentation by myself and my colleagues on the NICHE program.

40.     A true and correct copy of a portion of the NSF NICE proposal is attached hereto as **Exhibit 6**. I understand that a copy of this proposal was produced in this Action as P000156-230.

41.     At the time the NSF NICE proposal was submitted, Defendant had only limited credentials in QR instruction.

42.     An objective of NICE was to provide instruction in best practices for teaching QR to faculty at HSIs in the Bronx on the unique needs of Hispanic individuals and under-represented minorities.

43.     Other objectives included development of instructional materials that make use of effective strategies for teaching QR, increase faculty interest and comfort in teaching QR, and establish a network of Bronx (CUNY) faculty committed to improving student's QR abilities.

44.     Both NICHE and NICE utilized the instructional materials created for the NICHE program.

45.     The NICHE instructional material was to be adapted for HSIs.

46.     Defendant did not contribute to or adapt any of the training materials for the NICE program.

47.     Upon completion of the instructional units, the faculty were required to develop and incorporate instructional and assessment materials into their teaching, and then attend a capstone conference where they present their assessment results.

48.     As PIs, Defendant and I were to evaluate the effectiveness of the program by examining the assessment data that faculty gather in their QR infused courses and analyze that data.

49.     Defendant was to work collaboratively with me to develop and refine NICE and the NICE assessment instruments, recruit Hostos faculty for the program, promote the NICE project at Hostos and other CUNY schools in the Bronx and direct research on the qualitative data gathered. Defendant was also to ensure that the faculty development programs met the needs of faculty at HSIs, particularly community college faculty.

50.     As co-director of the NICE project, I was to assume primary responsibility for recruitment and admission into the NICE program and direct research activities on the quantitative assessment data gathered. I was also to work with other members of the NICE leadership team to recruit faculty and publicize NICE throughout the CUNY schools in the Bronx.

51.     Both Defendant and I were to disseminate our research results at conferences, publications in journals and other relevant outlets.

52.     The NICE grant was approved in 2016 and funding began in 2017.

53.     The NICE project ran from about January 2017 to about December 2019.

54.     To help train Defendant for her duties on the NICE project, I enrolled Defendant as a faculty participant in NICHE so she could review the NICHE materials on Blackboard.

55.     Enrolled in NICHE, Defendant reviewed the NICHE instructional materials, including the Copyrighted Work, which stated that they were subject to copyright and not to be used without my express authorization.

56.     While a goal of the NICE program had been to adapt the prior NICHE instructional materials for NICE to the HSI faculty, the NICHE instructional materials were instead essentially incorporated whole into NICE unchanged, except that references to NICHE were changed to NICE.

57.     As with NICHE project, the accessibility of the NICE assignments and associated instructional materials (formerly the NICHE instructional materials), including the Copyrighted Work was limited to the CUNY faculty enrolled in the NICE project.

58.     The NICE modules and instructional materials (formerly the NICHE modules and instructional materials) were made available only to the faculty enrolled in NICE and the administrators of the NICE program on Blackboard.

59.     Like the NICHE instructional materials, the videos in each unit of the NICE materials on Blackboard included a specific statement that they were subject to copyright and were not to be used without my express authorization.

60.     During the first year of the NICE program, Defendant was enrolled as faculty participant in NICE.

61.     Along with her responsibilities guiding the other faculty in NICE in preparing instructional and assessment materials, Defendant, as a faculty enrollee in the program, created instructional materials for her students, and assessed the effectiveness of those materials.

62.     Unbeknownst to me, in June 2018, Defendant applied to speak at a community college conference at Valencia College, the Community College Conference on Learning Assessment (the "CCLA Conference").

63.     After receiving approval to present at the CCLA Conference from Valencia College in about July 2018, Defendant informed me that she would be presenting and asked me if I wanted to co-present at the Conference. A true and correct copy of the email I received from Defendant asked me if I wanted to co-present at the CCLA Conference is attached hereto as **Exhibit 12**.  I understand that the email was produced in this action as P000428-249.

64.     Defendant did not provide me a copy of her presentation proposal, the abstract of her presentation, or any other information describing in any detail the subject of the proposed presentation.

65.     Prior to that time, Defendant and I had presented together on NICE only twice at national conferences: the National Numeracy Network (NNN) annual meeting and the Mathematical Association of America Metropolitan New York section Meeting.

