# Exhibit 20

1

2          IN THE UNITED STATES DISTRICT COURT

3        FOR THE SOUTHERN DISTRICT OF NEW YORK

4

5

6   ESTHER WILDER,               )

7                                )

8               Plaintiff,       )

9      vs.                       ) Civ Action No.

10                               ) 1:22-cv-01254-PKC

11  SARAH HOILAND,               )

12               Defendant.      )

13  --------------------------)

14

15          DEPOSITION OF SARAH HOILAND

16               Remote via Zoom

17             New York, New York

18          Friday, December 9, 2022

19

20

21

22

23

24  Reported by:
    Frank J. Bas, RPR, CRR
25  Job No. 220543

1

2

3

4

5                    December 9, 2022

6                    10:02 a.m. EDT

7

8          Remote Deposition of SARAH HOILAND,

9    pursuant to Notice, before Frank J. Bas, a

10   Registered Professional Reporter, Certified

11   Realtime Reporter, and Notary Public of the

12   State of New York.

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2   A P P E A R A N C E S:

3   (All attendees appearing via videoconference

4   and/or teleconference due to COVID-19

5   restrictions):

6

7        TARTER KRINSKY & DROGIN LLP

8        Attorneys for Plaintiff

9             1350 Broadway

10            New York, New York 10018

11   BY:   JANET LINN, ESQ.

12            SANDRA HUDAK, ESQ.

13

14        DAVIS & GILBERT LLP

15        Attorneys for Defendant

16            1675 Broadway

17            New York, New York 10019

18   BY:   DANIELLE ZOLOT, ESQ.

19

20

21   ALSO PRESENT:

22        ESTHER WILDER

23

24

25                    - o0o -

1             S. Hoiland

2        THE COURT REPORTER:  Good morning,

3    counselors.  My name is Frank Bas.  I am

4    a certified court reporter working in

5    association with TSG Reporting, Inc.

6        Due to the severity of COVID-19 and

7    following the practice of social

8    distancing, I will not be in the same

9    room with the witness.  Instead, I will

10   be reporting remotely and will swear in

11   the witness remotely.

12        Do all parties stipulate to the

13   validity of the remote reporting and

14   remote swearing and that it will be

15   admissible in the courtroom as if it had

16   been taken following Rule 30 of the

17   Federal Rules of Civil Procedure and/or

18   the state's rules where this case is

19   pending?

20        ATTORNEY HUDAK:  Plaintiff

21   consents.

22        ATTORNEY ZOLOT:  Yes, defendant as

23   well.

24        THE COURT REPORTER:  Could counsel

25   just state their appearances?

```
1                        S. Hoiland

2            ATTORNEY HUDAK:  This is Sandra

3         Hudak of Tarter Krinsky & Drogin on

4         behalf of the plaintiff Esther Wilder

5         and I'm joined by my colleague Janet

6         Linn.  And the plaintiff is also

7         present.

8            ATTORNEY ZOLOT:  Good morning.  I'm

9         Danielle Zolot with Davis & Gilbert LLP

10        defending the witness, Sarah Hoiland,

11        the defendant in the litigation.

12                     _ _ _

13

14           SARAH HOILAND,

15   called as a witness, having been first duly

16   sworn, was examined and testified

17   as follows:

18   EXAMINATION BY

19   ATTORNEY HUDAK:

20        Q.   Good morning again, Dr. Hoiland.

21   We have spoken before but just as a reminder

22   my name is Sandra Hudak and I'm one of the

23   attorneys for plaintiff in this action.  Can

24   you please state your full name and residence

25   for the record?
```

```
1                   S. Hoiland
2        A.    Sarah Louis Hoiland.   Residence is
3   79 Hamilton Place, Apartment 10, New York,
4   New York 10031.
5        Q.    Thank you.  And is that where you
6   are currently located at your residence?
7        A.    No, I'm located at my attorneys
8   office.
9        Q.    Okay.  And just for a clear record,
10  do you happen to know the address or the name
11  of the law firm?  Is it Davis & Gilbert?
12       A.    Davis & Gilbert.  I think it's 1675
13  Broadway.
14       Q.    All right.  Thank you.  And is
15  there anyone else in the room with you?
16       A.    No.
17       Q.    Okay.  Thanks for taking the time
18  to do this remotely.  If at any point the
19  video or the audio drops out please just let
20  us know so we can fix whatever technical
21  issues we have.  Just so you know I'm already
22  hearing a little bit of an audio lag so
23  hopefully we don't have any issues and if we
24  do we can get those quickly fixed.
25             Have you had your deposition taken
```

1                    S. Hoiland

2    in the past?

3         A.    No.

4         Q.    And I understand that you observed

5    the deposition of the plaintiff in this case

6    earlier this week, is that correct?

7         A.    Yes.

8         Q.    So you are aware that the general

9    process is that I'll be asking you some

10   questions and the court reporter will take

11   down your answers?

12        A.    Yes.

13        Q.    Do you understand that you're under

14   oath?

15        A.    Yes.

16        Q.    And what does that oath mean to

17   you?

18        A.    The oath means that I will tell the

19   truth.

20             THE COURT REPORTER:  Can we go off

21        the record?

22             ATTORNEY HUDAK:  Yes.

23             (Pause in proceedings.)

24             ATTORNEY HUDAK:  Back on the record

25        after a short technical break.

1                     S. Hoiland

2          Q.    So Dr. Hoiland, I believe when we

3    left off the question was do you understand

4    that you're under oath, and you might have

5    answered but I didn't hear the answer, so --

6          A.    Yes.

7          Q.    -- if you can answer that?   Okay.

8    And what does that oath mean to you?

9          A.    The oath means that I will tell the

10   truth.

11         Q.    So again I am going to be asking

12   you a series of questions.   If you do not

13   understand my question I want you to tell me

14   and I'll do my best to clarify.   I'm going to

15   assume that you understand the questions that

16   I ask you unless you tell me that you don't

17   understand them.   Is that fair?

18         A.    Yes.

19         Q.    Your counsel may object to some of

20   my questions but you still need to answer

21   unless your counsel instructs you not to.

22   Understood?

23         A.    Yes.

24         Q.    Also since the court reporter is

25   taking a verbatim transcript please give

1                    S. Hoiland

2   audible responses rather than for example,

3   nodding your head or saying uh-huh.  Is that

4   okay?

5        A.   Yes.

6        Q.   And for the same reason please wait

7   until I am finished asking the question before

8   speaking so we're not speaking over each other

9   and I'll try to do the same.  Is that okay?

10       A.   Yes.

11       Q.   If you need a break just let me

12   know.  However if there's a question pending I

13   would ask that we finish the question before

14   taking a break.

15            Is there any reason today that you

16   would not be able to provide truthful and

17   complete testimony?

18       A.   No.

19       Q.   Are you on any medications that

20   would interfere with your ability to provide

21   complete and truthful testimony today?

22       A.   No.

23       Q.   And are there any health issues

24   that would interfere with your ability to

25   provide complete and truthful testimony today?

```
 1                      S. Hoiland
 2         A.   No.
 3         Q.   Do you know why you are here today?
 4         A.   Yes.
 5         Q.   And why is that?
 6         A.   I am being charged with copyright
 7   infringement.
 8         Q.   And the person who has brought the
 9   case, the plaintiff in the case is Esther
10   Wilder, is that correct?
11         A.   Yes.
12         Q.   And I may refer to her as
13   Dr. Wilder or the plaintiff.  Is that okay?
14         A.   Yes.
15         Q.   All right.  And did you prepare for
16   today's deposition?
17         A.   Yes.
18         Q.   What did you do?
19         A.   I spoke with counsel.
20         Q.   Approximately for how long?
21         A.   I would say three hours.
22         Q.   On a single day?
23         A.   On a single day.
24         Q.   And when was that?
25         A.   Yesterday.
```

1                      S. Hoiland

2         Q.   And did you speak with anybody else

3    about the deposition today?

4              THE COURT REPORTER:  I think you

5         broke up.

6              ATTORNEY HUDAK:  Sorry about that.

7         Q.   The question was did you speak with

8    anybody else about the deposition today?

9         A.   Other than letting a few family and

10   friends know that it was occurring, no.

11        Q.   All right.  Dr. Hoiland, you said

12   that you spoke to some friends about the

13   deposition today.  Which friends were those?

14        A.   So I have a group of friends.  Do

15   you want them by name?

16        Q.   Are any of these friends

17   colleagues?

18        A.   Yes.  Three are colleagues.

19        Q.   Yes.  So if you could identify the

20   names of the colleagues?

21        A.   Sure.  Dr. Ria Banerjee.  Dr. Megan

22   Behrent.  Dr. Julia Rossi.

23        Q.   And what was the nature of your

24   discussions with them?

25        A.   I just told them I had the

1                    S. Hoiland

2  deposition.

3        Q.   Any other details?

4        A.   No.

5        Q.   And did you review any materials to

6  prepare for today's deposition?

7        A.   I went through a few of the

8  documents that were produced with my

9  attorneys.

10        Q.   Any other documents?

11        A.   The request for admission.  The

12  interrogatories.  I believe that's it.

13        Q.   Other than the documents that were

14  produced in this case or served as discovery

15  requests you did not review any other

16  materials, is that correct?

17        A.   No.

18        Q.   And did you bring anything with you

19  today, any documents or materials?

20        A.   No.

21        Q.   Do you have anything open in front

22  of you?

23        A.   No.

24        Q.   Any applications open other than

25  this Zoom session?

1                     S. Hoiland

2        A.   No.

3        Q.   Let's just go over your background

4   briefly, starting with what you did after high

5   school.  So did you go to college?

6        A.   I went to college.  I went to

7   Gonzaga University from 1997 until 2001.  And

8   then I worked for a year, and I deferred law

9   school.  And then I went to the University of

10  San Francisco School of Law for one year.  And

11  I intended to transfer as a joint JD/MA to The

12  New School in New York City in Cardozo and I

13  ended up finishing the MA and going into a

14  Ph.D. program at The New School.

15       Q.   Let's just back up a bit.  So you

16  said that you went to college from 1997 to

17  2001.  Did you graduate in 2001?

18       A.   Yes.

19       Q.   And what was your degree?

20       A.   I had a -- I earned a bachelor's

21  degree in sociology and criminal justice.

22       Q.   And then you said you worked for a

23  year.  Where did you work?

24       A.   I worked for the YMCA of Greater

25  Seattle as a treatment foster care worker.

```
 1                    S. Hoiland
 2    And I also worked part-time at a group home in
 3    Seattle.
 4         Q.    And then you said that you went to
 5    law school for a year, but instead you
 6    transferred to obtaining your masters, is that
 7    correct?
 8         A.    I completed one year of law school
 9    in good standing and so I considered first
10    doing a joint MA/JD because I wanted to do
11    more with sociology, so one of my professors
12    recommended looking for a joint degree and the
13    University of San Francisco did not have that.
14    So I relocated to New York and started the
15    masters program.
16         Q.    And what field was the masters
17    program in?
18         A.    Sociology.
19         Q.    And did you graduate from that
20    masters program?
21         A.    Yes.
22         Q.    And what year was that?
23         A.    2007.
24         Q.    And you said before that you
25    started into a Ph.D. program.  Did you start
```

```
 1                    S. Hoiland
 2   immediately after graduation from your masters
 3   program?
 4        A.   I believe there were six months
 5   between.  But yes, almost directly into the
 6   Ph.D.
 7        Q.   And what university was the Ph.D.
 8   program at?
 9        A.   The New School For Social Research.
10        Q.   And what field was the Ph.D. for?
11        A.   Sociology.
12        Q.   And did you complete the Ph.D.
13   program?
14        A.   Yes, I did.
15        Q.   And what year was that?
16        A.   The degree was conferred in January
17   of 2013.  Excuse me.  2012.
18        Q.   And what did you do after
19   completing the Ph.D. program?
20        A.   Well, I was already employed and at
21   that time I was tenured as a professor at Polk
22   State College, and so I continued to work
23   there for another year.
24        Q.   And when did you begin working at
25   Polk State college?
```

Page 16

1                        S. Hoiland

2          A.    2008.

3          Q.    So you said you worked there from

4    2008 to 2012, is that correct?

5          A.    2008 to 2013.  My degree was

6    conferred in 2012.

7          Q.    All right.  And then what did you

8    do starting in 2013 after leaving Polk State

9    College?

10         A.    I became an assistant professor at

11   Hostos Community College in New York.

12         Q.    And is that your current employer?

13         A.    Yes.

14         Q.    And have you continued your

15   employment continuously from 2013 until today?

16         A.    Yes.

17         Q.    Have you had any other employers

18   during that time period?

19         A.    Yes.

20         Q.    And what employers were those?

21         A.    So I currently teach for Bard

22   College through the Bard prison initiative.

23         Q.    And when did you begin working for

24   Bard College?

25         A.    I was hired in August of 2021, and

1                    S. Hoiland

2  I started my first class fall of 2021.

3       Q.   Have you had any other employers

4  between 2013 and today?

5       A.   No.

6       Q.   You said that you are currently

7  employed by Hostos College, is that correct?

8       A.   Yes.

9       Q.   What is your title at Hostos

10 College?

11      A.   Associate professor.

12      Q.   Have you had any other titles at

13 Hostos College?

14      A.   Yes.  I was hired as an assistant

15 professor.

16      Q.   And so you transitioned from an

17 assistant professor to an associate professor,

18 is that correct?

19      A.   Yes.  I was promoted.

20      Q.   And when was that promotion?

21      A.   2020.

22      Q.   All right.  We spoke before that

23 Dr. Wilder is the plaintiff in this case.

24 When did you meet Dr. Wilder?

25      A.   I believe it was 2015.

```
 1                      S. Hoiland

 2       Q.    And how did you meet Dr. Wilder?

 3       A.    I don't recall exactly how.  I know

 4  that our early communications were about an

 5  article that I was co-authoring with a

 6  colleague from Hostos.

 7       Q.    And did you have continuing

 8  conversations after the conversation about

 9  this article?

10       A.    Yes.

11       Q.    And what were those conversations

12  about?

13       A.    There were conversations about an

14  ASA panel that I was organizing in Seattle, it

15  could have been 2016.

16             There were conversations about

17  collaborating and submitting a proposal for an

18  NSF grant.

19       Q.    Can you please describe the

20  discussions about submitting a proposal for an

21  NSF grant?

22       A.    So the timeline on that was pretty

23  short, the discussions around the grant

24  occurred --

25             THE COURT REPORTER:  I think she
```

1                         S. Hoiland

2          froze.

3                  ATTORNEY HUDAK:  Yes, the witness

4          appears to be frozen.

5                  THE WITNESS:  It's okay now?

6                  THE COURT REPORTER:  Yes.

7                  THE WITNESS:  Oh, okay.  I'm

8          getting a sign the internet connection

9          is unstable.  Okay.  So we'll see.

10         A.    I just lost my train of thought.

11   Ms. Hudak, could you repeat the question?

12         Q.    Sure.  We were talking about

13   submitting a proposal for an NSF grant and I

14   asked for some additional details about that.

15   So can you please describe the circumstances

16   of the proposal for an NSF grant?

17         A.    Yes.  So the deadline was the end

18   of May and Professor Wilder approached myself

19   and a colleague of mine at Hostos.  The

20   colleague who worked with me on co-authoring

21   this other article.  And, let's see, I'm not

22   sure how much there is to say about that.  So

23   we -- the conversations were primarily over

24   email.  She had to select one of us to be the

25   PI, our institution would be the home

```
 1                    S. Hoiland
 2   institution for the grant.  And that was about
 3   it.  It was presented to me that this was a
 4   collaborative grant among Hispanic-serving
 5   institutions.  The goal was to promote
 6   quantitative literacy and quantitative
 7   reasoning among community college faculty and
 8   since I was a communities college faculty
 9   member at a Hispanic-serving institution, that
10   she was interested in having me as being a PI
11   on this project.
12        Q.   All right.  So I believe you
13   testified before that Dr. Wilder approached
14   you regarding a proposal for an NSF grant, is
15   that correct?
16        A.   Yes.  Myself and another colleague.
17        Q.   And so it's fair to say that
18   Dr. Wilder wished to apply for an NSF grant,
19   the NSF grant that she was approaching you
20   about?
21        A.   That she wished to apply?  Um, I
22   don't know if I can say what she wished.  I
23   mean she indicated that she intended to apply.
24        Q.   All right.  And did Dr. Wilder tell
25   you why she was reaching out to you and your
```

1                    S. Hoiland

2   colleague?

3        A.   Yes.  For all the reasons I just

4   mentioned.  So the specific request for

5   proposals, it was a Dear Colleague letter and

6   one of the requirements was that a

7   Hispanic-serving institution community college

8   be a collaborator on the project.

9        Q.   All right.  So Dr. Wilder reached

10  out to you because the project that she

11  intended to apply for required someone who

12  worked at a Hispanic serving institution, is

13  that correct?  And you worked at a

14  Hispanic-serving institution?

15       A.   Yes.

16            ATTORNEY ZOLOT:  Object to the

17       form.

18       Q.   All right.  And at the time that

19  Dr. Wilder approached you did she explain to

20  you what the project would be about?

21       A.   Yes.

22       Q.   And what did she explain the

23  project would be about?

24       A.   So what I can recall from that

25  time, right? this would have been in 2015, or

1                         S. Hoiland

2    2016, right? the conversations were generally

3    about, there was some background on the NICHE

4    project and what that project consisted of,

5    and what she intended the NICE project to be.

6         Q.   All right.  So you mentioned the

7    NICHE project.  What is the NICHE project?

8         A.   The NICHE project was a different

9    NSF grant that involved Dr. Wilder and co-PIs

10   from different institutions.  It involved

11   quantitative reasoning and quantitative

12   literacy in a faculty development program

13   mostly centered within CUNY and CUNY faculty.

14        Q.   Does NICHE stand for something?

15        A.   Yes.  It stands for the Numeracy

16   Infusion Course For Higher Education.

17        Q.   All right.  So if we refer to NICHE

18   going forward, we'll be referring to this

19   Numeracy Infusion Course for Higher Education

20   grant on which Dr. Wilder was a PI, is that

21   correct?

22        A.   Yes.

23        Q.   All right.  And so Dr. Wilder

24   explained to you what the project she was

25   approaching you for was a follow-up to the

1                      S. Hoiland

2   NICHE project, is that correct?

3        A.   I'm not sure if follow-up is the

4   term that I would use.  The projects were

5   related.

6        Q.   And how were they related?

7        A.   Well, so both projects involved

8   faculty development programs.  Both projects

9   involved materials that were created for the

10  NICHE project.

11       Q.   And how else were they related?

12       A.   Well, Esther was involved in a

13  leadership role on both projects.

14       Q.   So is it fair to say that the

15  project that Dr. Wilder was approaching you

16  about was an extension of the NICHE project?

17       A.   Yes.

18       Q.   And what did Dr. Wilder propose

19  your role to be in the project she was

20  approaching you about?

21       A.   So my role, as outlined in our

22  proposal, included a lot of different things.

23  It included recruiting faculty.  It included

24  working with faculty as they went through the

25  various iterations, the various modules.

1                        S. Hoiland

2  Working with several cohorts.  Organizing and

3  planning the workshops and the conference, all

4  of which were in person.

5              And then, you know, because I --

6  the way the grant is structured I had my own

7  budget, and so I also was the project manager

8  and director of my budget, which is a lot of

9  administrative work.

10      Q.   So did the project that Dr. Wilder

11  reached out to you about, does that project

12  have a name?

13      A.   Yes.  The name is the Numeracy

14  Infusion For the College Educators project, or

15  the NICE project.

16      Q.   Okay.  So is it okay to refer to

17  this project as the NICE project?

18      A.   Yes.

19      Q.   Okay.  And you testified before

20  that both the NICHE project and the NICE

21  project involved materials that were developed

22  in the NICHE project, is that correct?

23      A.   I'm not --

24              ATTORNEY ZOLOT:  Objection.

25      A.   -- sure.

1                          S. Hoiland

2              THE WITNESS:  Sorry.

3        A.    I'm not sure if the materials were

4   developed in the NICHE project or before the

5   NICHE project.  But they were already

6   developed when the NICE project began.

7        Q.    Prior to Dr. Wilder reaching out to

8   you had you heard of the NICHE project?

9        A.    No.

10       Q.    And so Dr. Wilder reached out to

11  you about applying for an NSF grant for the

12  NICE project, is that correct?

13       A.    Yes.

14       Q.    What was the process for applying

15  for the NSF grant for the NICE project?

16       A.    So the process for applying

17  includes writing a proposal, the proposal has

18  many parts, and working with each campus's

19  grants officer to ensure that they'll sign off

20  on it.  So the requirements are that the

21  grant's director signs off on the entire

22  project in order for it to be submitted to

23  NSF.  So each campus I believe submits

24  separately.

25       Q.    All right.  And did Dr. Wilder

1                          S. Hoiland

2     draft the initial draft of the grant

3     application for the NICE project?

4          A.   Yes.

5          Q.   And what happened after that?  Did

6     you review this application?

7          A.   So I don't have any specific dates,

8     but again this was a proposal in which, there

9     was somewhere between three and four a week to

10    get it all together.  And so the time allotted

11    to review what was submitted to me was very

12    short, maybe 48 hours.

13               I recall asking a friend to watch

14    my son for a weekend so that I could devote

15    the entire weekend to the proposal

16    preparation.  And I believe that was the

17    weekend before it was due, the holiday

18    weekend, Memorial Day.  So I provided feedback

19    and comments and suggestions and worked on the

20    components of the proposal that were specific

21    to my campus.

22         Q.   So after the application was

23    prepared it was filed, is that correct?

24         A.   Yes.

25         Q.   And was the grant awarded for the

1                    S. Hoiland

2    NICE project?

3         A.    Yes.

4         Q.    And after the grant was awarded

5    when did the NICE project begin?

6         A.    So we submitted in May and we were

7    notified in I think September by our program

8    officer that it would be funded.  There were

9    some questions, there were some changes that

10   needed to be made.  And then the money would

11   have been dropped or distributed to each

12   campus in January of the following year.  So

13   that would have been 2016.  I believe we were

14   notified in 2016 and the money would have --

15   no.  2015 or 2016.

16        Q.   All right.  And after the money

17   arrived at each campus when did the project

18   start after that?

19        A.   Well, the project starts before the

20   money comes.  It starts with an IRB

21   application and submission.  It starts with

22   doing some groundwork.  There were lots of

23   discussions before the official start date.

24        Q.   All right.  When was the official

25   start date?

Page 28

1                    S. Hoiland

2         A.   I believe it was January 1, 20 -- I

3    think it was 2016.

4         Q.   All right.  And so you mentioned

5    prior to the official start date there was

6    work on an IRB application.  What is an IRB

7    application?

8         A.   So IRB stands for internal review

9    board.  This is required for NSF funding if

10   you're doing research on human subjects.

11        Q.   Who drafted the IRB application for

12   the NICE project?

13        A.   Dr. Wilder.

14        Q.   And you mentioned that there was

15   other groundwork that needed to be done prior

16   to the official start date of the NICE

17   project, is that correct?

18        A.   That's correct.

19        Q.   And what type of groundwork are you

20   referring to?

21        A.   I don't recall.  I think we

22   discussed, you know, sort of recruitment.

23   Because the programming was set to begin six

24   months after the grant officially started.  So

25   there was a lot of work to be done early in

```
 1                      S. Hoiland
 2   the grant period.  And I think it was 2017 to
 3   2019 -- no, I don't know.  It was a two-year
 4   grant and we had an extension of one year.  So
 5   I'm not recalling -- if you pull up my CV you
 6   can get the date.  But I think it was 2016 to
 7   2018, and we added a year, which was 2019.
 8        Q.   Okay.  So we're talking about the
 9   groundwork that had to be done before the
10   official start date of the NICE project, and I
11   believe you testified that you didn't recall
12   what that groundwork involved, is that
13   correct?
14        A.   Primarily the IRB.
15        Q.   Was there anything else?
16        A.   I don't recall any specific
17   conversations or emails.
18        Q.   Were you involved in any other
19   groundwork prior to the start date of the NICE
20   project?
21        A.   Could you repeat the question?
22        Q.   Were you involved in any of the
23   groundwork prior to the start date of the NICE
24   project?
25        A.   Are you referring to the IRB
```

1                      S. Hoiland

2    proposal?

3         Q.   If you consider that to be part of

4    the groundwork.

5         A.   Yes.

6         Q.   I believe that we separated the

7    two, but all right.   Other than the IRB

8    application were you involved in any other

9    groundwork prior to the start date of the NICE

10   project?

11        A.   I don't recall.

12        Q.   And what was your involvement in

13   the IRB application?

14        A.   So it was a joint application and I

15   know that I read it and reviewed it, likely

16   made some comments or suggestions.   I believe

17   Dr. Wilder submitted it on both of our behalf.

18   But I don't recall.

19        Q.   What was your day to day role in

20   the NICE project on the start date of the NICE

21   project?

22        A.   Okay.   I don't think I missed

23   anything, but you froze for a few seconds,

24   Sandra.

25             So my role on the NICE project in

1                    S. Hoiland

2  the early phases was primarily recruiting

3  community college faculty.

4        Q.    And how did you go about

5  recruitment?

6        A.    So there were official ways that I

7  recruited.  We had a flyer, information was

8  sent to my campus and through another

9  community college campus as well as

10 Dr. Wilder's campus, Lehman college.  But most

11 of the recruiting was me asking people I knew

12 face to face if they would like to participate

13 in the program and encouraging them to do so.

14       Q.    All right.  In the early days did

15 your role involve anything other than

16 recruitment?

17       A.    There was preparation for our first

18 in-person workshop.  The first in-person

19 workshop was at Lehman college.

20            But primarily because the project

21 involved recruiting faculty who would be part

22 of this cohort, my primary duties for the

23 first five months were recruiting faculty.

24       Q.    So for the first five months other

25 than recruiting faculty did you perform any

1                    S. Hoiland

2   other tasks for the NICE project?

3        A.    I don't recall.

4        Q.    All right.  And so did your role

5   change at some point from recruiting faculty

6   to something else?

7             ATTORNEY ZOLOT:  Object to form.

8        A.    Well, so we have a timeline in our

9   proposal that indicates that both PI's role

10  shift throughout the project in terms of where

11  our attention is focused.  And so once the

12  summer program began and we had the faculty to

13  fill the cohort, then yes, my role changed.

14       Q.    All right.  And that role change

15  took place about five months after the

16  official start date of the NICE project?

17       A.    We started in June, so six months

18  might be more accurate.

19       Q.    All right.  And what tasks did you

20  perform starting in June of the first year of

21  the NICE project?

22       A.    So as a --

23            ATTORNEY HUDAK:  I'm sorry.  Hold

24       on.  Your counsel just went off video

25       and muted.  So I just want to make sure

```
 1                      S. Hoiland
 2          that she's still there.
 3                ATTORNEY ZOLOT:  Yes, I was just
 4          shutting the door.  There was some
 5          background noise.
 6                ATTORNEY HUDAK:  Sorry.  You could
 7          resume.  If you need the question back,
 8          let me know.
 9                THE WITNESS:  Could you repeat the
10          question?
11                ATTORNEY HUDAK:  Court reporter,
12          could you read back the last question?
13                THE COURT REPORTER:  Yes.
14                (The reporter read back as follows:
15                "Question:  And what tasks did you
16          perform starting in June of the first
17          year of the NICE project?")
18          A.   So there was an in-person workshop,
19     and there were some logistical and
20     administrative things to prepare for that
21     workshop.
22                Also my role, once the faculty were
23     involved in the cohort, was sort of dual.  So
24     I was enrolled in the cohort and completing
25     the materials with the other faculty
```

```
1                    S. Hoiland
2    participants and at the same time I was
3    leading and guiding and providing feedback to
4    each faculty member on the various tasks that
5    they completed.
6         Q.   So when you say that you were
7    completing materials with the other faculty,
8    can you expand on that?  What do you mean by
9    that?
10        A.   So I was both -- my role on
11   Blackboard was administrator along with
12   Dr. Wilder.  So I had back end access to
13   Blackboard.  But I was also serving as a
14   participant since I had not gone through the
15   modules prior to the start of the NICE
16   program.
17        Q.   When you say going through the
18   modules, what do you mean by that?
19        A.   So essentially it's like being both
20   a teacher and a student of the same class.
21        Q.   Okay.  So about six months into the
22   first year of the NICE project you were
23   participating as a student in the NICE
24   project, is that correct?
25                ATTORNEY ZOLOT:  Objection;
```

1               S. Hoiland

2        mischaracterizes the testimony.

3        A.   No, it's not correct.  So my

4   primary role was the facilitator of the

5   course, along with Dr. Wilder.  So she and I,

6   and at that time it would have been at least

7   two other people, Dr. Frank Wang and our

8   external evaluator Dr. Katherine Rowell, who

9   all provided feedback to the NICE

10  participants.  So in terms of time on task, 75

11  percent of my time was as an instructor.  25

12  percent of my time I would estimate was

13  completing materials as a participant.  We

14  didn't call them students because they were

15  faculty.  So participant is a more accurate

16  term.

17        Q.   Understood.  So you said that about

18  25 percent of your time was as a participant

19  in the NICE project, is that correct?

20        A.   During the time of the course.  So

21  the course in the summer I believe was around

22  eight weeks.

23        Q.   Okay.  And so when you say you were

24  a participant, you mean that you were

25  essentially taking the course that the NICE

Page 36

1                           S. Hoiland

2    project was offering to faculty, is that a

3    correct representation?

4          A.   Yes.

5          Q.   And then you say that in addition

6    to being a participant in the course you also

7    were a facilitator of the course, is that

8    correct?

9          A.   Yes.

10         Q.   And what was your role as a

11   facilitator of the course?

12         A.   So I just described it, but it's

13   commenting on each faculty participant's work.

14   So if someone were to submit an assignment or

15   a discussion forum post, my role as

16   facilitator was to comment from a

17   facilitator's perspective, not as a peer.

18         Q.   And how did you know how to provide

19   comments on the faculty participant in the

20   NICE project while you were also engaged as a

21   participant in the project?

22         A.   So I had a pretty robust CV at this

23   point, I had done a lot of faculty workshops,

24   teaching faculty how to do different things.

25   I had been a facilitator of service learning

```
 1                    S. Hoiland
 2   workshops and experiential learning workshops
 3   for a very long time, well before I came to
 4   CUNY, and so I had that experience.  And I
 5   also had, you know, I would say at that point
 6   three years of experience working with
 7   quantitative reasoning and quantitative
 8   literacy.  I had been part of an initiative on
 9   my campus.  I worked with graduate students
10   and also facilitated professional development
11   workshops on quantitative reasoning and
12   quantitative literacy at Hostos.
13        Q.   Did you undertake any specific
14   training for working as a facilitator in the
15   NICE project?
16        A.   I'm not sure what you mean by
17   specific training.
18        Q.   So I believe what you just
19   testified was that you believe that you had
20   the qualifications to comment on participants
21   of the NICE course because of your prior
22   teaching experience.  I'm wondering, did you
23   undergo any specific preparation or training
24   towards the NICE project that you wouldn't
25   have otherwise received if you weren't
```

1                       S. Hoiland

2    involved in the NICE project?

