**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ESTHER WILDER, | 1:22-cv-01254-PKC |
| Plaintiff, | **DEFENDANT'S RESPONSE TO** |
| -against- | **PLAINTIFF'S RULE 56.1** |
| | **STATEMENT OF MATERIAL** |
| SARAH HOILAND, | **FACTS** |
| Defendant. | |

Defendant Sarah Hoiland ("Dr. Hoiland" or "Defendant"), by and through her attorneys,

Davis+Gilbert LLP, submits this statement in response to Plaintiff Esther Wilder's ("Dr. Wilder"

or "Plaintiff") Rule 56.1 Statement of Material Facts.

## <u>RESPONSE TO PLAINTIFF'S RULE 56.1 STATEMENT</u>

1.      Plaintiff Esther Wilder ("Plaintiff") is a tenured professor in the Department of
Sociology at Lehman College, City University of New York ("CUNY"). (Declaration of Esther
Wilder, "Wilder Decl.," ¶ 2.)

<u>Response</u>: Admitted.[1]

2.      A major focus of Plaintiff's research for the past 15 years has been developing
methods for faculty to teach quantitative reasoning ("QR") effectively to college students, and
many of her scholarly papers and other publications, projects, and presentations have been
related to that research. (*Id.* at ¶ 9.)

<u>Response</u>: Admitted.

3.      In 2011, Plaintiff was the recipient of a National Science Foundation ("NSF")
grant of $600,000 for a project known as "NICHE," which is an abbreviation for "Numeracy
Infusion Course for Higher Education." (Wilder Decl. ¶ 10; Ex. 6 at P156–230 at P181.)

---

[1] To the extent Dr. Hoiland admits certain of Dr. Wilder's statements, such admissions are made
for purposes of Plaintiff's summary judgment motion only.

Response: Admitted.

4.      The NICHE program, an online faculty development program, was designed to teach faculty at CUNY about the best practices for infusing quantitative reasoning into their courses, and the assessment of that instruction. (Wilder Decl. ¶ 11.)

Response: Admitted.

5.      Plaintiff served as Principal Investigator ("PI") on the NICHE project from 2011 through 2016. (Wilder Decl. ¶ 12.)

Response: Admitted.

6.      The faculty enrolled in the NICHE program received instruction on teaching QR in three core areas, (1) identifying learning goals, (2) creating instructional materials, and (3) doing QR assessment. (Wilder Decl. ¶¶ 13–14.)

Response: Admitted.

7.      As the PI on NICHE, Plaintiff developed and created most of the instructional material and guidelines used in NICHE. (Wilder Decl. ¶ 15.)

Response: Admitted.

8.      Each of the NICHE instructional videos included a statement that unauthorized use of the NICHE course materials is strictly prohibited and that any questions regarding the authorization of use of the NICHE materials should be directed to Plaintiff. (Wilder Decl. ¶ 16, Ex. 5, P665.)

Response: Disputed.  Paragraph 8 is misleading to the extent it is intended to imply that the

referenced exhibit (the "Copyright Notice") identifies Dr. Wilder as the owner of the copyright

in the NICHE course materials.  It does not; it identifies "CUNY NICHE" as the owner.  The

Copyright Notice states, in relevant part:

> © Copyright 2013.  This presentation is owned by CUNY NICHE.  Unauthorized use of any of the material in this presentation or any supplementary course material from NICHE is strictly prohibited. . . Any questions regarding the authorization for use of materials from NICHE should be directed to Esther Isabelle Wilder.

2

Dr. Wilder's statement about what the instructional videos contain is inadmissible hearsay that is barred by the best evidence rule.  *See FRE* 802, 1008.  In addition, Dr. Wilder's statement in her declaration mischaracterizes what the Copyright Notice says.  The Copyright Notice is also inadmissible because it's an incomplete document; it's a single screenshot from a video and the video itself was not produced.  Accordingly, it cannot be determined how the Copyright Statement appeared in context.

Nevertheless, the Copyright Notice is generally consistent with Dr. Hoiland's view of the course materials for the NICE Project (the "Course Materials").  Questions regarding authorization to use the Course Materials were to be directed to Dr. Wilder.  But there were no questions concerning Dr. Hoiland's authorization to use the Course Materials as a co-equal Principal Investigator and co-Director of the NICE Project.  (*See*  Hoiland Decl. ¶¶ 125-137.)

9.     In 2013, Plaintiff authored the original instructional material for a key component of NICHE, Unit 7 (Unit 7H) on QR assessment. (Wilder Decl. ¶ 18.)

Response: Admitted to the extent that Plaintiff claims to have authored the instructional material for Subunit 7H of NICHE (the "Subunit 7H Materials"), which relates to assessment – determining whether an educator's materials related to quantitative-reasoning ("QR") actually improve their students' numeracy skills.  Although assessment is important, it is not the core or key part of the NICE Project.  The core – the main purpose – of the NICE Project was to help educators develop QR goals and QR lesson plans to "infuse" into their coursework.  Assessment tools are not useful without the underlying QR-related Units.  (Hoiland Decl. ¶¶ 169-170, 56-67.)

10.     Unit 7H provided instructions to faculty on preparing a QR assessment plan and instruction in accordance with the learning goals. (Wilder Decl. ¶ 19; Ex. 1.)

Response: Admitted.

11.    Plaintiff created the NICHE instructional materials drawing on her extensive experience researching QR instruction and teaching QR literacy in her courses. (Wilder Decl. ¶ 24.)

Response: Admitted.

12.    In creating the text of Unit 7H, Plaintiff selected the guidelines and strategies that she found effective in explaining assessment of QR instruction to an audience of non-specialists. (Wilder Decl. ¶ 25.)

Response: Admitted.

13.    Plaintiff registered the copyright in the assessment unit, Unit 7H, with the Copyright Office in about April 2021 (the "Copyrighted Work"). (Wilder Decl. ¶ 20; Ex. 1.)

Response: Admitted.

14.    The Copyright Office Certificate of Registration for the Copyrighted Work states that Plaintiff is the author and copyright claimant of the Copyrighted Work. (Ex. 2, P677.)

Response: Admitted.

15.    Access to the Copyrighted Work and the other NICHE core instructional materials was limited, available online in Blackboard, a content management program, only to the CUNY faculty that enrolled in NICHE and the administrators of the program. (Wilder Decl. ¶ 27.)

Response: Paragraph 15 is denied to the extent it is intended to suggest that efforts were made to limit access to the course materials for the NICHE and NICE Projects (the "Course Materials"). The opposite is true.  One of the major goals of the NICE Project was to disseminate the Course Materials as widely as possible by, among other methods, providing access on the NICHE/NICE website (the "Website") and making presentations about the NICE Project and the Course Materials at professional conferences.  (*See* Hoiland Decl. ¶¶ 41-51, 71, 72.)  In particular, the NSF Proposal states as follows:

> NICE will also help faculty beyond CUNY.  First, the project intervention and materials, including the NICE training program . . . will be made readily available on the NICE project website . . . To ensure that the NICE materials and evaluation results are widely available to educators, policymakers, administrators, and researchers, the results will be presented at conferences, published in journals and disseminated through other relevant outlets.

(Hoiland Decl. Ex. 3 , at P000171.)

This broader goal was reiterated in a section of the NSF Proposal titled "NICE at CUNY and Beyond." That section states as follows:

> We will also support QR instruction through the dissemination of our research results. With an increased emphasis on QR and accreditors' strong focus on assessment, there is high demand for programs and resources that can be used to promote and assess students' QR skills.  To ensure that our materials and evaluation results are widely available to educators, policymakers, administrators, and researchers, we will present at conferences, publish in journals, and disseminate our results through other relevant outlets.

(*Id.* at P000180**.**)

In addition, the Budget Justification made clear that Dr. Hoiland would be making presentations about the NICE Project at professional conferences, including community college and HIS conferences.  Specifically, it provided that she would "present at professional conferences [and] participate in a variety of dissemnination activities (e.g. community college and HIS conferences." Moreover, the NICE Project's proposed budget specifically contemplated Dr. Hoiland traveling to various conferences.  The NSF Proposal provided as follows: "The budget includes $7,000 for PI Hoiland to attend conferences both for professional development, dissemination activities, and networking with faculty from similar institutions.  (*See id.* at P000199.) ████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████

16.    The Copyrighted Work was not available to faculty outside of CUNY and was only available to CUNY faculty enrolled in the NICHE program. (Wilder Decl. ¶ 26.)