66.     At those conferences, we presented an overview of the NICHE and NICE programs, shared research results, and highlighted plans to adapt NICHE to NICE.

67.     At the NNN conference in 2018, Defendant and another colleague presented the instructional and assessment materials they created as participants in NICE.

68.     At none of these conferences did I or Defendant expose the Copyrighted Work or other segments of the NICHE/NICE core instructional and assignment materials to the attendees.

69.     Having had no input into Defendant's submission to Valencia College and having other commitments, I declined Defendant's invitation to co-present at the CCLA Conference.

70.     At the time that Defendant asked me to co-present (and thereafter, until about six months after the CCLA Conference), I assumed that Defendant's presentation at the CCLA Conference would consist of her own research and assessment data that she created in accordance with the NICE proposal and her prior presentations.

71.     Six months after Defendant's presentation at the CCLA Conference, Defendant showed me an abstract for another conference presentation that she was planning which she said would be like her presentation at the CCLA Conference.

72.    Defendant then provided me a copy of the PowerPoint that she had submitted for distribution to CCLA Conference attendees and displayed during her oral presentation at the CCLA Conference ("the CCLA PowerPoint"), which I had not previously seen.

73.    A true and correct printout of the PowerPoint that Defendant provided to me is attached hereto as **Exhibit 3**.  I understand that a copy of this PowerPoint printout was attached as Exhibit 3 to the Complaint in this Action (ECF No. 1-5) and was also produced in this Action as P000236-258 and D0234-256 and marked as Exhibit 2 to Defendant's deposition in this Action.

74.    A chart illustrating some of the text that was copied by Defendant in the CCLA PowerPoint from my Copyrighted Work is attached hereto as **Exhibit 4**.  I understand that a copy of this chart was attached as Exhibit 4 to the Complaint in this Action (ECF No. 1-6).

75.    When I reviewed Defendant's CCLA PowerPoint, I first learned that Defendant had copied verbatim large parts of the Copyrighted Work and other material I authored into the CCLA PowerPoint without obtaining my permission and without including any written attribution in the CCLA PowerPoint.

76.    I had never given Defendant permission to copy and distribute my Copyrighted Work to a national conference or to anyone outside of the enrolled CUNY faculty.

77.    To the contrary, the NICHE/NICE program instructional materials made it clear that they were subject to copyright and their use was subject to my consent.

78.    I immediately advised Defendant that I had not consented and did not consent to the use of the materials I authored for NICHE in Defendant's CCLA PowerPoint.  Since the CCLA PowerPoint had already been distributed and displayed with my Copyrighted Work

without my consent, I asked her to mitigate the damage done by contacting the organizers of the conference and adding my name as a co-author.

79.     Upon further review of the CCLA PowerPoint, I realized that the assessment materials developed by a junior faculty member from Bronx Community College, Professor Crystal Rodriguez, were also duplicated in the CCLA PowerPoint without attribution and apparently without her authorization.

80.     A true and correct copy of an email chain between Professor Rodriguez and me regarding the inclusion of Professor Rodriguez's work in the CCLA PowerPoint is attached hereto as **Exhibit 13**.  I understand that a copy of this email chain was also produced in this Action as P000480-484.  A true and correct copy of an email chain between Professor Rodriguez and Defendant regarding the inclusion of Professor Rodriguez's work in the CCLA PowerPoint is attached hereto as **Exhibit 14**.  I understand that a copy of this email chain was also produced in this Action as P000553-558.

81.     When Professor Rodriguez enrolled in NICE, she submitted an IRB form that indicated she wanted authorship credit whenever her work was used, so Defendant's CCLA PowerPoint violated the IRB. A true and correct printout of the IRB form submitted by Professor Rodriguez is attached hereto as **Exhibit 7**.  I understand that a copy of this form was also produced in this Action as P000231-233.

82.     After I realized that the CCLA PowerPoint included Professor Rodriguez's work as well, I indicated to Defendant that it was important that Professor Rodriguez name be identified in the presentation so that her contribution would be recognized.

83.     After several weeks passed since the time I first requested that Defendant contact Valencia College to acknowledge my contribution, and it appeared that no revised versions of

the CCLA PowerPoint had been circulated or made available, I contacted the CCLA Conference coordinator at Valencia College myself.  A true and correct copy of an email chain between Defendant and me which includes discussion about my contacting the CCLA Conference coordinator at Valencia College is attached hereto as **Exhibit 15**.  I understand that a copy of this email chain was also produced in this Action as P000475-477.