3              ATTORNEY ZOLOT:   Object to form.

4         A.    I would say the only related thing

5    was that I was put in the NICHE course before

6    the NICE project officially started.  So the

7    materials weren't new to me, I had seen them

8    before.  I was aware of the modular structure.

9         Q.    And when you say that you were put

10   in the NICHE course, are you referring to a

11   specific person putting you in that course?

12        A.    Well, Dr. Wilder enrolled me in the

13   NICHE course.

14        Q.    Did Dr. Wilder recommend that you

15   take the NICHE course before being a

16   facilitator in the NICE course?

17        A.    I think taking the course is not

18   entirely accurate.  So it wasn't a live

19   course.  It was between NICHE and NICE.  The

20   way that it's structured it's meant to be

21   interactive.  It's not just a static thing

22   where someone goes in and takes it.

23              So no, I don't believe the

24   recommendation was that I take it.  It was

25   that I become familiar with it, which I did.

1                    S. Hoiland

2         Q.   So Dr. Wilder recommended that you

3    become familiar with the NICHE course before

4    working as a facilitator on the NICE course,

5    is that correct?

6         A.   Yes.

7         Q.   Okay.  And then acting as a

8    facilitator on the NICE course, did you have

9    any other tasks other than commenting on

10   faculty participants in the NICE course?

11              ATTORNEY ZOLOT:  Object to form.

12        A.   Are you speaking about when the

13   course was active, so the eight weeks --

14        Q.   Sure, right now we're talking about

15   those eight weeks.

16        A.   Okay.  Well, sure, there were other

17   responsibilities.  Right?  So at the beginning

18   of the eight weeks we had an in-person

19   session.  At the end of the eight weeks we had

20   another in-person session.  The second one was

21   hosted on my campus and so it required a

22   significant amount of preparation, getting the

23   room, ordering food, doing all the kinds of

24   logistical things one does while hosting

25   faculty.

1                     S. Hoiland

2              So all of those things were

3    happening simultaneous.

4         Q.   All right.  And we're still talking

5    about this eight week period.  Other than

6    commenting on faculty participants and doing

7    administrative tasks to arrange for an

8    on-campus meeting were there any other tasks

9    that you performed as a facilitator on the

10   NICE project?

11        A.   I don't believe so.

12        Q.   All right.  So moving on to after

13   these eight weeks, what happened in the NICE

14   course then?

15        A.   So we had a second cohort that was

16   an academic year cohort.  I don't recall if

17   all of the summer participants finished on

18   time, so there might have been some

19   carryovers.  But the academic year cohort then

20   had to be ushered in and recruited.  And I

21   believe there was probably some overlap, so

22   when the summer cohort finished the in-person

23   session I think was for the next cohort.  And

24   so just one bled into the other.

25        Q.   All right.  So how long did the

1                    S. Hoiland

2    second cohort last?

3         A.   It was an academic year cohort, so

4    approximately eight months.

5         Q.   Okay.  So we're talking about

6    September 2016 to March 2017?

7         A.   I don't recall the dates, and I'm a

8    little bit -- I mean I would have to look at

9    my CV or a syllabus to confirm the years.

10        Q.   Okay.  So just for ease of

11   discussing what time period we're talking

12   about, the second cohort was approximately

13   eight months and it was after the first eight

14   weeks.

15        A.   Correct.

16        Q.   All right.  So what was your role

17   in the NICE project during this second cohort?

18        A.   So while these cohorts are active,

19   right? so while participants are enrolled in

20   the sessions the role was largely the same.

21   So there were a variety of tasks for people to

22   complete, and it was commenting on the various

23   assignments that people submitted --

24   discussion forum posts, basically being an

25   instructor in the course.

Page 42

1                    S. Hoiland

2         Q.   So in the second cohort did you

3    participant in the course?

4         A.   As a participant?

5         Q.   As a participant.

6         A.   I don't believe so.

7         Q.   All right.  And so your role was as

8    the facilitator commenting on faculty

9    participants, is that correct?

10        A.   Yes.

11        Q.   Did you have any other role in the

12   NICE project during this second cohort?

13        A.   Well, so we had been doing

14   presentations early in the project.  There

15   were several presentations Dr. Wilder and I

16   did together.  Some included other people.  So

17   the sort of talking about the project started

18   early, before we got to any component where

19   there would be data and research.

20        Q.   All right.  So are we still talking

21   about the second cohort time frame?

22        A.   Yes.  So there were already

23   presentations occurring at that time.

24        Q.   And when you say presentations what

25   do you mean by that?

1                    S. Hoiland

2        A.    So by presentations I mean going to

3    conferences and speaking about the NICE

4    project and the work that is being done.

5        Q.    And do you remember which

6    conferences you attended?

7        A.    So Dr. Wilder and I went to

8    Michigan together twice.  Once for, it was in

9    preparation for a Sloan Foundation grant

10   through ICPSR, I don't remember what that

11   acronym stands for.  And another time it was

12   for a National Numeracy Network annual

13   meeting.

14       Q.    And so you attended both of these

15   conferences with Dr. Wilder, is that correct?

16       A.    We attended the same conference,

17   yes.

18       Q.    Okay.  And did you make

19   presentations together at these two

20   conferences in Michigan?

21       A.    The ICPSR, yes.  The NNN, no.  We

22   each made separate presentations.

23       Q.    And why did you make separate

24   presentations at the NNN conference?

25       A.    Why?

1                     S. Hoiland

2        Q.   Yes.

3        A.   I'm not sure I can answer why she

4    presented.  I submitted a proposal for myself

5    and a colleague to talk about some

6    collaborative work we were doing in sociology.

7        Q.   And so did you present regarding

8    the NICE project at the NNN conference?

9        A.   We presented on work that we had

10   done as part of the NICE project.

11       Q.   And when you say work that you had

12   done, can you please explain what you mean by

13   that?

14       A.   So a colleague and I had worked on

15   some materials to improve quantitative

16   reasoning and quantitative literacy with our

17   introduction to sociology students and if I

18   recall correctly the sort of point of our

19   presentation was to encourage collaboration

20   among faculty.  So at one point we joined our

21   classes and our presentation was in part about

22   that collaboration and what that looked like.

23       Q.   Did you present any materials from

24   the NICE project at the NNN conference?

25                ATTORNEY ZOLOT:  Object to form.

1                       S. Hoiland

2        A.    Could you repeat the question?

3        Q.    Sure.  Did you present any material

4   from the NICE project at the NNN conference?

5        A.    Well, if materials from the NICE

6   project include assignments and curriculum

7   that were created as part of the NICE project,

8   yes.

9        Q.    So these were assignments that were

10  created following the course but they were not

11  the course materials themselves from the NICE

12  project, is that correct?

13             ATTORNEY ZOLOT:  Object to form.

14       A.    They were not created following the

15  NICE project.  They were created as part of

16  the NICE project.

17       Q.    Could you please explain what you

18  mean, that they were created as part of the

19  NICE project versus the distinction that you

20  are trying to draw here?

21       A.    Yeah.  So they were created while

22  the other colleague and I were creating

23  materials as participants in the NICE project.

24  So I believe when I introduced myself I talked

25  about my role in the NICE project as a PI, and

Page 46

```
 1                      S. Hoiland

 2    the gist of our presentation was about the

 3    specific intervention, pedagogical

 4    intervention we made in sociology.

 5         Q.   So you testified earlier that you

 6    also went to a Sloan Foundation conference in

 7    Michigan with Dr. Wilder, is that correct?

 8         A.   Yes.

 9         Q.   And did you present jointly with

10    Dr. Wilder at that conference?

11         A.   With Dr. Wilder and also with

12    Dr. Frank Wang.

13         Q.   Okay.  And what did the

14    presentation at that Sloan Foundation

15    conference concern?

16         A.   So what I recall is that it was a

17    general overview of the NICE project, and

18    NICHE.

19         Q.   All right.  And so this was a

20    different topic than what was covered at the

21    NNN conference, because the NNN conference

22    dealt with data produced by NICE participants

23    versus the NICE process itself, is that

24    correct?

25              ATTORNEY ZOLOT:  Objection;
```

```
1                    S. Hoiland

2         mischaracterizes the testimony.

3         A.    Could you repeat the question?

4         Q.    Sure.

5              ATTORNEY HUDAK:   Court reporter,

6         could you read that last question back,

7         please?

8              (The reporter read back as follows:

9              "Question:   All right.   And so this

10        was a different topic than what was

11        covered at the NNN conference, because

12        the NNN conference dealt with data

13        produced by NICE participants versus the

14        NICE process itself, is that correct?")

15        A.    So the NNN presentation was not

16   specifically about data produced.   Right?   So

17   there were curriculum materials produced, and

18   that was the focus.   It was specifically about

19   introduction to sociology.

20             The Sloan Foundation planning

21   meeting was not specifically about my

22   sociology course or anyone else's.   It was

23   more general.

24        Q.    Okay.   And when you're referring to

25   your sociology course, what do you mean by
```

1                    S. Hoiland

2    that?

3         A.   The courses I teach that are called

4    Introduction to Sociology.

5         Q.   And how is that course related to

6    the NICE project?

7         A.   So as I mentioned, my colleague and

8    I developed curricular materials to be used in

9    Introduction to Sociology.

10         Q.   So while you were a participant in

11    the NICE project, not acting as a facilitator

12    but as a participant, you developed coursework

13    for your sociology course, is that an accurate

14    representation?

15         A.   Yes.

16         Q.   And the presentation at the NNN

17    conference concerned your sociology course, is

18    that correct?

19         A.   Yes.

20         Q.   Other than these two conferences in

21    Michigan that we've been discussing were there

22    any other presentations during this time

23    period of the second cohort?

24         A.   Yes.

25         Q.   What other presentations were

```
 1                    S. Hoiland
 2    those?
 3         A.   You would have to pull up my CV or
 4    some documentation.   There are a lot of
 5    presentations.
 6         Q.   These were presentations done
 7    regarding the NICE project?
 8         A.   Correct.
 9         Q.   Do you recall any of these other
10    presentations?
11         A.   So the MAA, which I believe stands
12    for the Mathematical Association of America,
13    was a presentation that Dr. Wilder, Dr. Wang
14    and I gave prior to the start of the NICE
15    project.   This was at my campus, Hostos
16    Community College.
17              There was a presentation, again I
18    believe it was Dr. Wilder, Dr. Wang and myself
19    and some students, it was given at -- oh,
20    what's it called, the campus is alluding me in
21    New York City.   Wow, it's not there.   Across
22    the street from Columbia.   The women's
23    college.
24              There were many, many times when we
25    spoke together about the NICE project.
```

1                    S. Hoiland

2        Q.   Were there any -- other than the

3   NNN conference were there any presentations

4   where Dr. Wilder was not a participant in the

5   presentation?

6        A.   So Dr. Wilder was in the room, just

7   as I was in the room when she gave her

8   presentation at NNN.  If by participant you

9   mean listed as a presenter, I don't recall.  I

10  don't believe so.

11       Q.   All right.  So during this time

12  period of the second cohort we've been

13  discussing your role as a facilitator

14  commenting on faculty participants in the NICE

15  project and various presentations made.  Did

16  you have any other role in the NICE project

17  during this time period of the second cohort?

18       A.   Yes.  So there was also kind of a

19  triage role that Dr. Wilder and I discussed.

20  There were several participants that were

21  struggling, both to complete the materials in

22  a timely fashion and to understand the

23  materials.  And so at least two of those

24  faculty members were on my campus and so I had

25  several one-on-one meetings with them,

1                    S. Hoiland

2    explaining, discussing, encouraging.  Doing

3    those kinds of things.

4         Q.   Any other role during this time

5    period of the second cohort?

6         A.   Not that I recall.

7         Q.   What happened in the NICE project

8    after the second cohort?

9         A.   Well, so we had an informal third

10   cohort of people that did not complete the

11   other cohorts.  So there was, I would say,

12   concern on our behalf that our completion

13   rates were not what we anticipated that they

14   would be.  And so I ended up working with a

15   group of faculty that did not complete in the

16   summer after the other two cohorts finished.

17   So that would have been the summer of 2019.

18        Q.   And it was approximately an eight

19   week period again?

20        A.   Well, not really.  Because everyone

21   had finished a different amount of the

22   material.  So it wasn't a new group of people

23   starting at week one and going through it.  It

24   was me working with individual faculty,

25   letting them know what they were missing and

1                          S. Hoiland

2    helping them with any things that they didn't

3    understand.

4         Q.   Approximately how many participants

5    were involved during this period of the third

6    cohort?

7         A.   I believe it was six total.

8         Q.   So --

9         A.   Maybe eight.

10        Q.   Sure.  Sorry for cutting you off.

11   So during this period of the third cohort did

12   you make any presentations?

13        A.   Well, yes.  Because the third

14   cohort stretched through August, and even into

15   the fall of 2019.  So the faculty who

16   struggled to finish during their scheduled

17   time period also struggled to finish during

18   the summer.  Many of them were teaching and

19   had the same issues for not completing prior

20   to the summer in the summer.  And so there was

21   no kind of start -- start and end date.  I

22   gave suggested deadlines for faculty to

23   complete their missing work, and largely a lot

24   of the faculty missed those deadlines.

25        Q.   So we're talking about time

1                         S. Hoiland

2   periods.  Is it fair to say the third cohort

3   was in the summer of 2019, from the end of I

4   guess the school year in the spring until

5   August?

6         A.   Yes.  But it continued into the

7   fall as not all of them finished.

8         Q.   Okay.  And what happened after the

9   third cohort?

10        A.   What happened with what?

11        Q.   With the NICE project?

12        A.   Well, so the project reports were

13  due at the end of 2019.  So there's an annual

14  report due each year and then when the project

15  comes to a completion there's a final report

16  that's due.

17        Q.   So we've been talking about various

18  time periods in the NICE project, because you

19  said that your role changed throughout the

20  project.  So I am just trying to get a roadmap

21  here of when your roles changed versus stayed

22  the same.  So did your role change at all

23  between the second and third cohort?

24             ATTORNEY ZOLOT:  Object to form.

25        A.   The biggest difference is that

1                    S. Hoiland

2  Dr. Wilder was not involved with the third

3  cohort.

4        Q.   And why was that?

5        A.   I'm not sure.  You would have to

6  ask Dr. Wilder.

7        Q.   Did you ask Dr. Wilder?

8             MS. ZOLOT:  Objection.

9        A.   I don't recall the exact contents

10  of the discussion.  We both understood that it

11  was important to get more faculty to complete.

12  And since I tended to work more closely

13  particularly with the community college

14  faculty, it seemed to make sense that I would

15  assume the role as sole facilitator for the

16  summer.

17        Q.   And again your role as a

18  facilitator was commenting on the faculty

19  participants work in the NICE course, is that

20  correct?

21        A.   Well, at this point it was a lot

22  more than that, because the reasons that

23  people weren't completing the work was in part

24  because some didn't understand it, and some

25  just needed encouragement, or they needed

1                        S. Hoiland

2  guidance.  And so it was more than just

3  commenting on their things in Blackboard.

4  There were many emails exchanged.

5  Conversations.  I met with a few of them one

6  on one.

7                 ATTORNEY ZOLOT:  Sandra is this a

8        good time for a break, or in the next a

9        couple of minutes?

10                ATTORNEY HUDAK:  Sure.  We can take

11       a break now.  Let's go off the record.

12                        ---

13          (Recess from 11:22 to 11:37.)

14                        ---

15                ATTORNEY HUDAK:  Back on the record

16       after a short break.

17       Q.   So before the break we were talking

18  about the third cohort of the NICE project

19  occurring around the time frame of the summer

20  of 2019.

21                So Dr. Hoiland, I believe you

22  testified earlier that Dr. Wilder was not

23  involved in the third cohort, is that your

24  testimony?

25       A.   I said that she was not directly

Page 56

```
1                    S. Hoiland
2  involved in working with the faculty to
3  complete their missing materials.
4       Q.   Were you communicating with
5  Dr. Wilder during this time frame?
6       A.   Somewhat.
7       Q.   And what do you mean "somewhat"?
8       A.   I provided occasional updates via
9  email.
10      Q.   And was Dr. Wilder communicating
11 with the participants of the third cohort
12 during this time frame?
13      A.   I don't know.  I don't recall being
14 cc'd on emails between Dr. Wilder and the
15 participants.  Sandra, you froze.
16      Q.   Did any of the participants
17 discuss --
18           ATTORNEY HUDAK:  Sure.  Am I
19      unfrozen now?
20           ATTORNEY ZOLOT:  Well, your face is
21      frozen.
22           ATTORNEY HUDAK:  Am I unfrozen now?
23           ATTORNEY ZOLOT:  No.
24           (Discussion off the record.)
25           (Pause in proceedings.)
```

```
 1                    S. Hoiland
 2           ATTORNEY HUDAK:  Back on the record
 3       after another technical break.  Court
 4       reporter, could you please just read
 5       back the last question and answer.
 6           (Requested portion of the record
 7       read back.)
 8   BY ATTORNEY HUDAK:
 9       Q.   Dr. Hoiland, do you know if
10   Dr. Wilder was communicating with the
11   participants in other forms, not by email?
12       A.   I don't know.
13       Q.   And in your communications with
14   Dr. Wilder directly, did she inform you that
15   she was communicating with participants of the
16   third cohort?
17       A.   I don't recall that, no.
18       Q.   Do you recall one way or the other?
19       A.   So Dr. Wilder at that point had
20   their stipends in her budget.  So if there was
21   communication and I was included it was about
22   providing the stipends, which were given to
23   participants when they completed the program.
24   So those communications I would be cc'd on.
25   But I don't know if there were other forms of
```

1                    S. Hoiland

2   communication.

3        Q.   So you don't know if Dr. Wilder was

4   communicating with the participants at the

5   third cohort, is that accurate?

6        A.   Other than they're related to

7   stipends, no.  I don't know.

8        Q.   All right.  And in this time period

9   of the third cohort did you make any

10  presentations regarding the NICE project?

11       A.   So one that I recall was the ASA

12  presentation in the summer of 2019, that would

13  have been in August in New York City.

14       Q.   Do you recall any others?

15       A.   Do I recall any other ...?

16       Q.   Presentations during the third

17  cohort of the NICE project?

18       A.   I don't believe so, but I would

19  have to refer to my CV.  In June or July of

20  2019.  I'm not sure.

21       Q.   And what topic was the ASA

22  presentation regarding?

23       A.   So I submitted a proposal on behalf

24  of both Dr. Wilder and myself, it was for a

25  workshop, which is a different type of

```
 1                    S. Hoiland
 2   conference presentation.  And the topic I
 3   believe there was something in the title about
 4   more than statistical superlatives, and it was
 5   sort of looking at the ways in which community
 6   college faculty and students can exceed what
 7   the numbers show in terms of their abilities.
 8              And it also included student
 9   presenters.
10       Q.   And so Dr. Wilder was involved in
11   this ASA presentation, is that correct?
12       A.   Was she involved in writing the
13   proposal?
14       Q.   Was she involved in making the ASA
15   presentation?
16       A.   Well, so the way that it was
17   submitted, we were supposed to present
18   together.  It was a large workshop in a
19   ballroom at the Hilton in midtown here in New
20   York City.  Our collaboration and relationship
21   had really devolved by that point.  And so the
22   way we ended up doing it was as two separate
23   presentations under the same title.
24       Q.   And what do you mean by two
25   separate presentations?
```

```
 1                    S. Hoiland

 2       A.   I mean we didn't present together.

 3  One of us presented, then the other presented,

 4  almost as if there were two completely

 5  separate presentations.

 6       Q.   What did your presentation concern?

 7       A.   So my presentation, as I recall,

 8  was largely related to the abstract I

 9  submitted.  I had a student there named

10  Parnell, and he spoke about his experience

11  being a student in my class, doing some work

12  with quantitative research and quantitative

13  literacy.  If I recall correctly, he also

14  spoke about his own experience as a student.

15  He was homeless throughout the time he was in

16  my class and he spoke about that.

17            And I think what I wanted to convey

18  with that presentation was that campuses like

19  mine, students like mine, faculty like myself

20  are more than what the numbers say.  Which is

21  that they don't graduate, they don't stay,

22  they don't -- they're not capable of doing the

23  kinds of work that we were talking about.

24       Q.   Is it fair to say that the

25  presentation that you made at this ASA
```

1                      S. Hoiland

2  conference concerned your sociology class?

3       A.   I don't believe that presentation

4  was exclusively about my class.  Because I

5  also, again, if I recall correctly, Dr. Wilder

6  had brought a student and so part of the goal

7  of the presentation was to bring in a student

8  perspective.  So it was not exclusive to my

9  class.  It was about what it looked like to

10 have NICE creative materials in the classroom,

11 from the student's perspective, and from my

12 perspective as a PI.

13      Q.   So what was the relationship

14 between your ASA presentation and the NICE

15 project?

16      A.   Well, at that point --

17           ATTORNEY ZOLOT:  Object to form.

18           THE WITNESS:  Sorry.

19      A.   At that point the NICE project was

20 coming to a close, and so like I said, it was

21 really about students who had worked on

22 different materials, so Dr. Wilder's student

23 had taken her class and had experienced

24 whatever exercises Dr. Wilder included in her

25 class just as my student had done in my class.

Page 62

S. Hoiland

1
2  And so for the audience it was really a look
3  at the NICE project through the lens of
4  students.
5       Q.   You mentioned that this ASA
6  conference was in a large ballroom, is that
7  correct?
8       A.   Yes.
9       Q.   Were there other presentations that
10  were made in other settings?  I'm looking to
11  see how you're defining the word
12  "presentation" here.  Is it always at a large
13  conference or does it include anything other
14  than a conference that would take place in a
15  large ballroom, for example?
16            ATTORNEY ZOLOT:  Object to form.
17       A.   So that presentation I believe fell
18  under the heading of a workshop.  And within
19  ASA the workshops tend to be held in larger
20  spaces, they have more people attend, the
21  audience can be a little bit broader.  And no,
22  I mean it can vary widely, in terms of sort of
23  the formality of a presentation, whether, for
24  example, if someone is on a panel, that's
25  considered a presentation, there may or may

1                    S. Hoiland

2   not be any kind of visual aid along with that.

3   There may or may not be any paper along with

4   that.  So there's great variation.

5        Q.   So when we've been talking about

6   presentations made as part of the NICE

7   project, what scope of conference or other

8   event are you including in the definition of a

9   presentation?

10            ATTORNEY ZOLOT:  Object to form.

11       A.   So within the institutional context

12  there's a clear divide between a presentation

13  versus something that could be considered

14  service or something that could be considered

15  like service to a professional organization.

16            There's also distinctions between

17  invited talks and presentations.

18            And then completely separate from

19  that are publications.

20       Q.   Okay.  So when you're referring to

21  presentations, what are you referring to?

22       A.   So generally I'm referring to

23  conference presentations.

24       Q.   Okay.  And so the presentations we

25  discussed before, for example, the Sloan

1                    S. Hoiland

2   Foundation presentation in Michigan, was that

3   a conference presentation?

4        A.   I believe on my CV I included that

5   under Professional Reputation, because the

6   audience was specific to people who were

7   applying for a grant.  I know it was an

8   invited presentation.

9        Q.   Did it take place in a large

10  ballroom?

11       A.   It did not.

12       Q.   About how many people were in

13  attendance?

14       A.   Outside of Dr. Wilder's and Wang, I

15  would say three or four.

16       Q.   So when we've been discussing

17  presentations are you including any talks that

18  you had given in front of three or four

19  people, to a larger group of people?

20            ATTORNEY ZOLOT:  Object to form.

21       A.   So when I submit a proposal to a

22  conference it's never clear or guaranteed how

23  many people will show up.  Like for example, I

24  just had a friend who went to London for a

25  conference presentation and no one showed up.

1                    S. Hoiland

2  But that presentation still goes in her CV.

3      Q.    That doesn't really answer my

4  question.  I am trying to pin down when you

5  talk about presentations that you made as part

6  of the NICE project, how are you defining what

7  a presentation entails?

8      A.    So the things that are listed on

9  the NICHE/NICE website as NICE presentations

10  are those that have been submitted to a

11  conference.

12     Q.    And so the presentations that are

13  listed on the NICE website are the universe of

14  presentations that you are referring to when

15  you have been discussing presentations thus

16  far?

17            ATTORNEY ZOLOT:  Object to form.

18     A.    I've made other presentations about

19  other work unrelated to NICE.  But specific to

20  NICE, those -- those are the presentations

21  that we submitted as part of our reporting

22  that were done in conjunction with NICE.

23     Q.    So again that doesn't answer my

24  question.  We've been talking about

25  presentations during this deposition.  Have

Page 66

1                        S. Hoiland

2    you been considering the word "presentation"

3    to mean the presentations listed on the NICE

4    website?

5              ATTORNEY ZOLOT:  Objection; asked

6         and answered.

7         A.   Yes.

8         Q.   Now turning back to the ASA

9    presentation in about August of 2019.  You

10   mentioned that you and Dr. Wilder had made

11   separate presentations because of, I don't

12   remember the word you used, but I believe it

13   was something like conflict between the two of

14   you.  Is that correct?

15        A.   I said the relationship had

16   devolved by that point.

17        Q.   All right.  So I am going to share

18   an exhibit.

19                        ---

20             (Exhibit 1, email, Bates number

21        D0023 through D0024 was marked for

22        identification)

23                        ---

24        Q.   Do you see that I have shared my

25   screen?

1                        S. Hoiland

2          A.    Yes.

3          Q.    Do you see a PDF document shown on

4     the screen?

5          A.    Yes.

6          Q.    This is a PDF that was

7     peer-reviewed by defendant in this case and

8     has been marked with Bates number D0023

9     through D0024.  I am going to mark this as

10    exhibit 1.

11              Dr. Hoiland, do you recognize this

12    document?

13         A.    Yes.

14         Q.    And what do you recognize this

15    document to be?

16         A.    An email communication between

17    Dr. Wilder and myself.

18         Q.    And this is dated around August

19    2019, is this correct?

20         A.    Yes.

21         Q.    All right.  And this was during the

22    time of the third cohort, is that correct?

23         A.    Yes.

24         Q.    All right.  So turn to the second

25    page which is D0024.  Do you see on this page

Page 68

1                           S. Hoiland

2    an email that's dated Thursday, August 29,

3    2019 from Esther to -- Esther Wilder to you?

4         A.   Yes.

5         Q.   And the email says:  "Dear Sarah,

6    have you been providing updates/encouragement

7    to Enyuan, Min, and Adijat since you copied me

8    on some exchanges dated July 23, 2019?"

9              Did I read that correctly?

10        A.   Enyuan, Min and Adijat, yes.

11        Q.   And when Dr. Wilder is referring to

12   updates/encouragement to these three

13   individuals, what is she referring to?

14        A.   She's referring to my role in

15   ushering through the final cohort of the NICE

16   project.  Three of the participants are listed

17   there.

18        Q.   So she is following up with you to

19   make sure that you are providing

20   updates/encouragement to these three

21   individuals on the NICE project, is that

22   correct?

23        A.   No, I think she's saying that I

24   know you've been providing updates, please cc

25   me.

1                     S. Hoiland

2          Q.    Okay.  And why is she asking you to

3    cc her?

4          A.    I'm not sure why she's asking that.

5          Q.    Turn back to the first page of this

6    document, which is D 0023.  And I am looking

7    at the second email on the bottom of the page,

8    which is an email described as from Sarah

9    Hoiland to Esther Wilder on August 30, 2019.

10   And it says -- I am going to highlight some

11   text here.  It says Hi -- I'm sorry.  The

12   highlighting tool is not working very well so

13   I'll just read it to you.  It says, "Hi

14   Esther, yes, I have been providing updates.

15   This Sunday is their new extended deadline,

16   which is detailed in the emails I just

17   forwarded.  I fell behind during ASA and

18   traveled the next week, so several

19   communications were between each participant

20   and myself because they were all in different

21   places.  I should have cc'd you on the two I

22   forwarded and planned to email you and ask you

23   to provide feedback on the last deliverable

24   once all three were posted."

25                  Did I read that correctly?

```
 1                    S. Hoiland

 2        A.   Yes.  You're breaking up, but

 3   that's what I'm reading.

 4        Q.   Okay.  So is it fair to say that

 5   Esther's -- Dr. Wilder's prior email to you

 6   was asking if you had sent out an email and

 7   this email is a response saying that

 8   defendant, you, Dr. Hoiland, should have cc'd

 9   on the emails with the -- (audio distortion)

10             THE COURT REPORTER:  I'm sorry, you

11        broke up.

12             ATTORNEY ZOLOT:  You cut out.

13             ATTORNEY HUDAK:  Sure.  I'll repeat

14        that.

15        Q.   So the question was is it fair to

16   say that this email is responding to

17   Dr. Wilder's email advising that you had

18   not -- that you, Dr. Hoiland, had not cc'd

19   her, Dr. Wilder -- (audiovisual interruption)

20             ATTORNEY ZOLOT:  You froze again.

21        Q.   -- and you are responding here that

22   you should have cc'd her?

23             (Discussion off the record.)

24                       ---

25        (Recess from 12:07 to 12:16.)
```

1                    S. Hoiland

2                         ---

3              ATTORNEY HUDAK:  So back on the

4         record after a short technical break.

5         Court reporter, could you please read

6         back the last full question and answer?

7              (Requested portion of the record

8         read back.)

9    BY ATTORNEY HUDAK:

10        Q.   Please let me know if we need to

11   take a step back and refresh your memory about

12   this exhibit that we're looking at, but at the

13   current moment we're looking at the first page

14   of the document, which is D 23, and we were

15   discussing what this email says.  So is it

16   fair to say that this email is a response from

17   you to Dr. Wilder stating that you had not

18   cc'd her on emails with NICE project

19   participants but should have?

20        A.   So I think its important to

21   contextualize this email.  This email is

22   coming almost three weeks after a series of

23   emails in which Dr. Wilder had said many

24   things.  And so I was not under the impression

25   that I needed to include her and cc her on

1                        S. Hoiland

2    every single email communication I was sending

3    to NICE participants who were in that summer

4    cohort.  As it states here, she was not

5    directly involved.  She was going to look at

6    their final deliverable and provide feedback.

7              So I was agreeing with what she

8    said.  However, at the time I sent those

9    emails I did not see any need to include her.

10        Q.   All right.  And then looking at the

11   first email in this chain, which is at the top

12   of page D 23, it says "Dear Sarah, Yes I would

13   have liked to have been cc'd on these group

14   emails."

15             Did I read that correctly?

16        A.   Yes.

17        Q.   So isn't Dr. Wilder saying that she

18   assumed that you would cc her on group emails

19   with NICE project participants?

20             ATTORNEY ZOLOT:  Object to form.

21        A.   So my response indicates that I had

22   emailed individuals, because each person was

23   working on different things at different

24   times.  And so to cc a PI on what was

25   relatively a small part in terms of the scope

1                        S. Hoiland

2   of the project on an individual email between

3   myself and another faculty did not make sense

4   then and it does not make sense now.

5        Q.   What Dr. Wilder was saying is that

6   she expected you to cc her, correct?