<u>Response</u>: Paragraph 16 is denied to the extent it is intended to suggest that efforts were made to limit access to the Course Materials.  To the extent that Dr. Wilder limited access to the Course

Materials, such limitations were not consistent with Dr. Hoiland's goals as a Principal

Investigator or the goals articulated in the NSF Proposal that led to receipt of NSF funding.  As

stated, an important goal of the NICE Project was to make the Course Materials "readily

available" and as widely available as possible.  As discussed *supra* in response to paragraph 15,

one of the major goals of the NICE Project was to disseminate the Course Materials as widely as

possible and make them "readily available."  Defendant refers the Court to, and incorporates

herein by reference, her Response to Paragraph 15 above.

17.     In 2016, when presenting on NICHE at an NSF Conference, Plaintiff was
approached about doing an extension of her NICHE grant, adapted to be an in-person (and online)
faculty development program to train faculty at the three Bronx-based Hispanic Serving
Institutions (HSIs), specifically CUNY's Lehman College, Hostos Community College and Bronx
Community College, on QR literacy. (Ex. 20, Hoiland Tr. 20:12–16; Wilder Decl. ¶¶ 30–31.)

Response:  Denied in part.  Dr. Wilder stated that an employee of the National Science Foundation

("NSF") approached her about doing an extension of the NICHE Project, but the specifics were

determined by Dr. Wilder, in conjunction with Dr. Hoiland.  Moreover, being awarded a NSF grant

is a rigorous process, and Plaintiff would not be awarded a grant to do an extension of the NICHE

Project until after undergoing a strenuous review of the proposed project's merits. (Hoiland Decl.

¶¶ 25-27.).

18.     The extension project, Numeracy Infusion for College Educators ("NICE")
required that one of the PIs be from an HSI community college. (Wilder Decl. ¶ 32.)

Response: Denied in part.  Dr. Wilder stated that she wanted to target community colleges since

many/most NICHE participants were from four-year colleges, and she believed new funding

could be obtained if she submitted a proposal specifically targeting HSIs and two-year

community colleges in the Bronx.  Defendant admits that Plaintiff was under the impression that

she would not have been able to obtain NSF grants for the NICE Project unless Hostos

Community College was the primary organization on the project and Dr. Hoiland served as a

Principal Investigator.  (Hoiland Decl. ¶¶ 25-33.)

19.    After learning of Defendant Sarah Hoiland's ("Defendant") interest in teaching QR literacy from a colleague of hers, Plaintiff contacted Defendant, then an assistant professor at Hostos Community College, about being a PI on the project. (Ex. 20, Hoiland Tr. 19:12–20:16, 25:10–13; Wilder Decl. ¶ 33.)

Response: Denied in part.  Dr. Wilder had already been communicating with Dr. Hoiland about

an article on numeracy that Dr. Hoiland had co-authored when she contacted Dr. Hoiland about

serving as a Principal Investigator and co-Director on the NICE Project.  (Hoiland Decl. ¶¶ 13-

16, 25-33.)

20.    At the time she contacted Defendant about NICE, Plaintiff had never met Defendant. (Wilder Decl. ¶ 34.)

Response: Denied in part.  Prior to contacting Dr. Hoiland about serving as a Principal

Investigator and co-Director on the NICE Project, Dr. Wilder and Dr. Hoiland had

communicated by email about an article on numeracy Dr. Hoiland had co-authored.  (Hoiland

Decl. ¶¶ 13-16, 25-33.)

21.    Defendant had not been involved in NICHE, neither as an investigator or faculty participant, before Plaintiff approached her about being involved in NICE. (Ex. 20, Hoiland Tr. 25:7–9; Wilder Decl. ¶ 35.)

Response: Admitted.

22.    Defendant agreed to be a PI on NICE, with Plaintiff being the other PI. (Wilder Decl. ¶ 36.)

Response: Admitted.  Stated more precisely, Dr. Hoiland was the Principal Investigator on the

NICE Project under an NSF grant to Hostos; Dr. Wilder was the Principal Investigator on the

NICE Project under an NSF grant received on behalf of her institution, Lehman College.  The

NICE Project was a collaborative proposal involving two institutions.  (Hoiland Decl. ¶¶ 25-33,

Hoiland Decl. Ex. 3.)

23.     Plaintiff took the lead drafting the NSF grant proposal for NICE, and Defendant suggested some edits. (Ex. 20, Hoiland Tr. 25:10–26:2, 88:6–10; Wilder Decl. ¶ 37.).)

Response: Admitted in part.  Dr. Wilder was the primary author of the NSF Proposal.  Large

portions of the NICE Proposal were copied over from the prior NICHE proposal.  Dr. Hoiland

revised portions of the Proposal and drafted portions of it that specifically related to Hostos and

the work she would be performing as a Principal Investigator.  (Hoiland Decl. ¶ 33.)

24.     The NSF NICE proposal was submitted on about May 31, 2016. (Ex. 6, P156–230 at P163; Wilder Decl. ¶ 38.)

Response: Admitted.

25.     The NSF grant proposal said the NICE Program "will build on the strengths of the Numeracy Infusion Course for Higher Education (NICHE) (DUE #1121844), a CUNY-wide initiative that sought to infuse QR across the curriculum through an online faculty development program. Specifically, the NICE Program will refine and update NICHE in accordance with the assessment data gathered for the project [62] and adapt it into a face-to-face faculty development program suitable at CUNY's three Bronx based HSIs." (Ex. 6, P156–230 at P176, P185; *see also* Wilder Decl. ¶ 39.)

Response: Paragraph 25 accurately quotes the NSF Proposal.  However, Dr. Wilder and Dr.

Hoiland (a) only made minor revisions to the Course Materials used in the NICHE Project for

use in the NICE Project, and (b) did not update the NICHE Project into a face-to-face faculty

development program.  (Hoiland Decl. ¶¶ 36-37.)

26.     "[62]" refers to a panel presentation by Plaintiff and her colleagues. (Ex. 6, P156–230 at P185.)

Response: Admitted.

27.     At the time the NSF NICE proposal was submitted, Defendant was scheduled to do a workshop the following year at ASA on "Teaching Quantitative Literacy and Reasoning in the Social Sciences", but she had no other presentations or activities on the subject apart from NICE. (Ex. 6, P156–230 at P186; Wilder Decl. ¶ 41.)

Response: Denied.  Dr. Hoiland had also co-authored an article on numeracy titled *Measuring*

*Numeracy in a Community College Context: Assessing the Reliability of the Subjective*

*Numeracy Scale.*  This article was the result of several years of research and work.  (Hoiland Decl. ¶ 14.)

28.    An objective of NICE was to provide instruction in best practices for teaching QR to faculty at HSIs in the Bronx on the unique needs of Hispanics and under-represented minorities. (Wilder Decl. ¶ 42.)

Response: Admitted that Paragraph 28 accurately states <u>an</u> objective of the NICE Project.

29.    Other objectives included development of instructional materials that make use of effective strategies for teaching QR, increase faculty interest and comfort in teaching QR, and establish a network of Bronx (CUNY) faculty committed to improving student's QR abilities. (Ex. 6, P156–230 at P177; Wilder Decl. ¶ 43.)

Response: Admitted that Paragraph 29 accurately states additional objectives of the NICE Project.  Notably omitted from Paragraphs 28 and 29 are additional and critical goals of the NICE Project: to make the training program and Course Materials as widely available as possible and to ensure that the training program and Course Materials are made as widely available as possible by, among other means, making presentations about these topics at professional conferences.  (Hoiland Decl. ¶¶ 41-51, Exs. 3, 5.)  Defendant also refers the Court to, and incorporates herein by reference, her Response to Paragraph 15 above.

30.    Both NICHE and NICE involved instructional materials created for the NICHE project. (Ex. 20, Hoiland Tr. 23:6–17; Wilder Decl. ¶ 44.)

Response: Admitted.