84.     I learned that it was then too late to change Defendant's CCLA PowerPoint to add my name and Professor Rodriguez's name, but our names were added as co-presenters on the CCLA Conference website.

85.     I learned from the CCLA Conference coordinator at Valencia College that Defendant had signed an "Intellectual Property License and Photo Release" prior to the CCLA Conference, in which she purported to grant "a non-exclusive license to use, copy and distribute" the CCLA PowerPoint, and "warrant[ed] that the materials for which [Defendant was] providing a license do not violate the copyright . . . or other intellectual or proprietary rights of any third party."  As Defendant had not obtained consent from Professor Rodriguez to use her assessment materials or from me to use my Copyrighted Work, Defendant neither had the ability to grant a license to these materials, and her warranty was incorrect.

86.     A true and correct copy of the printout of the "Intellectual Property License and Photo Release" provided to me by Valencia College is attached hereto as **Exhibit 8**.  I understand that a copy of this form was also produced in this Action as P235 and D04.

87.     I was very surprised at Defendant's actions.

88.     Academic and professional norms require authorization from the author and the crediting of authorship when another's work is duplicated in a publication or presentation.

89.     Both Defendant and I are members of the American Sociological Association, which has specific rules on using another's work in a publication or presentation.

90.     A true and correct copy of the American Sociological Association's Code of Ethics, dated June 2018, is attached hereto as **Exhibit 9**.  I understand that a copy of this code of ethics was also produced in this Action as P000273-293 and marked as Exhibit 16 to Defendant's deposition in this Action.

91.     As noted above, both Defendant and I are professors within the CUNY university system, which has an Academic Integrity Policy that prohibits, *inter alia*, academic dishonesty, including, "[s]ubmitting someone else's work as your own," and plagiarism, including "[c]opying another person's actual words . . . without the use of quotation marks and citations attributing the words to their source."

92.     A true and correct copy of CUNY's Academic Integrity Policy is attached hereto as **Exhibit 10**.  I understand that a copy of this policy was also produced in this Action as P000649-654 and marked as Exhibit 15 to Defendant's deposition in this Action.

93.     It is not uncommon for professors to reiterate their university's academic integrity policies to their students.  In this regard, I understand that Defendant has expressed to her students in at least one course syllabus that it is prohibited under CUNY policy to engage in plagiarism, which includes "[c]opying another person's actual words without the use of quotation marks and footnotes attributing the words to their source."

94.     A true and correct copy of the above-referenced syllabus of one of Defendant's courses is attached hereto as **Exhibit 11**.  I understand that a copy of this syllabus was also produced in this Action as P000294-298 and marked as Exhibit 17 to Defendant's deposition in this Action.

95.     In view of these various organizational policies, it was not reasonable for Defendant to copy my Copyrighted Work or the work of Professor Rodriguez, without first obtaining our respective consents and without including written attribution within the CCLA PowerPoint.

96.     Based on Defendant's actions, including using, without consent or attribution, both my work and the work of a junior faculty member (i.e., Professor Rodriguez) whose IRB specifically required credit when her research was used, I sought assistance from CUNY to resolve the issue.

97.     When informal mediation efforts did not bring a resolution, I filed a formal complaint for research misconduct against Defendant with the Research Integrity Officer (RIO) at CUNY.

98.     I would never have agreed to the duplication and publication of a large section of the NICHE/NICE assessment materials comprising the Copyrighted Work to a national conference.

99.     I would never have consented to the duplication and publication of the Copyrighted Work, one core instructional unit of the NICHE and NICE programs, out of context, leading to a confusing and misleading impression of the programs.

100.    I would never have agreed to the use of the Copyrighted Work or any other materials that I authored without written attribution.

101.    In academia, a credit as a single author of a presentation at a national conference is beneficial to a person's career.

102.    Defendant's presentation of the Copyrighted Work under her name alone impairs my ability to publish and present my work.

14

103.    I have considered commercializing the NICHE program of study, including the Copyrighted Text, in a textbook.

104.    Defendant's presentation could adversely affect my ability to commercialize the NICHE materials.

105.    By presenting the Copyrighted Work under her name as sole author, Defendant impairs my ability to publish and present my work, because it may appear to others that I had plagiarized Defendant's work, rather than the other way around.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Dated: March 28, 2023                    By:    _Esther Wilder_
                                                         Esther Wilder

15