7             ATTORNEY ZOLOT:  Object to the

8        form.  Sandra, the document says what it

9        says, and you're --

10            ATTORNEY HUDAK:  I am asking for

11       the witness' interpretation of --

12            ATTORNEY ZOLOT:  You are asking the

13       witness if Dr. Wilder assumed something

14       when the language in the email itself

15       says "I would have liked."  You're

16       asking her --

17            ATTORNEY HUDAK:  Stop making

18       speaking objections.  You can make your

19       objection to form on the record.  But

20       we're talking about an email between the

21       plaintiff and the defendant in this case

22       and I'm allowed to ask her questions

23       about it.

24        Q.   So Dr. Hoiland, isn't it fair to

25   say that this email is stating that Dr. Wilder

Page 74

1                            S. Hoiland

2    was expecting you to cc her on emails with

3    NICE project participants?

4               ATTORNEY ZOLOT:  Object to form.

5          A.   Her language is I would have liked

6    to have been cc'd on these group emails.

7          Q.   And so Dr. Wilder expected to be

8    included in this third cohort of the NICE

9    project?

10              ATTORNEY ZOLOT:  Object to form.

11         A.   By "included" if you meant doing

12   the work of communicating regularly with each

13   of the faculty members, no.  She was aware of

14   the deadline.  She was aware of the timeline

15   that I created for the summer cohort.  And as

16   I said, the deadlines and the completion was

17   pertinent to her part in the summer cohort

18   because she distributed the stipends upon

19   completion.

20         Q.   Did you begin cc'ing Dr. Wilder on

21   emails with NICE project participants after

22   this email received on August 30, 2019?

23              ATTORNEY ZOLOT:  Object to form.

24         A.   I don't recall.

25         Q.   All right.  So I believe you

Page 75

1                     S. Hoiland

2   testified before that the ASA presentation was

3   the only presentation you could recall from

4   the third cohort of the NICE project, is that

5   correct?

6        A.   During the third cohort, in the

7   summer of 2019?

8        Q.   And were you responsible for any

9   other tasks in the NICE project --

10       A.   Wait, sorry.  That was a question.

11  Sandra, that was a question.  So could you

12  repeat the question you asked?  That wasn't my

13  answer.  I was trying to get clarification.

14       Q.   All right.  I was just trying to

15  confirm your testimony that the ASA

16  presentation that you mentioned previously was

17  the only presentation you could recall for the

18  NICE project during the third cohort of the

19  NICE project, is that correct?

20       A.   It is the only one I recall, but I

21  would have to refer to my CV.

22       Q.   Okay.  And other than presentations

23  and providing comments to faculty participants

24  of the third cohort of the NICE project, did

25  you perform any other tasks on behalf of the

Page 76

```
 1                       S. Hoiland
 2   NICE project during the third cohort?
 3        A.    I don't believe so.
 4        Q.    And after the third cohort what was
 5   your role in the NICE project?
 6        A.    Well, after the third cohort I was
 7   thinking about our annual report, which each
 8   of us had to write and submit separately for
 9   each of our grants.  So it's one project with
10   two separate grant numbers and a reporting
11   structure.  And so part of that report
12   required me to report on the results of the
13   NICE project.
14             At some point that fall, Dr. Wilder
15   removed me from the Blackboard shell, which is
16   what contained really any data from the
17   project.
18             So my role in that final phase was
19   trying to complete my end of the project and
20   submitting my annual report, which was due
21   December 31.
22        Q.    And other than preparing that
23   report you had no other role in the NICE
24   project, is that correct, at that final time
25   period?
```

1                    S. Hoiland

2        A.   Well, the role that I had in

3   ushering through the final cohort, there were

4   still a few that had not finished.  But

5   without access to Blackboard I could not

6   continue in that role.

7        Q.   And did you make any presentations

8   as part of the NICE project during this final

9   phase of the NICE project?

10       A.   I don't believe so.  I had

11  submitted an abstract for Esther and I had to

12  present at NNN, but I retracted the

13  acceptance, that conference was supposed to

14  take place in October of 2019, I believe it

15  was in Austin, Texas or maybe Houston, but I

16  did not attend and I did not present.

17       Q.   And other than these phases of the

18  NICE project that we discussed so far are

19  there any other phases or roles that you've

20  played in the NICE project that have not been

21  discussed?

22       A.   I don't believe so.

23       Q.   Did you conduct any research as

24  part of the NICE project?

25       A.   So the research generally occurs

Page 78

1                         S. Hoiland

2    when the project activities are completed, and

3    at that point I had been removed from the

4    Blackboard shell.

5         Q.   Did you write any publications as

6    part of the NICE project?

7         A.   Are you referring to publications

8    as in peer-reviewed articles?

9         Q.   Sure, we can start with that.

10        A.   No.

11        Q.   Do you have any other definition of

12   publication?

13        A.   I do not.  In academia the

14   definition of publication is clear.

15        Q.   You mentioned before providing

16   comments to faculty participants through

17   Blackboard, is that correct?

18        A.   Correct.

19        Q.   And what is Blackboard?

20        A.   Blackboard is a learning management

21   system.

22        Q.   And did it host the instructional

23   materials used in the NICE project?

24        A.   Yes, it did.

25        Q.   Did you make any contributions to

1                    S. Hoiland

2    the instructional materials used in the NICE

3    project hosted on Blackboard?

4         A.   I believe I pointed out a few

5    places where there were grammatical errors,

6    where the word NICHE was still there instead

7    of NICE, but not any substantive changes.  It

8    was not actually possible to change the

9    materials because the research began -- not

10   the research, excuse me.  The participants

11   started the NICE cohort very early in the

12   project so there was not time built into the

13   proposal to change the materials.

14        Q.   And did the instructional materials

15   used in the NICE project that were hosted on

16   Blackboard, did those come from the NICHE

17   project?

18        A.   Yes.

19        Q.   Did you make a presentation at the

20   Community College Conference on Learning

21   Assessment held at Valencia College in

22   Orlando, Florida on or about February 17,

23   2019?

24        A.   Yes.

25        Q.   Can we call that conference the

1                      S. Hoiland

2    CCLA conference for short?

3         A.   Yes.

4         Q.   And do you understand that the

5    presentation that you made at that CCLA

6    conference is an issue in this litigation?

7         A.   Yes.

8         Q.   Did people have to -- did

9    participants in the conference have to pay to

10   attend the conference?

11        A.   Yes.

12        Q.   And why did you apply to make a

13   presentation at the CCLA conference?

14        A.   So one of the goals of the NICE

15   project was to disseminate what we were doing

16   in the project to other community college

17   faculty.  And so a conference on learning

18   assessment for community college faculty fit

19   very well within the overarching project

20   goals.

21        Q.   Did you have any other motivation

22   for speaking at the conference other than

23   disseminating information regarding the NICE

24   project?

25        A.   There was geographic motivation.  I

1                          S. Hoiland

2    had taken my son along who at that time, you

3    know, he was young, it was a while ago, and my

4    son's father lives outside of Orlando, so it

5    was a good conference for me to attend because

6    I could facilitate a visit.

7          Q.   Was there any other motivation?

8          A.   No.

9          Q.   Was the presentation that you made

10   at the CCLA conference something that you

11   could put on your CV?

12         A.   Yes.

13         Q.   Was the presentation that you made

14   at the CCLA conference something that you

15   could have referenced in applications for

16   further grants in your career?

17         A.   So presentations don't count for

18   hardly anything.  Presentations fall into a

19   very different category than publications,

20   awards, grants.  My CV has a few dozen

21   presentations, so one more line on my CV would

22   have done absolutely nothing for my career.

23         Q.   Were you hoping to network with

24   people at the CCLA conference?

25         A.   I'm not a great networker.  I'm

1                    S. Hoiland

2  getting better.  In that particular conference

3  I actually did not get a single name or email

4  from that conference.

5      Q.   So you have not talked with anybody

6  that you met at the CCLA conference since that

7  conference?

8      A.   No.  Well, other than Rachel

9  Meister, which whom was an organizer.  But in

10  terms of faculty participants or

11  administrative participants, no.

12      Q.   Is it fair to say that you sent a

13  PowerPoint document to the CCLA conference

14  organizers to be distributed to the

15  registrants of the CCLA conference?

16            ATTORNEY ZOLOT:  Object to form.

17      A.   I submitted a PowerPoint

18  presentation to Rachel Meister.

19      Q.   Okay.  And if I refer to that

20  document as the CCLA PowerPoint are we clear

21  on what document that we're talking about?

22      A.   Yes.

23      Q.   I am going to take down the

24  document previously marked as exhibit 1, take

25  that off the screen.  And then I'm bringing up

1                         S. Hoiland

2    a new document.

3              Do you see that I have shared a

4    different document?

5         A.   Yes.

6         Q.   This document was produced by

7    defendant in this case and is marked with

8    Bates numbers 234 through 256.  Let me know if

9    you would like a chance to review each page of

10   the document, but do you recognize this

11   document?

12        A.   Yes.

13        Q.   And what do you recognize it to be?

14        A.   I recognize it to be the PowerPoint

15   I submitted for the CCLA conference.

16        Q.   Okay.  And at the CCLA conference

17   you made an oral presentation while showing

18   this CCLA PowerPoint, is that correct?

19        A.   Yes.

20        Q.   All right.  So is it okay going

21   forward to refer to that oral presentation as

22   the oral presentation?

23        A.   Yes.

24        Q.   And on the first page of the CCLA

25   PowerPoint or slide, I should say, does the

1                    S. Hoiland

2   first slide include your name?

3       A.   Yes.

4            ATTORNEY LINN:   Sandra, I don't

5       think you have marked this as an

6       exhibit.

7            ATTORNEY HUDAK:   Thank you, Janet.

8       Let's mark this as exhibit 2.

9                    ---

10           (Exhibit 2, PowerPoint, Bates D0234

11      through D0256 was marked for

12      identification)

13                   ---

14      Q.   So Dr. Hoiland, I believe you

15   answered yes?

16      A.   Yes.

17      Q.   Are any other names included on

18   this first slide of the CCLA PowerPoint?

19      A.   No.

20      Q.   I am going to turn to slide 2 of

21   the PowerPoint which has Bates numbers D 235.

22   Do you see that I have turned the page?

23      A.   Yes.

24      Q.   And at the top of the slide it says

25   Numeracy Infusion For College Educators

1                      S. Hoiland

2      (NICE).  Is that correct?

3           A.   Yes.

4           Q.   And is NICE referring to the NICE

5      project that we've been discussing so far

6      today?

7           A.   Yes.

8           Q.   The first bullet point here says

9      "What is NICE?"  Is that correct?

10          A.   Yes.

11          Q.   And the word NICE is in blue and

12     underlined.  Does that indicate that it's a

13     hyperlink?

14          A.   Yes.

15          Q.   And what does the word NICE

16     hyperlink to?

17          A.   I believe it hyperlinked to the, to

18     each QR page, which was the project site for

19     the NICE project, and also NICHE.

20          Q.   I am going to take exhibit 2 down

21     for a second.  All right.  And do you see that

22     I've shared a different document on the

23     screen?

24          A.   Yes.

25          Q.   And I will represent to you that

```
 1                    S. Hoiland
 2   this is a printout of the webpage that opened
 3   when I clicked on the NICE link that we just
 4   saw.
 5            Do you recognize this document --
 6       A.   Yes.
 7       Q.   -- or this webpage?
 8       A.   Yes.
 9            ATTORNEY LINN:  Sandra, are you
10       marking this as an exhibit?
11            ATTORNEY HUDAK:  Yes, let's mark
12       this as exhibit 3.
13                    ---
14            (Exhibit 3, NICE webpage was marked
15       for identification)
16                    ---
17       Q.   Dr. Hoiland, I believe you answered
18   yes, that you recognize this document?
19       A.   Yes.
20       Q.   And what do you recognize it to be?
21       A.   So this is the award abstract.
22       Q.   And the award for the NICE project
23   was granted in two parts, to you and
24   Dr. Wilder, is that correct?
25       A.   Yes.
```

1                    S. Hoiland

2         Q.    Does this document refer to

3    Dr. Wilder?

4         A.    No.

5         Q.    So it's fair to say that the link

6    from the NICE hyperlink that we were looking

7    at on exhibit 2 refers to a document that did

8    not include Dr. Wilder's name, is that

9    correct?

10         A.    Yes.

11         Q.    I am going to take exhibit 3 off

12    the screen.  And I've put back up slide 2 of

13    exhibit 2.  Do you see that?

14         A.    Yes.

15         Q.    Did you author the text that is

16    shown on this slide?

17         A.    The text that is shown on the slide

18    comes from the proposal for the NICE project.

19    The research questions.  And the first bullet

20    point is just saying what it is.  So ...

21         Q.    So did you author this text?

22         A.    Yes, I worked on the proposal with

23    Dr. Wilder.  We discussed the research

24    questions.

25         Q.    Did you draft the research

1                    S. Hoiland

2   questions for the NICE proposal?

3        A.   It was a collaborative proposal.  I

4   was involved in writing the research

5   questions.

6        Q.   I believe you testified earlier

7   that Dr. Wilder prepared the first draft of

8   the proposal for the NICE project, is that

9   correct?

10       A.   Yes.

11       Q.   And that you reviewed that draft

12  and made minor revisions, is that correct?

13       A.   That's correct.

14       Q.   Was the text that's shown on slide

15  2 of exhibit 2 revised by you in reviewing the

16  NICE proposal?

17       A.   I don't recall if I made specific

18  revisions.

19       Q.   Did Dr. Wilder draft the research

20  questions that are shown on slide 2 of exhibit

21  2?

22       A.   I don't recall if the research

23  questions changed significantly.

24       Q.   Did Dr. Wilder draft the research

25  questions for the NICE proposal?

1                       S. Hoiland

2          A.    What I can recall is that there was

3    a draft of the proposal.  To the extent that

4    the research questions shifted or changed

5    during that process, I don't recall.  The

6    proposal was submitted by both of us.  So

7    we're both considered co-authors of the

8    proposal.

9          Q.    Turning to slide 7 of exhibit 2,

10   which has Bates numbers D 240.  Do you see

11   that I've changed the page?

12         A.    Yes.

13         Q.    Did you author the text that is

14   shown on slide 7?

15         A.    This is the text that was in our

16   proposal 1 through 8.

17         Q.    And did that text -- was that text

18   written by you?

19               ATTORNEY ZOLOT:  Object to form.

20         A.    Did I write this text on this

21   slide?  Yes.  Are these the names of the units

22   that were part of the NICE project?  Yes.  Did

23   I create those units?  No.

24         Q.    So you took the text that's shown

25   on slide 7 from the NICE proposal, is that

1                          S. Hoiland

2  correct?

3               ATTORNEY ZOLOT:   Object to form.

4        A.   These are the modules that were the

5  basis of the NICE project.

6        Q.   And how did you prepare the text

7  that's shown on slide 7?  Did you copy it from

8  a source?

9               ATTORNEY ZOLOT:   Object to form.

10       A.   Are you asking whether I typed 1

11  through 8 into the slide or whether I copy and

12  pasted?  I don't recall.

13       Q.   I am asking where you obtained the

14  text that is shown in slide 7?

15       A.   Well, I had been working in the

16  modules at this point for almost two years, so

17  I wouldn't really need to look at anything,

18  because I knew the modules.

19       Q.   And when you say working with the

20  modules, do you mean the modules shown in the

21  materials on Blackboard?

22       A.   Right.  The modules that were

23  central to the NICE project.

24       Q.   And so these modules are shown in

25  the materials in Blackboard?

1                    S. Hoiland

2        A.    They are in Blackboard.

3        Q.    All right.  And do you see that I

4   have turned the page to slide 8 which has

5   Bates stamp D 241?

6        A.    Yes.

7        Q.    Did you author the text that is

8   shown on this slide?

9        A.    Again, this text came from one of

10  the modules.

11       Q.    So you copied this text from the

12  materials in Blackboard?

13            ATTORNEY ZOLOT:  Object to form.

14       A.    These were the basic instructions

15  included at the module on assessment.

16       Q.    So the answer is yes, you copied

17  these -- the text that's shown on slide 8 from

18  the materials in Blackboard?

19            ATTORNEY ZOLOT:  Object to form.

20       A.    It is the same text.

21       Q.    I'm turning to --

22       A.    Sorry.

23       Q.    -- slide 9 now?

24       A.    Sandra --

25       Q.    Do you see that I have turned the

1                        S. Hoiland

2   page?

3          A.   Yeah, with the exception of the

4   hyperlink at the bottom which did go to the

5   Teach QR page.

6          Q.   All right.  And we've discussed

7   before that that link, the information shown

8   at that link does not include Dr. Wilder's

9   name, is that correct?

10         A.   No, we didn't discuss that.  That

11  was the first hyperlink.

12         Q.   Does this link to some other

13  webpage?

14         A.   That's to the project webpage,

15  which does have Dr. Wilder's name all over it.

16         Q.   Is that publicly accessible?

17         A.   Yes.  And I showed that during the

18  presentation.

19         Q.   How did you show it?

20         A.   I clicked on it and moved through

21  several of the pages.

22         Q.   We're on slide 9.  Do you see that

23  we're on the next slide that has Bates numbers

24  242?

25         A.   Yes.

1                    S. Hoiland

2        Q.   Did you author the text that is

3   shown on this slide?

4        A.   This text came from the assessment

5   module as well.

6        Q.   The assessment module located on

7   Blackboard?

8        A.   Correct.

9        Q.   Turn to slide 10 of exhibit 2 which

10  has Bates number D 243.  Do you see slide 10

11  on your screen?

12       A.   Yes.

13       Q.   Did you author the text that is

14  shown on slide 10?

15       A.   The text at the bottom is mine.

16       Q.   Did you author any of the other

17  text on the slide?

18       A.   That text came from the module.

19       Q.   And that's the module on

20  Blackboard?

21       A.   Correct.

22       Q.   Turn to slide 11 of exhibit 2 which

23  has Bates number D 244.  Do you see that we're

24  on slide 11?

25       A.   Yes.

```
 1                      S. Hoiland
 2          Q.   Did you author the text that is
 3   shown on slide 11?
 4          A.   The text came from the assessment
 5   module.
 6          Q.   And that's the assessment module on
 7   Blackboard?
 8          A.   Yes.
 9          Q.   Turning now to slide 12 which has
10   Bates number D 245.  Do you see that we're on
11   slide 12 now of exhibit 2?
12          A.   Yes.
13          Q.   Did you author the text that is
14   shown on slide 12?
15          A.   This text came from the assessment
16   module on Blackboard.
17          Q.   Turning now to slide 13 which has
18   Bates number D 246.  Do you see slide 13 on
19   your screen?
20          A.   Yes.
21          Q.   Did you author the text shown on
22   slide 13 of exhibit 2?
23          A.   The text at the bottom is mine.
24          Q.   Did you author any of the other
25   text on slide 13?
```

1                    S. Hoiland

2          A.    No.

3          Q.    Turning to slide 14, which has

4    Bates number D 247.  Do you see slide 14?

5          A.    Yes.

6          Q.    Did you author the text that is

7    shown on slide 14 of exhibit 2?

8          A.    No.

9          Q.    Turning now to slide 15 which has

10   Bates number D 248.  Do you see slide 15 on

11   your screen?

12         A.    Yes.

13         Q.    Did you author the text that is

14   shown on slide 15 of exhibit 2?

15         A.    No.

16         Q.    Turning now to slide 16 which has

17   Bates number D 249.  Do you see slide 16 on

18   your screen?

19         A.    Yes.

20         Q.    Did you author the text shown on

21   slide 16 of exhibit 2?

22         A.    No.

23         Q.    Turning now to slide 17 which has

24   Bates number D 250.  Do you see exhibit [sic]

25   17 on your screen?

1                         S. Hoiland

2          A.    Yes.

3          Q.    Did you author any of the text on

4     slide 17 of exhibit 2?

5          A.    No.   This came from the prison

6     policy initiative.

7          Q.    And is that source noted on this

8     slide?

9          A.    There's a link at the bottom.

10         Q.    Turning now to slide 18, which has

11    Bates number D 251.   Do you see slide 18 on

12    your screen?

13         A.    Yes.

14         Q.    Did you author any of the text

15    shown on slide 18 of exhibit 2?

16         A.    Yes.

17         Q.    What text did you author?

18         A.    The blue text.   And I don't know if

19    I made the red red, or if that was like that.

20    But the blue text is mine.

21         Q.    Other than the blue and possibly

22    changing the color of the red text, did you

23    author any of the text shown on slide 18 of

24    exhibit 2?

25         A.    No.

1                        S. Hoiland

2         Q.   Turning to slide 19 which has Bates

3    number D 252.  Do you see slide 19 on your

4    screen?

5         A.   Yes.

6         Q.   Did you author any of the text on

7    slide 19 of exhibit 2?

8         A.    I'm not sure if the red was red or

9    if I made the red red.  Other than that, no.

10             MS. HUDAK:  All right.  It's almost

11         1 o'clock.  I think it's a good time to

12         take a lunch break.  Let's go off the

13         record.

14             (Discussion off the record.)

15             (Lunch recess taken at 12:57 p.m.)

16

17

18

19

20

21

22

23

24

25

Page 98

1                        S. Hoiland

2        A F T E R N O O N    S E S S I O N

3                      (1:47 p.m.)

4                         — — —

5

6              SARAH HOILAND,

7        resumed as a witness, having been

8        previously sworn by the Notary Public,

9        was examined and testified further as

10       follows:

11                   ATTORNEY HUDAK:   Back on the record

12          after a lunch break.

13          Q.   We were talking before about the

14    CCLA PowerPoint.   Do you recall that?

15          A.   Yes.

16          Q.   And I am going to put it back up on

17    the screen.   All right, do you see the

18    document that I have marked before as exhibit

19    2?

20          A.   Yes.

21          Q.   All right.   Great.   We were talking

22    before about -- (audio distortion) Do you

23    recall that?

24          A.   Excuse me?

25          Q.   Do you recall before talking about

1                    S. Hoiland

2   modules on Blackboard?

3        A.   Yes.

4        Q.   And who created the modules that

5   are on Blackboard?

6        A.   I believe Dr. Wilder created most

7   of the content in the modules.

8        Q.   Do you know if anybody else created

9   other content in the modules?

10       A.   Through email communication,

11  Dr. Wilder told me that Dr. Wang had created

12  content for one of the modules.

13       Q.   And which module is that?

14       A.   Can you pull the slide with the

15  modules back up?

16       Q.   Sure.  We're on slide 7 of exhibit

17  2.

18       A.   I believe it was module 3, the

19  brain, cognition and QR.

20       Q.   I am going to turn to slide 8 of

21  exhibit 2.  Do you see that?

22       A.   Yes.

23       Q.   And again this has Bates number

24  D 241.  And is Dr. Wilder's name shown on this

25  slide?

1                    S. Hoiland

2        A.   No.

3        Q.   And you mentioned before that the

4   last line see:  NICE/NICHE Teach QR linked to

5   a webpage, is that correct?

6        A.   Yes.

7        Q.   I'll take exhibit 2 down for a

8   second.

9             And do you see that I've put a new

10  document up on the screen?

11       A.   Yes.

12       Q.   And do you recognize this document?

13       A.   No.  It looks like they're either

14  screenshots or some kind of reproduction of

15  website pages.

16       Q.   Yes.  So I will represent to you

17  that this is a printout of the webpage that

18  the link in exhibit 2, slide 8, are links to.

19  I printed this out over the lunch break.  The

20  formatting shows a little differently in the

21  PDF version printout, so we can look at the

22  actual webpage if you prefer.  But if you

23  recognize this page let me know, this

24  document, which I am going to mark it as

25  exhibit 4.

```
 1                    S. Hoiland

 2                       ---

 3            (Exhibit 4, PDF page of NICHE/NICE

 4         hyperlink was marked for identification)

 5                       ---

 6     A.    Yes.

 7     Q.    So does exhibit 4 look like what

 8  you would expect the link on slide 8 to link

 9  to?

10     A.    I'm not sure.  I mean the link was

11  put in the PowerPoint in 2019 and you pulled

12  the website today, so I can't say what the

13  home page of the website looked like in 2019

14  versus 2022.

15     Q.    Do you know if there are any

16  changes to the home page between 2019 and

17  2002?

18     A.    I don't know.

19     Q.    And in this exhibit 4 that's up on

20  the screen right now, does exhibit 4 include

21  Dr. Wilder's name?  Let me know if you need me

22  to scroll through.

23     A.    Are you asking me if this

24  screenshot of the website today -- I'm not

25  sure what you're asking me.
```

```
 1                    S. Hoiland

 2        Q.   Is Dr. Wilder's name present in

 3   this document?

 4        A.   Her name is on the home page of the

 5   actual website.  It's not on this PDF page

 6   that you're showing me right now.

 7        Q.   All right.  Let me pull up the

 8   actual website.  All right.  So I have taken

 9   exhibit 4 down from the screen and I'm sharing

10   the web browser which shows the link, I

11   clicked on the link on slide 8 of exhibit 2,

12   and this is the webpage that showed up.

13                    ---

14             (Exhibit 5, NICHE hyperlink was

15        marked for identification)

16                    ---

17        A.   But if you scroll down, there's a

18   significant amount of content on the home

19   page.  Right?

20        Q.   I have scrolled from the top to the

21   bottom of this webpage.

22        A.   Okay.

23        Q.   Let me know if, maybe I can zoom

24   out you could see the whole thing at once?

25        A.   So the website has changed.  I do
```

1                    S. Hoiland

2   not do the web content, that's Dr. Wilder's

3   role.  So the page I'm looking at right now

4   does not have her name on it.

5        Q.   All right.  I'll take that down

6   from the screen.  You said the website has

7   changed.  How do you know that it has changed?

8        A.   Well, so the last time I looked at

9   it I noticed there is a reference to the NICE

10  project, but no named PIs, and Dr. Wilder's

11  new project, the DARE project is listed with

12  herself and her co-PIs.

13       Q.   On the webpage that we were just

14  looking at that was shared on the screen?

15       A.   Not on that page.  On the "about

16  NICHE" page.

17       Q.   All right.  So I have put back up

18  on the screen exhibit 2, slide 8.  Do you see

19  that?

20       A.   Yes.

21       Q.   Other than the link shown on the

22  last line of slide 8, does text of the

23  PowerPoint reference the NICHE project?

24       A.   Does it reference the NICHE

25  project?  No.

1                    S. Hoiland

2      Q.   I am going to take that down for a

3  second and bring up a new document.

4           All right.  Do you see that I've

5  brought up a new document on the screen?

6      A.   Yes.

7      Q.   And this is a document produced by

8  plaintiff in this action with Bates number

9  P665.

10                    ---

11           (Exhibit 6, PowerPoint, Bates

12           P000665 was marked for identification)

13                    ---

14      Q.   Do you recognize this document?

15      A.   It appears to be a PowerPoint

16  slide.

17           THE COURT REPORTER:  Counsel, this

18           will be exhibit 5?

19           ATTORNEY HUDAK:  Yes.

20           ATTORNEY LINN:  I thought we were

21           up to 6.

22           ATTORNEY HUDAK:  Are we marking the

23           webpage as exhibit 5?  We could do that.

24           Exhibit 5 is the webpage that was just

25           shown.  And then this will be exhibit 6.

1                    S. Hoiland

2              THE COURT REPORTER:  Thank you.

3              ATTORNEY LINN:  We had marked one

4         webpage as exhibit 4, so ...

5              ATTORNEY ZOLOT:  So the printed PDF

6         was exhibit 4 and the hyperlink she just

7         went through is 5 so now we're at 6?  Is

8         that right?

9              ATTORNEY HUDAK:  Yes.

10        Q.   All right.  In the discussion of

11   the exhibits I think I missed your last

12   answer, Dr. Hoiland.  So do you recognize the

13   exhibit that we have marked as exhibit 6 with

14   Bates number P 665?

15        A.   This appears to be a PowerPoint

16   slide, but I don't know from what or when.

17        Q.   Have you seen the image shown in

18   this document before?

19        A.   The image of the tree and the

20   numbers?  Yes.  Dr. Wilder's used that image

21   before.

22        Q.   Have you seen any of the text shown

23   on the document before?

24        A.   I believe this slide might have

25   been included in one of the presentations we

1                    S. Hoiland

2  did prior to the start of NICE.

3        Q.   Have you seen the text on this page

4  anywhere else?

5        A.   I don't believe so.

6        Q.   Prior to beginning the NICE project

7  did you review materials given to you by

8  Dr. Wilder from the NICHE project?

9        A.   I reviewed the modules, as I stated

10 earlier I was given access to the NICHE course

11 in Blackboard prior to the NICE project.

12       Q.   Did the NICHE course in Blackboard

13 have videos included in it?

14       A.   I believe so.

15       Q.   Did you watch those videos?

16       A.   I don't recall.

17       Q.   Did those videos include a

18 copyright notice?

19       A.   I don't recall.

20       Q.   The document shown on the screen --

21            (Audio distortion.)

22            ATTORNEY LINN:  You cut out.  Was

23       there --

24       Q.   The question was, does the document

25 shown on the screen right now, exhibit 6

1                    S. Hoiland

2    include a copyright notice?

3         A.   Yes.

4              ATTORNEY ZOLOT:   Object; calls for

5         a legal conclusion.

6         Q.   What does that copyright notice

7    say?

8         A.   Are you asking me to read the

9    slide?

10        Q.   Yes.

11        A.   Copyright 2013.  This presentation

12   is owned by CUNY NICHE.  Unauthorized use of

13   the material in this presentation or any

14   summertime course material from NICHE is

15   strictly prohibited.  Please note that all

16   sources referenced in this presentation are

17   indicated on our NICHE website

18   (www.teachqr.org.)  Any questions regarding

19   the authorization for use of materials from

20   NICHE should be directed to Esther Isabelle

21   Wilder."

22        Q.   In watching the videos included in

23   the NICHE materials did you review this

24   copyright notice anywhere in those videos?

25             ATTORNEY ZOLOT:   Object to form.

1                     S. Hoiland

2        A.   I said I didn't recall watching

3   videos about copyright.

4        Q.   Did you ever ask Dr. Wilder for

5   authorization to use NICHE materials?

6             ATTORNEY ZOLOT:   Object to form.

7        A.   So if by NICHE materials you mean

8   NICE materials, um, I did not.

9        Q.   I am going to take exhibit 6 off

10   the screen.  And do you see that I've shared a

11   new document on the screen?

12        A.   Yes.

13        Q.   This document was produced by

14   defendant in this action.

15        A.   Yes.

16        Q.   It has Bates numbers D 1 through

17   D 3.

18             ATTORNEY HUDAK:   I'll mark this as

19             exhibit 7.

20                      ---

21             (Exhibit 7, Presentation Proposal -

22             the Community College Conference on

23             Learning Assessment, Bates D0001 through

24             03 was marked for identification)

25                      ---

1                       S. Hoiland

2         Q.    Do you recognize this document?

3         A.    Yes.

4         Q.    And what do you recognize this

5  document to be?

6         A.    So this was the electronic proposal

7  I submitted to the CCLA conference.

8         Q.    I'll turn to page 2 of the document

9  which has Bates number D 2.  Do you see page 2

10 on your screen?

11        A.    Yes.

12        Q.    All right.  And do you see in the

13 third field down it says "I understand that my

14 presentation materials will be available on a

15 private website for attendees to download"?