31.    Upon completion of the instructional units, the faculty participating in NICE (like in NICHE) were required to develop instructional and assessment materials to incorporate into their teaching. (Ex. 6, P156–230 at P177; Wilder Decl. ¶ 47.)

Response: Denied.  Dr. Hoiland admits that faculty participants were required to develop instructional and assessment materials to incorporate into their teaching, but such materials were required to be developed as part of (not upon completion of) the instructional units.  (Hoiland Decl. ¶¶ 38, 52-67.)

32.     The PIs of NICE were to evaluate the effectiveness of the program by examining the assessment data that faculty gathered in their QR infused courses and analyze that data. (Ex. 6, P156–230 at P179, 181; Wilder Decl. ¶ 48.)

Response: Admitted that this was one component of the evaluation plan.

33.     Defendant was to work collaboratively with Plaintiff to develop and refine NICE and the NICE assessment instruments, recruit Hostos faculty for the program, and promote the NICE project at Hostos and other CUNY schools in the Bronx. (Ex. 20, Hoiland Tr. 23:18–24:18; Ex. 6, P156–230 at P199; Wilder Decl. ¶ 49.)

Response: Admitted that Paragraph 33 recites certain of Dr. Hoiland's responsibilities as a Principal Investigator and co-Director of the Nice Project.  Notably omitted from Paragraph 33 are additional and critical goals of the NICE Project: to make the training program and Course Materials as widely available as possible and to ensure that the training program and Course Materials are made as widely available as possible by, among other means, making presentations about these topics at professional conferences.  (Hoiland Decl. ¶¶ 41-51, Exs. 3, 5.)  Defendant also refers the Court to, and incorporates herein by reference, her Response to Paragraph 15 above.

34.     As co-director of the NICE project, Plaintiff was to assume primary responsibility for recruitment and admission into the NICE program and direct research activities on the quantitative assessment data gathered. Plaintiff was also to work with other members of the NICE leadership team to recruit faculty and publicize NICE throughout the CUNY schools in the Bronx. (Ex. 6, P156–230 at P205; Wilder Decl. ¶ 50.)

Response: Admitted that Paragraph 34 accurately recites certain of Dr. Wilder's responsibilities as stated in the NSF Proposal.

35.     Both Defendant and Plaintiff were to disseminate their research results at conferences, publications in journals and other relevant outlets. (Ex. 6, P156–230 at P180–181, P199; Wilder Decl. ¶ 51.)

Response: Admitted.  Dr. Hoiland and Dr. Wilder were also expected to present at professional conferences to ensure that the training program and Course Materials were made as widely

available as possible.  (Hoiland Decl. ¶¶ 41-51, Exs. 3, 5.)  Defendant also refers the Court to, and incorporates herein by reference, her Response to Paragraph 15 above.

36.    The NICE grant was approved in 2016 and funded in 2017. (Ex. 20, Hoiland Tr. 25:25–28:3; Wilder Decl. ¶ 52.)

Response: Admitted.

37.    The NICE project ran from about January 2017 to about December 2019. (Ex. 19; Ex. 6, P156–230 at P201, 207; Wilder Decl. ¶ 53.)

Response: Admitted.

38.    To help train Defendant for her duties on the NICE project, Plaintiff enrolled Defendant as a faculty participant in NICHE. (Ex. 20, Hoiland Tr. 37:13–39:6; Wilder Decl. ¶ 54.)

Response: Denied.  Dr. Wilder enrolled Dr. Hoiland in the NICHE program to give Dr. Hoiland access to the Course Materials in advance of using the Course Materials, potentially in modified form, as the materials for the NICE Project and to further prepare her for assuming her responsibilities as a Principal Investigator on the NICE Project.  (Hoiland Decl. ¶ 52.)

39.    Enrolled in NICHE, Defendant reviewed the NICHE instructional materials. (Ex. 20, Hoiland Tr. 106:6–14; Wilder Decl. ¶ 54.)

Response: Admitted.

40.    The NICHE instructional materials which Defendant reviewed included the Copyrighted Work, and the videos for each unit that specifically stated that they were subject to copyright and not to be used without Plaintiff's express authorization. (Ex. 5, P665.)

Response: Denied.  Defendant referss the Court to, and incorporates herein by reference, her Response to Paragraph 8 above.

41.    During the first year of NICE, Defendant was also enrolled as a faculty participant in NICE. (Hoiland Tr. 34:6–36:4; Wilder Decl. ¶ 60.)

Response: Admitted.

42.    The NICE instructional materials carried the same statement, that they were not to be used without Plaintiff's express authorization. (Wilder Decl. ¶ 59.)

Response: Denied.   Defendant refers the Court to, and incorporates herein by reference, her Response to Paragraph 8 above.

43.     At no time did Defendant request permission to use the NICHE/NICE instructional materials in a presentation. (Ex. 20, Hoiland Tr. 108:4–8.)

Response: Denied.   Dr. Wilder consented to Dr. Hoiland's use of the Course Materials in conference presentations about the NICE Project.   Specifically: (a) Dr. Wilder was the primary author of the NSF Proposal for the NICE Project; (b) Dr. Wilder asked Dr. Hoiland to serve as a Principal Investigator and co-Director of the NICE Project, which was funded by an NSF grant; (c) Dr. Wilder made the Course Materials, including the Subunit 7H Materials, available for use in the NICE Project; (d) the Course Materials were just that – the materials for the NICE Course; (e) one goal of the NICE Project, as stated in the NSF Proposal, was to make the NICE Course and the Course Materials widely available to educators and administrators; (f) the NSF Proposal stated that the Principal Investigators would ensure that the NICE Course and the Course Materials were made widely available to educators and administrators by making presentations at conferences; and (g) the Budget Justification for the grant to Hostos specifically provided that Dr. Hoiland would be making presentations about the NICE Project and the Course Materials at professional conferences.

Under these circumstances, Dr. Wilder consented to Dr. Hoiland's use of the Course Materials in presentations at professional conferences about the NICE Project.   Dr. Wilder knew that, as a Principal Investigator and co-Director of the NICE Project, Dr. Hoiland was *obligated* to present at professional conferences, including community-college conferences, about the NICE Project and the Course Materials, and she had made the Course Materials available for such use.

CCCLA was a community-college conference, and Dr. Hoiland made a presentation at the CCCLA about the NICE Project, using certain of the Course Materials, including the Subunit 7H Materials, as visual aids.  In other words, Dr. Hoiland used the Course Materials for one of the explicitly stated purposes for which Dr. Wilder had provided them.

Dr. Hoiland did not specifically ask Dr. Wilder for permission to use the Course Materials as visual aids in the Presentation because she already had Dr. Wilder's consent; it was implied from the circumstances set forth above.

As a Principal Investigator and co-Director of the *NICE Project*, Dr. Hoiland was authorized to use the Course Materials of the *NICE Project* for uses related to the *NICE Project* without asking for Dr. Wilder's permission.  (Hoiland Decl. ¶¶ 41-51, 117-124, Exs. 3, 5.) Defendant also refers the Court to, and incorporates herein by reference, her Response to Paragraph 15 above.

44.    Like the NICHE instructional materials, the NICE instructional materials were hosted on Blackboard. (Ex. 20, Hoiland Tr. 78:19–24.)

Response: Admitted.

45.    Defendant understood the instructional materials used in NICE came from NICHE. (Ex. 20, Hoiland Tr. 79:14–18.)

Response: Admitted.

46.    While a goal of NICE program was to adapt the prior NICHE instructional materials for NICE to the HSI faculty, the adaptation did not happen and the NICHE instructional materials were instead essentially incorporated whole into NICE unchanged other than the references changed from NICHE to NICE. (Ex. 20, Hoiland Tr. 78:25–79:18; Wilder Decl. ¶¶ 46, 56.)

Response: Admitted.  Although the NSF Proposal stated that adaptation to the instructional materials would occur, Dr. Wilder and Dr. Hoiland did not, for the most part, update the materials, though changes from "NICHE" to "NICE" were added in some instances.  (Hoiland Decl. ¶¶ 35-37.)

13

47.     As with the NICHE project, the accessibility of the NICE instructional materials, including the Copyrighted Work was limited, available only to the faculty enrolled in NICE and the administrators of the NICE program on Blackboard (Wilder Decl. ¶ 57.)