16        A.    Yes.

17        Q.    And was your answer to that

18 question yes --

19        A.    Yes.

20        Q.    -- in your -- so the answer to that

21 question was yes in your application for the

22 CCLA conference?

23        A.    Yes.

24        Q.    So the CCLA PowerPoint we were

25 discussing earlier was available on a private

1                    S. Hoiland

2   website for attendees to download, is that

3   correct?

4        A.   That's my understanding.  I never

5   went to that website or saw, or reviewed or

6   downloaded any of the presentations.

7        Q.   And that website was available to

8   all attendees of the CCLA conference

9   regardless of which live presentations they

10  attended, is that correct?

11            ATTORNEY ZOLOT:  Object to form.

12       A.   I didn't have any personal

13  knowledge of that.  Like I said, I never used

14  the website or logged into it.  When I gave my

15  presentation it was waiting for me when I

16  walked into the room.

17            THE COURT REPORTER:  Excuse me.  I

18       think I lost you.  Am I the only one?

19            ATTORNEY ZOLOT:  I heard everyone

20       fine, Frank.

21            THE COURT REPORTER:  I lost the

22       audio.  "When I gave my presentation..."

23       A.   -- it was already pulled up for me

24  on the screen.

25            THE COURT REPORTER:  Thank you.

```
 1                    S. Hoiland
 2          ATTORNEY HUDAK:  All right.  So
 3     sorry.  Just to confirm.  Could you read
 4     back the last question and answer you
 5     have, so I know where you might have cut
 6     off?
 7          (Requested portion of the record
 8     read back.)
 9          ATTORNEY HUDAK:   Thank you.
10     Q.   I am going to take this document
11  down.  I am going to put up a new document.
12          (Pause.)
13     Q.   Do you see that I have showed a new
14  document on the screen?
15     A.   Yes.
16     Q.   This document was produced by
17  defendant in this case and has Bates number
18  D 4.  I'll mark this as exhibit 8.
19                    ---
20          (Exhibit 8, Intellectual property
21     license and photo release, Bates D0004
22     was marked for identification)
23                    ---
24     Q.   Do you recognize this document?
25     A.   Yes.
```

1                    S. Hoiland

2        Q.    And what do you recognize this to

3    be?

4        A.    This is the intellectual property

5    license and photo release form for the CCLA

6    conference.

7        Q.    And is your signature shown on the

8    document?

9        A.    Yes.

10       Q.    And did you submit this signed

11   document to the organizers of the CCLA

12   conference?

13       A.    Yes.

14       Q.    Do you see that I've highlighted

15   some text on the screen?

16       A.    Yes.

17       Q.    And it says:  "I am responsible for

18   obtaining the written consent of the owner of

19   copyrighted material (if I am not the owner);

20   and am responsible for the cost and fees of

21   such consents.  I warrant that the materials

22   for which I am providing a license do not

23   violate the copyright, trade secret, trademark

24   or other intellectual or proprietary rights of

25   any third party or any applicable law,

Page 113

```
 1                    S. Hoiland

 2  including export control law, obscenity laws,

 3  or laws regarding consumer privacy, and agree

 4  to indemnify and defend Valencia against and

 5  hold it harmless from any loss and/or expense

 6  of defense of the forgoing warranties except

 7  for material for which Valencia is responsible

 8  for receiving permission."

 9          Did I read that correctly?

10      A.   Yes.

11      Q.   Did you obtain the written consent

12  of any owner of copyrighted material prior to

13  making the CCLA -- prior to submitting your

14  CCLA PowerPoint to the organizers of the CCLA

15  conference?

16          ATTORNEY ZOLOT:  Objection; calls

17          for a legal conclusion as to "copyright

18          owner."

19      A.   So I had email back and forth about

20  this conference with Dr. Wilder and as a PI of

21  a project that relied upon these materials as

22  the basis for our funding and our

23  dissemination, I felt then and I still feel

24  today that I did not have to ask for

25  permission.
```

1                     S. Hoiland

2        Q.   So you did not obtain her written

3   consent to use any NICHE materials in the CCLA

4   PowerPoint, is that correct?

5        A.   I did not get written consent to

6   use NICE materials.

7        Q.   And you did not get written consent

8   to use NICHE materials?

9        A.   Well, I wasn't on the NICHE

10  project, and I wasn't talking about the NICHE

11  project.  I was talking about the NICE

12  project.

13       Q.   Did you understand the modules that

14  are on Blackboard to have come from the NICHE

15  project?

16            ATTORNEY ZOLOT:  Object to form.

17       A.   I understand that the modules were

18  similar from NICHE to NICE.

19       Q.   All right.  I am going to take this

20  exhibit 8 off the screen.  And I have put back

21  up exhibit 2.  Do you see that?

22       A.   Yes.

23       Q.   All right.  So earlier I believe

24  you testified that you gave -- you discussed

25  Dr. Wilder while making your oral presentation

1                    S. Hoiland

2   at the CCLA conference, is that your position?

3        A.   I did more than discuss Dr. Wilder.

4   Dr. Wilder's name came up many, many, many

5   times during the presentation.  In fact, when

6   I left the presentation I thought that if she

7   was there, she would be embarrassed at how

8   much I spoke about her.  I pointed her out in

9   the photos, if you want to scroll to those.  I

10  explained, when I clicked on the NICE/NICHE

11  Teach QR website that there were two projects,

12  the first being NICHE, the second being NICE.

13            There was significant time and

14  attention given to Dr. Wilder throughout my

15  oral part of the presentation.

16       Q.   Did you identify Dr. Wilder as the

17  author of any of the text shown in the CCLA

18  PowerPoint?

19       A.   I recall saying that the assessment

20  unit was part of a larger project, which

21  included NICHE.

22       Q.   And did you identify Dr. Wilder as

23  the author of the NICHE materials?

24       A.   I don't recall if I used the term

25  "author."

1                        S. Hoiland

2              That's a little bit out of the

3    particular context.  I likely said something

4    that she created the materials with a team of

5    people that were part of a project called

6    NICHE.

7         Q.   So you didn't give Dr. Wilder

8    credit for authoring the text shown in your

9    CCLA PowerPoint, is that correct?

10             ATTORNEY ZOLOT:  Objection;

11        mischaracterizes the testimony.

12        A.   No. That's not what I said.

13        Q.   Then could you please explain what

14   you mean?

15        A.   Sure.  I gave Dr. Wilder all kinds

16   of credit, so much credit that when the

17   presentation was over, like I said, I thought

18   that she would be embarrassed if she were

19   there, because I referred to her so many

20   times.  There was no one in that room that had

21   a doubt that Dr. Wilder, as indicated in the

22   conference interactive which was available to

23   everyone and public, that I was one of two

24   PIs, and that the NICE project came from the

25   NICHE project.

1                    S. Hoiland

2         Q.    Is Dr. Wilder the author of the

3    NICHE materials?

4         A.    I think you've asked this before,

5    and I said to my knowledge she authored most

6    of the materials.  At some later date

7    Dr. Wilder informed me that Dr. Wang had in

8    fact created parts of one of the modules.

9         Q.    So we're looking at slide 8 of

10   exhibit 2 right now.  Is Dr. Wilder the author

11   of the text shown on slide 8?

12        A.    Again, I would assume so, but I was

13   not part of the NICHE project.  So I don't

14   know who wrote what.  I think it's safe to say

15   that Dr. Wilder wrote most of the materials in

16   NICHE.

17        Q.    Turning to slide 7.  Is Dr. Wilder

18   the author of the text shown on slide 7?

19        A.    I think it's the same answer.

20   Again, I was not around at the creation of

21   these materials, so some of what I learned

22   about how they were created occurred after I

23   gave this presentation.  My understanding was

24   that these materials were in the NICE project,

25   and that my job as a NICE PI was to talk about

1                        S. Hoiland

2    the NICE project, which included these

3    materials.  That's what we were funded to do.

4         Q.   And turning to slide 9 of exhibit

5    2.  Is Dr. Wilder the author of the text shown

6    on slide 9?

7         A.   To the extent that I know, yes.

8         Q.   And turning to slide 10.  Is

9    Dr. Wilder the author of the text shown on

10   slide 10?

11        A.   The text that's not in purple, to

12   the extent that I know, yes.

13        Q.   And turning to slide 11.  Is

14   Dr. Wilder the author of the text shown on

15   slide 11?

16        A.   To the extent that I know, yes.

17        Q.   And turning to slide 12.  Is

18   Dr. Wilder the author of the text shown on

19   slide 12?

20        A.   To the extent that I know, yes.

21        Q.   Turning to slide 13.  Is Dr. Wilder

22   the author of the text shown on slide 13?

23        A.   With the exception of the green

24   text at the bottom, to the extent that I know,

25   yes.

1                    S. Hoiland

2        Q.    About how many people attended the

3   oral presentation you gave at the CCLA

4   conference?

5        A.    So I can't say for certain.    There

6   was no sign-in sheet.    There was no record of

7   who was in the room.    It was small, it was a

8   small room with several slat tables and I had

9   guesstimated there was somewhere around 15,

10  maybe 20 at the most.    12 at the least.    I

11  mean it was under 20 people.

12       Q.    Do you know any of the individuals

13  who attended the oral presentation you gave at

14  the CCLA conference?

15       A.    No.

16       Q.    Were there people who registered

17  for the CCLA conference that did not attend

18  your oral presentation?

19            ATTORNEY ZOLOT:    Objection; calls

20       for speculation.

21       A.    I mean I did not know how many

22  people registered for the conference until

23  recently, and I can tell you there were not

24  200 people in the room where I presented.    So

25  I can infer that yes, not every conference

```
 1                     S. Hoiland
 2   attendee was in my presentation.
 3         Q.   So it's your understanding that
 4   about 200 people registered for the CCLA
 5   conference?
 6         A.   As I said, the only way I knew
 7   about this was because of discovery.  So I did
 8   not have any count.  That's not something
 9   that's provided to conference attendees.
10         Q.   Where did you learn this
11   information in discovery?
12         A.   I believe there was a document from
13   Rachel Meister, who was the CCLA organizer.
14         Q.   Did you speak with Rachel Meister
15   about how many people were in attendance at
16   the CCLA conference?
17         A.   No.
18         Q.   Have you spoken with Rachel Meister
19   about this litigation?
20         A.   I believe there was a phone call
21   when I was trying to get information about the
22   specifics about the presentation.  When I had
23   filled out the document there was a long
24   period of time between checking the box and
25   the presentation and when all this started.
```

1                    S. Hoiland

2        Q.   Were there any emails with Rachel

3   Meister about this litigation?

4        A.   I think so.  If there were I would

5   have produced them.

6        Q.   I am going to take this exhibit 2

7   off of the screen.  Do you see that I have put

8   up a new document?

9        A.   Yes.

10       Q.   This is a document produced by

11  defendant in the litigation, which has Bates

12  numbers D 301 through D 304.  I'll mark this

13  as exhibit 9.

14                    ---

15            (Exhibit 9, email chain, Bates

16        D0301 through D0304 was marked for

17        identification)

18                    ---

19       Q.   Do you recognize this document?

20       A.   Yes.

21       Q.   What do you recognize this document

22  to be?

23       A.   This is an email from myself to

24  Dr. Katherine Rowell.

25       Q.   And who is Dr. Katherine Rowell?

1                        S. Hoiland

2          A.    She was the external evaluator for

3     the NICE project.

4          Q.    What is this email chain

5     discussing?

6          A.    Can you scroll down?

7          Q.    Sure.   And there's two more pages

8     so let me know when you need to scroll.

9          A.    Yeah, you can scroll again.

10             So I was seeking guidance from a

11    trusted colleague who knew both Dr. Wilder and

12    myself, and was actually closer to Dr. Wilder

13    than me, their relationship had gone back

14    farther, and I was asking her for guidance on

15    what to do about some of the allegations that

16    Dr. Wilder was bringing against me through

17    email.

18         Q.    And what allegations are you

19    referring to?

20         A.    Well, you can pull up the emails

21    from August of 2019 between Dr. Wilder and

22    myself, but there were many things being put

23    out there that were very damning to my

24    professional reputation, and so I wanted to

25    seek mediation and find someone that could

```
 1                    S. Hoiland
 2   help us to resolve the dispute.
 3        Q.   I'm on page 3 of the document.
 4        A.   Mm-hmm.
 5        Q.   Which has Bates number D 303.  And
 6   I am looking at the last email on that page
 7   which is an email dated October 8, 2019 from
 8   you to Katherine Rowell.
 9        A.   Mm-hmm.
10        Q.   And I'm highlighting some text here
11   which says:  "Yes, I absolutely agree that
12   Esther should have been a co-presenter and
13   that I should have included parenthetical
14   citations for Crystal's NICE assessment and
15   attributed the BB components to Esther's work
16   with NICE [sic] and that I" -- going on to the
17   next page --
18             ATTORNEY LINN:  I think you
19        misspoke.  It says "NICHE."  Not NICE.
20             ATTORNEY HUDAK:  Oh, I'm sorry.
21        Q.   "Esther's work with NICHE and that
22   I" -- going to the next page -- "acknowledged
23   that in our various communications ..."
24             Did I read that correctly?
25        A.   Do you want to finish the sentence?
```

1                         S. Hoiland

2        Q.    Did I read the first part of the

3   sentence correctly?

4        A.    Yeah.  It just seems like finishing

5   the sentence is keeping it in context.

6        Q.    Sure.  Let's talk about the first

7   part of the sentence first.  So do you agree

8   that Esther should have been a co-presenter on

9   the CCLA PowerPoint?

10       A.    No.

11       Q.    Why did you say that Esther should

12  have been a co-presenter to Katherine Rowell?

13       A.    So at this point in time, this is

14  about eight weeks into a barrage of emails and

15  various things that were extremely concerning

16  to me.  And so part of Dr. Wilder's initial

17  demands were to add her name, which I was

18  happy to do to close this matter and move on.

19  And because that was so important to

20  Dr. Wilder, I didn't have any issue with

21  adding her name.

22             But the way the conference was

23  structured, the reason that it's not referred

24  to as authorship in any of the conference

25  materials is because they were trying to line

1                    S. Hoiland

2  up presenters.  So there were photos of people

3  who were there so that you could see who the

4  person was that was presenting the material.

5       Q.   So when you say here I absolutely

6  agree that Esther should have been a

7  co-presenter, that was untrue?

8       A.   At the time my knowledge of

9  copyright, authorship, presenter is different

10 than it is now.  So when I submitted it, I did

11 not believe that I should list Esther as a

12 presenter.  Today I do not believe I should

13 have listed Esther as a presenter, because she

14 did not present.

15           During this particular period of

16 time I was under intense pressure to make this

17 go away from Dr. Wilder, and from everyone

18 around me.  And so if it made Dr. Wilder feel

19 better to have her name as a co-presenter, I

20 was happy to do that and to say hey, I should

21 have done that in the first place.

22      Q.   But that's not what's stated in

23 this email, is that correct?

24      A.   That is not what is stated in this

25 email.

1                    S. Hoiland

2        Q.    The email also says that you agree

3   that you should have included parenthetical

4   citations for Crystal's NICE assessment?

5        A.    Yes, I don't believe Crystal should

6   have been listed as a presenter either.

7        Q.    Do you believe that you should have

8   included parenthetical citations for Crystal's

9   NICE assessment?

10       A.    Yes.

11       Q.    And why is that?

12       A.    Because she was a participant in

13  our program and signed an IRB agreement.

14       Q.    And what's an IRB agreement?

15       A.    So I spoke about that earlier, that

16  outlined how we deal with human subjects in a

17  research project.  So Crystal's and Esther's

18  role were very different.  Crystal should have

19  had a parenthetical citation, because those

20  were materials created for the NICE project,

21  and she indicated she wanted her name

22  attached.  So although I repeated her name and

23  also pointed out the photo of her and Esther

24  and myself during the presentation and

25  explained that that's who Dr. Rodriguez was

```
 1                    S. Hoiland
 2   and where she worked and what she taught, and
 3   that these were materials that she created for
 4   the NICE project, it was not indicated on the
 5   slide.  And it should have been.
 6        Q.   And this email also states "but you
 7   should have attributed the BB components to
 8   Esther's work with NICHE."
 9             Do you agree with that statement?
10        A.   So when I gave the presentation I
11   did not, because I was talking about the NICE
12   project and giving full attribution in my oral
13   projection.  Because the slides were, right?
14   At this point months later.  So I gave the
15   presentation in February.  This is October.
16   After Dr. Wilder's side by side breakdown it
17   would have been an additional safeguard for me
18   to include her name on the PowerPoint
19   presentation.  Because what I said orally does
20   not appear on the PowerPoint presentation.
21        Q.   When you refer to BB components,
22   you mean Blackboard components?
23        A.   Yes.
24        Q.   And these are the modules from
25   Blackboard that we were discussing earlier?
```

1                        S. Hoiland

2          A.    Yes.

3          Q.    I am going to take that exhibit

4     down, which was exhibit 9.  And do you see

5     that I have put up a new document on the

6     screen?

7          A.    Yes.

8                ATTORNEY HUDAK:  This document was

9          produced by defendant in this case and

10         has the Bates numbers D 41 to D 42.  And

11         I'll mark this as exhibit 10.

12                        ---

13               (Exhibit 10, email, Bates D0041

14         through 42 was marked for

15         identification)

16                        ---

17         Q.    Do you recognize this document?

18         A.    Yes.

19         Q.    What do you recognize it to be?

20         A.    So this is an email that I sent to

21    the Committee on Professional Ethics, COPE,

22    through the American Sociological Association.

23         Q.    What is the email generally

24    discussing?

25         A.    So it's largely relating to me

1                    S. Hoiland

2    asking for assistance from COPE to mediate

3    this dispute between Dr. Wilder and myself.

4         Q.   I am going to be looking at the

5    second email starting at the bottom of page

6    D 41 and extending on to the next page.  So

7    this is an email dated September 6, 2019.  And

8    starting on page D 42, I have actually

9    highlighted some text that says "The issue

10   centers around a presentation I gave last

11   February in Orlando at a community college

12   conference on our collaborative project.  I

13   made two mistakes by 1, not including her as a

14   co-presenter in absentia and 2, not including

15   a references page in my slideshow and

16   citations on each slide."

17             Did I read that correctly?

18        A.   Yes.

19        Q.   So here are you discussing the CCLA

20   PowerPoint oral presentation at the CCLA

21   conference?

22        A.   Yes.

23        Q.   And when you say "her" were you

24   referring to Dr. Wilder?

25        A.   When it says I invited her to

1                    S. Hoiland

2   co-present?

3        Q.   Where it says "I made two mistakes

4   by not including her as a co-presentation in

5   absentia"?

6        A.   Yes.

7        Q.   Do you agree that you made a

8   mistake by not including Dr. Wilder as a

9   co-presenter on your CCLA PowerPoint?

10       A.   No.

11       Q.   And why not?

12       A.   Well, for the same reasons I

13  mentioned before.  So I was a lead principal

14  investigator of the NICE project.  One of my

15  responsibilities and something that I had

16  budgeted funds to do was to present about the

17  NICE project at community college conferences.

18  And that's what I did.  And I gave all kinds

19  of credit and attribution to Dr. Wilder.

20  However, she was not a presenter at that

21  conference.

22            As I said, there was a lot of

23  heated communication, several kind of

24  immediate things that made me very concerned

25  that this issue would turn into something

```
1                    S. Hoiland
2   bigger, and so I was very willing to add her
3   name to the presentation in order to try to
4   make her feel better about what she perceived
5   as being harm to her.
6        Q.   So is your statement in this email
7   that "I made two mistakes by 1, not including
8   her as a co-presenter in absentia," untrue?
9        A.   When I wrote this email I was
10  actually looking for ASA to provide
11  professional guidance, which is why I emailed
12  them.  So Dr. Wilder was very convincing that
13  what I had done was wrong.  And I didn't
14  agree, but I was willing to agree in order to
15  try to resolve the issue.
16            So for me, as I said, a line on my
17  CV meant absolutely nothing.  And whether I
18  presented alone or whether I presented with
19  two other people, it made no difference.
20            My concern was at -- depending on
21  what the date again is -- at some point I was
22  cut out of the Blackboard shell, which then
23  inhibited my ability to file and finish the
24  annual report, which is a requirement for me
25  as a PI.
```

1                    S. Hoiland

2              Dr. Wilder was not willing to pay

3   me summer salary for the work that I had done

4   over the summer.  I had retracted a proposal

5   for a conference that I had already been

6   accepted to just sort of out of fear that

7   Dr. Wilder would perceive it as me

8   misconstruing her work.  And so I was doing my

9   best to end both the project and the

10  relationship with Dr. Wilder.  And if it meant

11  adding her name to the presentation, I was

12  okay with that.

13         Q.   So to repeat my question.  Your

14  statement that "I made two mistakes by 1, not

15  including her as a co-presenter in absentia,"

16  you believe that statement to be untrue, is

17  that correct?

18         A.   When I wrote this email I was

19  willing to maybe -- said maybe this was a

20  mistake.  Right?  I didn't think I made a

21  mistake, but I was willing to admit that I

22  made a mistake.

23         Q.   You said I -- so the second mistake

24  listed here is "not including a references

25  page in my slideshow and citations on each

1                    S. Hoiland

2     slide."

3              Do you agree that was a mistake?

4         A.    No. So we had an entire proceeding

5     about that particular issue, and verbal

6     attribution was viewed as being sufficient to

7     provide acknowledgment and recognition.

8     Again, at this time I was being pressured into

9     moving in a direction that I did not feel

10    comfortable with, but that I was willing to go

11    if it appeased Dr. Wilder.

12        Q.    So you made this representation

13    that you made a mistake by "not including a

14    references page in my slideshow and citations

15    on each slide," even though you believed that

16    to be untrue?

17        A.    So I was writing to COPE in order

18    to get professional guidance and clarity.  So

19    what I'm writing here is what Dr. Wilder told

20    me this is what you did wrong.  So I'm writing

21    to them saying hey, maybe I made two mistakes,

22    right?  Here's what they are.  Can you help us

23    resolve this matter.

24        Q.    So you represented that these were

25    mistakes, is that correct?

1                        S. Hoiland

2          A.    Yes.

3          Q.    And then moving to the third

4    paragraph on this page, D 42.  I have

5    highlighted some text.  It says:  I understand

6    failing to formally reference collaborators'

7    work is a serious violation."

8                Did I read that correctly?

9          A.    The first half of the sentence,

10   yes.

11         Q.    Do you believe that failing to

12   formally reference collaborators' work is a

13   serious violation?

14         A.    I think that at the time that I

15   wrote this I was -- I felt very confident that

16   the reference that I provided, the verbal

17   attribution from beginning to end of the

18   presentation was sufficient.  However, I had

19   gotten such strongly worded communication from

20   Dr. Wilder to signal that that was not

21   acceptable, that I was saying that this --

22   this is serious.  I understand that these

23   allegations that she's bringing against me are

24   very serious.  And I want to do whatever I can

25   to work with her and COPE through confidential

1                    S. Hoiland

2   mediation to make this okay.

3        Q.   So then that doesn't answer the

4   question, which was do you believe that

5   failing to formally reference a collaborators'

6   work is a serious violation?

7        A.   Yes, I do believe that's true.  But

8   as I said, I did reference her work.  So if

9   her perception was that I did not, that's what

10  I'm saying in the email, is that I realize

11  this is serious.  If my collaborator is not

12  believing that I provided sufficient

13  attribution, this is very serious.

14       Q.   And the reference made to

15  Dr. Wilder at the CCLA conference was solely

16  oral, is that correct?

17       A.   Well, no, the abstract had that I'm

18  one of two PIs.  So on paper that everyone

19  saw, it was clear that I was not the sole PI

20  of this faculty development program.  And as I

21  said, I also believe that when I went to the

22  project website, I went to the about NICHE

23  page, which has Dr. Wilder's name on it.  And

24  as I also mentioned, I pointed out her photo

25  on several occasions and, yes, verbally

1                    S. Hoiland

2  mentioned her name many, many, many times.

3       Q.   But you did not credit her as the

4  author of the text shown in the CCLA

5  PowerPoint, correct?

6            ATTORNEY ZOLOT:  Objection to form.

7       A.   I gave her credit for the NICHE

8  project, which is where those materials came

9  from.  So if you want to say that that's

10 authorship credit, then yes.

11      Q.   Did you say that Dr. Wilder

12 authored the NICHE materials?

13           ATTORNEY ZOLOT:  Objection; asked

14      and answered.

15      A.   So to say that is ridiculous.

16 Right?  That would -- I mean that's not

17 something that I would have said.  Because

18 there was a much larger story that I was

19 telling.  The slides were not the focus of the

20 presentation.

21      Q.   Were you displaying the slides

22 while you were making the presentation?

23      A.   For some of the presentation.  But

24 a lot of it was question and answer at the

25 end.

1                    S. Hoiland

2        Q.   How much of the presentation was

3    question and answer?

4        A.   It could have been up to a half an

5    hour.

6        Q.   And how long was the total

7    presentation?

8        A.   I don't recall.  They're typically

9    between an hour and, I would say maybe

10   somewhere around an hour and fifteen.

11       Q.   And how do you know that the

12   question and answer section lasted about a

13   half an hour?

14       A.   Well, I recall from the

15   presentation that the faculty were not

16   interested in the particularities of the NICE

17   program.  They had different kinds of

18   questions.  So the audience was predominantly

19   community college faculty and their questions

20   were more related to things like how did you

21   recruit faculty?  How much did you pay them?

22   How did you get faculty to complete work when

23   they're teaching four or five classes.  Like

24   what are some best practices related to, you

25   know, working with a four year institution.

1                          S. Hoiland

2              They were almost wholly unrelated

3    to the slides themselves.

4         Q.   Were these questions asked

5    throughout the oral presentation or only at

6    the end?

7         A.   I believe they were mostly at the

8    end.  As I said, I didn't spend very much time

9    on the slides.  I actually paused longer on

10   the photos.  Participants were interested in

11   the students, kind of in the people part of

12   the project.

13        Q.   I would like to take down this

14   exhibit, what we have marked as exhibit 10.

15              And do you see that I've put a new

16   document on the screen?

17        A.   Yes.

18              ATTORNEY HUDAK:  This is a document

19         produced by defendant in this action

20         with Bates numbers D 9 through D 12.

21         I'll mark this as exhibit 11.

22                     ---

23              (Exhibit 11, email, Bates D0009

24         through 12 was marked for

25         identification)

1                       S. Hoiland

2                          ---

3        Q.    Do you recognize this document?

4        A.    Yes.

5        Q.    What do you recognize this document

6   to be?

7        A.    This is one of several emails

8   between myself and Crystal Rodriguez.

9        Q.    And who is Crystal Rodriguez?

10       A.    Crystal Rodriguez was a participant

11  in the NICE program, a professor -- an

12  assistant professor at Bronx Community College

13  of Criminal Justice.

14       Q.    This is an email dated March 5,

15  2020.  In the second paragraph it says:

16  "First and foremost, I should have emailed you

17  to ask your permission to showcase your

18  assessment materials for the presentation."

19            Did I read that correctly?

20       A.    Yes.

21       Q.    So do you believe that you should

22  have asked Crystal for permission to showcase

23  her assessment materials for the presentation?

24       A.    Yes.

25       Q.    And the presentation you're

```
 1                    S. Hoiland
 2   referring to is the CCLA PowerPoint?
 3        A.   Yes.
 4        Q.   And is that because she signed the
 5   IRB agreement stating that she wished to have
 6   her material attributed to her if they were
 7   used for the NICE project?
 8        A.   Yes.
 9        Q.   Is there any other reason?
10        A.   Well, that's the primary reason.
11   I'm not sure I understand what you're asking.
12   Are there other reasons?
13        Q.   Yes.  Are there other reasons?
14        A.   Well, so I wanted to show a
15   community college faculty's member's work that
16   was not my own, and Crystal's work, neither
17   Crystal's work nor any other community college
18   faculty's materials were on the public
19   website, the Teach QR website.  So I did, I
20   felt badly that I should have asked her in
21   advance before I used her materials as an
22   example of what community college faculty are
23   doing.  So outside the IRB I felt badly.  I
24   should have asked her.
25        Q.   Because it was her work product?
```

```
 1                     S. Hoiland

 2          A.    Um, that's part of it.  But

 3     there --

 4          Q.    What's the other part?

 5          A.    Well, there would be no assumption

 6     that out of all our attendees I would have

 7     selected hers.  So had I selected someone that

 8     I'm friends with, which was the case with many

 9     of the NICE participants, you know, it could

10     have been a quick text or they would have been

11     more than happy for me to use their work and

12     to show what they were doing.

13               So my relationship with Crystal was

14     not that.  And so I felt badly that I did not

15     send her a formal email in advance asking for

16     permission as per our IRB.

17          Q.    And do you see that the email shown

18     on this first page, D 9, is partially cut off

19     on the bottom?

20          A.    Yes.

21          Q.    And turning to the next page, do

22     you see that the email is partially cut off on

23     the top?

24          A.    I do.

25          Q.    Is this page, D 10, a continuation
```

1                       S. Hoiland

2    of the email chain shown on prior page, D 9?

3         A.   Yes.

4         Q.   Was there anything cut out in

5    between that email shown on D 9 and the email

6    shown on D 10?

7         A.   Yes, there was an email from

8    Dr. Rodriguez to myself after we had agreed to

9    meet, it was fairly short saying -- I don't

10   recall the exact language and I'm not sure why

11   it's not here, but there was an email from her

12   before I sent the last email.

13        Q.   And why was it cut out of this

14   document?

15        A.   I didn't know it was not there

16   until I saw it yesterday.

17        Q.   How did you prepare this document

18   when producing it?

19        A.   How did I prepare my document

20   production?

21        Q.   This particular document.  Was it

22   printed out as an email chain and then scanned

23   in?  Was there some other methodology that you

24   used to create this document?

25        A.   I would have to check.  Several of

1                       S. Hoiland

2    these documents were submitted to prior

3    proceedings, so there were two other kind of

4    efforts in which we produced a lot of emails.

5    And so I don't know if it was from one of

6    those and I included it in this.  I don't know

7    why that email is not there.

8         Q.   But would you agree that the emails

9    shown on D 9 is a continuation of this chain

10   of email that's shown on D 10?

11        A.   Yes.

12        Q.   And thus if you printed out the

13   email and did not alter it, there would be

14   text shown in between that's shown on D 9 and

15   D 10?

16             ATTORNEY ZOLOT:  Objection;

17        mischaracterizes the document.

18        A.   Can you scroll back up?  Do they

19   have all have the same subject title?

20        Q.   I am on page D 9.  Let me know when

21   you need to see D 10.

22        A.   I don't know why that email -- I

23   mean if that email were there I think it would

24   complete the story.  So I wish that email were

25   there.  I'm not sure why it didn't get

1                    S. Hoiland

2    included or where it is.

3         Q.   So you said you became aware of

4    that missing email yesterday, is that correct?

5         A.   Yes.

6         Q.   Are you aware of any other

7    documents missing from defendant's document

8    production?

9         A.   I am not aware of -- this is an

10   accidental omission.  I did not intentionally

11   cut out part of an email.  So I'm not aware of

12   any others.

13        Q.   Did you intentionally cut out

14   portions of any other email?