Response:  Denied.  Defendant refers the Court to, and incorporates herein by reference, her responses to Paragraphs 15 and 16 above.

48.     Along with her responsibilities guiding the other faculty in NICE in preparing instructional and assessment materials, Defendant created instructional materials for her students, and assessed the effectiveness of those materials. (Wilder Decl. ¶ 61.)

Response: Admitted.

49.     Prior to Defendant's presentation in February 2019, Defendant and Plaintiff had presented together at national conferences twice about the NICE project, at the National Numeracy Network annual meeting and at the Mathematical Association of America Metropolitan New York section meeting. (Ex. 20, Hoiland Tr. 43:5–17; Wilder Decl. ¶ 65.)

Response: Admitted.

50.     At these conferences, Plaintiff and Defendant presented an overview of the NICHE and NICE programs, shared research results, and highlighted plans to adapt NICHE to NICE. (Ex. 20, Hoiland Tr. 42:24–43:4, 44:7–46:4; Wilder Decl. ¶ 66; Ex. 16, D504–529.)

Response: Admitted except that, to the extent project-wide research results were shared, they were presented by Dr. Wilder and concerned the NICHE Project, not the NICE Project.  (Hoiland Decl. ¶ 69.)

51.     At the NNN conference, Defendant and another colleague presented the instructional and assessment materials they created as participants in NICE. (Ex. 20, Hoiland Tr. 44:7–48:19; Wilder Decl. ¶ 67.)

Response: Admitted.

52.     At none of these conferences were sections of the NICHE/NICE instructional and assignment materials shared with the conference attendees. (Wilder Decl. ¶ 68.)

Response: Denied.  At the referenced conferences, information about the Course Materials was presented and shared with conference attendees.  (Hoiland Decl. ¶ 69.)

14

53.     In about June 2018, Defendant applied to speak at a community college conference at Valencia College, entitled the Community College Conference on Learning Assessment (the "CCLA Conference"). (Ex. 17, D01–03.)

Response: Admitted.

54.     Defendant's presentation proposal for the CCLA Conference stated that she would be presenting alone. (Ex. 17, D01–03 at D03.)

Response: Denied. Defendant's presentation proposal for the CCLA Conference identified Dr.

Hoiland as the "Primary Speaker" and noted that "[t]he presenter is one of two principal

investigators of a National Science Foundation (NSF) faculty development program titled

Numeracy Infusion for College Educations (NICE)." (Hoiland Decl. ¶¶ 73-78; Ex. 7.)

55.     In her presentation proposal, Defendant acknowledged that her "presentation materials will be available on a private website for attendees to download." (Ex. 17, D01–03 at D02; Ex. 20, Hoiland Tr. 108:10–110:6.)

Response: Admitted that the presentation proposal contained the referenced hearsay statement.

There is no record evidence that Dr. Hoiland's presentation materials (the "CCCLA Slides")

were in fact made available on a private website for attendees to download.  Plaintiff has not

submitted any non-hearsay evidence that the CCCLA Slides were actually made available to

conference attendees, other than as visual aids shown on a screen during Dr. Hoiland's

presentation to 12-20 attendees.  (Hoiland Decl. ¶¶ 84-85, 110-113.)

56.     In about July 2018, the organizers of the CCLA Conference informed Defendant by email that her presentation proposal was accepted. (Ex. 12, P428–429 at P428.)

Response: Admitted.

57.     The acceptance email advised that Defendant's PowerPoint for the presentation "will be placed on a password-protected website for conference attendees to download prior to the conference." (Ex. 12, P428–429 at P428.)

Response: Admitted that the acceptance email contained the referenced hearsay statement.

There is no record evidence that the CCCLA Slides were in fact made available on a password-

protected website for attendees to download.   Plaintiff has not submitted any non-hearsay evidence that the CCCLA Slides were actually made available to conference attendees, other than as visual aids shown on a screen during Dr. Hoiland's presentation to 12-20 attendees. (Hoiland Decl. ¶¶ 84-85, 110-113.)

58.    In response to the acceptance email, Defendant signed and submitted an "Intellectual Property License and Photo Release" to the organizers of the CCLA Conference. (Ex. 8, D04; Ex. 20, Hoiland Tr. 111:13–112:13; *see also* Ex. 12, P428–429 at P428.)

Response: Admitted.

59.    The "Intellectual Property License and Photo Release" states that Defendant gave the Board of Trustees of Valencia College "and its designees and assignees" a "nonexclusive license to use, copy and distribute, by whatever means appropriate and convenient, outlines, PowerPoint and other presentations . . . identified or created by me in connection with" the CCLA Conference, including "posting these materials online for downloading on the Conference website and mobile application for Conference participants." (Ex. 8, D04; Ex. 20, Hoiland Tr. 111:13–112:13.)

Response: Admitted that Dr. Hoiland signed and submitted the referenced document and that she was justified in doing so.   (Hoiland Decl. ¶¶ 166-167.)   Defendant refers the Court to, and incorporates herein by reference, her Responses to Paragraph 43 above (explaining Defendant's authorization to use the Course Materials in presentations about the NICE Project).

60.    The "Intellectual Property License and Photo Release" also states that Defendant is "responsible for obtaining the written consent of the owner of the copyrighted materials," and that Defendant "warrant[ed] that the materials for which [she] was providing a license do not violate the copyright, trade secrets, trademark or any intellectual or proprietary rights of any third party . . . ." (Ex. 8, D04; Ex. 20, Hoiland Tr. 112:17–114:6.)

Response: Admitted that Dr. Hoiland signed and submitted the referenced document and that she was justified in doing so.   (Hoiland Decl. ¶¶ 166-167.)   Defendant refers the Court to, and incorporates herein by reference, her Responses to Paragraph 43 above (explaining Defendant's authorization to use the Course Materials in presentations about the NICE Project).

61.    Defendant first informed Plaintiff about Defendant's application to the CCLA Conference after Defendant received the acceptance email from the organizers of the CCLA

Conference, and at that time Defendant asked Plaintiff if she wanted to co-present. (Ex. 12, P428– 429 at P428; Ex. 20, Hoiland Tr. 187:2–18.)

Response: Admitted.  Dr. Hoiland received the acceptance to the CCCLA on July 26, 2018, and she emailed Dr. Wilder on July 27, 2020 – more than six months before the date of the conference – to invite Dr. Wilder to co-present.  The email to Dr. Wilder stated that the title of the planned presentation was "Assessing Numeracy in a Faculty Development Program." (Hoiland Decl. ¶¶ 79-82.)

62.    When she asked Plaintiff if she wanted to co-present at the CCLA Conference, Defendant did not provide Plaintiff a copy of the proposal, the abstract, or any other information describing the substance of the presentation. (Ex. 20, Hoiland Tr. 189:18–20.)

Response: Denied.  The email to Dr. Wilder stated that the title of the planned presentation was "Assessing Numeracy in a Faculty Development Program."  Dr. Wilder did not request a copy of the proposal, the abstract or any other additional information about the substance of the presentation. (Hoiland Decl. ¶¶ 79-82.)

63.    Having had no input into the submission and having other commitments, Plaintiff declined Defendant's invitation to co-present. (Wilder Decl. ¶ 69.)

Response: Denied.  Dr. Wilder has never presented at a community-college conference, and the CCCLA, which is attended primarily by community-college faculty, was not an especially prestigious conference.  Dr. Wilder did not decline because she did not have input into the submission or because she had other commitments; rather, Dr. Wilder declined to co-present because she was "not interested in attending the CCLA Conference."  (Hoiland Decl. ¶¶ 79-82;

███████████████████████████████████████

██

64.    Plaintiff assumed that Defendant would present Defendant's NICE research results at the CCLA Conference, in accordance with the NICE proposal and her prior presentations with Plaintiff. (Wilder Decl. ¶ 70.)

Response: Denied.  Dr. Wilder understood that Dr. Hoiland would be presenting about the NICE Project as outlined in her responsibilities in the NSF Proposal.  (Hoiland Decl. ¶¶ 41-51; Exhibit 3.)