15        A.   No.

16             ATTORNEY ZOLOT:   Objection;

17        mischaracterizes the testimony.

18        Q.   I am going to take this exhibit 11

19   down.  I have put up a new document on the

20   screen.  Do you see that?

21        A.   Yes.

22             ATTORNEY HUDAK:   This is a document

23        produced by plaintiffs in this

24        litigation with Bates numbers P 553

25        through P 558.  And I will mark this as

1                    S. Hoiland

2          exhibit 12.

3                    ---

4          (Exhibit 12, email, Bates P0000553

5          through 558 was marked for

6          identification)

7                    ---

8     Q.    Do you recognize this document?

9     A.    Yes, it looks like the same email

10  you just showed.

11    Q.    I'm scrolling on to the next page.

12  You were looking at the first page, which is

13  P 553.  Now I have scrolled down to the next

14  page which is P 554.  Does this still appear

15  to be the same email?

16    A.    So this is the missing email, yes.

17    Q.    And so the missing email is an

18  email from Crystal Rodriguez to you dated

19  February 24, 2020, is that correct?

20    A.    Yes.

21    Q.    And in the second paragraph of the

22  email Crystal says:  "You never asked and I

23  never gave you permission to use my work in

24  your presentation."

25            Did I read that correctly?

1                       S. Hoiland

2          A.    Yes.

3          Q.    And so is Crystal saying that she

4     never gave you permission to use her work in

5     your CCLA PowerPoint?

6          A.    Yes.

7          Q.    And then following, continuing on

8     in the sentence, it says "even when using my

9     work you did not give me credit, written and

10    verbal credit are always required when using

11    other's work."

12               Did I read that correctly?

13         A.    You read that correctly.

14         Q.    So would you interpret this

15    statement as Crystal saying that she was upset

16    that you did not give her credit in your CCLA

17    PowerPoint?

18               ATTORNEY ZOLOT:   Objection; calls

19         for speculation.

20         A.    I mean in that sentence I don't

21    read any disappointment in it.  She's stating

22    what she sees as a fact.  So she's saying even

23    when using my work you did not give me credit.

24    Which is not true.

25         Q.    The next sentence says:  "I am

1                    S. Hoiland

2   disappointed in your lack of professionalism

3   and dishonesty."

4           Did I read that correctly?

5       A.   Yes.

6       Q.   So from that statement does Crystal

7   seem to be expressing disappointment with your

8   lack of credit in the CCLA PowerPoint?

9           ATTORNEY ZOLOT:  Objection; calls

10          for speculation.

11      A.   Her tone in this email was

12  dramatically different from the one that we

13  were just looking at, saying yes, I'll meet

14  you for coffee.  I'll see you soon.  So --

15      Q.   That does not answer the question.

16      A.   What is your question?

17      Q.   Does the statement "I'm

18  disappointed in your lack of professionalism

19  and dishonesty" indicate that Crystal is

20  disappointed that you did not give her credit

21  in the CCLA PowerPoint?

22          ATTORNEY ZOLOT:  Objection; calls

23          for speculation.

24      A.   I think it's hard to tell whether

25  that sentence is about CCLA or about

```
 1                      S. Hoiland
 2  conversations that she had afterward.  I read
 3  it as being conversations that she had with
 4  Dr. Wilder.
 5       Q.   Is the prior sentence before "I am
 6  disappointed in your lack of professionalism
 7  and dishonesty" discussing your CCLA
 8  PowerPoint?
 9       A.   Yes.
10       Q.   And so you don't believe that the
11  sentence "I am disappointed in your lack of
12  professionalism and dishonesty" refers to the
13  CCLA PowerPoint?
14            ATTORNEY ZOLOT:  Objection; calls
15       for speculation.  You've asked this
16       three times.  You're asking --
17            ATTORNEY HUDAK:  She has not
18       answered.
19            ATTORNEY ZOLOT:  How does she know
20       what Crystal is saying.
21            ATTORNEY HUDAK:  You need to stop
22       the speaking objections.  You can note
23       your objection for the record.
24            ATTORNEY ZOLOT:  Yes, it's been
25       noted the three times you have asked.
```

1                    S. Hoiland

2          A.    Well, so the next sentence is not

3    about CCLA.  It's about the NICE program.

4    It's much broader.  And so when I read this

5    email, after getting the very friendly

6    correspondence from her, I think it was just

7    days earlier, it seemed as if there was some

8    type of intervention made that went from a

9    friendly yes, I would like to see you and talk

10   about this and have coffee to, I think it gets

11   a little bit worse, that I don't attend her

12   presentation.

13         Q.    So that's not responsive to the

14   question.  Again, the question is about the

15   sentence "I am disappointed" --

16         A.    It's about the CCLA, and I'm saying

17   that the sentence following it is not about

18   CCLA.  It's about the NICE program.  So she

19   seems to be speaking in general terms, that

20   professionalism and dishonesty is larger than

21   CCLA.  Which is why this particular email

22   upset me.

23         Q.    So your testimony is that the

24   sentence, "I am disappointed in your lack of

25   professionalism and dishonesty," does not

```
1                    S. Hoiland
2   refer to the CCLA PowerPoint, is that correct?
3               ATTORNEY ZOLOT:  Objection;
4          mischaracterizes the testimony.
5          A.   I'm saying I don't know what it
6   refers to.  Because the context before is
7   CCLA.  My bigger concern is the context
8   afterward, that it's the NICE program and now
9   it's extending into an entirely different
10  conference.  And ESS is a conference for
11  sociologists.
12         Q.   So the next sentence says "I
13  trusted you as a coordinator/lead faculty in
14  the NICE program."
15              Did I read that correctly?
16         A.   Yes.
17         Q.   So is Crystal discussing the
18  responsibilities of crediting work among
19  collaborators?
20              ATTORNEY ZOLOT:  Objection; calls
21         for speculation.
22         A.   That's not what that sentence says
23  to me.  You would have to ask Crystal.
24         Q.   And again this email that we're
25  looking at between -- from Crystal to you on
```

1                    S. Hoiland

2    February 24, 2020 was not included in the

3    email chain, the same email chain that you

4    produced in your production, is that correct?

5         A.    That's correct.

6         Q.    So going back to Crystal's

7    statement "even when using my work you did not

8    give me credit.  Written and verbal credit are

9    always required when using other's work."

10             Do you consider that to be a

11   complaint to you about misuse of Crystal's

12   intellectual property?

13             ATTORNEY ZOLOT:  Objection to form.

14        A.    I don't know.

15        Q.    Why don't you know?

16             ATTORNEY ZOLOT:  Object to form.

17        A.    I don't know what Crystal was

18   thinking when she was writing this email.  She

19   produced curriculum for the NICE project,

20   which was to be used for learning purposes.

21        Q.    Have you received complaints from

22   any other individuals regarding misuse of

23   their intellectual property?

24        A.    No.

25        Q.    When others complain -- strike

1                     S. Hoiland

2      that.

3              When you receive a complaint, an

4      email from a person stating that credit was

5      not given for use of the work, do you consider

6      that a complaint about intellectual property?

7              ATTORNEY ZOLOT:  Objection; calls

8          for speculation.  Is that a

9          hypothetical?

10             ATTORNEY HUDAK:  Your objection is

11         noted.

12         A.   I don't know what you're asking.

13     Can you rephrase?

14         Q.   How would you know if somebody is

15     making a complaint of intellectual property

16     misuse against you?

17             ATTORNEY ZOLOT:  Object to form.

18         A.   Well, one way is they sue you.

19         Q.   Are there any other ways?

20         A.   I really don't know what you're

21     asking.  How do I know when someone is making

22     a complaint against me?

23         Q.   Yes.

24         A.   They say they're making a complaint

25     against me.  I'm literally completely lost.

1                          S. Hoiland

2    I'm not trying to dodge the question.  I don't

3    know what you're asking.

4         Q.   Sure.  So you testified before that

5    you can't tell what Crystal was thinking based

6    on this email, is that correct?

7         A.   That's correct.

8         Q.   And you do not consider this to be

9    a complaint to you that you misused Crystal's

10   intellectual property?

11                ATTORNEY ZOLOT:  Objection;

12        mischaracterizes the testimony.

13        A.   She's not saying intellectual

14   property.  So if you want me to read something

15   into it that's not there, I can't do that.  If

16   you're talking about credit, credit is there.

17        Q.   Let me take this document off the

18   screen.

19                (Pause.)

20        Q.   So you were just looking at exhibit

21   12, which I took down.  And I'm putting up a

22   new document.  Do you see that I've shared a

23   different document?

24        A.   Yes.

25        Q.   So this document is titled

1                    S. Hoiland

2     Responses and Objections to Plaintiff's Second

3     Set of Interrogatories to Defendant.  It was

4     served by defendant on plaintiff in this

5     litigation.  I'll mark this as exhibit 13.

6                         ---

7               (Exhibit 13, Responses and

8          Objections to Plaintiff's Second Set of

9          Interrogatories to Defendant was marked

10         for identification)

11                        ---

12         Q.   Do you recognize this document?

13         A.   I'm not sure if this went to my

14    attorneys or to me.  This likely went to my

15    attorneys.

16         Q.   So you did not review this document

17    before?

18         A.   I would say that since my attorney

19    signed it, that the content in it reflects

20    their responses to the responses and

21    objections.

22              ATTORNEY ZOLOT:  Sandra, maybe just

23         start at page 1 and scroll through

24         and --

25              ATTORNEY HUDAK:  Yes, I have

1                         S. Hoiland

2          scrolled through it.

3          Q.   Dr. Hoiland, if would you like me

4     to scroll slower just let me know?

5          A.   You can scroll a little slower.

6               ATTORNEY ZOLOT:  You started and

7          then you went to the last page.  I think

8          you just confused her as to what this

9          document is.  So just start at 1, scroll

10         through and have her look at the whole

11         document.

12              ATTORNEY HUDAK:  Sure.

13              ATTORNEY ZOLOT:  And see if she

14         understands what it is.

15         Q.   Dr. Hoiland, please let me know

16    when you need me to scroll up?

17         A.   Yes, you can scroll up.  I've seen

18    this page.  Keep going.  Okay.

19              Okay.

20              Okay.  Yes, I recognize the

21    document.

22         Q.   Have you reviewed this document

23    before?

24         A.   Yes.

25         Q.   So I have scrolled -- do you want

1                    S. Hoiland

2   me to keep scrolling through the document?

3       A.   It's okay.

4       Q.   Dr. Hoiland, I am looking at the

5   bottom of the page, which says interrogatory

6   No. 18.  Describe in detail the facts and

7   circumstances concerning prior copyright

8   complaints received by you, including without

9   limitation, any communications alleging that

10  you plagiarized another person's work.

11           Did I read that correctly?

12      A.   Yes.

13      Q.   Do you consider the email we were

14  just looking at from Crystal Rodriguez, which

15  was marked as exhibit 12, to be a copyright

16  complaint received by you?

17      A.   No.

18      Q.   Why not?

19      A.   Well, this is a legal document, so

20  complaint sounds formal to me.  And secondly,

21  Dr. Rodriguez's email is related to the same

22  presentation that we're talking about today.

23  The reason that Dr. Rodriguez had issue with

24  that particular presentation is because

25  Dr. Wilder told her that she should have an

1                    S. Hoiland

2  issue with that presentation.  So I did not

3  see that email as being outside the current

4  litigation or the current complaint.

5       Q.   So just to be clear, you do not

6  consider Crystal's email we were just looking

7  at to be a copyright complaint received by you

8  because it's related to the issues in this

9  litigation?

10      A.   Well, it says prior copyright

11  complaint, so I would assume that's before the

12  presentation that's being discussed.

13      Q.   So you did not consider in

14  answering this interrogatory any copyright

15  complaints received by you after the CCLA

16  conference?

17           ATTORNEY ZOLOT:  Objection to form.

18      A.   I don't consider that email a

19  copyright complaint.  So my answer is no.

20      Q.   So there was no time limitation

21  imposed on this interrogatory, is that

22  correct?

23           ATTORNEY ZOLOT:  Objection; vague.

24      A.   I'm not sure what you're asking.

25      Q.   Sure.  So we read the interrogatory

1                    S. Hoiland

2   on page 6, and then there's a response from

3   defendant on page 7, which says defendant

4   states as follows: "Dr. Hoiland has not

5   received prior copyright complaints or any

6   prior communications alleging that she

7   plagiarized another person's work."

8               So I believe that you have

9   testified that Crystal's email does not fall

10  into this category, and I'm trying to

11  understand what you're reasoning is for that?

12      A.   So I spoke with counsel about that

13  and I don't believe I'm --

14              ATTORNEY ZOLOT:  Objection.  I just

15          want to counsel my witness not to reveal

16          any attorney-client privileged

17          communications.

18      Q.   Yes, so without discussing what

19  your attorneys told you, I believe you

20  testified before that you don't think that

21  Crystal's email is a copyright complaint, and

22  I'm trying to understand the reason for that?

23      A.   Well, I read this and I wondered if

24  it was a trick, trying to confuse me, and so I

25  asked --

1                    S. Hoiland

2        Q.   Again, I don't want -- I don't want

3    to know what your attorneys told you.

4        A.   I understand.  I'm trying to

5    finish.

6        Q.   Sure.

7        A.   -- and I was counseled.  And so my

8    response here is -- is what it is.  I have not

9    received any prior copyright complaints.

10       Q.   Has anyone ever contacted you to

11   complain about your use of their work without

12   giving them credit for being the author of

13   that work?

14       A.   Are you referring to

15   Dr. Rodriguez -- are you saying outside

16   Dr. Rodriguez's email in the current

17   litigation?

18       Q.   Sure.

19       A.   I didn't hear you.

20       Q.   I said sure, let's impose that

21   limitation.

22       A.   Outside of the CCLA presentation I

23   have not had any copyright complaints or

24   communications.

25       Q.   And so just to be clear, you

1                    S. Hoiland

2    excluded Crystal's email from this answer, but

3    then you -- which you say is not a copyright

4    complaint, but then you say you haven't

5    received any copyright complaints?

6         A.   I said outside the CCLA

7    presentation.  Crystal's email is related to

8    the CCLA presentation.

9         Q.   Again I am trying to understand

10   what you consider to be a copyright complaint.

11   You said before you do not consider Crystal's

12   to be a copyright complaint.  So I just would

13   like you to answer the question:  Have you

14   received complaints from anyone regarding your

15   lack of giving them credit for use of their

16   work in your materials?

17        A.   No.

18        Q.   I am going to take this exhibit 13

19   off the screen.

20             (Pause.)  And I have put up a new

21   document.  Do you see that I've showed a new

22   document?

23        A.   Yes.

24             ATTORNEY HUDAK:  And this is a

25        document produced by defendant in this

1                    S. Hoiland

2          litigation which has Bates numbers D 69

3          through D 72.

4                THE WITNESS:  Yes.

5                ATTORNEY HUDAK:  Which I will mark

6          as exhibit 14.

7                         ---

8                (Exhibit 14, preliminary inquiry

9          report, Bates D0069 through 72 was

10          marked for identification)

11                         ---

12          Q.    Do you recognize this document?

13          A.    Yes.

14          Q.    And what do you recognize this

15    document to be?

16          A.    These are the findings from the

17    research integrity officer related to the

18    inquiry Dr. Wilder initiated against me.

19          Q.    And the research integrity

20    officer's name is Dr. Yoel Rodriguez, is that

21    correct?

22          A.    Yoel Rodriguez, yes.

23          Q.    And he works at Hostos Community

24    College?

25          A.    Yes.

```
1                      S. Hoiland

2         Q.    And I have scrolled to the last

3    page of the document, which has Bates number

4    D 72 and I'm reading from the last paragraph:

5    "I would recommend asking Dr. Hoiland to sign

6    a letter of understanding."

7              Did I read that correctly?

8         A.    Yes.

9         Q.    And he lists a number of things

10   that should be included in that letter of

11   understanding.  Is that correct?

12        A.    Yes.

13        Q.    And number 5 says "being aware of

14   acknowledging all co-authors, collaborators,

15   funding agencies in writing when presenting

16   using, for example, PowerPoint presentation."

17             Did I read that correctly?

18        A.    Yes.

19        Q.    And what does being aware of

20   acknowledging all co-authors, collaborators,

21   et cetera, mean?

22        A.    Well, I think the being aware part

23   goes along with where we are today, right?  So

24   that if one is making a presentation based on

25   years of working with someone and an assumed
```

1                         S. Hoiland

2    trust, that doesn't necessarily translate to

3    that relationship being based on trust and a

4    collegial relationship and friendship over the

5    years.  So to cover your butt, cite.

6              Sandra, you froze.

7         Q.   In other words you're saying that

8    when using -- sorry.  So in other words he's

9    saying that when using the work of any

10   co-authors or collaborators, use of that

11   material should be acknowledged, is that

12   correct?

13        A.   So I think these recommendations

14   are there in part to try to please both sides.

15   So the paragraph before says that there is no

16   recommendation for an investigation for

17   research misconduct.  Right?  So that's my

18   side.

19              However, the person who filed the

20   complaint had serious concerns.  And so the

21   recommendations are in part to try to

22   ameliorate the situation in a way that it's

23   being viewed that the person is also getting

24   some kind of -- that she's also getting

25   something.

1                        S. Hoiland

2              So if I'm being cleared from

3    research misconduct then here's what we're

4    going to give to Professor Wilder.  I wrote a

5    detailed response which I included in my

6    discovery to these particular recommendations

7    saying I have grave concerns that these

8    recommendations could be construed that I did

9    something wrong, and your inquiry found that I

10   did not do these things wrong.  And I asked

11   for something to be signed by both Dr. Wilder

12   and myself.  And it was not.

13        Q.   Did you sign a letter of

14   understanding with these seven items?

15        A.   I believe I signed a document at

16   the end of this with my addendum.

17        Q.   Was that document produced in

18   discovery?

19        A.   Yes.  The letter I wrote?  Yes.

20        Q.   And that was a letter of

21   understanding?

22        A.   No.  What I wrote was a response to

23   this.

24        Q.   Have you ever signed a letter of

25   understanding, referred to by Yoel Rodriguez?

```
 1                    S. Hoiland

 2        A.   No. I don't believe so.

 3        Q.   And in the prior paragraph

 4  Dr. Rodriguez says "I conclude that an

 5  investigation is not warranted.  While it was

 6  not an easy decision, I did not find

 7  sufficient evidence to support an

 8  investigation into plagiarism.  Rather, I

 9  found this case to be more of an authorship

10  dispute than plagiarism."

11             Did I read that correctly?

12        A.   Yes.

13        Q.   And what is your understanding of

14  an authorship dispute?

15        A.   I'm not sure I can say what he

16  thinks an authorship dispute is.  The issue

17  here was plagiarism, and he's saying that in

18  part it's a communication issue, because these

19  things weren't discussed in advance.  That's

20  his next sentence.

21        Q.   And he says it was not an easy

22  decision, correct?

23        A.   What's that?

24        Q.   And Dr. Rodriguez says it was not

25  an easy decision, correct?
```

```
 1                    S. Hoiland
 2        A.   Well, he says that, yes.
 3             ATTORNEY HUDAK:  I am going to take
 4        this document off the screen.
 5             Let's take a short break.  Let's go
 6        off the record.
 7             THE COURT REPORTER:  We're off the
 8        record.
 9                    ---
10        (Recess from 3:30 to 3:42.)
11                    ---
12             ATTORNEY HUDAK:  All right.  Back
13        on the record after a short break.
14        Q.   I am going to bring back up exhibit
15   2.  So you should be seeing slide 17 of
16   exhibit 2.  Do you see that, Dr. Hoiland?
17        A.   Yes.
18        Q.   Okay.  And this is one of the
19   slides from your CCLA PowerPoint, correct?
20        A.   Yes.
21        Q.   And at the bottom of the page it
22   says sources and data notes, and then it gives
23   a web address.  Do you see that?
24        A.   Yes.
25        Q.   Did you add that text to this
```

1                    S. Hoiland

2    slide?

3         A.    No.

4         Q.    And so it was in the material that

5    you copied and pasted from, correct?

6         A.    It was in Dr. Rodriguez's

7    curricular lesson plans.

8         Q.    Do you know if Dr. Rodriguez added

9    that statement, sources and data notes with

10   the webpage?

11        A.    I have no idea what Dr. Rodriguez

12   added.

13        Q.    Would you consider that statement,

14   sources and data notes with the webpage a

15   citation to the source of the material?

16        A.    It's not a full citation.  It's a

17   link to the website.

18        Q.    Do you ever include citations

19   whether full or in website form, on PowerPoint

20   presentations that you create?

21        A.    Yes.

22        Q.    And how do you decide to include a

23   citation on a PowerPoint slide?

24        A.    So I would say generally, if I'm

25   presenting a paper or something that is based

1                    S. Hoiland

2  on research, so for example, that the ESS

3  conference that I was attending with

4  Dr. Rodriguez, I was being given an award for

5  a paper that I had written and submitted

6  several months before the conference.  And so

7  the presentation I gave for that paper was a

8  PowerPoint, and included several full

9  citations and a bibliography.

10       Q.   And why did you include a

11  bibliography in that presentation?

12       A.   I created a bibliography for that

13  one because it was a paper presentation.  It's

14  a different kind of presentation.

15       Q.   Are there any other circumstances

16  when you need to include citations other than

17  a paper presentation?

18       A.   I think the question is really

19  broad.  I mean there are many different types

20  of presentations that can occur at these

21  conferences.  The conferences themselves are

22  pretty different.  So it's a hard question to

23  answer.  I can give you more examples, if you

24  like.

25       Q.   When do you decide to include a

1                         S. Hoiland

2   citation on a PowerPoint slide?  And you can

3   give it by examples and then we can discuss

4   those examples.

5          A.   Well, generally I don't -- I don't

6   like to give PowerPoint presentations.  My

7   presentations for many years have been much

8   more interactive, including students,

9   including activities, including

10  demonstrations.  So presenting like a full

11  research paper is something I don't do very

12  often.  In those contexts in which a paper --

13  in this case I was presenting a book chapter

14  that will be published, and so most of the

15  research was my unique research.  But when I

16  did pull from other sources that were central

17  to my arguments, I included citations to those

18  authors.  They were outside the work that I

19  was doing.

20         Q.   How many presentations would you

21  say that you've created with a PowerPoint deck

22  in your career?

23         A.   In my career?  Um, I don't know.

24  It would be very difficult to estimate that.

25  I mean my CUNY CV lists what I've done at

1                    S. Hoiland

2    CUNY.  But I was a professor in Florida for

3    five years before that.  I don't know.

4         Q.   Was it more than one?

5         A.   Yes.

6         Q.   Was it more than five?

7         A.   More than five PowerPoint

8    presentations I've created?

9         Q.   Yes.

10        A.   For class? for conferences?  Are we

11   talking in general?

12        Q.   In any context.  About how many

13   PowerPoint presentations do you believe that

14   you've created?

15        A.   A lot.

16        Q.   More than 50?

17        A.   Probably.

18        Q.   More than a hundred?

19        A.   I'm not sure if I could say more

20   than a hundred.

21        Q.   So roughly speaking, between 50 and

22   a hundred, possibly more than a hundred?  But

23   in that general ballpark, is that correct?

24        A.   Yes.

25        Q.   And in approximately what

1                    S. Hoiland

2     percentage of these PowerPoints would you say

3     that you draw on materials created by others,

4     meaning not your own written authorship but

5     drawn from the work of others?

6               ATTORNEY ZOLOT:  Objection; vague.

7          A.   Well, I would say in most cases any

8     work that someone does is influenced by the

9     work of others.  Creating a completely unique

10    idea that's just yours is not really what we

11    do in academia.  There's always people to pull

12    from.

13         Q.   And how do you decide when to

14    include a citation on a PowerPoint slide that

15    includes materials influenced by others?

16         A.   Well, I would say that when I'm

17    creating PowerPoints for my classes, which is

18    something I used to do, I don't really use

19    PowerPoint anymore, I include citations to any

20    thinkers that have contributed unique ideas.

21    It's important that students understand the

22    sociologists that have contributed these.

23         Q.   In any other circumstances do you

24    include citations on PowerPoint slides?

25         A.   There are potentially many

1                    S. Hoiland

2   circumstances.  I don't -- I mean it's kind of

3   hard to just draw from nothing.  If you want

4   to show me something I can -- I can tell you.

5            I mean if I were using something

6   like this in class, like slapping a link down

7   there is not exactly like how I would cite

8   that.  But certainly you would make sure that

9   students understand that this is not a chart

10  that you created and explain that to them.

11       Q.   Okay.  So I believe you're

12  referencing this slide 17 of exhibit 2 that

13  we're looking at, and you say that the

14  citation on this page is not how you would

15  have cited to the source of this information.

16  Is that a proper characterization of your

17  testimony?

18       A.   Yes.

19       Q.   All right.  And how would you have

20  cited this information differently?

21       A.   So there's a way to cite sources

22  that involves more than dropping a web link.

23       Q.   Do you believe that any citation

24  should include more than a web link?

25       A.   I mean I don't know exactly what

1                    S. Hoiland

2    you're asking.   I mean there are variations in

3    the way that people choose to cite.   In this

4    case Dr. Rodriguez chose to drop a website

5    link.   That's one way to cite.

6              Another would be to include the

7    title of the webpage, and author if there is

8    one.   And the other pertinent information like

9    the year and so on and so forth.

10             If it were in a paper it would

11   require something different, right?   That

12   would absolutely require the full citation.

13        Q.   So if you are creating a PowerPoint

14   presentation for use, for display at a

15   conference and you quote from another person's

16   work, would you include a citation on that

17   PowerPoint slide?

18             ATTORNEY ZOLOT:   Objection; lacks

19        foundation.

20        A.   Well, so in this case it's a

21   website link.   So including a hyperlink or

22   some kind of link to the source is one way to

23   indicate attribution.

24        Q.   I am asking about your process for

25   creating PowerPoint presentations and citing

1                      S. Hoiland

2    other people's work.  So if you were creating

3    a PowerPoint presentation for display at an

4    academic conference and you quoted to another

5    person's work, would you include a citation on

6    that PowerPoint slide?

7         A.   It depends.

8         Q.   On what?

9         A.   Well, I think it depends on -- I

10   mean if you're asking specifically about the

11   CCLA presentation or you're asking in general.

12   I'm not sure -- you want me to answer in

13   general?

14        Q.   Yes.

15        A.   Okay.  I mean I think in general if

16   the work is wholly outside the work that one

17   is involved or engaged in, then it should be

18   cited.

19             If the work is sort of internal and

20   it's part of a project or something you're

21   working on, like a full citation basically to

22   yourself is a little strange.

23        Q.   So is it your position that if you

24   quote to somebody's work on a PowerPoint slide

25   who's outside of your organization, you always

1                   S. Hoiland

2  must include a citation?

3            ATTORNEY ZOLOT:  Objection;

4        mischaracterizes the testimony.

5        A.   Like I said, I think it really

6  depends.  I mean I've been to many

7  presentations by top scholars, which I tended

8  to notice a little bit more after all of this

9  started between Dr. Wilder and myself, that

10  the format at professional conferences,

11  including ESS and ASA can often be very

12  informal.  People show a slide deck.  I saw

13  several top scholars at ESS that didn't

14  include a single citation and they would

15  credit their co-authors verbally and had

16  nothing in their written materials about their

17  co-authors.

18            So like I said, the context is

19  generally one in which people tend to sort of

20  trust what people say, and so the PowerPoint

21  often serves a different role than, say, a

22  paper.

23            So again it depends on the context.

24  Generally I think there is a level of

25  professionalism that's assumed.  And so, you

```
1                    S. Hoiland

2    know, if I heard a presentation where there

3    were two co-authors and only one author was

4    listed on the program, one author was listed

5    on the PowerPoint, and they say my coauthor

6    can't be here, da, da, da, and proceeded.  And

7    there was no written reference to that person.

8         Q.   So do you believe you can always

9    quote the work of a colleague without giving

10   them credit in the PowerPoint slide?

11             ATTORNEY ZOLOT:  Object to form.

12        A.   I didn't say that.  I didn't say

13   not giving credit.  And I didn't say quote.  I

14   said I think there's a general understanding

15   that when people are working closely together,

16   particularly for long periods of time, it's

17   assumed that the work that's being presented

18   is the work of the project or the book or the

19   whatever is being talked about.

20        Q.   So is it your position that when

21   you quote the work of a colleague you never

22   have to include a citation -- a written

23   citation to their work?

24             ATTORNEY ZOLOT:  Object to form.

25        A.   I didn't say that.
```

1                    S. Hoiland

2       Q.   When do you need to include a

3  citation to a colleague's work?

4            ATTORNEY ZOLOT:  Objection; asked

5       and answered.

6       A.   So as I mentioned, what I would say

7  today, sitting here, is that you never know

8  what your colleague might think or say or

9  accuse you of.  So the kind of implicit

10  relationship that one has with someone, with

11  whom one is working closely, cannot be

12  assumed.

13            So if I were to advise a junior

14  colleague or a colleague at all I would say be

15  careful, and do it as a precautionary measure.

16  Not because it's sort of the norm of the

17  discipline.

18       Q.   If a coauthor makes a PowerPoint

19  presentation without the name of the other

20  coauthor on it, is it assumed that the work in

21  that presentation came from both coauthors?

22            ATTORNEY ZOLOT:  Objection; vague.

23       Lacks foundation.

24       A.   I don't know if I can say what

25  other people assume.  But I certainly have

1                     S. Hoiland

2  been to a number of presentations in which one

3  person is talking about the work of more than

4  one person or a team.  I've certainly been in

5  other collaborative projects in which someone

6  else has presented my work and my name has not

7  showed up.

8          And again there's kind of an

9  underlying basis in academia that your work is

10  recognized.

11      Q.   When you say that in academia you

12  expect that your work will be recognized, you

13  mean that you expect that others will cite

14  your work when quoting from it?

15      A.   I think there's generally an

16  expectation that we don't have reason to

17  suspect other people of ill intent, and that

18  generally speaking, like since we're actually

19  paying to go to these conferences and putting

20  in far more hours than we ever get compensated

21  for, you know the idea is not one of a

22  commercial enterprise, in which I'm trying to

23  take what someone else has, because it's about

24  generally helping students and helping other

25  faculty.

1                    S. Hoiland

2        Q.   So are you saying you don't need to

3   be too concerned about including proper

4   citations in a presentation given in an

5   academic setting?

6             ATTORNEY ZOLOT:  Object to form.

7        A.   That's not what I said.  I actually

8   said the opposite; that given what I've been

9   through over the last three years, I now

10  unfortunately have sort of an attitude in

11  which I see what can happen when someone

12  misconstrues someone else's integrity or

13  intent, or what is said in a presentation.

14       Q.   You are employed by Hostos

15  Community College, is that correct?

16       A.   Yes.

17       Q.   And Hostos is part of the CUNY

18  system?

19       A.   Yes.

20       Q.   Are you familiar with the academic

21  integrity policy of CUNY?

22       A.   Yes.

23            ATTORNEY HUDAK:  I would like to

24       take down exhibit 2 from the screen.

25       I'll put up a new document.  (Pause.)

1                     S. Hoiland

2          Do you see that I've put a new

3     document on the screen.