65.     Defendant presented at the CCLA Conference at Valencia College in February 2019. (Ex. 20, Hoiland Tr. 79:19–24.)

Response: Admitted.

66.     Defendant prepared a PowerPoint for her presentation at the CCLA Conference, which she submitted to the organizers of the CCLA Conference and displayed during her oral presentation at the CCLA Conference ("the CCLA PowerPoint"). (Ex. 3; Ex. 20, Hoiland Tr. 82:12–84:12.)

Response: Admitted.

67.     Defendant's CCLA PowerPoint was also available to all CCLA Conference attendees on the CCLA Conference website. (Ex. 17, D01–03 at D02; Ex. 12, P428–429 at P428; Ex. 20, Hoiland Tr. 108:10–110:6.)

Response: Denied.  There is no record evidence that the CCCLA Slides were in fact made available on a password-protected website for attendees to download.  Plaintiff has not submitted any non-hearsay evidence that the CCCLA Slides were actually made available to conference attendees, other than as visual aids shown on a screen during Dr. Hoiland's presentation to 12-20 attendees.  (Hoiland Decl. ¶¶ 84-85, 108-113.)

68.     The only individual's name appearing anywhere in the CCLA PowerPoint is Defendant's name. (Ex. 3, D234–256 at D234.)

Response: Admitted.  (But see Hoiland Decl. ¶¶ 83-107 (describing, among other things, the extent to which Dr. Hoiland discussed and gave "credit" to Dr. Wilder and Dr. Crystal Rodriguez.)

69.     Slides 9 through 13 copied almost verbatim the majority of the Copyrighted Work. (*Compare* Ex. 3, D234–256 at D242–246, *with* Ex. 1; *see also* Ex. 4.)

<u>Response</u>: Denied as phrased.  Dr. Hoiland admits that she included text directly from Subunit 7H of the Course Materials in Slides 9 through 13 of the CCCLA Slides.  Slide 10 also includes the following text added by Dr. Hoiland: "Keep it simple: pre/post, three questions, and a scoring rubric."  Slide 13 also includes the following text added by Dr. Hoiland: "Clarity, alignment, generalizability, validity, and soundness." (Hoiland Decl. ¶¶ 83-107.)

70.     Plaintiff is the author of the portions of the Copyrighted Work appearing on Slides 9 through 13. (Wilder Decl. ¶¶ 72–75.)

<u>Response</u>: Admitted.  Slide 10 also includes the following text added by Dr. Hoiland:  "Keep it simple: pre/post, three questions, and a scoring rubric."  Slide 13 also includes the following text added by Dr. Hoiland: "Clarity, alignment, generalizability, validity, and soundness." (Hoiland Decl. ¶¶ 100-101.)

71.     Defendant did not give Plaintiff written credit as the author of Slides 9 through 13. (*See generally* Ex. 3, D234–256 at D234.)

<u>Response</u>: Denied as vague and ambiguous.  Dr. Hoiland admits that there is no text in Slides 9 through Slide 13 stating that Dr. Wilder authored portions of the text contained on those slides. (Hoiland Decl. ¶ 100.)  No such written statement was required or necessary.  (*See* Hoiland Decl. ¶¶ 41-51, 71, 72, 117-124.)

72.     Defendant did not give Plaintiff oral credit as the author of Slides 9 through 13. (Ex. 20, Hoiland Tr. 136:3–20.)

<u>Response</u>: Denied.  Throughout the Presentation and in discussions at the CCCLA afterwards, Dr. Hoiland repeatedly referenced Dr. Wilder and her leadership role in developing and implementing both the NICHE Project and the NICE Project.  In fact, Dr. Hoiland mentioned Dr. Wilder so frequently and glowingly that she is confident Dr. Wilder would have been embarrassed had she been in attendance. Based on what Dr. Hoiland said during the Presentation, all of the Attendees knew and understood that Dr. Wilder was the driving force

behind the NICHE Project and the NICE Project, and the associated Course Materials.  (Hoiland Decl. ¶¶ 88-92.)

73.     Defendant copied the text on Slides 9 through 13 almost verbatim from the NICE instructional materials on Blackboard. (Ex. 20, Hoiland Tr. 92:22–95:2, 210:13–211:7.)

<u>Response</u>: Denied as phrased.  Dr. Hoiland admits that she included text directly from Subunit 7H of the Course Materials in Slides 9 through 13 of the CCCLA Slides.  Slide 10 also includes the following text added by Dr. Hoiland: "Keep it simple: pre/post, three questions, and a scoring rubric."  Slide 13 also includes the following text added by Dr. Hoiland: "Clarity, alignment, generalizability, validity, and soundness." (Hoiland Decl. ¶¶ 100-101.)

74.     Defendant copied the text on Slides 9 through 13 from the NICE instructional materials on Blackboard either by taking a screenshot of the text, or copying and pasting the text into the slides. (Ex. 20, Hoiland Tr. 210:13–211:7.)

<u>Response</u>: Denied as phrased.  Dr. Hoiland admits that she included text directly from Subunit 7H of the Course Materials in the Slides 9 through 13 of the CCCLA Slides.  Slide 10 also includes the following text added by Dr. Hoiland: "Keep it simple: pre/post, three questions, and a scoring rubric."  Slide 13 also includes the following text added by Dr. Hoiland: "Clarity, alignment, generalizability, validity, and soundness." (Hoiland Decl. ¶¶ 100-101.)

75.     Both Slide 9 of the CCLA PowerPoint and the Copyrighted Work include the following text authored by Plaintiff, including the same typo as Plaintiff's Copyrighted Work ("You assessment"):

> QR Assessment Instrument
> Please restate your revised QR learning goals that you developed in this blog along with your QR assessment instrument. We ask that your QR assessment be simple and consist of 3 questions (. . .) that directly correspond to the 3 learning goals you have articulated (if you are undertaking a pre-test/post-test design, you may want to develop two versions of the instrument . . . ).
> PLEASE KEEP YOUR ASSESSMENT INSTRUMENT SIMPLE and include only 3 questions/problems with scoring rubrics, etc.!
> You assessment instrument should be designed to measure whether or not (or the extent to which) your QR lesson/assignment succeeded in teaching students the 3 learning goals

you put forward. The assessment should be designed to give feedback to you as an instructor! Please indicate when and how you plan to administer your assessment instrument . . . !

(*Compare* Ex. 3, D234–256 at D242, *with* Ex. 1; *see also* Ex. 4; Ex. 20, Hoiland Tr. 92:22–93:8, 210:13–211:10.)

Response: Admitted.  The iteration of the Subunit 7H Materials that Plaintiff registered and is

attached as Exhibit 1 to Dr. Wilder's declaration was one that was used in connection with the

NICHE Project.  The portions of the Subunit 7H Materials that were included in the CCCLA

Slides are from a later iteration that was used in connection with the NICE Project.  The text

from Subunit 7H that appears on Slide 9 is not identical to the corresponding portion of Exhibit 1

because either Dr. Wilder or Dr. Hoiland made minor changes to the text for use in connection

with the NICE Project.  (Hoiland Decl. ¶ 103.)

    76.    Both Slide 10 of the CCLA PowerPoint and the Copyrighted Work include the following text authored by Plaintiff:

    QR Assessment Instrument
    Please note that there are examples of course-specific assessment instruments on our instructional materials from NICHE. . . webpage.
    Assessments can take a huge variety of forms and we encourage you to assess in a way that makes sense for your course and for your learning objectives. However, we also strongly encourage you to assess narrowly, specifically focusing on your QR . . . , rather than the course as a whole or the college experience as a whole.
    . . . Since you have articulated 3 learning goals [in each of three areas, e.g., (a) [k]nowledge and conceptual understanding; (b) thinking and other skills; and (c) attitudes, values, dispositions and habits of mind], we ask you to develop a simple 3-question assessment instrument that . . . 3 learning goals. . .

(*Compare* Ex. 3, D234–256 at D243, *with* Ex. 1; *see also* Ex. 4; Ex. 20, Hoiland Tr. 93:9–21.)