4          THE WITNESS:  Yes.

5          ATTORNEY HUDAK:  This document was

6     produced by plaintiffs in this case with

7     Bates numbers P 649 through P 654.  I'll

8     mark this as exhibit 15.

9                     ---

10         (Exhibit 15, academic integrity

11    policy Bates P000649 through 654 was

12    marked for identification)

13                    ---

14    Q.   Do you recognize this document?

15    A.   Yes.

16    Q.   And what do you recognize it to be?

17    A.   This is the academic integrity

18 policy.

19    Q.   Of CUNY?

20    A.   Yes.

21    Q.   So I have scrolled to the second

22 page of the document, which has the heading

23 under P 650.  I am looking at section 1.2,

24 which says, "Plagiarism is the act of

25 presenting another person's ideas, research,

1                      S. Hoiland

2   or writing as your own.  Examples of

3   plagiarism include:  Copying another person's

4   actual words or images without the use of

5   quotation marks and citations attributing the

6   words to their source."

7              Did I read that correctly?

8        A.   Yes.

9        Q.   So turning back to exhibit 2,

10  looking at slide 9, I believe you testified

11  before that the text on this slide was

12  authored by Dr. Wilder.  Does this text

13  include the use of another person's actual

14  words without the use of quotation marks and

15  footnotes attributing the words to their

16  source?

17       A.   Yes.

18       Q.   So under CUNY's definition of

19  plagiarism, does this slide 9 of exhibit 2

20  plagiarize Dr. Wilder's work?

21             ATTORNEY ZOLOT:  Object to form.

22       A.   Well, after a lengthy two-month

23  inquiry with hours of zoom interviews with the

24  research integrity officer, the people who

25  were selected to decide whether this is

1                          S. Hoiland

2    plagiarism, using that same policy, said no.

3          Q.   Under the words of the policy the

4    slide uses another person's actual words or

5    images without the use of quotation marks and

6    footnotes attributing the words to their

7    source.  Correct?

8               ATTORNEY ZOLOT:  Object to form.

9          A.   There are not quotation marks on

10   this slide.

11         Q.   Nor is there a footnote attributing

12   the words to their source, correct?

13         A.   Correct.

14         Q.   I am taking down exhibit 2 and I am

15   going to put up a new document.  Do you see

16   that I have shared a new document on the

17   screen?

18         A.   Yes.

19         Q.   And this document was produced by

20   plaintiff in this litigation with Bates

21   numbers P 273 to P 293.

22               ATTORNEY HUDAK:  And I will mark

23          this as exhibit 16.

24                          ---

25               (Exhibit 16, American Sociological

1                    S. Hoiland

2         Association's Code of Ethics, Bates

3         P000273 to 293 was marked for

4         identification)

5                    ---

6         Q.   Do you recognize this document?

7         A.   Yes.

8         Q.   What do you recognize this document

9    to be?

10        A.   This is the American Sociological

11   Association's Code of Ethics.

12        Q.   And are you a member of the

13   American Sociological Association?

14        A.   Yes.

15        Q.   And so as a member of the American

16   Sociological Association have you pledged to

17   uphold the American Sociological Association's

18   code of ethics?

19        A.   Yes.

20        Q.   I have scrolled down to page 16 of

21   the document which has Bates stamp P 288.  It

22   says under section 13, Plagiarism.

23   Sociologists do not present others' work as

24   their own, whether it is published,

25   unpublished, or electronically available."

1                     S. Hoiland

2          Did I read that correctly?

3     A.    Yes.

4     Q.    So do you agree that in the field

5  of sociology, sociologists are expected not to

6  present others' work as their own, whether in

7  published form, unpublished form or

8  electronically available form?

9     A.    Yes.

10     Q.    I am going to take down exhibit 16.

11  I'll put up a new document.  (Pause.)

12          Do you see that I have shared a new

13  document on the screen?

14     A.    Yes.

15     Q.    This document was produced by

16  plaintiff in this case with Bates number P 294

17  to P 298.  And I'll mark this as exhibit 17.

18                     ---

19          (Exhibit 17, screenshot, Bates

20          P000294 through 298 was marked for

21          identification)

22                     ---

23     Q.    Do you recognize this document?

24     A.    This looks like a screenshot from a

25  class that I teach at Hostos.

1                   S. Hoiland

2        Q.   And what's the name of that class?

3        A.   It is a Capstone class titled Bronx

4   Beautiful.

5        Q.   And did you write the text that's

6   shown in this exhibit 17?

7        A.   Well, the course description was

8   created before I started teaching the course,

9   so that's a general course description that's

10  found in the course catalog.  And as faculty

11  we are not allowed to alter that.

12       Q.   I have scrolled down to page 4 of

13  the document, which is page P 297.  And I'm

14  looking at the second full paragraph here that

15  says:  "Plagiarism is also prohibited as part

16  of the college Academic Integrity Policy,

17  spelled out in the course catalog."

18            Did I read that correctly?

19       A.   Yes.

20       Q.   Do you agree with that statement?

21       A.   Yes.

22       Q.   And then it says:  "Plagiarism is

23  the act of presenting another person's ideas,

24  research or writings as your own."

25            Did I read that correctly?

1                      S. Hoiland

2       A.   Yes.

3       Q.   Do you agree with that statement?

4       A.   Yes.

5       Q.   And then it says:  "Internet

6    plagiarism is covered by this definition;

7    examples include submitting downloaded term

8    papers or parts of term papers, paraphrasing

9    or copying information from the internet

10   without citing the source, and cutting and

11   pasting from various sources without proper

12   attribution."

13           Did I read that correctly?

14      A.   Yes.

15      Q.   Do you agree that statement?

16      A.   Yes.

17      Q.   I am going to take down this

18   exhibit 17.  And do you see that I have shared

19   a new document on the screen?

20      A.   Yes.

21           ATTORNEY HUDAK:  So this is a

22           document produced by plaintiff in the

23           case with Bates numbers P 428 through

24           P 429.  I'll mark this as exhibit 18.

25                         ---

```
 1                     S. Hoiland
 2              (Exhibit 18, email, Bates P000428
 3         through P 429 was marked for
 4         identification)
 5                     ---
 6         Q.   Do you recognize this document?
 7         A.   Yes.
 8         Q.   What do you recognize this document
 9    to be?
10         A.   This is an email between myself and
11    Dr. Wilder about the CCLA confirmation.
12    Speaker confirmation.
13         Q.   And so is it fair to say in this
14    email dated July 27, 2018 that you're
15    informing Dr. Wilder that you submitted a
16    proposal to the CCLA conference and it was
17    accepted?
18         A.   Yes, that's what it says.
19         Q.   Prior to submitting this proposal
20    to the CCLA conference organizers did you
21    inform Dr. Wilder that you were applying?
22         A.   I recall an email communication
23    that included something about our kids and
24    Disney and a discussion about, I don't recall
25    if it was before I submitted the proposal,
```

1                    S. Hoiland

2  which would have been months before this, or

3  if it was subsequent email communication, in

4  her response to this.  It was not produced, I

5  could not find the email and plaintiff did not

6  produce it.

7          Q.   And why do you think that you could

8  not find the email?

9          A.   So my campus has a very small

10 storage system available for email and I

11 frequently run out of storage and go through

12 fairly regularly and clean my in box of emails

13 that I don't think I have any need for.  So a

14 back and forth about a conference in early

15 2018 like would probably not have been an

16 email I would have thought I needed to keep.

17         Q.   So you believe that it was deleted?

18         A.   Yes.

19         Q.   And do you have an estimate of when

20 that email was deleted?

21         A.   I don't recall if that email

22 exchange took place that summer, if it took

23 place before I submitted the proposal.  I

24 don't recall.  We had on a few occasions not

25 only traveled together but also our kids had

```
 1                    S. Hoiland

 2   spent some time together, and so I definitely

 3   know there was some exchange about kids and

 4   Disney at this particular conference.

 5        Q.   And in this email there seems to be

 6   an attachment that's titled IP License and

 7   Release.  What do you believe that document,

 8   that attachment to be?

 9        A.   I believe it was the document you

10   pulled up earlier titled Intellectual Property

11   License and Release.

12        Q.   And at this email that we're

13   looking at now, exhibit 18, you did not attach

14   a copy of your CCLA PowerPoint, is that

15   correct?

16        A.   No, the PowerPoint was not created

17   in July.  The presentation was in February.

18        Q.   And did you send Dr. Wilder a copy

19   of the CCLA PowerPoint before February 2019?

20        A.   I did not.

21        Q.   Did you --

22        A.   I thought I sent her a copy of the

23   abstract.  But I'm not sure about that.

24        Q.   I believe you testified before that

25   the abstract goes out to everybody at the CCLA
```

1                     S. Hoiland

2   conference, is that correct?

3          A.   No.  I said that the abstract is on

4   a website that is available to anyone.  Well,

5   it was until the website was pulled down.

6          Q.   Okay.  So the abstract was not

7   specifically sent to attendees, but you

8   believe it was available on a website, is that

9   correct?

10          A.   Well, the conference program and

11   the speakers were available on the conference

12   website.  I don't recall if they also gave out

13   paper programs to attendees or not.

14          Q.   And attendees were sent access

15   information to download presentations that

16   were being made at the CCLA conference, is

17   that correct?

18          A.   Again, I don't recall getting that

19   email.  I never logged in or used that system.

20          Q.   I'm going to take down exhibit 18.

21   And do you see that I've shared a new document

22   on the screen?

23          A.   Yes.

24               ATTORNEY HUDAK:  So this document

25          is Exhibit 1 to the complaint in this

1                    S. Hoiland

2        action.  It's a three-page document, a

3        cover sheet with two pages of text.  And

4        I am going to mark this as exhibit 19.

5                         ---

6           (Exhibit 19, Exhibit 1 to the

7        complaint was marked for identification)

8                         ---

9        Q.   Do you recognize this document?

10       A.   Can you scroll down?

11       Q.   Sure.

12       A.   Yes.

13       Q.   And what do you recognize this

14   document to be?

15       A.   Well, this document is, I believe

16   it was given to me in this form as what

17   Dr. Wilder had submitted for copyright.  This

18   is like bits and pieces of the assessment

19   module all on two pages.

20       Q.   And what do you mean by bits and

21   pieces of the assessment module?

22       A.   So it looks different in

23   Blackboard, it's not set up -- well, as I

24   recall it's not set up like this.  There would

25   be different, one folder with different links.

1                      S. Hoiland

2          Q.    Does the text shown in this

3    document appear to be the full text of unit 7H

4    of the modules on Blackboard?

5          A.    I don't know if I can say it's the

6    full text.  I have not looked at that module

7    in Blackboard since September of 2019 or

8    probably before that.  I haven't had access.

9          Q.    Would you agree that the text shown

10   in this exhibit 19 was incorporated in almost

11   its entirety into the CCLA PowerPoint?

12         A.    I don't know if those dates were.

13   I mean I would have to see a side by side

14   comparison.  I don't think this is exactly

15   what was in the slides.  The part about please

16   restate your 2 hour learning goals, yes.

17   Parts of it were in the slides.

18         Q.    Would you agree that a majority of

19   the text shown here was included in the CCLA

20   PowerPoint?

21              ATTORNEY ZOLOT:  Object to form.

22         A.    Majority meaning over 50 percent of

23   this one page?  I think the answer is yes.

24   But again some of the stuff is very different.

25   I don't recall all the dates and some of

1                          S. Hoiland

2    the -- some of those parentheticals being in

3    the slides, it wouldn't make sense.

4         Q.   And just to be clear, this document

5    spans two pages.  So we were looking at the

6    first page of text, which is page 2 of the

7    document.  And now we're looking at the second

8    page of text, which is page 3 of the document.

9         A.   Yes.

10        Q.   Was the majority of the text shown

11   on this page included in the CCLA PowerPoint?

12        A.   Yes.

13        Q.   And why did you include so much

14   text from the -- from this unit 7H into the

15   CCLA PowerPoint?

16             ATTORNEY ZOLOT:  Object to form.

17        A.   So I included a lot of text because

18   I knew I wasn't going to spend a lot of time

19   on those slides.  So slides that have a lot of

20   text are not read.  Right?  They're just kind

21   of there so that people can see the types of

22   things that are there, and then when I present

23   things like that I just move on.

24             So for example, I wasn't reading

25   the questions 1 through 4 with A, B, and C, D

1                    S. Hoiland

2  parts within them.  I was just saying these

3  are the types of things we ask people to think

4  about.  Next slide.

5          Q.   I am going to take this exhibit 19

6  off the screen.  I have put up a document that

7  was previously marked as exhibit 11, which has

8  Bates stamps D 9 through D 12.

9              Do you recall seeing this document

10  before?

11         A.   Yes.

12         Q.   And this was an email chain between

13  you and Crystal Rodriguez, is that correct?

14         A.   Yes.

15         Q.   And you were discussing the CCLA

16  PowerPoint, is that correct?

17         A.   Primarily.

18         Q.   So I'm looking at paragraph 4 on

19  the first page of this document, which has

20  Bates stamps D 9.  And in the middle of the

21  fourth paragraph it says:  "While I could have

22  used my own materials, which were developed

23  prior to becoming a PI of this project and

24  have been revised over the past 4 years, I

25  wanted to showcase a faculty participant's

1                    S. Hoiland

2   instructional materials."

3            Did I read that correctly?

4        A.   Yes.

5        Q.   And so are you referring to the use

6   of Crystal Rodriguez's materials in the CCLA

7   PowerPoint?

8        A.   Are you referring to the last part

9   where it says "I wanted to showcase a faculty

10  participant's instructional materials"?

11       Q.   I'm referring to the sentence as a

12  whole.

13       A.   No, that's not about her materials.

14  That's about saying that I had plenty of

15  things that I've created over the years, but I

16  wanted to showcase NICE faculty, because

17  that's why I was there.  And that none of

18  those materials were yet on the website.

19       Q.   Just to back up a step.  The

20  sentence is referring to the CCLA PowerPoints

21  included in Crystal Rodriguez's material as a

22  faculty participant's instructional materials,

23  is that correct?

24       A.   The sentence is general.  I'm

25  explaining my motivation for selecting her

```
1                        S. Hoiland
2    materials.  That if you recall her previous
3    email had said something that, to the effect
4    that I'm trying to advance my own career by
5    taking her scholarship on as my own, and I'm
6    responding to that specific comment saying I
7    have plenty of my own curriculum, I don't
8    teach criminal justice.  Like it doesn't make
9    any sense that anyone would think that that
10   was stuff that I created because that's not
11   even my subject area.
12        Q.   Okay.  So are you saying in this
13   sentence that you could have used your own
14   materials but you decided to use Crystal
15   Rodriguez's instead in the CCLA PowerPoint?
16        A.   I'm not saying that.  I'm saying I
17   wanted to showcase a faculty participant's
18   instructional materials.  And clearly if I had
19   selected a different community college faculty
20   member with whom I had had a different
21   relationship, we wouldn't be looking at emails
22   like this right now.
23        Q.   Is Crystal Rodriguez a faculty
24   participant in the NICE project?
25        A.   Yes.
```

1                    S. Hoiland

2          Q.    And when you're referring to

3   showcasing a faculty participant's

4   instructional materials are you referring to

5   the inclusion of Crystal Rodriguez's work in

6   the CCLA PowerPoint?

7          A.    Could you repeat the question?

8          Q.    When you're referring to showcasing

9   a faculty participant's instructional

10  materials, are you referring to the inclusion

11  of Crystal Rodriguez's work in the CCLA

12  PowerPoint?

13         A.    No, I've said that twice.  This

14  sentence is a general sentence about my

15  motivation; that I didn't need her

16  instructional materials, because I had my own.

17  Right?  Like I'm not presenting as a single

18  person showing my instructional materials.

19  I'm presenting as the PI of the project.  And

20  so it wouldn't make sense, as the PI of a

21  project, to go out and only show things that

22  I've created.

23         Q.    Why is that?

24         A.    Well, because I'm not the only

25  person in the project.  So I was the

1                          S. Hoiland

2    facilitator through three cohorts of people,

3    the third being the extra cohort over years.

4    So to only show my own work, I feel like would

5    have undermined the project.  And since none

6    of the work was on the website yet I selected

7    someone's work from the Blackboard shell.

8         Q.   So is it fair to say that you

9    included another, a faculty participant's of

10   the NICE project's work in the CCLA PowerPoint

11   because you wanted to show that the project

12   did not involve just you?

13        A.   No.  As the title of the

14   presentation states, it's about a faculty

15   development program.  So I think it would be

16   strange to talk about a program and then show

17   only things that I've created.  Like I said,

18   there was a significant lag between what was

19   being produced and what was being added to the

20   website.  And so I made a judgment call to use

21   a participant's work that had not yet been put

22   on the website.

23        Q.   So just to back up a bit.  The CCLA

24   PowerPoint includes the work of a faculty

25   participant of the NICE project, is that

1                        S. Hoiland

2    correct?

3         A.    Yes.

4         Q.    And it also includes a subunit of

5    the modules from Blackboard, is that correct?

6         A.    Yes.  All of which we stated in our

7    proposal were to be made public as part of our

8    broader impact statement.

9         Q.    And what was the purpose of

10   including the subunit in the CCLA PowerPoint?

11        A.    The subunit on assessment fit with

12   the conference on assessment.

13        Q.    Was it to promote the NICE project?

14        A.    Yes.

15        Q.    And how did it promote the NICE

16   project?

17        A.    Well, for the 15 or so people in

18   the room it was a chance to talk about what we

19   had done up until that point.  So part of our

20   dissemination plan, part of our project goals,

21   part of our, again, broader impacts were to

22   reach out to other community college faculty,

23   particularly at Hispanic-serving institutions,

24   and tell them about the NICE program.  Which

25   is exactly what I was doing.

1                    S. Hoiland

2      Q.   And what was the purpose of quoting

3  the entire subunit rather than describing the

4  project?

5           ATTORNEY ZOLOT:  Objection;

6      mischaracterizes testimony.

7      A.   Yeah, I mean I'll say it again

8  because I think it bears repeating, I used a

9  lot of text specifically because I didn't plan

10 to spend very much time on those slides.  In

11 fact, initially I had sort of put all of them

12 on like two slides, and then I ended up

13 creating more slides, because it was so tiny

14 you couldn't even like see a word.  But it was

15 explicitly because I did not plan to read the

16 slides, stay on the slides, get into the

17 nitty-gritty of the assessment unit but rather

18 provide an overview of how the faculty

19 development program approaches assessment.

20     Q.   So couldn't you have used a smaller

21 portion of the text from the module to express

22 the same idea?

23          ATTORNEY ZOLOT:  Objection; calls

24     for speculation.

25     A.   Well, so my recollection, and I

1                    S. Hoiland

2    searched for emails to back this and did not

3    have them, but Rachel Meister, when I

4    submitted it to her like that said it's too

5    small, please make the font bigger or change

6    the -- and I said but I'm not using it for

7    that.  Like that's not what the presentation's

8    about.  Just a quick visual to kind of give

9    people an idea of what it looks like.

10               And then she said well, can you

11   change the slides anyway?

12               And so I did.  And it probably, I

13   don't know, doubled or tripled the number of

14   slides.

15        Q.   So the purpose of using the entire

16   subunit was just to fill up slides?

17               ATTORNEY ZOLOT:  Object to form.

18        A.   No.  I just -- I just had my

19   purpose for using them.  Rachel Meister's

20   purpose apparently was that she didn't like

21   the way the slides looked.

22        Q.   And you said that you didn't plan

23   on discussing the content of those slides in

24   detail?

25        A.   So that had typically not been our

```
 1                      S. Hoiland

 2   practice before, as I mentioned, Dr. Wilder

 3   and I co-presented several times.  I don't

 4   recall too many examples of where we worked

 5   very collaboratively and talked about slide

 6   show presentations before they happened.  In

 7   addition, she made several presentations on

 8   her own without me and we definitely did not

 9   discuss her proposals or presentations at

10   those conferences.

11             ATTORNEY HUDAK:  So we've been

12        going I think for about another hour.

13        Let's take a short break.

14             ATTORNEY ZOLOT:  Sure.

15             THE COURT REPORTER:  We're off the

16        record.

17                      ---

18        (Recess from 4:40 to 4:50.)

19                      ---

20             ATTORNEY HUDAK:  Back on the record

21        after a short break.

22        Q.   I would like to share my screen.

23   Do you see that I have shared a document on

24   the screen?

25        A.   Yes.
```

1                    S. Hoiland

2          ATTORNEY HUDAK:  This is the Answer

3       filed in this litigation, filed under

4       ECF numbers 10 and 10-1.  I'll mark it

5       as exhibit 20.

6                    ---

7          (Exhibit 20, Answer to Complaint

8       was marked for identification)

9                    ---

10      Q.   Do you recognize this document?

11      A.   Yes.

12      Q.   What do you recognize it to be?

13      A.   This is the Answer that I submitted

14   to Dr. Wilder's complaint.

15      Q.   I have scrolled to the last page of

16   the document which is page 6.  Do you see page

17   6?

18      A.   Yes.

19      Q.   And listed as defendant's first

20   defense is Ownership of a Valid Copyright.  It

21   states "Upon information and belief, plaintiff

22   cannot establish that she created or is

23   otherwise the owner of the portions of the

24   NICE materials at issue, or that such

25   materials are sufficiently original to warrant

1                          S. Hoiland

2    copyright protection."

3             Did I read that correctly?

4        A.   Yes.

5        Q.   On what basis do you assert that

6    plaintiff cannot establish that she created

7    the portions of the NICE materials at issue?

8        A.   So in looking at 7H and the

9    material that was copyrighted, I believe in

10   2021, many of the things in it are just very

11   general to the discipline.  So questions like

12   is this valid are not significantly unique.

13            In addition, like the three

14   components in which participants were to

15   create assessment materials were created by an

16   educator named Susan Suski in a book, and so I

17   also was not aware of when or how the NICHE

18   materials were created.  I did not have any

19   personal knowledge as to whether they were

20   created by the NICHE team or by Dr. Wilder and

21   colleagues at Lehman college prior to NICHE.

22       Q.   Any other reasons?

23       A.   No.  I mean as you can see, I'm

24   representing myself at this point, and so I'm

25   not a copyright attorney, but when I looked at

```
 1                    S. Hoiland
 2   the copyright materials they did not seem like
 3   something that warranted copyright.  In
 4   education assessment those are very common
 5   ways to approach assessment.  My campus uses a
 6   similar framework.
 7        Q.   And you are represented by counsel
 8   now, correct?
 9        A.   Yes.
10        Q.   So do you have any other reasons
11   now for asserting that plaintiff cannot
12   establish that she created the portions of the
13   NICE materials at issue?
14        A.   I mean I will leave the legal
15   understanding of ownership of a valid
16   copyright to my attorneys.
17        Q.   I am asking for your factual basis.
18   So I believe that the two bases that you just
19   gave were that you don't believe that the text
20   is sufficiently unique, and that you believe
21   that perhaps work created by Susan Suski has
22   an impact on whether plaintiff created the
23   portions of the NICE materials at issue.
24             Is that an accurate representation
25   of your testimony?
```

1                    S. Hoiland

2        A.    Yes.

3        Q.    So are there other, any other

4   reasons other than those two?

5        A.    I don't think so.

6        Q.    Why do you believe that the text is

7   not sufficiently unique to warrant copyright

8   protection?

9        A.    Can you pull up the 7H document

10  again?

11       Q.    Sure.

12       A.    I can walk you through a few

13  points.

14       Q.    So I am closing exhibit 20, and

15  I'll pull up exhibit 19.

16             So what I have put up on the screen

17  has been previously marked as exhibit 19,

18  which is exhibit 1 to the complaint.  I'm

19  scrolling to the second page but let me know

20  if you need me to scroll.

21       A.    So let's go to the next page --

22  well, okay.  We can stay here for a second.

23  So the paragraph that begins "please restate

24  your revised QR learning goals."

25             So those three goals and three

1                    S. Hoiland

2   questions come from Suski.  I don't know if

3   they're listed on here.  The font is really

4   small on the screen so I am going to look at

5   this one.

6              The dates and instructions for an

7   assignment are also not in any way unique to

8   this particular project or this copyrighted

9   material and that's basically the first three

10  paragraphs.

11             Instructions for how to create a

12  blog, that's definitely not anything unique to

13  this.

14             Providing peer feedback is

15  something very common across disciplines in

16  higher education.

17             And as for the instrument itself,

18  which would be the part that would be more

19  unique, again, you know, I mentioned that a

20  lot of the comments are just things that are

21  very standard knowledge or generalizable

22  knowledge.  For example, an assessment, your

23  assessment -- "you assessment" -- okay.

24  Sorry.  Let me read it as it is.  "You

25  assessment instrument should be designed to

Page 208

```
 1                     S. Hoiland
 2   measure whether or not or the extent to which
 3   your QR lesson assignment succeeded in
 4   teaching students the three learning goals you
 5   put forward."
 6              So yes, assessment should show
 7   whether there's learning.  That's the point.
 8              The assessment should be designed
 9   to give feedback to you as an instructor,
10   exclamation point.
11              Again, very kind of basic things
12   you could find in many courses.
13              Please indicate when and how you --
14   okay, more instructions.
15              If you go to the next slide.
16   Q.   I am scrolling to page 3 of the
17   document.
18   A.   So those three areas listed in the
19   third paragraph are Suski's.  So knowledge and
20   conceptual understanding, thinking, and other
21   skills, attitudes, values, dispositions and
22   habits of mind all come directly from Suski.
23   And in fact, Suski quotes a different author
24   and puts "habits of mind" in quotations.
25   Because that is specific in terms of and
```

1                    S. Hoiland

2    intellectual contribution to someone else.

3            Moving through the guidelines.  So

4    again things like are they clear and

5    straightforward.

6            What are the strengths and

7    weaknesses.

8            Is the assessment instrument valid.

9    Is the instrument sound.  I mean all of those

10   kinds of things are extremely ordinary in a

11   variety of contexts, particularly assessment.

12       Q.   And so you believe that the ideas

13   expressed in this unit are known and therefore

14   the text is not entitled to copyright

15   protection?  Is that a fair assessment of your

16   testimony?

17       A.   Well, again I'm an sociologist.

18   Even after all this I'm not an expert in

19   copyright or, you know, I don't work at the

20   copyright office to decide what is and what

21   isn't.  But as far as this being an original

22   and unique contribution, it's not.  It's a

23   compilation of things that are both commonly

24   known and then things that are unique

25   contributions, such as Suski's framework or

1                    S. Hoiland

2     the habits of mind that are then not

3     attributed to anyone else.

4          Q.   Why did you decide to use this text

5     in your CCLA PowerPoint that was just ordinary

6     ideas?

7          A.   Because --

8               ATTORNEY ZOLOT:  Object to form.

9          A.   Because I was there to speak about

10    the NICE faculty development program and I was

11    there to speak about assessment, and this is

12    what we were using.

13         Q.   And you agree that you copied

14    verbatim the text shown in this unit 7H?

15         A.   Again, there are some differences.

16    I don't know if some of the typos and dates

17    and other things are included.  But large

18    portions of these pages appear in the slides

19    that I used at the CCLA.

20         Q.   So I think on page -- the first

21    page of text of this document, which is page 2

22    of the document, you pointed out a typo, where

23    it says "you assessment instrument," and that

24    typo appears in the CCLA PowerPoint.  So the

25    text itself was copied into the CCLA

1                    S. Hoiland

2    PowerPoint, correct?

3              ATTORNEY ZOLOT:  Object to form.

4         A.   I don't know if they were

5    screenshots or if it was copy/paste.  I don't

6    recall exactly how the text moved from the

7    Blackboard shell to my slides.

8         Q.   But you would agree that saying

9    "you assessment instrument" indicates a typo?

10        A.   Typo or grammatical error.

11        Q.   And you discussed work from Susan

12   Suski, is that correct?

13        A.   Yes.

14        Q.   And did you produce any information

15   supporting your arguments about Susan Suski's

16   work in your document production?

17        A.   I don't recall.

18             ATTORNEY ZOLOT:  Object to form.

19        Q.   And your reference to Susan Suski

20   concerns ideas about assessment that she's

21   discussed in the past?

22        A.   No. My -- I don't know if I would

23   call it a concern.  I mean what I'm saying is

24   that the very specific three-prong criteria

25   for assessment in NICE comes from Susan Suski.

1                    S. Hoiland

2          Q.   Is there anything else that you

3     assert comes from Susan Suski that's present

4     in unit 7H?

5          A.   I'm not sure, as part of the

6     request for documents I asked for the

7     materials that Dr. Wilder used to create the

8     materials.  So I can't -- I can't say that I

9     know Susan Suski's work so well to know that

10    there might be something else in here.  But

11    that stands out to me.

12         Q.   As of right now there's no other

13    basis for your arguments concerning Susan

14    Suski other than what you just described about

15    three prongs?

16              ATTORNEY ZOLOT:  Object to form.

17         A.   Well, other than the entire

18    framework for the assessment, which are those

19    three prongs.  I also produced a website that

20    had very similar questions to the questions

21    that were on the next page of this document,

22    that another institution had created and made

23    public.

24         Q.   Was that website related to Susan

25    Suski?

1                    S. Hoiland

2         A.   No.

3         Q.   So is that a third reason that you

4    contend that the text here -- sorry.  I'm just

5    trying to find a quote.  That plaintiff cannot

6    establish that she created the portions of the

7    NICE materials at issue?

8         A.   I'm not sure what you're numbering

9    is, 1, 2, 3, so I don't know if I can say yes

10   or no to that.  But I have expressed a few

11   different reasons why I questioned whether or

12   not this unit 7H has a valid copyright, or is

13   copyrighted.  Or copyrightable.

14        Q.   So I am trying to understand

15   defendant's actual position for its first

16   affirmative defense.  And before you gave two

17   reasons.  One about the text -- text

18   uniqueness, and the second, you referenced

19   Susan Suski.  So I'm asking if the website

20   that you referenced in your document

21   production relates to those two reasons?

22        A.   Yes.

23        Q.   So was the website created by Susan

24   Suski?

25        A.   You can pull up the document if you

```
 1                      S. Hoiland
 2   want.  To my recollection the institution that
 3   had that as their assessment framework, so I'm
 4   not talking about the three prongs that Suski
 5   contributed.  I'm talking about the list of
 6   questions.  If you scroll to the next page.
 7   So the guidelines.  That many of those are
 8   found in --
 9        Q.   These are the guidelines that you
10   are referring to?
11        A.   Yeah.  That many of those are found
12   in other places.
13        Q.   The guidelines listed starting
14   about halfway down the page and then numbered
15   1, 2, 3 and then A, B, C, D and 4, are those
16   the guidelines you're referring to?
17        A.   Correct.
18        Q.   And do you recall the institution
19   that you are referring to as having a website
20   that was -- (audio distortion) -- production?
21        A.   You froze, Sandra.
22        Q.   Sure.  You referenced -- oh, I am
23   sorry.  Let me start again.
24             So you referenced that there's a
25   website in your document production.  Whose
```

```
 1                    S. Hoiland
 2   website is included in your document
 3   production?
 4        A.   I don't recall.  You would have to
 5   pull it up.  I submitted my documents in June
 6   when they were due.  So this is months ago.  I
 7   don't recall the institution.
 8        Q.   Was the text included on the
 9   website authored by Susan Suski or are you
10   referring to this website as a separate piece
11   of evidence in support of your first
12   affirmative defense?
13             ATTORNEY ZOLOT:  Objection; asked
14        and answered.
15        A.   Yeah, a couple of times I think --
16   as I indicated I believe that the institution
17   is completely separate from Susan Suski.  It
18   did not include Suski's framework.  The
19   website included several of the guidelines.
20   Suski's framework are the three questions
21   above.  Or the three areas.
22        Q.   So other than --
23        A.   So this page, I'm saying, can
24   largely be found in other places.
25        Q.   So other than the material created
```

1                      S. Hoiland

2    by Susan Suski and this website that you've

3    referenced, do you have any other factual

4    basis for defendant's first affirmative

5    defense?