Response: Admitted.  The iteration of the Subunit 7H Materials that Plaintiff registered and is

attached as Exhibit 1 to Dr. Wilder's declaration was one that was used in connection with the

NICHE Project.  The portions of the Subunit 7H Materials that were included in the CCCLA

Slides are from a later iteration that was used in connection with the NICE Project.  The text

21

from the Subunit 7H Materials that appears on Slide 10 is not identical to the corresponding portion of Exhibit 1 because either Dr. Wilder or Dr. Hoiland made minor changes to the text for use in connection with the NICE Project.  Dr. Hoiland also added to Slide 10, for instructional purposes at the CCCLA, the following language, which is not part of Unit 7: "Keep it simple: pre/post, three questions, and a scoring rubric." (Hoiland Decl. ¶¶ 100-101, 103.)

77.    Both Slide 11 of the CCLA PowerPoint and the Copyrighted Work include the following text authored by Plaintiff:

> Guidelines for Developing and Providing Feedback on QR Assessment Instrument (1) Does the assessment instrument (or instruments if there are two versions) include 3 questions (or scoring rubrics, etc.) that are clear and straightforward?
>  (2) Can (and how will) the results of the assessment plan and instrument be used to evaluate whether the instructor effectively taught specific QR skills and/or achieved his or her QR learning goals? How do the skills assessed in the instrument correspond to the QR learning goals articulated by the instructor as well as those taught in the QR lesson plan in terms of (a) knowledge and conceptual understanding; (b) thinking and other skills; and (c) attitudes, values, dispositions and habits of mind?

(*Compare* Ex. 3, D234–256 at D244, *with* Ex. 1; *see also* Ex. 4; Ex. 20, Hoiland Tr. 93:22–94:8.)

Response: Admitted.  The iteration of Subunit 7 that Plaintiff registered and is attached as Exhibit 1 to Dr. Wilder's declaration was one that was used in connection with the NICHE Project.  The portions of Subunit 7 that were included in the CCCLA Slides are from a later iteration that was used in connection with the NICE Project.  The text from Subunit 7 that appears on Slide 11 is not identical to the corresponding portion of Exhibit 1 because either Dr. Wilder or Dr. Hoiland made minor changes to the text for use in connection with the NICE Project. (Hoiland Decl. ¶¶ 100-101, 103.)

78.    Both Slide 12 of the CCLA PowerPoint and the Copyrighted Work include the following text authored by Plaintiff:

> Guidelines for Developing and Providing Feedback on QR Assessment Instrument
> . . .

(3) What are the strengths and weaknesses of the QR assessment plan and instrument? Please indicate at least one way in which the assessment instrument could be improved. In responding to this question, please consider the following:

(a) . . . the assessment . . . be . . . to evaluate the effectiveness of the QR lesson plan (including assignments, readings, etc.)? For example, does the instructor plan to use a pre-test/post-test design, is there a comparison group, etc.

(b) Does the QR assessment instrument extend beyond just being a math skills test and emphasize the ability to reason with quantitative information?

(c) Is the assessment instrument valid (i.e., does it get at what the instructor is trying to measure)?

(d) Is the instrument sound? For example, if the instrument relies on multiple choice questions, are the response options mutually exclusive and is the correct answer clearly identifiable? If the assessment instrument (or a specific question) relies on a rubric, do the scoring criteria make sense and will the exercise authoritatively assess a QR skill (or skills)?

(*Compare* Ex. 3, D234–256 at D245, *with* Ex. 1; *see also* Ex. 4; Ex. 20, Hoiland Tr. 94:9–94:16.)

Response: Admitted. The iteration of Unit 7 that Plaintiff registered and is attached as Exhibit 1 to Dr. Wilder's declaration was one that was used in connection with the NICHE Project.  The portions of Unit 7 that were included in the CCCLA Slides are from a later iteration that was used in connection with the NICE Project.  The text from Unit 7 that appears on Slide 12 is not identical to the corresponding portion of Exhibit 1 because either Dr. Wilder or Dr. Hoiland made minor changes to the text for use in connection with the NICE Project.  (Hoiland Decl. ¶¶ 100-101, 103.)

78.    Both Slide 13 of the CCLA PowerPoint and the Copyrighted Work include the following text authored by Plaintiff:

Guidelines for Developing and Providing Feedback on QR Assessment Instrument

. . .

(4) Is the assessment instrument independent of the course QR . . .assignment(s)? In other words, can it be used to evaluate the effectiveness of the QR . . .assignment(s)?

(*Compare* Ex. 3, D234–256 at D246, *with* Ex. 1; *see also* Ex. 4; Ex. 20, Hoiland Tr. 94:17–95:2.)

Response: Admitted. The iteration of Unit 7 that Plaintiff registered and is attached as Exhibit 1 to Dr. Wilder's declaration was one that was used in connection with the NICHE Project.  The

portions of Unit 7 that were included in the CCCLA Slides are from a later iteration that was

used in connection with the NICE Project.  The text from Unit 7 that appears on Slide 13 is not

identical to the corresponding portion of Exhibit 1 because either Dr. Wilder or Dr. Hoiland

made minor changes to the text for use in connection with the NICE Project.  Dr. Hoiland also

added to Slide 10, for instructional purposes at the CCCLA, the following language, which is not

part of Unit 7: "Clarity, alignment, generalizability, validity, and soundness." (Hoiland Decl. ¶¶

100-101, 103.)

80.    Defendant did not intend that the CCLA PowerPoint be the focus of her oral
presentation at the CCLA Conference, and instead intended them to be displayed to the audience
as a quick visual. (Ex. 20, Hoiland Tr. 136:11–138:12, 200:2– 202:10.)

Response: Admitted.

81.    Defendant did not intend to and did not discuss the Copyrighted Work on Slides 9
through 13 in any detail during her oral presentation at the CCLA Conference, nor did she intend
for the audience to read those slides during her oral presentation (because they had a lot of text).
(Ex. 20, Hoiland Tr. 193:10–194:4, 200:2– 202:10.)

Response: Admitted.

82.    The attendees of the CCLA Conference were interested in the procedures for
recruiting faculty and interactions between the institutions, not the instructional materials
comprising the Copyrighted Work. (Ex. 20, Hoiland Tr .137:14–138:12.)

Response: Denied.  Defendant admits that to the extent that Attendees asked questions during the

Presentation, those questions were focused on topics other than the substance of the Course

Materials.  (Hoiland Decl. ¶ 107.)

83.    In addition to Slides 9 through 13, other slides within Defendant's CCLA
PowerPoint included text that was not authored by Defendant, including Slides 14 through 19.
(Ex. 20, Hoiland Tr. 95:3–97:9.)

Response: Denied as phrased.  Defendant admits that Slides 14 through 19 were assessment

materials developed by Dr. Crystal Rodriguez.  (See Hoiland Decl. ¶¶ 104-105, 162-165;

Hoiland Decl. Ex. 12.).

84.     Slides 14 through 19 were copies of instructional assessment materials developed by a faculty member enrolled in the NICE program, Professor Crystal Rodriguez. (Wilder Decl. ¶ 79.)

Response: Admitted.

85.     Professor Rodriguez had not given her consent to Defendant to copy and distribute her work. (Ex. 14, P553–558 at P554; Ex. 20, Hoiland Tr. 145:21–146:6.)

Response:  Denied.  The Faculty Consent Form executed by Dr. Rodriguez provided her consent.

See Hoiland Decl. ¶¶ 104-105, 162-165; Hoiland Decl. Ex. 12.)

86.     Before incorporating Professor Rodriguez's work into the CCLA PowerPoint, Defendant knew that Professor Rodriguez signed an Institutional Review Board (IRB) consent form stating that she wanted written credit any time her work was used. (Ex. 20, Hoiland Tr. 126:7– 13, 139:10–141:2; Ex. 7, P231–233 at P233.)

Response: Denied.  Plaintiff has mischaracterized the Faculty Consent Form, which does not

state Dr. Rodriguez "wanted written credit any time her work was used."  (See Hoiland Decl.

¶¶ 104-105, 162-165; Hoiland Decl. Ex. 12.).

87.     Although Defendant could have used her own instructional assessment materials in place of the materials that Professor Rodriguez created, Defendant chose not to do so. (Ex. 20, Hoiland Tr. 196:12–22.)