6         A.   No.

7         Q.   I'll take down this exhibit.  You

8    said before that you're not an expert in

9    copyright law.  But what's your general

10   understanding of what a copyright is?

11        A.   My general understanding of

12   copyright is that when someone creates

13   something that is unique, and I guess in some

14   ways sufficiently different than what's

15   already out there, that then it's a

16   copyrightable work.  So I guess generally I

17   would think about this as things that are then

18   produced.  But that's about the extent of my

19   knowledge.

20        Q.   So if somebody authors text would

21   that be copyrightable?

22             ATTORNEY ZOLOT:  Objection; calls

23        for a legal conclusion.

24        A.   Well, if my son is writing

25   something on a piece of paper, I don't think

1                    S. Hoiland

2    that's copyrightable.  So no.  I mean it's not

3    just text on a page.

4         Q.   When does it become copyrightable?

5              ATTORNEY ZOLOT:  Objection; calls

6         for a legal conclusion.

7         A.   So again I said I think there has

8    to be some kind of sufficient uniqueness or if

9    it's in academia some kind of contribution

10   that is not already there.

11        Q.   What's your understanding of

12   intellectual property?

13        A.   So my understanding of intellectual

14   property I guess is somewhat similar.  It's an

15   intellectual contribution that one makes that

16   one can consider sufficiently unique to be

17   theirs.  However, when, you know, one is

18   involved in larger projects or, for example, I

19   created a survey for my college that was

20   solely mine, and I gave it to the college and

21   gave it to them to use to do what they wanted

22   to do with it.  So I mean there are many times

23   we create things in academia that are ours,

24   and that are uniquely ours and we give them,

25   or allow them to be used for the betterment of

```
 1                    S. Hoiland
 2   students or other faculty or just general
 3   knowledge.
 4        Q.   So when do you have to ask somebody
 5   for permission to use work that they've
 6   created?
 7             ATTORNEY ZOLOT:  Objection; vague.
 8        A.   Well, I would say -- so I'm
 9   thinking about using an art book that I
10   purchased with photos of an artist's work in
11   one of my classes.  And my students aren't
12   present so they can't actually go and see the
13   art itself.  And so what I want to do is make
14   a few copies of the pages, because I can't
15   bring a book into the institution.
16             And so in this case I would email
17   the artist and ask if I can use his work in
18   that particular way, in an educational
19   context, to show his art to students.
20        Q.   If you're friendly with somebody do
21   you still need to ask for their permission to
22   use their materials?
23             ATTORNEY ZOLOT:  Object to form.
24        A.   I think "friendly" is vague.  I
25   mean I think that, you know, as I mentioned
```

1                   S. Hoiland

2   before, there are many people where I think we

3   see it as kind of a compliment of sorts,

4   right?  If one of my friends says oh, I was

5   talking about your work to so and so.  I mean

6   generally I think that's something that people

7   are pleased about.  You're spreading the kind

8   of intellectual contributions that people are

9   making.  And that can occur in many different

10  contexts.

11       Q.   And so in that situation that you

12  just described, the person whose work you're

13  referencing is pleased because you're giving

14  them credit for their work and praising it, is

15  that an accurate assessment?

16       A.   Yes.

17       Q.   And so if you didn't give that

18  person credit but you just talked about their

19  work, then they might not be so pleased, is

20  that correct?

21            ATTORNEY ZOLOT:  Objection.

22       A.   I think you -- sorry.

23            ATTORNEY ZOLOT:  Object to form.

24       A.   I think you're using "credit" in a

25  way that I'm not.  So if I were to talk about,

1                    S. Hoiland

2   you know, my friend's book on modernist

3   interiors, of course I would say her name.

4   Right?  That would be how I would give credit,

5   would be a verbal attribution.

6        Q.   And if you created a PowerPoint

7   presentation where you copied and pasted text

8   from this friend, would you include a written

9   citation to the work?

10            ATTORNEY ZOLOT:  Objection; lacks

11       foundation.  Calls for speculation.

12       Hypothetical.

13       A.   So if the friend and I were

14   collaborators on a multi-year project, no.  It

15   would just be a given.  Like this is --

16   everyone knows we're doing this together.

17       Q.   And so you believe that you never

18   need to credit, in written form, a

19   collaborator's work on a multi-year project?

20            ATTORNEY ZOLOT:  Objection;

21       mischaracterizes testimony.

22       A.   That's not what I said at all.

23       Q.   Please clarify?

24       A.   So your original question was

25   something different.  It was if you're

```
 1                    S. Hoiland
 2   friendly with someone, do you think that you
 3   don't need to cite their work.  And what I'm
 4   saying is that if you're working with someone
 5   on a long-term or even, you know, a multi-year
 6   project, I think the assumption is that you
 7   will talk about the other person and give
 8   credit where credit is due.  Which is what I
 9   did at CCLA.
10            Now I mean on the other hand, you
11   know -- it's okay.  That's it.
12       Q.  So what would be an alternative
13   situation?  You were about to give an
14   alternative situation.
15       A.  Well, an alternative situation was
16   our ASA presentation, where Dr. Wilder did not
17   introduce me as the PI of the NICE project,
18   but as the person who's going to introduce the
19   students.  So those are very large public
20   forum, where my introduction should have been
21   as the PI of the project, and was reduced to
22   just some person who was introducing students.
23   So that's an example of where people are
24   presenting together and there's a certain
25   decorum that's expected, that someone's role
```

1                    S. Hoiland

2    be expected.

3         Q.   It depends on the size of the

4    forum, whether you need to include written

5    credit for a colleague's work?

6              ATTORNEY ZOLOT:  Objection;

7         mischaracterizes of the testimony.

8         A.   Yeah, that wasn't what I said at

9    all.

10        Q.   Right.  In the example that you

11   just gave, was the colleague presenting your

12   work as her own?

13        A.   The colleague was presenting on a

14   project that I had been working on with her

15   for three years.

16        Q.   And was your work presented as her

17   own?

18        A.   Well, if you consider my work being

19   making sure people actually completed the

20   program, then yes.  There would be no program

21   without faculty participants.

22        Q.   And does the size of the forum

23   matter when deciding whether to include a

24   written credit when referencing another's

25   work?

1                        S. Hoiland

2        A.   Well, we were discussing verbal

3   credit, or even a verbal nod to someone else

4   and who they are.  I think generally speaking,

5   you know, if the audience is going to be quite

6   large, it might be more likely that someone

7   might not be as in tune to what's being said.

8   So in that case we both had PowerPoint

9   presentations.  It was a little bit more of a

10  formal presentation, given the setting and the

11  audience.

12       Q.   And so what size of an audience

13  requires giving written credit in a PowerPoint

14  slide when referencing another's work?

15            ATTORNEY ZOLOT:  Objection; vague.

16       A.   I mean I don't know as if I have a

17  specific number that I can relay to you.  You

18  know, what I'm saying in the example that I

19  gave was there's an example of blatant not

20  giving credit to a very large audience.  And

21  so I'm not exactly sure what you're asking.

22  If I'm presenting to a football stadium am I

23  going to have citations in my PowerPoint?  I

24  don't know.  I've never done that.

25       Q.   So I believe your testimony was

1                      S. Hoiland

2    that the size of the audience matters when

3    deciding whether to give written credit.  Is

4    that accurate?

5         A.   I think there are all kinds of

6    considerations.  As I mentioned, the types of

7    presentations vary greatly.  So I feel like

8    you're asking a technical question, trying to

9    pin me to saying X amount of people need to be

10   in a room to do XY and Z, and I don't feel

11   comfortable saying that.

12        Q.   I'm just trying to understand the

13   considerations that you used.  So what

14   considerations?  Is the size of the audience a

15   factor?

16        A.   I don't think I've ever known the

17   size of the audience prior to giving a

18   presentation.  I mean with the ASA

19   presentation I just mentioned, I think

20   Dr. Wilder and I both knew that it would be

21   larger, because of the place that I submitted

22   the proposal.  So when you submit a proposal

23   to different tracks, that can give you an idea

24   as far as how many people might show up.

25                   But again it can vary widely from

1                    S. Hoiland

2    year to year, from conference to conference.

3    So in a sort of small session like the one I

4    did in CCLA, I assume it would be quite small,

5    more informal, more of a talk, less of a

6    presentation.  It was a tiny room.  That was

7    not the case with the ASA presentation, which

8    had double screens, many, many roundtables, in

9    a ballroom that could be filled with people.

10        Q.   So you've been referring to this

11   ASA presentation and I understand you

12   testified before that you and Dr. Wilder gave

13   separate presentations at that event, is that

14   correct?

15        A.   Essentially, yes.  So we were in

16   the same slot.  I submitted a proposal for us

17   to present together, and because at that time

18   there were many issues coming up between us

19   over email, I had said that I will back out of

20   the presentation altogether and she can have

21   it by herself.  And she indicated that, I

22   don't know, we would have to look at the

23   emails, but that I don't think she was

24   prepared to do it by herself, and so we

25   decided to just split the time.

1                     S. Hoiland

2         Q.   And did you give Dr. Wilder credit

3    for any contribution to your presentation at

4    this ASA conference?

5         A.   I recall acknowledging her as

6    another person in the room with whom I was a

7    PI on a project with, yes.

8         Q.   Any other --

9    (audio/video interruption.)

10             THE COURT REPORTER:  Could you

11        repeat your question, counsel?

12             ATTORNEY ZOLOT:  You froze.

13             ATTORNEY HUDAK:  I might have

14        frozen for a second and missed the

15        answer.

16             ATTORNEY ZOLOT:  I think she

17        answered the question.  I think you were

18        frozen and we didn't hear a question.

19             ATTORNEY HUDAK:  Okay.  Court

20        reporter, can you please read back the

21        last question and answer you have?

22             (Requested portion of the record

23        read back.)

24             ATTORNEY HUDAK:  Okay.  And my

25        question was:

1                    S. Hoiland

2        Q.   Did you give any other

3    acknowledgment or credits to Dr. Wilder at

4    that ASA presentation?

5        A.   I don't recall.  I mean one of her

6    students was there with my students, so I'm

7    guessing her name came up again when I

8    introduced the student as being someone who

9    had taken Dr. Wilder's class.

10       Q.   You're just speculating, though, is

11   that correct?

12       A.   Well, I mean I remember introducing

13   the students pretty clearly, and so it would

14   make sense to say why they were there.  And

15   I'm fairly certain I can say that I introduced

16   Dr. Wilder's student as her name, and that she

17   was a student of Dr. Wilder's.

18       Q.   And do you recall this or you're

19   assuming that you would have said that?

20       A.   Three years later, I'm fairly

21   certain that's what I said.

22       Q.   Based on your assumption of

23   introducing the student?

24       A.   No. Based on memory.

25            ATTORNEY ZOLOT:  Objection.

1                      S. Hoiland

2         Q.    Okay.  So you recall mentioning

3    Dr. Wilder upon introducing the student?

4         A.    That's what I said.

5         Q.    Any other mentions or credits

6    given?

7         A.    I don't believe so.

8         Q.    So we were talking before about

9    when you would ask a person for permission to

10   use their materials and we were talking about

11   the factors that you would consider when you

12   ask for permission.

13             Is one of those factors related to

14   how much of the other person's work that you

15   use?

16             ATTORNEY ZOLOT:  Objection; lacks

17        foundation.

18        A.    I think the factor in this case,

19   because I assume that's what we're talking

20   about -- are you asking about Dr. Wilder's

21   permission?  Are we back to generalities?

22        Q.    I'm asking about generalities.

23   What considerations you use when determining

24   whether to ask for permission in using

25   somebody else's work in a written material?

1                     S. Hoiland

2          A.   Well, so I'll go back, if we're

3     going to do generalities, I'll make it more

4     specific with this example of asking an

5     artist.  So an artist creates products that

6     have commercial value.  The book is sold for

7     commercial value.  Since my particular group

8     of students cannot see the art nor purchase

9     the book, I would have to reproduce pages of

10    the book in order for my students to have

11    access to it.

12               So in that case, right, I've been

13    thinking about this, planning it and like okay

14    I need to email the artist and ask if he's

15    okay with me using his work in this way.

16               Again the size of the class is

17    small, right?  And there are certain

18    limitations in terms of people not being able

19    to access the materials, and the materials

20    being commercial.

21         Q.   So one of your considerations is

22    using pages from a book, using multiple pages

23    of a book warrants asking permission?

24               ATTORNEY ZOLOT:  Objection;

25          mischaracterizes the testimony.

1                    S. Hoiland

2        A.   So I don't think there's one factor

3   to consider.  I think there are many.  Another

4   being I don't know the artist.  I don't

5   have ...

6        Q.   Okay.  I want to understand what

7   these factors are.  You keep just saying that

8   there are many factors but we haven't

9   discussed any of these factors in particular.

10  So is the size or the amount of the material

11  used a factor when deciding whether permission

12  needs to be asked?

13       A.   Yes.

14       Q.   And is there a certain percentage

15  of the material being used that would warrant

16  asking for permission?

17       A.   I don't know if I can distill it to

18  a percentage.

19       Q.   If you use more than 50 percent of

20  a given material, would that warrant asking

21  for permission?

22            ATTORNEY ZOLOT:  Objection; calls

23       for speculation.

24       A.   Well, so this particular book is

25  hundreds of pages.  I would plan to use some

```
1                       S. Hoiland

2     of those pages.  But it's not the number of

3     pages per se.  Right?  Each piece of art is

4     uniquely created by this artist.

5          Q.   So even just one page would warrant

6     asking for permission?

7               ATTORNEY ZOLOT:  Objection;

8          mischaracterizes testimony.

9          A.   I don't know.  Again at this point

10    like I would probably ask someone before I

11    were to do something like that.  My first

12    instinct in that case was to reach out to the

13    artist.

14         Q.   Are there any other factors that

15    you use when considering whether to ask for

16    permission to use another's work?

17         A.   Well, I said in this case because

18    the work is -- has commercial value, great

19    commercial value.  It's in the Guggenheim.

20    That's a consideration.

21              I think I'm a little more -- I

22    think copyright is protected a little more

23    tightly in certain areas, maybe art and music

24    and things that are completely new in an

25    individual's contribution.
```

1                    S. Hoiland

2               Again, as I said, in academia a lot

3    of things are borrowed and reused and recycled

4    and it's a different context.  Artists don't

5    do that in the same way.

6          Q.   In academia is there a habit of

7    giving citations when other sources are

8    referenced?

9               ATTORNEY ZOLOT:  Objection; vague.

10         A.   I mean it depends what the context

11   is.  If I'm speaking to you or if I'm speaking

12   to a class and I might say this thinker came

13   up with this idea, I might not have a full

14   citation behind it but I'm going to tell them.

15              ATTORNEY ZOLOT:  Sandra, is now a

16         good time for a break?

17              ATTORNEY HUDAK:  We can take a

18         break.  Let's go off the record.

19              THE COURT REPORTER:  Thank you.

20                    ---

21         (Recess from 5:35 to 5:48.)

22                    ---

23              ATTORNEY HUDAK:  Back on the record

24         after a short break.

25         Q.   So Dr. Hoiland, I think you

1                      S. Hoiland

2    testified before that you were promoted at

3    Hostos from an assistant professor to an

4    associate professor in the year 2020, but I'm

5    not sure if we got a month for that before.

6    Do you recall around what month that promotion

7    occurred?

8         A.   I believe it was finalized in

9    November of 2020.  And then back dated to

10   September 1 of 2020.

11        Q.   And do you have documents

12   concerning that promotion, such as what time

13   period it occurred in?

14        A.   I believe I received a letter

15   stating that my promotion was effective

16   September 1.

17        Q.   And did you produce that document

18   in this litigation?

19        A.   I don't believe so.

20             ATTORNEY HUDAK:  We would request a

21        copy of that letter.

22             ATTORNEY ZOLOT:  You froze.

23             ATTORNEY HUDAK:  Sorry, I didn't

24        hear a response?

25             ATTORNEY ZOLOT:  You froze.

1                    S. Hoiland

2            ATTORNEY HUDAK:  Oh, I asked for --

3            ATTORNEY ZOLOT:  I think you froze

4       again as you started to say.

5            ATTORNEY HUDAK:  All right.  I'm

6       unfrozen now?

7            ATTORNEY ZOLOT:  Yes.

8            ATTORNEY HUDAK:  Okay.  We were

9       talking about a letter that concerns the

10      promotion of Dr. Hoiland from assistant

11      professor to associate professor and the

12      timing of that and I was just requesting

13      a copy of the letter be produced.

14      Please let me know if I freeze again

15      because I can't tell.

16           ATTORNEY ZOLOT:  No, you didn't.

17           ATTORNEY HUDAK:  Great.  Thank you.

18      Q.   So the CCLA conference occurred in

19   around February 2019, is that correct?

20      A.   Correct.

21      Q.   And since that time have you

22   applied for any other grants?

23      A.   Yes.

24      Q.   What grants have you applied for?

25      A.   So I had a PSC-CUNY grant in 2020,

1                        S. Hoiland

2   I believe.  I would have to check the dates on

3   that, though, because the application probably

4   went in the December before CCLA.  I'm not

5   sure, I would have to check.

6            I currently have an NSF grant that

7   I applied for in May of 2020.

8        Q.   Did you apply for any other grants

9   since February 2019?

10       A.   Yes.  I applied for a National

11  Institute of Health grant in I believe we

12  submitted it in November -- October or

13  November of 2019.

14       Q.   Any other grants?

15       A.   I don't believe so.

16       Q.   I believe that you listed out three

17  grants just now.  PSC CUNY grant, an NSF grant

18  and an NIH grant.  Is that correct?

19       A.   Correct.

20       Q.   So each of the applications for

21  those three grants, did you list your

22  presentation at the CCLA conference in the

23  application materials?

24       A.   Yes.

25       Q.   Did you receive each of those three

1                    S. Hoiland

2   grants that you just listed?

3        A.    No.

4        Q.    Which ones did you not receive?

5        A.    The NIH was a revise and resubmit.

6   And I did not revise and resubmit.  The

7   PSC-CUNY, which again I would have to check

8   the dates, I have four or five of them, and

9   the last one I believe was predominantly in

10  20 -- I can't remember whether it was 2019,

11  2020.  I can't remember the dates.  But yes,

12  the CCLA would have been listed as one of I

13  think 35 plus presentations that I've given

14  during my tenure at CUNY.

15       Q.    And you said the PSC-CUNY grant you

16  did not receive?

17       A.    No, I did receive the PSC-CUNY and

18  the NSF proposal was funded.

19       Q.    Have you applied for any

20  professional honors since February 2019?

21       A.    Yes, I submitted a book chapter for

22  the Barbara R. Walters board through the

23  Eastern Sociological Society and I received

24  that award in February of 2020.

25       Q.    And did you list your presentation

```
 1                     S. Hoiland
 2   at the CCLA conference in your application
 3   materials for the Barbara R. Walters honor
 4   that you just mentioned?
 5        A.   Yes.  So again I think my CV is 15
 6   pages or so, it's two lines in that CV.
 7        Q.   And other than the Barbara R.
 8   Walters honor have you applied for any other
 9   professional honors since February 2019?
10        A.   So the Mellon/ACLS fellowship.
11   That was not -- that was before CCLA.  I'm
12   sorry.  So I received that in 2019 so the
13   application would have gone in in 2018.
14        Q.   Have you applied for any other
15   professional honors other than the -- the
16   Barbara R. Walters and Mellon/ACLS fellowship?
17   Am I unfrozen now?
18        A.   Yes.  So there was an application,
19   and I don't recall when it was submitted for
20   the CUNY academy junior faculty.  There's two
21   separate awards.  I think one is the Feliks
22   Gross and the other is the Henry Wasser.  My
23   provost nominated me and I did not receive
24   that.  Again, I'm not sure whether that was
25   submitted before -- well, it had to have
```

Page 238

1                       S. Hoiland

2      been -- I don't know.  It was somewhere in

3      that time period.

4           Q.   Are there any other professional

5      honors that have not been listed so far?

6           A.   I mean if you want to include --

7      no.  There's professional service, which is a

8      separate kind of category.

9           Q.   And what's professional service?

10          A.   Be nominated and elected to

11     different positions in professional societies.

12     The work.  Volunteer work.

13          Q.   Do you apply for those positions?

14          A.   No.

15          Q.   How do you get appointed to the

16     positions?

17          A.   Nomination.

18          Q.   Have you applied for any other

19     professional opportunities that haven't been

20     mentioned so far since February 2019?

21          A.   Not that I recall.

22          Q.   I am going to share my screen.  Do

23     you see that I have shared a document on the

24     screen?

25          A.   Yes.

1                     S. Hoiland

2       Q.   This is a document produced by

3  defendant in this case with Bates numbers D

4  486 through D 500.  I'll mark this as exhibit

5  21.

6                    ---

7            (Exhibit 21, project description,

8            Bates D0486 through 500 was marked for

9            identification)

10                   ---

11      Q.   Do you recognize this document?

12      A.   Yes.

13      Q.   And what do you recognize this

14  document to be?

15      A.   This is the proposal for the NSF

16  funded project, Hostos Oasis For Parents'

17  Education.

18      Q.   So this is the application for the

19  NSF grant that you testified you applied for

20  in around May 2020 and received?

21      A.   This is not the full application.

22  This is part of it.  This is the project

23  description.

24      Q.   What other parts were involved in

25  the application?

1                      S. Hoiland

2         A.    So it's similar to the application

3    that was submitted with discovery.  They can

4    be 135-plus pages.  There's a lot of

5    documentation.  It includes a cover page, a

6    facilities page, CVs from each of the PI and

7    co-PIs.  It includes budgets and budget

8    justifications.  This is a five-year project,

9    so it was a five-year budget, a cumulative

10   budget.  Budget justification.  Conflict of

11   interest forms for each of the co-PIs and

12   myself.  Some other documentation about who

13   people have collaborated with.

14        Q.    What do you mean communications

15   about who people have collaborated with?

16        A.    So there's a standard form that

17   asks, I would have to look at it, but it's who

18   you have worked with in the past X amount of

19   years.

20        Q.    And do you see that this is a

21   15-page document and there are redactions on

22   every page of the document?  What information

23   is redacted in this document?

24             ATTORNEY ZOLOT:  Objection.

25             ATTORNEY HUDAK:  Let me rephrase.

1                         S. Hoiland

2          Q.    Please do not reveal any

3    attorney-client communications, however, since

4    you represented that this is a document that

5    was submitted to a third party I did not

6    believe there to be any attorney-client

7    privileged information.  So let's start with

8    do the redactions relate to any

9    attorney-client privileged information?

10         A.    No.

11         Q.    All right.  What is the information

12   that's redacted in this document?

13         A.    The information is related to the

14   project that was funded.

15         Q.    And why was it redacted?

16               ATTORNEY ZOLOT:  Objection.

17         A.    So this project just started, it's

18   in its first year, and my understanding, and

19   what I've been advised -- and including what

20   Dr. Wilder had told me when she had shared the

21   NICE proposal with me and other proposals --

22   is that you don't share them with other

23   people.  Right?  So there's no purpose of

24   having that text available in this litigation,

25   it's completely unrelated.

1                     S. Hoiland

2          Q.    So the text was redacted based on a

3     determination that the text was not relevant

4     to the issues in this litigation?

5                ATTORNEY ZOLOT:  Objection.  I am

6          going to counsel my client not to answer

7          about decisions that lawyers made about

8          relevant redactions.

9          Q.    And Dr. Hoiland, are you going to

10    take your counsel's advice?

11         A.    Yes.

12               ATTORNEY HUDAK:  So we would

13         request an unredacted version of this

14         document.

15         Q.    I'll take that exhibit down.  That

16    was exhibit 21.

17               When did you first make contact

18    with any lawyer about the issues in this

19    litigation?

20               ATTORNEY ZOLOT:  Objection.  I'm

21         just going to counsel my client not to

22         reveal any attorney-client privileged

23         communications.

24         A.    So I believe it was shortly after

25    receiving the demand letter from Janet Linn.

```
 1                    S. Hoiland
 2        Q.   And do you remember what,
 3   approximately what time frame that was?
 4        A.   I'm fairly certain the demand
 5   letter came on June 10, 20 -- 2021.
 6        Q.   And were the lawyers you contacted
 7   your current lawyers at Davis & Gilbert?
 8        A.   So I was referred to a different
 9   attorney at this firm.
10        Q.   But you did not make contact with
11   any other lawyers at other law firms, is that
12   correct?
13        A.   No.
14        Q.   And in this litigation you were
15   representing yourself pro se from the start of
16   the case until about mid-October, is that
17   correct?
18        A.   Yes.
19        Q.   And is it correct to say that
20   during the time you were representing yourself
21   pro se you received assistance from attorneys
22   regarding this litigation?
23        A.   I received some assistance, yes.
24        Q.   And in all instances when you
25   received assistance from counsel in this
```

```
 1                      S. Hoiland

 2   litigation when you were representing yourself

 3   pro se, was that legal assistance provided by

 4   your current attorneys, Davis & Gilbert?

 5        A.   Yes.

 6        Q.   And is it correct that in some of

 7   the documents that were filed and exchanged in

 8   this case you stated on the paper that the

 9   document was prepared with the assistance of

10   counsel admitted in the Southern District of

11   New York?

12        A.   Yes.

13        Q.   And is it correct to say that other

14   documents that were filed or submitted or

15   exchanged with counsel in this case while you

16   were representing yourself pro se did not

17   include that statement?

18        A.   I'm not sure what you're referring

19   to.

20        Q.   Sure.  Let me rephrase.  So in

21   every instance when you received assistance

22   from an attorney in preparing documents to be

23   either filed with the court or exchanged with

24   counsel for plaintiff, did you identify on the

25   document that you received assistance from the
```

Page 245

```
 1                    S. Hoiland
 2    attorneys in preparing the document?
 3         A.   I'm not sure.
 4         Q.   Did you receive assistance from
 5    counsel regarding your responses to
 6    plaintiff's first set of document requests?
 7         A.   I want to say no.  I recall the
 8    timing of that and I -- I don't think I had
 9    assistance with that.  Or if it was, it was
10    very minimal.
11         Q.   Did you receive assistance from
12    counsel in collecting documents in response to
13    plaintiff's first set of document requests?
14         A.   Wait, didn't you just ask me that?
15    I missed the difference from the question
16    before.
17         Q.   Sure.  So the question I asked
18    before related to the formal written responses
19    regarding plaintiff's document requests.  And
20    now I'm asking as far as collecting documents
21    in response to those document requests, did
22    you receive assistance from counsel?
23         A.   No.
24         Q.   During the time that you were
25    representing yourself pro se in this
```

1                    S. Hoiland

2    litigation did you pay any attorney fees to

3    Davis & Gilbert?

4         A.   Yes.

5         Q.   And why was that?  Because they

6    were providing you with legal services?

7         A.   Yes.

8         Q.   At some point during the time when

9    you were representing yourself pro se in this

10   litigation did Davis & Gilbert stop charging

11   you attorneys' fees?

12        A.   No.

13        Q.   Have you paid all attorneys' fees

14   incurred during the course of this litigation?

15             ATTORNEY ZOLOT:  Objection;

16        relevance.

17        A.   Can you go back to your last

18   question?  Did you ask if they stopped

19   charging me when I was pro se?

20        Q.   Yes, I did ask that question.  I

21   might have phrased it slightly differently.

22   But yes, I did ask that question.

23        A.   So the answer to that is yes.  I

24   just wanted to -- I thought maybe I misheard

25   you.

```
1                    S. Hoiland

2        Q.   I'm sorry.  I believe that your

3   testimony before was no, they did not stop

4   charging you.  Let's back up a bit.

5             Was there a point in time when

6   Davis & Gilbert stopped charging you

7   attorneys' fees during this litigation?

8        A.   At the time when they became my

9   official representation, then the charges

10  stopped.

11       Q.   But prior to that, when

12  representing yourself pro se, you were being

13  charged attorneys' fees, is that correct?

14       A.   Yes.

15       Q.   And just to be clear.  Since the

16  time that Davis & Gilbert has entered an

17  appearance in this action, you have not been

18  charged any attorneys' fees?

19       A.   As far as I know, the answer is no.

20  But that's relatively recent, so I don't -- I

21  don't know when the last billing cycle ends

22  and the next one begins.

23       Q.   Since the time that Davis & Gilbert

24  entered an appearance in this action have you

25  incurred any attorneys' fees from Davis &
```

```
 1                    S. Hoiland
 2   Gilbert?
 3        A.   I am not sure.  We would have to
 4   check with the accountant here.  I have not
 5   received any invoices of amounts due.
 6        Q.   Is it your understanding that Davis
 7   & Gilbert has represented to the court in this
 8   litigation that they are representing you on a
 9   pro bono basis?
10        A.   Yes.
11        Q.   And is it a truthful statement to
12   say that Davis & Gilbert is representing you
13   on a pro bono basis?
14        A.   Yes.  My understanding is part of
15   that agreement is that there are fees that can
16   be incurred.
17        Q.   And do those fees relate to
18   attorney services?
19             ATTORNEY ZOLOT:  Sandra, where is
20        this line of questioning going?  You're
21        tripping her up with fees and costs and
22        asking her about pro bono
23        representation.  What's your point here?
24             ATTORNEY HUDAK:  I am just asking
25        about representations that were made to
```

```
1              S. Hoiland
2   the court in this case.
3        ATTORNEY ZOLOT:  Right.  That
4   counsel prepared, and counsel made to
5   the court.  So you're asking her --
6        ATTORNEY HUDAK:  The defendant
7   in --
8        ATTORNEY ZOLOT:  You are asking the
9   witness whether she -- whether she's
10  being charged for fees.  Fees, costs,
11  mean different things.  So I think
12  you're trying to confuse her and
13  you're --
14       ATTORNEY HUDAK:  Yes, I'm trying
15  to understand --
16       (Multiple speakers)
17       ATTORNEY ZOLOT:  -- going to try
18  to --
19       (Multiple speakers.)
20       ATTORNEY HUDAK:  That's uncalled
21  for.  I'm just trying to understand
22  representations that were made to the
23  court.
24       ATTORNEY ZOLOT:  By her attorneys.
25       ATTORNEY HUDAK:  On her behalf.
```

1                    S. Hoiland

2              ATTORNEY ZOLOT:  By her attorneys.

3        I'll stick with that.

4              ATTORNEY HUDAK:  All right.

5        A.   So I don't know what my attorneys

6    have --

7              ATTORNEY HUDAK:  Can the court

8        reporter read back the last question.

9              THE COURT REPORTER:  Did you ask me

10       to read back the last question?