Response: Denied, Professor Hoiland used both Professor Rodriguez's materials in the Slides, as

well as her own materials.  (See Hoiland Decl. ¶¶ 86-107.)

88.     About six months after Defendant's presentation at the CCLA Conference, Defendant showed Plaintiff an abstract for another conference presentation that she was planning which she said would be like her presentation at the CCLA Conference. (Wilder Decl. ¶ 71.)

Response: Admitted in general.  The planned presentation was to have been similar in certain

respects to the CCCLA Presentation.  (Hoiland Decl. Exs. 5, 11.)

89.     Defendant then provided Plaintiff with a copy of the PowerPoint that Defendant had submitted to the organizers of the CCLA Conference and that had displayed during her oral presentation at the CCLA Conference ("the CCLA PowerPoint"). (Wilder Decl. ¶ 72.)

Response: Admitted.

90.    Prior to Defendant sending Plaintiff the CCLA PowerPoint in approximately August 2019, Plaintiff had not previously seen a copy of the CCLA PowerPoint. (Wilder Decl. ¶ 72.)

Response: Admitted.

91.    Plaintiff first learned that Defendant had copied her Copyrighted Work into the CCLA Presentation when Plaintiff reviewed Defendant's CCLA PowerPoint in about August 2019. (Wilder Decl. ¶¶ 72, 75.)

Response: Denied as argumentatively phrased.  Dr. Hoiland admits that Dr. Wilder first received a copy of the CCCLA Slides in or around August 2019. (Hoiland  Decl. ¶¶ 114-116; Exs. 5, 11.)

92.    Plaintiff immediately advised Defendant that Plaintiff did not consent to the use of the materials she authored for NICHE in Defendant's CCLA PowerPoint. (Wilder Decl. ¶¶ 76– 78.)

Response: Denied.  Dr. Wilder's statement that she advised Dr. Hoiland in August that she "did not consent to the use of the materials" she authored for the NICHE Project in the CCCLA Slides is false.   All of the communications between Dr. Hoiland and Dr. Wilder concerning Dr. Wilder's allegations are by email, and Dr. Wilder never stated that she did not consent to the use of the Couse Materials in the CCCLA Slides; rather, Dr. Wilder stated her view that Dr. Hoiland should have (a) treated her as a "co-author" of the CCCLA Slides; and (b) provided a written citation to Dr. Wilder at every point in the CCCLA Slides where Dr. Hoiland either referred to or quote from materials that Dr. Wilder had written.  (Hoiland Decl. ¶¶ 114-119; Exs. 5, 11.)

93.    Plaintiff asked Defendant to contact the organizers of the CCLA Conference to add Plaintiff's name as a co-author to mitigate the damage done to her. (Wilder Decl. ¶ 78.)

Response: Admitted to the extent that Dr. Wilder asked Dr. Hoiland to contact the organizers of the CCCLA to add Dr. Wilder's name to the conference materials; but denied to the extent Dr. Wilder alleges that she asked Dr. Hoiland to contact the CCCLA "to mitigate the damage done to her."  (Dr. Hoiland Decl. Exs. 5, 11.)

94.     Plaintiff subsequently realized that assessment materials developed by Professor Rodriguez for the NICE project were also copied by Defendant into the CCLA PowerPoint. (Wilder Decl. ¶ 79; Ex. 13, P480–484 at P480.)

Response: Admitted to the extent that Dr. Hoiland included Dr. Rodriguez's assessment materials in the CCCLA Slides, and that Dr. Wilder subsequently asked Dr. Hoiland to add Dr. Rodriguez's name to the conference materials.  (Hoiland Decl. ¶¶ 104-105, 141-143.)

95.     Plaintiff then asked Defendant to add attribution to Professor Rodriguez in the CCLA PowerPoint as well. (Wilder Decl. ¶ 82; Ex. 13, P480–484 at P480–481.)

Response: Admitted to the extent that Dr. Wilder subsequently asked Dr. Hoiland to Dr. Rodriguez's name to the conference materials. (Hoiland Decl. ¶¶ 104-105, 141-143.)

96.     When it appeared to Plaintiff after several weeks that no correction had been made to the CCLA PowerPoint, Plaintiff contacted the organizers of the CCLA Conference directly. (Wilder Decl. ¶ 83; Ex. 13, P480–484 at P483; Ex. 15, P475–477 at P475–476.)

Response: Admitted.  As requested, Dr. Hoiland contacted the CCCLA and asked that Dr. Wilder and Dr. Rodriguez's names be added to the conference materials.  Thereafter, Dr. Wilder contacted the CCCCLA directly.  (Hoiland Decl. ¶¶ 141-143.)

97.     At that point, it was too late to change the CCLA PowerPoint, but Plaintiff's and Professor Rodriguez's names were added as co-presenters on the CCLA Conference website. (Wilder Decl. ¶ 84; Ex. 13, P480–484 at P481; Ex. 15, P475–477 at P475.)

Response: Admitted in part.  Dr. Hoiland admits that Dr. Wilder and Dr. Rodriguez were added as co-presenters (even though they were not co-presenters) on the CCCLA website.  Dr. Hoiland denies as vague and ambiguous the statement that it was "too late" to change the CCCLA Slides. There is no record evidence that the CCCLA Slides were publicly available, and there is therefore no record evidence that it was "too late" to change the Slides.  (Hoiland Decl. ¶ 160.)

98.     After contacting Valencia College, Plaintiff pursued her complaint concerning Defendant's use of her Copyrighted Work and Professor Rodriguez's work informally at CUNY. (Wilder Decl. ¶ 96.)

Response: Denied.  Dr. Hoiland attempted to have the parties' differences addressed through mediation through the American Sociological Association's Committee on Professional Ethics, but Dr. Wilder refused to participate.  (Hoiland Decl. ¶ 181.)

99.    After informal efforts to resolve the matter were unsuccessful, Plaintiff filed a formal complaint for research misconduct against Defendant with the Research Integrity Officer (RIO) at CUNY. (Wilder Decl. ¶ 97.)

Response: Denied, except admitted that Plaintiff filed a formal complaint of research misconduct that was rejected and it was determined that Dr. Hoiland did not engage in misconduct.  (Hoiland Decl. ¶¶ 181-193, Cohen Decl. Exs. 4-6.)

100.    In academia, a credit as a single author of a presentation at a national conference is beneficial to a person's career. (Wilder Decl. ¶ 101.)

Response: Denied. Publications, awards and grants may have positively impact one's career in academia.  In Dr. Hoiland's experience, speaking engagements have had no impact on her career.  Dr. Wilder's curriculum vitae lists more than 30 conference presentations, and the inclusion of the CCCLA presentation on her resume had no impact on her career.   Furthermore, it is inaccurate to characterize Dr. Hoiland as the "author" of the CCCLA presentation; rather, she was the presenter – the person who gave made the presentation at the CCCLA.  (Hoiland Decl. ¶¶ 138-143, 175-180; Hoiland Decl. Ex. 1.)

101.    Defendant's presentation at the CCLA Conference added such an authorship credit to her resume. (Ex. 20, Hoiland Tr. at 27; 81:9–12, 234:18–235:24, 236:19–237:6; *see also id.* at 169:20–170:3; Ex. 18, D88–103 at D0094.)

Response: Denied. Publications, awards and grants may have positively impact one's career in academia.  In Dr. Hoiland's experience, speaking engagements have had no impact on her career.  Dr. Wilder's curriculum vitae lists more than 30 conference presentations, and the inclusion of the CCCLA presentation on her resume had no impact on her career.   Furthermore, it is inaccurate to characterize Dr. Hoiland as the "author" of the CCCLA presentation; rather, she

was the presenter – the person who gave made the presentation at the CCCLA. (Hoiland Decl. ¶¶ 138-143, 175-180; Hoiland Decl. Ex. 1.)

102.   In each of Defendant's subsequent applications for grants and a professional award, Defendant listed the CCLA presentation. (Ex. 20, Hoiland Tr. 234:18–235:24, 236:19–237:6.)

Response: Denied as phrased.  When Dr. Hoiland applies for grants, awards or academic conferences, she typically submits a current version of her curriculum vitae.  Dr. Hoiland's curriculum vitae typically lists academic and professional honors she has received; scholarly and/or creative works she has authored or co-authored; and grants she has received.  After all of these items, she lists conference presentations and lectures she has given.  Her CV lists more than 30 such presentations and lectures. (Hoiland Decl. ¶¶ 138-143; Hoiland Decl. Ex. 1.)