11             ATTORNEY HUDAK:  Yes, I was trying

12       to understand where we left off before

13       that aside.

14             (The reporter read back as follows:

15             "Question:  And do those fees

16       relate to attorney services?")

17             THE COURT REPORTER:  And then we

18       had some colloquy.

19             ATTORNEY ZOLOT:  Objection.  I'm

20       going to again instruct my witness not

21       to answer these questions about the

22       nature of her legal representation with

23       our firm.

24             ATTORNEY HUDAK:  I am asking about

25       fees, and defendant made a

```
 1                S. Hoiland
 2  representation to the court that she was
 3  being represented on a pro bono basis,
 4  and so I'm just trying to --
 5       ATTORNEY ZOLOT:  Right.
 6       ATTORNEY HUDAK:  -- understand the
 7  nature of that statement.
 8       ATTORNEY ZOLOT:  Right.  And she
 9  already testified that she hasn't
10  received a bill for fees since she's
11  been represented by counsel on a
12  pro bono basis.  So --
13       ATTORNEY HUDAK:  And she was unsure
14  if she was going to be billed.  So
15  that's where the follow-up questions are
16  coming from.
17       ATTORNEY ZOLOT:  So then how could
18  you ask her some hypothetical question
19  about whether she knows what's in the
20  future when she's being represented on a
21  pro bono basis under the guise that --
22       ATTORNEY HUDAK:  You know that
23  invoices take a month to go out.  So I'm
24  just asking about that.  There's a
25  timeline.
```

1              S. Hoiland

2         ATTORNEY ZOLOT:  She was being

3    represented on a pro bono basis.  What

4    is the point of this line of

5    questioning?

6         ATTORNEY HUDAK:  I am just trying

7    to get a basis for that statement.

8         ATTORNEY ZOLOT:  It is so

9    irrelevant and it's improper.  So I'm

10   cutting it off.  That's it.

11        ATTORNEY HUDAK:  So are you

12   instructing your witness not to answer?

13        ATTORNEY ZOLOT:  Yeah.  Like I have

14   for the last five minutes.

15        ATTORNEY HUDAK:  And on what basis

16   are you instructing her not to answer?

17        ATTORNEY ZOLOT:  On the basis that

18   the nature of her legal representation

19   with counsel is not relevant to the

20   litigation and --

21        ATTORNEY HUDAK:  You can't

22   object -- or you can't instruct a

23   witness not to answer based on

24   relevance.

25        ATTORNEY ZOLOT:  Based on

```
1                 S. Hoiland
2    confidentiality.  Based on
3    attorney-client privilege.
4         ATTORNEY HUDAK:  What is the
5    attorney-client privilege that you're
6    alleging here?
7         ATTORNEY ZOLOT:  Sandra --
8         ATTORNEY HUDAK:  What's the
9    attorney-client privilege that you're
10   alleging here?
11        ATTORNEY ZOLOT:  What goes into the
12   nature of the representation.
13        ATTORNEY HUDAK:  I am asking about
14   fees.  Not about any legal advice.
15        ATTORNEY ZOLOT:  And she has
16   testified now numerous times that she
17   has not received a bill for fees from
18   our firm since we have taken on her
19   representation pro bono.
20        ATTORNEY HUDAK:  And she said that
21   she didn't know if she was going to
22   receive a --
23        ATTORNEY ZOLOT:  Okay.
24        ATTORNEY HUDAK:  -- bill for recent
25   activity.  So that's what I am trying to
```

1                    S. Hoiland

2          get at here.

3               ATTORNEY ZOLOT:  So she doesn't

4          know.  So what are you asking?  Whether

5          she doesn't know something else?

6               ATTORNEY HUDAK:  I was trying to --

7               ATTORNEY ZOLOT:  The nature of her

8          not knowing it?  This is ridiculous.

9               ATTORNEY HUDAK:  Can the court

10         reporter read back the last two

11         questions and answers, please.

12               (The reporter read back as follows:

13               "Question:  And is it a truthful

14         statement to say that Davis & Gilbert is

15         representing you on a pro bono basis?")

16               (The reporter read back as follows:

17               "Answer:  Yes.  My understanding is

18         part of that agreement is that there are

19         fees that can be incurred.")

20         Q.   So a question is pending.  I

21    believe that your counsel may be instructing

22    you not to answer.  I'm not sure if she is

23    maintaining that after the read back.

24               ATTORNEY HUDAK:  Is there an

25         objection?

1                    S. Hoiland

2         ATTORNEY ZOLOT:  I'll object that

3      it calls for speculation.  I'll instruct

4      my witness not to answer something if

5      she does not know the answer to your

6      question.

7         ATTORNEY HUDAK:  Are you

8      instructing your witness not to answer

9      or just not to speculate?

10         ATTORNEY ZOLOT:  I'll instruct her

11      not to answer.

12         ATTORNEY HUDAK:  On the basis of

13      attorney-client privilege?

14         ATTORNEY ZOLOT:  Yes.

15      Q.   Dr. Hoiland, is it your

16  understanding that your counsel will be

17  representing you on a pro bono basis for the

18  continuation of the litigation?

19         ATTORNEY ZOLOT:  Objection; calls

20      for speculation.  But you can answer.

21      A.   I don't know.

22      Q.   I am not asking about the contents

23  of any agreement but is there an agreement in

24  place with your attorneys regarding the fees

25  being incurred in this matter?

1                          S. Hoiland

2          A.    Yes.

3          Q.    And do you have an understanding of

4     the contents of that agreement?

5          A.    I have a basic understanding.

6          Q.    And is it still your testimony that

7     you don't know if plaintiff -- if counsel will

8     be representing you on a --

9                ATTORNEY HUDAK:  Let me strike

10          that.

11          Q.    With an understanding of the

12     agreement with your attorneys, it's your

13     position that you don't know if your counsel

14     will be representing you on a pro bono basis

15     for the remainder of this litigation?

16          A.    I don't know.

17          Q.    Have you communicated with anybody

18     at NSF, the National Science Foundation, about

19     this litigation?

20          A.    Yes.

21          Q.    And who have you communicated with?

22          A.    So I reached out to my program

23     officer on my current project and my previous

24     program officer from the NICE project.

25          Q.    What are the names of those two

1                    S. Hoiland

2  individuals?

3        A.   Michael Davis and Karen Keene.

4        Q.   Have you produced all of the

5  communications that you had with these two

6  individuals about this litigation?

7        A.   Yes.

8        Q.   Are there any other individuals

9  that you spoke with -- (audiovisual

10 interruption)

11            THE WITNESS:  We lost you.

12       Q.   -- at the National Science

13 Foundation about this litigation?

14            ATTORNEY HUDAK:  Am I unfrozen now?

15       Can you hear me now?

16            THE WITNESS:  Yes.

17       Q.   I was just asking if there is

18 anybody else that you didn't mention other

19 than the two individuals that you just

20 mentioned, Michael Davis and Karen Keene?

21       A.   So Dr. Keene forwarded my email to

22 other individuals at NSF, and their names are

23 on the documents I produced.

24       Q.   Anybody else at NSF that you know

25 of, that you've communicated with about this

1                    S. Hoiland

2    litigation?

3         A.   No.

4         Q.   Have you communicated with anyone

5    at the National Numeracy Network about this

6    litigation?

7         A.   No.

8         Q.   Have you communicated with anybody

9    at ASA about this litigation?

10        A.   Yes.

11        Q.   Who have you communicated with?

12        A.   Nancy Kidd.  And she cc'd, her name

13   is escaping me right now.  So Nancy Kidd was

14   going on personal leave and so she cc'd the

15   person who would be taking her place while she

16   was away, who was like the vice executive

17   director.  Margaret Vitullo.

18        Q.   Have you communicated with anybody

19   else at ASA about this litigation?

20        A.   No.

21        Q.   When was the last time that you

22   communicated with Nancy Kidd about this

23   litigation?

24        A.   I believe it was February or March.

25        Q.   Of this year?

1                    S. Hoiland

2          A.    Correct.

3          Q.    And have you produced all written

4    communications with Nancy Kidd about this

5    litigation?

6          A.    Yes.  I think you asked me that.

7          Q.    Have you communicated with anyone

8    else other than your attorneys about this

9    litigation?

10         A.    With anyone else other than my

11   attorneys and the NSF and the ASA?

12         Q.    Yes.

13         A.    Are you including family?

14         Q.    We can exclude family.  Any third

15   parties.

16         A.    So I believe I listed them all in

17   the interrogatory.  I have some very close

18   friends who are also faculty at CUNY.  They're

19   aware of the current litigation.  I informed

20   my department chair.  And since the -- I don't

21   know if he informed our college president or

22   if I did, but she's aware of the current

23   litigation.

24              And I also -- I reached out to John

25   Tsapogas at the research foundation, asking

1                    S. Hoiland

2    whether I should involve NSF at this time.

3        Q.    Anybody else that you can recall?

4        A.    My unit coordinator who is my

5    direct report.

6        Q.    Anybody else?

7        A.    I don't think so.

8             ATTORNEY HUDAK:  I want to share a

9        document.  Do you see that I've shared a

10       document on the screen?

11       A.    Yes, I do.

12       Q.    This document was produced by

13   defendant in this action with Bates stamps

14   D 352 through D 354.  I would like to mark

15   this as exhibit 22.

16                    ---

17            (Exhibit 22, email, Bates D0352

18       through D 354 was marked for

19       identification)

20                    ---

21       Q.    Do you recognize this document?

22       A.    Yes, I do.

23       Q.    What do you recognize this document

24   to be?

25       A.    This is an email between myself and

1                    S. Hoiland

2    Dr. Yoel Rodriguez.

3         Q.   And generally what is the subject

4    matter of this email chain?

5         A.   Well, the title of it is "RIO

6    Matter," which is research integrity officer.

7              ATTORNEY ZOLOT:  If you need her to

8         scroll through to show her the whole

9         email.

10             ATTORNEY HUDAK:  Sure.  Let me know

11        when you would like me to scroll through

12        to the next page.

13             ATTORNEY ZOLOT:  Doesn't it start

14        at the bottom?

15             ATTORNEY HUDAK:  Oh, sure.  Let me

16        know how you would like to review it.

17             Would you like me to scroll to the

18        last page?

19             THE WITNESS:  You can scroll past

20        the first one.

21             ATTORNEY HUDAK:  All right.  I'll

22        go to the second page.  Let me know when

23        you need me to scroll.

24             THE WITNESS:  Yes.

25             (Scrolling.)

Page 262

```
1                    S. Hoiland

2              THE WITNESS:  Yes.

3              ATTORNEY HUDAK:  I'll scroll to the

4         last page.

5              (Scrolling.)

6              THE WITNESS:  Yes.

7         Q.   So do you recall what this email

8    chain generally relates to?

9         A.   Yes.

10        Q.   And what is that?

11        A.   Well, so the -- I'm asking him if

12   we can speak about whether or not I should

13   pursue something through ASA in conjunction

14   with this lawsuit.

15        Q.   I will scroll to the second page of

16   the document and I'm looking at paragraph 4,

17   which is on page marked D 353.  And it says:

18   "If the COPE committee finds my complaint to

19   have merit, there are specific actions they

20   can take, which I believe would, once and for

21   all, end this two-year ordeal."

22              Did I read that correctly?

23        A.   Yes.

24        Q.   And this is (undecipherable) is

25   that correct?
```

Page 263

1                    S. Hoiland

2       A.   Yeah.   You're cutting out but I

3    think I heard it.

4            THE COURT REPORTER:   I'm sorry.

5            Could you repeat your last question

6            counsel?

7            ATTORNEY HUDAK:   Sure.   I read the

8            first sentence of the fourth paragraph

9            and then I asked the witness if this was

10           a statement made by her to Yoel

11           Rodriguez.   And I believe the witness

12           answered yes.

13      A.   Yes.

14      Q.   And the next sentence says, "The

15   process is highly confidential but could

16   result in a formal letter of their findings

17   and determination being sent to CUNY as well

18   as a termination or suspension of Dr. Wilder's

19   membership in ASA."

20           Did I read that correctly?

21      A.   Yes.

22      Q.   Were you hoping that Dr. Wilder

23   would be terminated or suspended from ASA?

24           ATTORNEY ZOLOT:   Object to form.

25      A.   I was not hoping for any outcome

1                    S. Hoiland

2   other than that there would be some resolution

3   to this matter, which is why I went to ASA in

4   the first place.

5          Q.   This sentence specifically

6   discusses a potential termination or

7   suspension of Dr. Wilder's membership in ASA,

8   is that correct?

9          A.   So it says it can result in.   These

10  are the things that ASA can do.

11         Q.   And that was one potential outcome?

12         A.   As I'm reading it, it's more than

13  one potential outcome.   There can be a formal

14  letter of their findings, and there can be

15  terminations or suspensions of membership.

16         Q.   And so termination or suspension of

17  membership was a potential outcome?

18         A.   Correct.

19         Q.   I am going to take this exhibit

20  down.

21              (Pause.)

22              ATTORNEY HUDAK:  Let's go off the

23         record and take a ten-minute break if

24         that's okay.  I just need to look at my

25         notes to see if there's anything left.

1                    S. Hoiland

2          ATTORNEY ZOLOT:  Sure.

3               ---

4     (Recess from 6:38 to 6:53.)

5               ---

6          ATTORNEY HUDAK:  Back on the

7     record?

8          THE COURT REPORTER:  We're back on

9     the record.

10         ATTORNEY HUDAK:  I just want to

11    share my screen again.

12    Q.   Do you see that I have shared a

13 document on the screen?

14    A.   Yes.

15    Q.   And this is a document produced by

16 defendant in this case with Bates number D 275

17 through D 278.

18               ---

19         (Exhibit 23, email, Bates D0275

20    through  278 was marked for

21    identification)

22               ---

23    Q.   Do you recognize this document?

24    A.   Can you scroll down?

25    Q.   Sure.

```
 1                    S. Hoiland
 2        A.   Yes.
 3        Q.   Would you like me to keep
 4   scrolling?
 5        A.   Yes.
 6             (The witness reviews document.)
 7        A.   Okay.  Yes, I'm familiar.
 8        Q.   What do you recognize this document
 9   to be?
10        A.   This is an email communication
11   between myself and Nancy Kidd and Margaret
12   Vitullo.
13        Q.   What's the general subject matter
14   of this email chain?
15        A.   Can you scroll back up --
16        Q.   Sure.
17        A.   -- to the third page?  So this was
18   about the summons I received and talking to
19   them about a COPE case, with the ASA.
20        Q.   And the COPE case was related to
21   the dispute you were having with Dr. Wilder?
22        A.   Yes.
23        Q.   And this is the same COPE case that
24   we were discussing before in an email chain
25   with Nancy Kidd, is that correct?
```

1                    S. Hoiland

2        A.    No.   So the basis I think and the

3   tenor of it had changed from me asking for

4   mediation and for ASA to weigh in and make

5   some recommendations to settle the dispute

6   prior to any of the litigation.   That was the

7   communication in 2019.   This communication is

8   in 2022 and it's related to me making an

9   ethics complaint against Dr. Wilder.

10       Q.    And is the COPE case that you are

11  referencing in this email on page 3 of the

12  document related to an ethics complaint that

13  you wished to make against Dr. Wilder?

14       A.    Yeah, so I did not make that ethics

15  complaint, but in these set of emails we were

16  discussing it.

17       Q.    All right.   And in this set of

18  emails, the email that we're looking at on

19  page 3 of the document which has Bates number

20  D 277, there's an email dated February 11,

21  2022 from you to Nancy Kidd, is that correct?

22       A.    Yes.

23       Q.    And in the fourth paragraph you

24  say:   "Thus, the COPE case is more important

25  than ever."

1                    S. Hoiland

2          Did I read that correctly?

3     A.    You cut out, but I believe so.

4     Q.    All right.  And the next sentence

5  says:  "Also I was afraid a COPE case would

6  incense her more, so I held back, but since

7  she's filed a lawsuit anyway, I am ready."

8          Did I read that correctly?

9     A.    Yes.

10     Q.    And is the "her" and "she" that

11  you're referring to in this email Dr. Wilder?

12     A.    Yes.

13     Q.    And then the next sentence says:

14  "Feel free to relay this information to

15  Margaret Weigers Vitullo as I know she will be

16  coordinating this case.  I will let my

17  attorney know this is in the works when I

18  speak to him again next week and ask him about

19  timing and whether the COPE case could prolong

20  the legal (fees) fight."

21          Did I read that correctly?

22     A.    Yes.

23     Q.    And then you go on to say:  "In

24  that case, it might be better to hold off or

25  it might be better to do it right away and

Page 269

```
 1                    S. Hoiland
 2   perhaps this will end more quickly if she
 3   realized her professional reputation could be
 4   at stake."
 5             Did I read that correctly?
 6        A.   Yes.
 7        Q.   And so what did you mean when you
 8   said her professional reputation could be at
 9   stake?
10        A.   So the ethics claim, I think it's
11   copied and pasted on a different email, is
12   related to making frivolous or baseless or
13   complaints specifically designed to harm
14   another member of the ASA, which I believe
15   Dr. Wilder is doing.
16        Q.   And by going forward with the COPE
17   case were you hoping that her professional
18   reputation would be at stake and be harmed?
19             ATTORNEY ZOLOT:  Object to form.
20        A.   No, I do not hope that her
21   professional reputation is harmed.
22        Q.   And so why were you mentioning that
23   you thought that this will end more quickly if
24   she, Dr. Wilder, realized her professional
25   reputation could be at stake?
```

```
 1                    S. Hoiland

 2        A.   Well, a litigation is extremely

 3   costly and it's not money that I have or that

 4   am prepared to spend to fight over something

 5   that I strongly felt like could have been

 6   resolved within our professional association.

 7        Q.   So you thought that the threat of

 8   filing a COPE case would motivate Dr. Wilder

 9   in this litigation?

10             ATTORNEY ZOLOT:  Objection;

11        mischaracterizes the testimony.

12        A.   Again, I feel that COPE would have

13   been much better suited to handle the current

14   dispute, not copyright attorneys.  COPE is

15   free.  It's a service to members of the

16   organization.  It's confidential.  And they're

17   specifically there to work with faculty

18   surrounding issues like this.

19        Q.   And again you mentioned in this

20   email that you thought this will end more

21   quickly if she realized her professional

22   reputation could be at stake.  Why were you

23   mentioning Dr. Wilder's professional

24   reputation here?

25             ATTORNEY HUDAK:  Objection; asked
```

1                          S. Hoiland

2          and answered.

3          A.    So as I said, I believe that she

4     did violate one of the ethical principles and

5     since she had been on the offensive for the

6     past almost three years at this point, I

7     thought that potentially if an outside body

8     that has knowledge of our professional ethics

9     was willing to weigh in and look at the

10    existing events that had transpired from 2019

11    all the way up until this email in February of

12    2022, that that might motivate Dr. Wilder to

13    stop.

14         Q.    So you thought that filing a COPE

15    case would motivate Dr. Wilder to drop her

16    lawsuit, is that correct?

17         A.    I didn't say drop the lawsuit.  I

18    think that this could have very easily been

19    settled outside of the court system and it

20    wasn't.  I think as a member of ASA I have a

21    right to COPE and to seek professional

22    guidance.

23         Q.    And again this last sentence talks

24    about the litigation ending more quickly if

25    Dr. Wilder realized her professional

```
 1                    S. Hoiland

 2   reputation could be at stake.  And that is in

 3   reference to the COPE case you were intending

 4   to file, is that correct?

 5              ATTORNEY ZOLOT:  Objection;

 6         mischaracterizes the testimony.

 7         A.   Can you ask the question again?  I

 8   feel like you've asked the same thing over and

 9   over and maybe I'm not hearing you correctly.

10         Q.   Possibly because you haven't

11   answered my question.  So you make a reference

12   here to the litigation ending more quickly if

13   Dr. Wilder realized her professional

14   reputation could be at stake.  And you make

15   this in reference to your discussion of the

16   COPE case.  Is that correct?

17         A.   Yes.

18         Q.   So you thought by filing the COPE

19   case the litigation would end more quickly

20   because Dr. Wilder's professional reputation

21   could be at stake, is that correct?

22         A.   That's what I wrote in the email.

23   I believe she's put her own professional

24   reputation at stake by the action she's taken

25   since 2019.
```

1                     S. Hoiland

2        Q.   And you thought that the COPE case

3   would cause the litigation to end more quickly

4   because it would potentially impact her

5   professional reputation, is that correct?

6             ATTORNEY ZOLOT:  Objection; asked

7        and answered.

8             ATTORNEY HUDAK:  It's not been

9        answered.

10       A.   So again I think that the ethics

11  case and the specific thing that Dr. Wilder

12  has been doing clearly violates the ASA code

13  of ethics.  And I had been on defense and the

14  defendant and being the person asked the

15  question since 2019, and so putting this in

16  front of COPE would level the playing field to

17  some extent in a way that it has not been and

18  only recently has been.

19       Q.   Because it would threaten

20  Dr. Wilder's professional reputation?

21            ATTORNEY ZOLOT:  Objection;

22       mischaracterizes the testimony.

23       A.   So this entire thing from beginning

24  to end has threatened both of our professional

25  reputations.

1                        S. Hoiland

2        Q.   That doesn't answer the question.

3   So again you're talking about the COPE case in

4   this paragraph of the email, is that correct?

5        A.   Yes.

6        Q.   And then you reference the filing

7   the COPE case perhaps will cause the

8   litigation to end more quickly.  Is that

9   correct?

10       A.   Yes, that's correct.

11       Q.   And that's because the filing of

12  the COPE case would put Dr. Wilder's

13  professional reputation at stake, correct?

14       A.   You're reading my email, so I can

15  say yes.  You're reading my email.

16       Q.   And did you ultimately file the

17  COPE case that was mentioned in this email?

18       A.   I already testified that I did not.

19       Q.   And why was that?

20       A.   So I believe it falls under

21  attorney-client privilege.

22            ATTORNEY HUDAK:  I am going to take

23       this document down.  I am going to put

24       up a new document.  Do you see that I've

25       shared a different document on the

1                    S. Hoiland

2       screen?

3                THE WITNESS:  Yes.

4                ATTORNEY HUDAK:   This is

5       Plaintiff's First Set of Interrogatories

6       to Defendant in this litigation.  I'll

7       mark this as exhibit 24.

8                        ---

9                (Exhibit 24, Plaintiff's First Set

10      of Interrogatories to Defendant was

11      marked for identification)

12                       ---

13      Q.   Do you recognize this document?

14      A.   Yes.

15      Q.   And do you recognize it to be

16   Plaintiff's First Set of Interrogatories to

17   Defendant in this litigation?

18      A.   Yes.

19      Q.   And I've scrolled to the second

20   page.  I'm looking at interrogatory No. 8,

21   which asks defendant to "Identify each person

22   with whom you have communicated about your

23   CCCLA presentation."

24                Did I read that correctly?

25      A.   Yes.

1                    S. Hoiland

2       Q.   And do you understand the "CCCLA

3  presentation" referred to here as being the

4  CCLA PowerPoint that we've been discussing

5  today?

6       A.   Yes.

7       Q.   I am going to take that down and

8  put up a new document.  Do you see the new

9  document on the screen?

10      A.   Yes.

11           ATTORNEY HUDAK:  And this is

12      Defendant's Responses to Plaintiff's

13      First Set of Interrogatories that was

14      served in this case.  I'll mark this as

15      exhibit 25.

16                    ---

17           (Exhibit 25, Defendant's Responses

18      to Plaintiff's First Set of

19      Interrogatories was marked for

20      identification)

21                    ---

22      Q.   Do you recognize this document?

23      A.   Yes.

24      Q.   And do you recognize it to be

25  Defendant's Responses to Plaintiff's First Set

1                    S. Hoiland

2    Interrogatories?

3         A.   Yes.

4         Q.   And I've scrolled to page 2.  Do

5    you see on this page where it says

6    interrogatory No. 8, and then it lists a

7    number of names and organizations?

8         A.   Yes.

9         Q.   And that list extends on to page 4?

10        A.   Yes.

11        Q.   Scrolling back to page 2.  I'll

12   give you time to review if you need.  But does

13   this list of individuals represent all persons

14   you've had communications with regarding the

15   CCLA PowerPoint?

16        A.   So I don't see the research

17   integrity officer from Lehman.

18             ATTORNEY ZOLOT:  You have to go to

19        the other pages, Sandra.  If you're

20        asking about --

21             ATTORNEY HUDAK:  Yes, I asked the

22        witness to let me know if she needs me

23        to scroll.

24        A.   You can scroll down.  Oh, there he

25   is.

1                    S. Hoiland

2        Q.   And there's potentially more on the

3    next page.  It might just be an address.

4        A.   Okay.

5        Q.   Scroll to the next page?

6        A.   Yes.

7        Q.   So does this list represent all

8    individuals you've communicated with regarding

9    the CCLA PowerPoint?

10       A.   Well, can you scroll up again?

11       Q.   Sure.  I'm scrolling back to the

12   beginning.  Let me know if you need me to

13   scroll down.

14       A.   Okay.

15       Q.   Scroll?

16       A.   Yep.  So I see Margaret Vitullo's

17   name is not here.  And Nancy Kidd had

18   forwarded my email to her.  I don't know, this

19   looks like a pretty exhaustive list to me.

20       Q.   So you don't recall having

21   communications with any other individuals that

22   are not listed in response to interrogatory

23   No. 8, other than Margaret Vitullo who you

24   mentioned?

25       A.   Nothing comes to mind that is not

1                    S. Hoiland

2   here.

3        Q.   And have you produced all

4   communications with the individuals listed in

5   response to interrogatory No. 8 regarding this

6   litigation?

7        A.   Yes, I believe so.

8             ATTORNEY HUDAK:  I'll take that

9        document down.

10        Q.   I believe you testified earlier

11   that you observed the entirety of the

12   deposition of Dr. Wilder in this litigation,

13   is that correct?

14        A.   Yes.

15        Q.   And do you have any comments on the

16   testimony given during that deposition?

17             ATTORNEY ZOLOT:  Objection; vague.

18        A.   I'm not going to make any comments

19   about someone else's statements, no.

20             ATTORNEY HUDAK:  All right.  No

21        further questions at this time.  Thank

22        you for your time, Dr. Hoiland.

23             THE WITNESS:  Thank you.

24             THE COURT REPORTER:  Counsel, do

25        you have any questions?

Page 280

1                    S. Hoiland

2          ATTORNEY ZOLOT:  No questions from

3      us.

4                       ---

5        (Time noted:  7:16 p.m.  EDT)

6

7                 _____

8                 SARAH HOILAND

9

10  Sworn and subscribed to before

11  me this _____day

12  of _____, 2022,

13  in the jurisdiction aforesaid.

14

15  _____

16      NOTARY PUBLIC

17

18

19

20

21

22

23

24

25

1

2                C E R T I F I C A T E

3    STATE OF NEW YORK         )

4    COUNTY OF NEW YORK        )

5            I, FRANK J. BAS, a Certified

6    Shorthand Reporter and Notary Public within

7    and for the State of New York, do hereby

8    certify:

9            That the witness whose testimony is

10   hereinbefore set forth, was duly sworn by me

11   and that such testimony given by the witness

12   was taken down stenographically by me and then

13   transcribed.

14           I further certify that I am not

15   related by blood or marriage, to any of the

16   parties in this matter and that I am in no way

17   interested in the outcome of this matter.

18           That any copy of this transcript

19   obtained from a source other than the court

20   reporting firm, including from co-counsel, is

21   uncertified and may not be used at trial.

22           IN WITNESS WHEREOF, I have hereunto

23   set my hand this 21st day of December, 2022.

24   _____

25   FRANK J. BAS, RPR, CRR

1

2  --------------- I N D E X -----------------

3  WITNESS              EXAMINATION BY        PAGE

4  SARAH HOILAND    MS. HUDAK             5

5  --------------- EXHIBITS------------------
   (Exhibits remotely introduced and provided
6  electronically to the court reporter.)

7  EXHIBIT              DESCRIPTION        PAGE

8   Exhibit 1, email, Bates number       66
    D0023 through D0024
9
    Exhibit 2, PowerPoint, Bates D0234   84
10  through D0256

11  Exhibit 3, NICE webpage              86

12  Exhibit 4, PDF page of NICHE/NICE    101
    hyperlink
13
    Exhibit 5, NICHE hyperlink           102
14
    Exhibit 6, PowerPoint, Bates         104
15  P000665

16  Exhibit 7, Presentation Proposal -   108
    the Community College Conference on
17  Learning Assessment, Bates D0001
    through 03
18
    Exhibit 8, Intellectual property     111
19  license and photo release, Bates
    D0004
20
    Exhibit 9, email chain, Bates D0301  121
21  through D0304

22  Exhibit 10, email, Bates D0041       128
    through 42
23
    Exhibit 11, email, Bates D0009       138
24  through 12

25

1

2      ------- EXHIBITS CONTINUED -------

3      Exhibit 12, email, Bates P0000553     145
       through 558
4
       Exhibit 13, Responses and             154
5      Objections to Plaintiff's Second
       Set of Interrogatories to Defendant
6
       Exhibit 14, preliminary inquiry       161
7      report, Bates D0069 through 72

8      Exhibit 15, academic integrity        180
       policy Bates P000649 through 654
9
       Exhibit 16, American Sociological     182
10     Association's Code of Ethics, Bates
       P000273 to 293
11
       Exhibit 17, screenshot, Bates         184
12     P000294 through 298

13     Exhibit 18, email, Bates P000428      187
       through P 429
14
       Exhibit 19, Exhibit 1 to the          191
15     complaint

16     Exhibit 20, Answer to Complaint       203

17     Exhibit 21, project description,      239
       Bates D0486 through 500
18
       Exhibit 22, email, Bates D0352        260
19     through D 354

20     Exhibit 23, email, Bates D0275        265
       through  278
21
       Exhibit 24, Plaintiff's First Set     275
22     of Interrogatories to Defendant

23     Exhibit 25, Defendant's Responses     276
       to Plaintiff's First Set of
24     Interrogatories

25

1

2     DIRECTIONS NOT TO ANSWER

3     Page/Line

4     242/2; 248/17

5

6     REQUESTS

7     Page/Line

8     233/20; 242/12

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 285

```
 1                    ERRATA SHEET
 2   Case Name:
 3   Deposition Date:
 4   Deponent:
 5   Pg.  No. Now Reads      Should Read  Reason
 6   ____ ____ _____   _____  _____
 7   ____ ____ _____   _____  _____
 8   ____ ____ _____   _____  _____
 9   ____ ____ _____   _____  _____
10   ____ ____ _____   _____  _____
11   ____ ____ _____   _____  _____
12   ____ ____ _____   _____  _____
13   ____ ____ _____   _____  _____
14   ____ ____ _____   _____  _____
15   ____ ____ _____   _____  _____
16   ____ ____ _____   _____  _____
17   ____ ____ _____   _____  _____
18   ____ ____ _____   _____  _____
19   ____ ____ _____   _____  _____
20
21                                 _____
22                                 Signature of Deponent
     SUBSCRIBED AND SWORN BEFORE ME
23   THIS _____ DAY OF _____, 2022.
24   _____
25   (Notary Public)   MY COMMISSION EXPIRES:_____
```