103.   Defendant's presentation of the Copyrighted Work under her name impaired Plaintiff's ability to publish and present her work, having had a section of it appear under Defendant's name. (Wilder Decl. ¶ 102.)

Response: Denied.  There is no record evidence to support (a) Dr. Wilder's conclusory statement that the Presentation somehow impaired or impairs her ability to publish and present her work; and (b) the contention that Dr. Wilder has been damaged in any way by the inclusion of materials she authored in visual aids for a conference presentation attended by 12-20 community college educators and administrators.  Dr. Wilder's allegations are unsupported speculation without any foundation.  Dr. Hoiland did not claim to be the author of the Course Materials.  (Hoiland Decl. ¶¶ 88-95, 138-143, 175-180; Hoiland Decl. Ex. 1.)

104.   Plaintiff has considered commercializing the NICHE program of study, including the Copyrighted Work, in a textbook. (Wilder Decl. ¶ 103.)

Response: Denied.  There is no record evidence to support Dr. Wilder's contention that Dr. Hoiland's CCCLA presentation could adversely affect Dr. Wilder's ability to commercialize the NICHE materials.  Dr. Wilder's allegations are unsupported speculation without any foundation.

105.   Defendant's presentation could adversely affect Plaintiff's ability to commercialize the NICHE materials. (Wilder Decl. ¶ 104.)

Response: Denied.   There is no record evidence to support Dr. Wilder's contention that Dr. Hoiland's CCCLA presentation could adversely affect Dr. Wilder's ability to commercialize the NICHE materials.  Dr. Wilder's allegations are unsupported speculation without any foundation.

106.   Defendant's presentation of the Copyrighted Work under her name hinders Plaintiff's ability to publish and present her work, because it would seem the Plaintiff was copying and plagiarizing Defendant's work. (Wilder Decl. ¶ 105.)

Response: Denied.  Dr. Hoiland did not "present the Copyrighted Work" under her name.  Dr. Hoiland made a presentation at a professional conference in which she identified herself as the presenter on the CCCLA Slides.  Dr. Hoiland presented herself as the Principal Investigator and co-Director of the NICE Project, not as the author of the Course Materials.  There is no record evidence to support Dr. Wilder's contention that the CCCLA Slides hinder Dr. Wilder's ability to publish and present her work.  Dr. Wilder's allegations are unsupported speculation without any foundation.  (Hoiland Decl. ¶¶ 88-95.)

107.   Academic and professional norms require authorization and the crediting of other's work of authorship when duplicated in a publication or presentation. (Ex. 20, Hoiland Tr. 180:2– 181:8, 183:20–184:9, 184:12–185:16, 185:22–186:16; Ex. 10, P649–654 at P649–650; Ex. 11, P294–298 at P297; Ex. 9, P273–293 at P288–289; Wilder Decl. ¶¶ 88, 95.)

Response: Denied as phrased.  Although authorization and credit to authors should be given as a general matter, the extent and form of such authorization and credit can vary depending on the circumstances.  (Hoiland Decl. ¶¶ 158-159.)

108.   Both Plaintiff and Defendant work in the field of sociology. (Ex. 20, Hoiland Tr. 14:4–15:14, 47:24–48:9, 209:17; Wilder Decl. ¶¶ 2–7.)

Response: Admitted.

109.   Both Plaintiff and Defendant are members of the American Sociological Association ("ASA") and have pledged to uphold the ASA's code of ethics. (Ex. 20, Hoiland Tr. 183:12–19; Wilder Decl. ¶ 89.)

<u>Response</u>: Admitted.

110.   Sociologists are expected not to present others' work as their own, whether in published form, unpublished form or electronically available form. (Ex. 20, Hoiland Tr. 184:4–9; Ex. 9, P273–293 at P288.)

<u>Response</u>: Admitted.

111.   In presentations, sociologists explicitly identify, credit and reference the author(s) when they take data or material verbatim from their own or another person's written work, whether it is published, unpublished or electronically available. (Ex. 9, P273–293 at P288; Ex. 20, Hoiland Tr. 183:20–184:9.)

<u>Response</u>: Denied as phrased.  Although credit to authors should be given as a general matter,

the extent and form of such credit can vary depending on the circumstances.  (Hoiland Decl.

¶¶ 158-159.)

112.   Sociologists take responsibility and assume credit, including authorship credit, only for work they actually performed or to which they have made a substantial contribution. (Ex. 9, P273–293 at P289.)

<u>Response</u>: Admitted.

113.   Both Plaintiff and Defendant are on the faculty of colleges in the CUNY system and are familiar with CUNY's Academic Integrity Policy. (Ex. 20, Hoiland Tr. 179:14–22; Wilder Decl. ¶ 91.)

<u>Response</u>: Admitted.

114.   CUNY's Academic Integrity Policy prohibits plagiarism. (Ex. 10, P649–654 at P649–650; Ex. 20, Hoiland Tr. 180:2–181:8.)

<u>Response</u>: Admitted.

115.   Academics, including sociologists like Defendant, are expected not to plagiarize. (Ex. 20, Hoiland Tr. 179:14–22, 180:2–181:8, 183:12–19; Ex. 10, P649–654 at P649–650.)

<u>Response</u>: Admitted.

116.   Plagiarism is the act of presenting another person's ideas, research or writings as your own. (Ex. 10, P649–654 at P650; Ex. 11, P294–298 at P297; Ex. 20, Hoiland Tr. 180:2–181:8, 185:22–186:4.)

<u>Response</u>: Admitted.

117.   Plagiarism includes copying another person's words without the use of quotation marks and citations attributing the words to their source. (Ex. 10, P649–654 at P650; Ex. 20, Hoiland Tr. 180:2–181:8, 184:12–185:16; Ex. 11, P294–298 at P297.)

<u>Response</u>: Denied as phrased.  Plagiarism can include copying another person's words without the use of quotation marks and citations attributing the words to their source.  It depends on the circumstances.  (*See* Hoiland Decl. ¶¶ 158-159.)

118.   Plagiarism also includes cutting and pasting from various sources without proper attribution. (Ex. 20, Hoiland Tr. 184:12–185:16, 186:6–16; Ex. 11, P294–298 at P297.)

<u>Response</u>: Denied.  Plagiarism can include cutting and pasting without proper attribution.  It depends on the circumstances.  (*See* Hoiland Decl. ¶¶ 158-159.)

119.   Plaintiff would not have agreed to the duplication and publication of a large section of the NICHE/NICE assessment materials comprising the Copyrighted Work to a national conference. (Wilder Decl. ¶ 98.)

<u>Response</u>: Denied.  Plaintiff authorized Dr. Hoiland to make presentations about the NICE Project at professional conferences, and she did not place any restrictions on such use.  Hoiland Decl. ¶¶ 117-123, 132-137.)

120.   Plaintiff would not have consented to the duplication of the Copyrighted Work, a unit of the NICHE and NICE programs out of context, leading to a misleading impression of the programs. (Wilder Decl. ¶ 99.)

<u>Response</u>: Denied.  Plaintiff authorized Dr. Hoiland to make presentations about the NICE Project at professional conferences, and she did not place any restrictions on such use.  Hoiland Decl. ¶¶ 117-123, 132-137.)

121.   Plaintiff would not have agreed to the use of materials that she authored without attribution. (Wilder Decl. ¶ 100.)

<u>Response</u>: Denied.   Plaintiff authorized Dr. Hoiland to make presentations about the NICE Project at professional conferences, and she did not place any restrictions on such use.  Hoiland Decl. ¶¶ 117-123, 132-137.)

Dated: April 18, 2023                            By:       <u>s/ Guy R. Cohen</u>
                                                                       Guy R. Cohen
                                                                       Davis+Gilbert LLP
                                                                       1675 Broadway
                                                                       New York, NY 10019
                                                                       Tel.: (212) 468-4800
                                                                       Email: gcohen@dglaw.com

                                                                       **Counsel for Defendant Sarah Hoiland**