**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ESTHER WILDER,

|                                        | Plaintiff, | 1:22-cv-01254-PKC |
|----------------------------------------|------------|-------------------|

-v-

SARAH HOILAND,

Defendant.

**DECLARATION OF**
**SARAH HOILAND**

**SARAH HOILAND** declares under penalty of perjury under the laws of the United States of America that the following is true and correct:

1.  I am the defendant in this action.  I submit this declaration in support of my motion for summary judgment and in opposition to plaintiff Esther Wilder's motion for summary judgment.

**Education and Professional Background**

2.  In 2001, I graduated from Gonzaga University and received a Bachelor of Arts degree in Sociology and Criminal Justice.  In 2007, I received a masters degree in Sociology from The New School for Social Research.  In 2012, I obtained a Ph.D. in Sociology from The New School for Social Research.

3.  A true and accurate copy of my curriculam vitae as of 2022 (my "CV") is attached to this declaration as Exhibit 1.

4.  Shortly after I received my masters degree, I began working as a full-time higher-education faculty member.  From August 2008 to July 2013, I was a professor at Polk State College in Winter Haven, FL.  Polk State, formerly known as Polk Community College, is a predominantly

two-year community college.  While employed by Polk State, I became a tenured professor, and I taught courses in, among other subjects, sociology, English and American history.  In 2012, I received an endowed teaching chair.

5.     From August 2013 to the present, I have been a full-time faculty member at Hostos Community College ("Hostos"), a two-year community college located in the South Bronx. Hostos is part of the City University of New York ("CUNY"), and it serves a primarily Hispanic student body.  Hostos is designated as an "Hispanic-Serving Institution" or an "HSI."

6.     From August 2013 to August 2020, I was an Assistant Professor at Hostos.  My tenure was voted on and approved in November 2019.  Since August 2020, I have been an Associate Professor of Sociology at Hostos.  At Hostos, I typically teach sociology, anthropology, and liberal arts capstone classes.

7.     From August 2021 to the present, I have also worked as a part-time faculty member at Bard College on its Bard Prison Initiative, through which I have taught sociology courses to incarcerated individuals at Fishkill (Fall 2021 and Spring 2023), Greenhaven (Fall 2022), and Taconic (Spring 2022) Correctional Facilities.

8.     My service record at Hostos, CUNY, regionally, and nationally shows a longstanding commitment to undergraduate education and equity and includes leadership positions at Hostos, CUNY, and nationally.

9.     In addition to teaching and service, I am actively involved in research projects and scholarly writing.  For example, I am currently the Principal Investigator on a program funded by the National Science Foundation ("NSF") titled "A Holistic Two-Generation Approach to Improving STEM Education Outcomes in the South Bronx," and referred to as the Holistic Oasis for Parents Education Program (the "HOPE Program").  Supported by a $2.3 million NSF grant,

the HOPE Program, among other things, provides support during the summer for student-parents who are taking STEM classes and a STEM academy for their children.  This five-year research project studies the effectiveness of these academic, family, and professional interventions.

10.     On NSF-funded programs, the Principal Investigator is the person who leads and is in charge of the project that receives the funding.  As the Principal Investigator of the Hope Program, I supervise, implement and am otherwise responsible for all aspects of the program.

11.     I have dedicated my career to teaching and improving the lives and social mobility of community-college students, who, in most cases, face difficult financial circumstances and attend school while also working full-time jobs and/or raising children.

**Numeracy**

12.     As a Hostos professor, I place significant emphasis on helping my students develop their quantitative-reasoning ("QR") and numeracy skills.  Numeracy can be defined as the ability to understand and use numbers and data in everyday life.  It is often referred to as "quantitative literacy."  Just as it is important for educational institutions to ensure that students develop literacy skills, scholars and educators also emphasize numeracy because quantitative literacy can be critical to success both in work and everyday life.

13.     From 2019-2021, I was a member of the National Numeracy Network ("NNN's") Board of Directors.

14.     In 2016, Dr. Kate Wolfe, a colleague at Hostos, and I wrote a scholarly article titled *Measuring Numeracy in a Community College Context: Assessing the Reliability of the Subjective Numeracy Scale* (the "Community College Numeracy Article").  The Subjective Numeracy Scale ("SNS") was developed for use in the health-care context to assess numeracy among patients.  In the Community College Numeracy Article, we assessed, among other things, whether the SNS

3

could also be used in a new context with predominantly minority students and whether there was any correlation between SNS scores and race/ethnicity, gender, and "English as a Second Language" enrollment.  This article was the result of several years of research.

15.    In March and April 2016, while Dr. Wolfe and I were working on the Community College Numeracy Article, we exchanged emails with Dr. Esther Wilder, a professor at Lehman College with significant experience relating to numeracy.  Dr. Wilder reviewed and commented on a draft of the article.  True and correct copies of emails, dated from March 24 to May 3, 2016 and relating to these communications. are attached to this declaration as Exhibit 2.

16.    In 2017, Dr. Wolfe and I published the Community College Numeracy Article.

**Dr. Wilder and the NICHE Project**

17.    In May 2016, Dr. Wilder contacted me about potentially serving as a Principal Investigator at Hostos on an NSF-funded research project titled "Numeracy Infusion for College Educators" (the "NICE Project").  (*Id.*).

18.    At that time, Dr. Wilder had recently completed a faculty-development program through another NSF-funded project titled "Numeracy Infusion Course for Higher Education" (the "NICHE Project").  To a significant degree, the NICE Project was a continuation of the NICHE Project.

19.    I was not involved and did not have any role on the NICHE Project.  As a result of my subsequent work on the NICE Project, I have personal knowledge about the NICHE Project.

20.    The NICHE Project ran from approximately 2011 to 2016 and involved a grant made to the Research Foundation of the City University of New York.  Dr. Wilder was the Principal Investigator and Director of, and the driving force behind, the NICHE Project.

21.     The NICHE Project was a CUNY-wide faculty-development program designed to help educators at higher-education institutions throughout New York City "infuse" numeracy or QR materials into their coursework.  The NICHE Project was primarily an online course that taught faculty to: (a) apply quantitative reasoning within their respective disciplines and coursework; (b) implement best practices for teaching quantitative literacy; and (c) assess the effectiveness of the faculty member's QR initiatives in order to further improve instruction (the "NICHE Course").

22.     For example, a European History professor who participated in the NICHE Course could: (a) infuse QR materials into her coursework by including charts, graphs and statistics showing numerically the extent to which, say, political instability results in population shifts; (b) integrate best practices on how to teach students to use charts, graphs and statistics to better understand the topic; and (c) implement tools to assess whether the QR materials were effective in improving students' quantitative-reasoning skills.

23.     The NICHE Course consisted of eight instructional units ("Units"), and each Unit was supported by written materials, which included a variety of readings, short exercises, activities/assignments, questions for interactive discussion, and other pedagogical materials.  To the best of my knowledge, most of these written instructional materials were specifically created for use in the NICHE Project (the "Course Materials").

24.     The NICHE Project had goals that extended beyond CUNY.  As Dr. Wilder wrote in the publicly available asbstract for the NICHE Project: "The broader impacts of the project lie primarily in its demonstration of a model for engaging faculty throughout a large and diverse university system of campuses."  Dr. Wilder explained further: "The project is also providing tested QR learning materials and disseminating the NICHE course materials to other institutions who are similarly committed to improving the quantitative literacy and reasoning of their

students."  A copy of the NICHE abstract is attached to the Declaration of Guy Cohen ("Cohen Decl.") as Exhibit 1.

**The NSF Proposal for the NICE Project**

25.     In 2016, it was my understanding (and it remains my understanding today) that Dr. Wilder was the primary author of the Course Materials.  In 2016, it was also my understanding from communications with Dr. Wilder that she wanted to target community colleges since many/most NICHE participants were from four-year colleges, and she believed new funding could be obtained if she submitted a proposal specifically targeting HSIs and two-year community colleges in the Bronx.  Lehman is a four-year college.

26.     With that goal in mind, Dr. Wilder asked me to serve as Principal Investigator and co-Director of the NICE Project.  As noted, Hostos is a two-year community college with an overwhelmingly Hispanic student body, and Dr. Wilder made clear that her interest in having me serve as a co-equal leader of the NICE Project was based, at least in part, on her need or perceived need to have the NICE Project focused on and headquartered at Hostos.

27.     I informed Dr. Wilder that I was interested in serving as Principal Investigator and co-Director with Dr. Wilder of the NICE Project, and in May 2016, we together submitted a grant proposal to the NSF (the "NSF Proposal" or the "Proposal").  Being awarded a NSF grant is a rigorous process, and we would not be awarded a grant until after undergoing a strenuous review of the proposed project's merits.  True and correct copies of portions of the NSF Proposal are collectively attached to this declaration as Exhibit 3.

28.     The NSF Proposal was submitted as a collaborative proposal, which means that investigators from two or more organizations wish to collaborate on a unified research project. The NSF Proposal was actually two related but separate proposals, with two different

organizations submitting separate budget proposals and requesting separate grants. In collaborative proposals, one organization must be designated as the "lead."

29. The first proposal identified: (a) "CUNY Hostos Community College" as the organization to which the award should be made; (b) "CUNY Hostos Community College" as the primary place of performance; and (c) "Sarah L. Hoiland" as the Principal Investigator and Project Director. *Id.* at P000163.

30. The second proposal identified: (a) "Research Foundation of CUNY on behalf of Lehman College" as the organization to which the award should be made; (b) "Hostos Community College," – not Lehman College – as the primary place of performance; and (c) Dr. Wilder as the Principal Investigator and Project Director. *Id.* at P000166.

31. As Principal Investigators on separate proposals, Dr. Wilder and I would, upon receipt of the awards, be separately responsible for and in charge of the programs for the grants awarded to our respective institutions. As co-Directors of the NICE Project, we would be – and ultimately were – jointly and equally responsible for the NICE Project's collaborative work.

32. Despite our co-equal status, the NSF Proposal was intentionally framed in a way that emphasized my role and the role of Hostos as the lead organization. The NSF Proposal emphasized that the NICE Project was to be "headquartered" at Hostos – not at Lehman. In addition, my name was listed first in the section of the NSF Proposal identifying the NICE Leadership Team and in other places throughout the Proposal. *See, e.g., Id.* at P000180, P000229, P000230.

33. Dr. Wilder was the primary author of the NSF Proposal. My understanding was that large portions of the NICE Proposal were copied over from the prior NICHE proposal. I

revised portions of the Proposal and drafted portions of it that specifically related to Hostos and the work I would be performing as a Principal Investigator.

**The Format and Goals of the NICE Project for HSIs in the Bronx**

34.     The NICE Project was, to a significant degree, an extension and continuation of the NICHE Project.  Like the NICHE Project, the NICE Project was a faculty-development program designed to help educators at higher-education institutions "infuse" numeracy materials into their coursework.  Like the NICHE Project, the NICE Project involved a predominantly online course, and it used the very same or subtantially identical Course Materials.

35.     The primary difference between the two programs was that, unlike the City-wide focus of the NICHE Project, the NICE Project specifically targeted faculty at three HSIs in the Bronx: Hostos, Bronx Community College ("BCC") and Lehman.

36.     In the Proposal, Dr. Wilder and I indicated that the Course Materials from the NICHE Project would be revised for use in the NICE Project.  Ultimately, however, Dr. Wilder and I only made minor revisions to the Course Materials.

37.     In the Proposal, Dr. Wilder and I indicated that the online NICHE Course would be updated so that the NICE Project's faculty-development course (the "NICE Course") would be conducted both online and in-person.  Our NSF Program Officer informed us that the NICE Project should remain a predominantly online course to facilitate an "apples-to-apples" comparison of the summer cohort and the academic year cohort.  Accordingly, we did not update the materials to support a face-to-face course, though the NICE Course had certain in-person components.

38.     The NICE Course was designed primarily to: (a) provide participating faculty members ("Faculty Participants" or "Participants") with an overview of the importance of QR skills in every day life and the need to incorporate QR materials into higher-education courses; (b)

help Participants develop and refine QR goals or outcomes for their classes – *i.e.*, determine what they want their students to learn; (c) help Participants develop and refine a lesson plan incorporating QR materials; (d) provide Participants with best practices for teaching quantitative reasoning in their classrooms; (e) provide Participants with guidance on developing tools to assess whether their numeracy-related efforts have been effective with their students; (f) have participants incorporate the lesson plan and assessment in their actual classes; and (g) report their students' assessment data.

39.     One goal of the NICE Project was to train a cadre of educators at three HSIs in the Bronx who could then: (a) improve the QR skills of the many students who enroll in their classes; and (b) impart their knowledge on other educators at Hostos, Lehman and BCC, who could then make efforts to improve the QR skills of their own students.

40.     In the NSF Proposal, we indicated that we intended to evaluate how effective the NICE Project was by assessing, following completion of the NICE Course, whether Faculty Participants: (a) had increased their use of QR materials in their coursework; (b) were pleased with the NICE Course and believed it was effective; and (c) had improved their own quantitative-reasoning skills (which, in turn, could increase their ability to improve their students' QR skills).

**The Broader Goal: Dissemination of the NICE Project Beyond CUNY**

41.     The NICE Project's goals also extended beyond CUNY.  Dr. Wilder and her collaborators on the NICHE Project had produced invaluable faculty-development and training materials on numeracy that could potentially benefit educators and administrators around the country.  Accordingly, the NSF Proposal stated that the NICE Project's goals extended beyond the three CUNY institutions whose faculty would participate in the program; the broader goal was to make the faculty-training program and associated materials as broadly available as possible.

42.     This broader goal was articulated in the "Broader Impacts" section of the "Project

Summary."  In that section of the NSF Proposal, we stated as follows:

> NICE will also help faculty beyond CUNY.  First, the project intervention and
> materials, including the NICE training program . . . will be made readily available
> on the NICE project website . . . To ensure that the NICE materials and evaluation
> results are widely available to educators, policymakers, administrators, and
> researchers, the results will be presented at conferences, published in journals and
> disseminated through other relevant outlets.

*See* Ex. 3, at P000171.

43.     This broader goal was reiterated in a section of the NSF Proposal titled "NICE at

CUNY and Beyond."  In that section, we stated as follows:

> We will also support QR instruction through the dissemination of our research
> results.  With an increased emphasis on QR and accreditors' strong focus on
> assessment, there is high demand for programs and resources that can be used to
> promote and assess students' QR skills.  To ensure that our materials and evaluation
> results are widely available to educators, policymakers, administrators, and
> researchers, we will present at conferences, publish in journals, and disseminste our
> results through other relevant outlets.

*Id.* at P000180**.**

44.     This broader goal was also articulated in the budget justification section of the

Proposal on my role as Principal Investigator on the Hostos grant and co-Director of the NICE

Project.  That section – titled "Budget Justification – PI Sarah Louise Hoiland" – sets forth my

duties and responsibilities and indicates that I will, among other duties, work collaboratively with

Dr. Wilder to direct the faculty-development program; recruit Hostos faculty to participate in the

NICE Project; ensure that the faculty-development program "meets the needs of faculty at HSI

community colleges"; coordinate all in-person activities at Hostos; and direct all of the research-

related data gathering.  *Id.* at P000199.

45.     Beyond educating Faculty Participants, the Budget Justification made clear that I

would be making presentations about the NICE Project at professional conferences, including

community college and HSI conferences.   Specifically, it provided that I would: "present at professional conferences [and] participate in a variety of dissemination activities (e.g., community college and HSI conferences)."

46.   Moreover, the NICE Project's proposed budget specifically contemplated my traveling to various conferences.  The NSF Proposal provided as follows: "The budget includes $7,000 for PI Hoiland to attend conferences both for professional development, dissemination activities, and networking with faculty from similar institutions."  *See* Exhibit 3 at P000199.

47.   When we submitted the NSF Proposal, the NICE Project was intended to be a two-year project, running from January 2017 to December 2018, and research results would not have been expected until late 2018.   We ultimately requested and obtained an extension of the completion date to December 2019.

48.   The budget submitted with the NSF Proposal contemplated my attending a number of national conferences outside of New York, including several in 2017 before research results would be available.   These identified conferences included the following: "2018 American Sociological Association (August 11-14 in Philadelphia), 2017 Hispanic Eudcation Technology Serivces (HETS) Conference (January TBD), 2018 The Alliance of Hispanic Serving Institution Educators (AHSIE) Annual Conference (March, TBD), and the 2017 League for Innovation in Community Colleges STEMTech (November 2016 in Philadelphia) or Innovations Conference (March 2017, San Francisco)."  *Id.* at P000199-200.

49.   The primary purpose of attending these conferences, paid for with NSF funding, was to disseminate information about the NICE Project and the Course Materials to higher-education faculty members, administrators and others outside the CUNY system, and to community colleges and HSIs in particular.

11

50.     Upon completion of the NICE Project, Dr. Wilder reported that we had successfully carried out our goals with respect to dissemination of the Course Materials and information about the NICE Project.  In Dr. Wilder's publicly available Project Outcomes Report for NICE, she wrote:

> NICE has also helped faculty beyond CUNY as a result of our dissemination activities.  The instructional materials from the project are readily available on the NICE website (www.teachqr.org), which also includes resources on best practices and tools for engaging students in data analysis.  Moreover, our research on NICE—both existing publications/presentations and those in progress—contributes to our understanding of best practices for faculty development.  Finally, we have worked to ensure that the NICE materials and evaluation results are widely available to educators, policymakers, administrators, and researchers.  These efforts have included more than a dozen presentations, workshops, and scholarly papers.

A true and correct copy of the Project Outcomes Report is attached to this declaration as Exhibit 4.

51.     And in communications with me after the dispute that led to this lawsuit arose, Dr. Wilder emphasized the importance of faculty development and noted the NICE Project's goal of widely disseminating the Course Materials.  ███████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ████████████████████████████████████████████  A true and correct copy of the referenced email is attached to this declaration as Exhibit 5.

**The NICE Project**

52.     In 2016, the NSF granted the requested awards and funded the NICE Project.  Like the NICHE Project, the primary tool of the NICE Project was an online faculty-development course that taught Faculty Participants to, among other things: (a) apply QR within their respective disciplines; (b) implement best practices for teaching quantitative literacy; and (c) assess the

effectiveness of the Faculty Participant's QR initiatives in order to further improve instruction.  In advance of commencing the NICE Course, Dr. Wilder enrolled me in the NICHE Course in order to give me access to the Course Materials in advance of using the Course Materials, potentially in modified form, as the materials for the NICE Project and to further prepare me for assuming my responsibilities as a Principal Investigator on the NICE Project.

53.    The first group – or cohort – of Faculty Participants took the NICE Course over eight weeks in the summer of 2017.  Twelve educators participated.  The second cohort of Faculty Participants took the NICE Course throughout the 2017-2018 academic year.  Fourteen educators participated.

54.    Because several Faculty Participants did not complete the NICE Course as scheduled, I worked separately with several of them to complete the NICE Course during the summer of 2019.  In total, 21 out of 26 Faculty Participants completed the NICE Course.

55.    As noted, the NICE Course was predominantly online.  At the outset, the Faculty Participants attended an all-day in-person orientation session in which Dr. Wilder and I gave an overview of the NICE Course and the goals of the NICE Project.  After that, the Faculty Participants attended an all-day session in which they were administered the Critical-Thinking Assessment Test ("CAT"), an examination that created by an NSF-funded project out of Tennessee Tech University.  The remainder of the NICE Course was conducted online through a learning management system called Blackboard.  At the conclusion of both cohorts, the Faculty Participants attended a capstone conference summarizing the work that had been completed during the NICE Course.

**The Eight Units and Associated Course Materials**

56.     As noted, the NICE Course consisted of the same eight Units as the NICHE Course, and the NICE Course used substantially identical Course Materials to support each instructional Unit.  Like the NICHE Course, the Course Materials for the NICE Course included a variety of readings, short exercises, activities/assignments, questions for interactive discussion, and other pedagogical materials that were accessed through Blackboard.

57.     A true and correct copy of the syllabus for the NICE Course for the 2017-2018 academic year (the "Syllabus") is attached to this declaration as Exhibit 6.

58.     The eight Units – each supported by the Course Materials – were titled as follows: (1) QR and Making Numbers Meaningful; (2) QR Learning Outcomes; (3) The Brain, Cognition, and QR; (4) QR and Writing; (5) Discovery Methods; (6) Representation of Data; (7) QR Assessment; (8) Math Anxiety and QR Stereotypes and Culture.  To the best of my recollection and belief (I have not had access to the Course Materials in over three years), each of the Units was broken down into five to ten subunits (i.e., 1A, 1B, 1C, etc.; each a "Subunit"), so that there were several dozen Subunits in total.  Based on my recollection and a review of the Syllabus, I have summarized each Unit below.

59.     Unit One, "QR and Making Numbers Meaningful," provided background on what quantitative reasoning is and why it is an important skill to be taught in college classrooms.  It included examples of deficiencies in American education and examples of curricular interventions designed to address these deficiencies.

60.     Unit Two, "QR Learning Outcomes," provided background on creating learning outcomes or goals specific to quantitative reasoning to improve students' comprehension of visual

representations of data.  Faculty Participants were required to create learning goals for their coursework and to contribute to an online discussion forum (the "Discussion Forum").

61.     Unit Three, "The Brain, Cognition, and QR," to the best of my recollection from 2019, covered the ways in which thinking processes are "fast," thereby leading individuals to jump to conclusions or misinterpret test results, statistics, or other numerical information, especially in healthcare and medical decision-making.  Faculty participants were asked to provide peer review on learning goals and contribute to the Discussion Forum.

62.     Unit Four, "QR and Writing," focused on the importance of being able to write about numbers accurately and clearly across curricular disciplines.  Faculty participants were required to revise their learning goals based on comments both from peer review and from the NICE supervisory team (the "NICE Team"), which consisted of Dr. Wilder, an external advisor, and me.  Faculty Participants were also asked to begin creating a QR lesson plan or assignment for their own courses (a "QR Assignment").

63.     Unit Five, "Discovery Methods," emphasized engaging students in ways that they can work with numbers and that those numbers are meaningful. For example, an interactive map showing the prevalence of grocery stores and bodegas in New York City or creating one's own map encourages students to see social inequality and the overlapping inequalities (i.e. poverty, food deserts, race/ ethnicity) and for students who live in these areas, these numbers are especially meaningful. Faculty participants were asked to create a QR Assignment and to post and reply in the Discussion Forum.

64.     Unit Six, "Representations of Data," contained materials designed to help faculty understand graphs, charts, and other visual representations of data and integrate them into their

QR materials.  Faculty Participants were required to provide peer review on QR Assignments and contribute to the Discussion Forum.

65.     Unit Seven, on "QR Assessment" provided an overview of assessment and evaluation, with a specific focus on how to measure whether students are reaching QR learning goals.  Faculty Participants were required to revise their QR Assignments, create QR assessment materials "QR Assessments," and contribute to the Discussion Forum.

66.     The Course Materials at issue in this action concern one of the Subunits of Unit 7 – specifically Unit 7H.  Those materials will be referred to as the "Subunit 7H Materials."

67.     Unit Eight, on "Math Anxiety and QR Stereotypes and Culture," focused on culture, gender, and race in an effort to better understand from a social science perspective disparities in mathematics performance and the structural components that fuel these disparities. Faculty Participants were required to submit their QR Assessments and participate in the Discussion Forum.

**<u>My Duties and Responsibilities</u>**

68.     As a Principal Investigator and co-Director of the NICE Project, my duties and responsibilities, all of which I carried out, included: (a) recruiting Faculty Participants; (b) co-supervising and managing the in-person aspects of the NICE Course; (c) reviewing and commenting on all tasks and assignments submitted by Faculty Participants; (d) addressing questions and issues relating to Faculty Participants; (e) collecting data; (f) analyzing and reporting on collected data; and (g) attending and presenting at professional conferences.

69.     As part of our duties and responsibilities as co-Directors of the NICE Project, Dr. Wilder and I both made presentations about the NICE Project at professional conferences.  We were required to do so under the NSF grants for our respective institutions.  On at least two

occasions we did so together; on other occasions, we did so separately.  When we presented together, there were not yet any research results from the NICE Project as a whole available.  To the extent that any project-wide research results were shared when we presented together, Dr. Wilder presented such results and they were results from the prior NICHE Project – not the NICE Project.  At these conferences, exerpts were shared from the Course Materials because the Course Materials were, in essence, the basis of both the NICE Project and the NICHE Project.

70.     As articulated in the NSF Proposal, our goal in making these presentations was to inform educators, policymakers, administrators, researchers and others about the NICE Course and the Course Materials so that they could potentially benefit from it.  Each of us was obligated to do so under our respective NSF grants.  We reported these presentations in our annual NSF reports and shared the presentation citations on the NICHE/NICE website.

71.     Dr. Wilder and her team from the NICHE Project had developed, in my view, a very effective and transferable faculty-training program and our goals, as stated in the NSF Proposal, included directing faculty members and others to the NICE website (www.teachqr.org), where the instructional materials were to be "readily available"; and to otherwise broadly disseminate and make widely available the training program, teachings and Course Materials of the NICE Project.  *See* Ex. 3 at P000171.

72.     In her declaration, Dr. Wilder states that the Course Materials were only made available to faculty enrolled in the NICE Project and administrators of the NICE Project on Blackboard.  Wilder Decl. [para] 58.  I do not know whether Dr. Wilder's statement is accurate. But if Dr. Wilder limited access to the Course Materials, such limitations were not consistent with my goals as a Principal Investigator or the goals articulated in the NSF Proposal that led to our receipt of NSF funding.  As stated, an important goal of the NICE Project was to make the Course

Materials "readily available" and as widely available as possible.  In my role as Principal Investigator at Hostos and co-Director of the NICE Project, I considered it to be important for me to make presentations at professional conferences about the NICE Project and make the Course Materials as widely available as possible both because of my obligations under the NSF grant and because I considered the NICE Course (and the associated Course Materials) to be an effective faculty-development program that could have a positive impact on faculty (and students) at HSIs and community colleges.

**My Presentation Proposal for the Community**
**College Conference on Learning Assessment**

73.     On or around June 1, 2018, as part of my professional obligations on the NICE Project, I submitted a presentation proposal to the Community College Conference on Learning Assessment (the "CCCLA").  A true and correct copy of my CCCLA proposal (the "CCCLA Proposal") is attached to this declaration as Exhibit 7.

74.     To the best of my knowledge and understanding, the CCCLA was not intended as a forum for presenting professional research and scholarly papers; instead, it was primarily offered as an opportunity for community-college educators and administrators to improve their pedagogical skills for the benefit of their students and network with colleagues.

75.     The CCCLA provided an excellent opportunity for me – as a community-college professor – to comply with my dissemination obligations as a Principal Investigator and co-Director of the NICE Project.  One of the specific goals of the NICE Project was to disseminate its teachings to community colleges, and the CCCLA was specifically on the topic of learning assessment.  Because the NICE Project had a learning-assessment component and most or all of the CCCLA attendees would be from community colleges, I considered the CCCLA to be a

particularly appropriate forum for presentation of information about our training program and other work on the NICE Project.

76.     In the CCCLA Proposal, I titled my planned session "Assessing Numeracy in a Faculty Development Program," and I identified the target audience as "Teaching Faculty."

77.     I began the abstract section of the CCCLA Proposal (which would be used to tell attendees why they should attend my session) by discussing my status as one of the two Principal Investigators on the NICE Project.  I wrote as follows:

> This section will focus attention on strategies for assessing quantitative reasoning (QR) at community colleges.  The presenter is one of two principal investigators of a National Science Foundation (NSF) faculty development program titled Numeracy Infusion for College Educators (NICE).

Thereafter, I emphasized that I worked with another Principal Investigator by repeatedly using the pronoun "we":

> In promoting the infusion of numeracy across the curriculum at CUNY, with specific attention to assessment, we will discuss both the challenges and successes we have encountered.  Numeracy is tied to upward social mobility and we see our faculty development program as a way to infuse numeracy, using high impact practices and clear assessment tools, and help create more numerate students and citizens.

78.     In the CCCLA Proposal, I focused my planned presentation on the assessment portion of the NICE Course, and I listed the following as the three primary learning objectives for my presentation: (1) "To share best practices in faculty development related to assessment"; (2) "To disseminate assessment results of our QR/QL faculty development program"; and (3) "To discuss the challenges and successes related to assessment in the community college context."

**Dr. Wilder Expresses No Interest in Co-Presenting at the CCCLA**

79.     On July 26, 2018, I was informed that I had been accepted to present at the CCCLA, which was scheduled to proceed in February 2019.  I was pleased to have been given this

opportunity because, in addition to providing a required dissemination opportunity, I am passionate about helping community-college faculty members improve their teaching skills.  A true and accurate copy of the acceptance email I received from the CCCLA, along with a subsequent email between Dr. Wilder and me, is attached to this declaration as Exhibit 8.

80.     The next day – more than six months before the CCCLA – I forwarded the correspondence concerning my acceptance, which included the presentation title, "Assessing Numeracy in a Faculty Development Program," to Dr. Wilder.  I asked her if she wanted to co-present with me.  (*Id.*)

81.     The CCCLA – attended primarily by community-college faculty – was not a prestigious conference, and Dr. Wilder declined to co-present with me.  Documents produced in discovery indicate that Dr. Wilder had no interest in attending the CCCLA.  ████████████

████████████████████████████████████████████████

████████████████████████████████████████

82.     It is my understanding that Dr. Wilder has never presented at a community college conference.

**The CCCLA Presentation and the CCCLA Slides**

83.     From on or around February 17 to February 19, 2019, I attended the CCCLA in Florida.  At the CCCLA, I gave a presentation on "Assessing Numeracy in a Faculty Development Program" during a breakout session (the "Presentation").  I did not get paid for speaking at the CCCLA.  The CCCLA did not reimburse me for my travel expenses, which were covered under the budget for the NSF grant.

84.     The Presentation was informal and attended by around 12-20 conference participants (the "Attendees").  The Presentation, in its entirety, related to the NICE Project.  To

the best of my knowledge and recollection, all of the Attendees were faculty instructors from community colleges, along with a few administrators.

85.     During the Presentation, I used a PowerPoint slide deck that I had prepared in advance as a visual aid (the "CCCLA Slides" and each, a "Slide").  I did not hand out or otherwise provide the CCCLA Slides to the Attendees; the CCCLA Slides were shown, one at a time, on a screen.  True and correct copies of the CCCLA Slides are attached to this declaration as Exhibit 9.

86.     Slides 1-4 were introductory Slides.  On Slide 1, I identified the title of the Presentation and listed myself, my title and my employer.  I identified myself on Slide 1 because I was the presenter – I was making the Presentation.  I did not identify Dr. Wilder on Slide 1 because she was neither a presenter nor a co-presenter at the CCCLA.  I had asked her to co-present with me, but she had declined.

87.     Slide 2 contains a brief summary of the NICE Project, as well as the research questions we had been addressing.  Slide 3 and Slide 4 each contain a photograph of Faculty Participants in the NICE Project, along with members of the NICE Project team.  Dr. Wilder appears in both photos.  She is seated on the far left in the photo in Slide 3, and she is standing and on the far left in the photo in Slide 4.

88.     During this introductory portion of the Presentation, I introduced the NICE Project and stated that it was an offshoot and continuation of the NICHE Project.  I discussed that the NICE Project relied on the same Course Materials that were developed and used in connection with the NICHE Project.  I explained that I had not worked on the NICHE Project, and that I had joined a program in which the faculty-development course and the supporting Course Materials were already in place.

89.     I pointed to Dr. Wilder in the photos, identified her status as a professor at Lehman, and told Attendees about her leading and instrumental role on both the NICHE Project and the NICE Project.  I explained that Dr. Wilder had created, developed and was the driving force behind the NICHE Project; and that Dr. Wilder was also the driving force behind the NICE Project, which used the same Course Materials.

90.     I also discussed my role as a Principal Investigator on the NICE Project.  Because community college faculty and administrators are often interested in understanding the process by which one can become a Principal Investigator on an NSF-funded program, I specifically showed the Attendees both of the abstracts for the NICE Project (for my institution and for Dr. Wilder's).  I also explained the type of grant we had obtained (a collaborative proposal) and provided some basic information about NSF grants, such as how to search for NSF grants online.  True and correct copies of the abstracts for Hostos and for Lehman are collectively attached to this declaration as Exhibit 10.

91.     Throughout the Presentation and in discussions at the CCCLA afterwards, I repeatedly referenced Dr. Wilder and her leadership role in developing and implementing both the NICHE Project and the NICE Project.  In fact, I mentioned Dr. Wilder so frequently and glowingly that I'm confident she would have been embarrassed had she been in attendance.

92.     Based on what I said during the Presentation, all of the Attendees knew and understood that Dr. Wilder was the driving force behind the NICHE Project and the NICE Project, and the associated Course Materials.

93.     As a Principal Investigator and co-Director of the NICE Project, I discussed during the Presentation my role and our collective work on the NICE Project, with a focus on my specific efforts working with community-college Faculty Participants.

94.     I did not at any point in time state, imply or suggest that I was the author of the Course Materials.  I did not write the Course Materials.  I never claimed to have written the Course Materials.  And the Attendees knew that I did not write the Course Materials because I told them that I was not involved in the NICHE Project and that the Course Materials were used in connection with the NICHE Project.

95.     The Attendees knew and understood that I was speaking to them as a Principal Investigator of an NSF-funded faculty-development program, and that the Course Materials were the course materials for that program.

96.     Slide 5 and Slide 6 relate to an in-person workshop that we conducted as part of the NICE Project.  Slide 5 contains a high-level summary of the workshop, during which we assessed faculty and trained faculty on how to assess using the CAT.  Slide 6 contains CAT data for Faculty Participants in the NICE Project.  My understanding of the CAT data is that it was prepared for us by Tennessee Tech.

97.     Slide 7 contains a summary of the eight Units of the NICE Project that are available online through Blackboard.

98.     Slide 8 is titled "How to Develop a QR Assessment Instrument."  The focus of the CCCLA was learning assessment, and, accordingly, the main topic of the Presentation was assessment.  I did not focus the Presentation on the first six Units of the NICE Course, which concerned developing QR learning goals, developing QR lessons, and learning best practices for teaching QR.  Instead, I focused on a sub-section of Unit 7, which involved developing materials to assess whether and to what extent QR learning goals have actually been met.  To the best of my knowledge, many, if not most, community-college faculty members have some familiarity with creating assignment assessments.  During my tenure at Polk State College, this was required as

part of the college's regional accreditation process.  Slide 8 summarizes, in general terms, the steps for developing a QR assessment instrument.

99.     Consistent with the goal of making the NICE Project's materials readily available to higher-education faculty members, Slide 8 contains a link to the "NICE/NICHE Teach QR" website (the "Website").  I clicked on the link and showed the audience the Website again to reiterate the NICHE/NICE connection.  At that time, the Website clearly identified Dr. Wilder as the project's Director and main contact person.

100.    Slides 9 through 13 contain portions of the actual text on assessment from the Course Materials for Unit 7 – the Subunit 7H Materials.  Slide 9 and Slide 10 contain actual text from the Subunit 7H Materials on developing the key deliverable – the QR assessment instrument. Slide 10 also includes a link to the portion of the Website where course-specific assessment instruments are available for review.  Slide 10 also includes specific advice I added for purposes of the Presentation regarding creation of the assessment instrument: "Keep it simple: pre/post, three questions, and a scoring rubric."

101.    Slide 11, Slide 12 and Slide 13 contain actual text from the Subunit 7H Materials on developing and providing feedback to others on their QR assessment instruments.  Slide 13 also includes specific advice I added for purposes of the Presentation relating to giving feedback on QR assessment instruments: "Clarity, alignment, generalizability, validity, and soundness."

102.    The NICE Course is collaborative, and I discussed with the Attendees how Faculty Participants both create and revise a QR assessment instrument, and provide feedback to at least one other Faculty Participant on that Participant's QR assessment instrument.

103.    I told the Attendees and it was clear in context that what I was showing them on Slides 9 through 13 were actual excerpts of the Course Materials from the NICE Project.  I moved

through Slides 9 to 13 quickly to show Attendees what the Course Materials on Blackboard looked like and the types of questions Faculty Participants were asked to answer in preparing their assessment materials.  The Subunit 7H Materials that were included in the CCCLA Slides are the ones used in the NICE Project.  They are substantially the same as the Subunit 7H Materials used in connection with the NICHE Project, but minor changes were made for use in the NICE Project.  I did not read the slides out loud.

104.    After showing the Attendees the instructional materials, it was, in my view, important to show the Attendees an actual sample exercise completed by a Faculty Participant.  Accordingly, Slides 14 through 19 show a sample assessment exercise in criminal justice completed by Dr. Crystal Rodriguez, one of the Faculty Participants.

105.    When I discussed Dr. Rodriguez's sample exercise, I specifically identified her by name as the Faculty Participant who had completed the sample assessment.  I also identified the college at which she teaches (BCC) and her department (Criminal Justice), and I also pointed her out in one of the photos on Slide 23.

106.    In addition to serving as a Principal Investigator and co-Director of the NICE Project, I also took the course myself and incorporated the QR lesson plan I created into my Sociology 101 course at Hostos.  Slide 20 relates to my own development of assessment materials for my Sociology 101 course and the associated results.  Slide 21 contains assessment questions I asked students from the class, along with examples of student responses to my assessment questions.

107.    To conclude the Presentation, Slide 22 and Slide 23 contain photos from the capstone conference we held after the two groups of Faculty Participants had completed the Nice Course.  Dr. Wilder appears in the group photo on Slide 22, and Dr. Wilder and I are behind the

dais in the photo in the lower right corner on Slide 23.  To the extent that questions were asked by Attendees during the Presentation, those questions were focused on more general subjects – like recruiting faculty members for projects – and were not focused on the Course Materials.

**Distribution of the CCCLA Slides**

108.    As required by the CCCLA sponsors, I provided the CCCLA organizers with the CCCLA Slides in advance of the conference.  Although I do not specifically recall this, documents I received from the CCCLA organizers state that the CCCLA Slides would be made available on a password-protected website for conference attendees to access.

109.    I have attended many professional conferences over the years, and materials for presentations are sometimes made available on websites for attendees to view.  I generally do not access those sites to review the materials either in advance, during the presentation, or after the conference.

110.    I did not look at the CCCLA website nor did I access my materials or anyone else's materials through the CCCLA website.

111.    Although I was told after the fact that the CCCLA Slides were available online for a short period of time in connection with the conference, I do not have personal knowledge as to whether they were actually made available on a conference website or distributed to participants in any other manner.

112.    I do not recall seeing any of the Attendees at the Presentation with printed copies of the CCCLA Slides.  I do not recall any of the Attendees using laptops during the Presentation.

113.    I only have personal knowledge of one public use of the CCCLA Slides: As discussed, they were shown on a screen, one after the other, to the 12-20 Attendees of the Presentation.

**Dr. Wilder's Allegations Regarding Credit and Co-Authorship**

114.     On August 5, 2019, I willingly and without any concerns shared the CCCLA Slides with Dr. Wilder in the context of a broader email chain discussing a different presentation proposal. From August 6 to August 10, Dr. Wilder and I exchanged emails regarding the CCCLA Slides (the "August Emails").   True and correct copies of emails between Dr. Wilder and me, dated from August 5 to August 7, 2019 are attached to this declaration as Exhibit 5**,** true and correct copies of emails between Dr. Wilder and me, dated from August 8 to August 10, 2019, are attached to this declaration as Exhibit 11.

115.     ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████

116.     ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████

**Dr. Wilder Consented to My Use of the**
**Course Materials in Conference Presentations**

117.    Dr. Wilder claims that she did not consent to my use of the Course Materials in the CCCLA Slides, and that, upon receiving a copy of the CCCLA Slides in August 2019, she immediately advised me that she "had not consented and did not consent to the use of the materials [she] authored for NICHE" in the CCCLA Slides.  Wilder Decl. ¶ 78.

118.    This statement is false.   During this time period, Dr. Wilder and I only communicated about her allegations, any my responses to her allegations, by email.  We did not communicate with each other about these disagreements in person or by phone.

119.    In the August Emails and thereafter, Dr. Wilder did *not* allege that I lacked authority, permission or consent to use the Course Materials in the Presentation; Dr. Wilder's complaint, as noted, was that I allegedly did not give her "credit" or co-authorship status.

120.    And, in fact, Dr. Wilder consented to my use of the Course Materials in conference presentations about the NICE Project.  As of February 2019, Dr. Wilder and I were both aware of the following facts:  (a) Dr. Wilder was the primary author of the NSF Proposal for the NICE Project; (b) Dr. Wilder asked Dr. Hoiland to serve – and Dr. Hoiland served – as Principal Investigator at Hostos and co-Director of the NICE Project; (c) the NICE Project was funded by NSF grants; (d) the Course Materials were the instructional materials for the NICE Project; (e) Dr. Wilder made the Course Materials, including the Subunit 7H Materials, available for use in the NICE Project; (e) a goal of the NICE Project was to make the NICE Course and the Course Materials widely available to educators and administrators; (f) the NSF Proposal stated that Dr. Wilder and Dr. Hoiland would ensure that the NICE Course and the Course Materials were made widely available to educators and administrators by making presentations at conferences; and (g) the Budget Justification for the grant to Hostos specifically provided that Dr. Hoiland would be

making presentations about the NICE Project and the Course Materials at professional conferences.

121.     Under these circumstances, Dr. Wilder consented to my use of the Course Materials in presentations at professional conferences about the NICE Project.  Dr. Wilder knew that, as a Principal Investigator and co-Director of the NICE Project, I was *obligated* to present at professional conferences, including community-college conferences, about the NICE Project and the Course Materials, and she had made the Course Materials available for such use.

122.     The CCCLA was a community college conference, and I made a presentation at the CCCLA about the NICE Project, using certain of the Course Materials, including the Subunit 7H Materials, as visual aids.  In other words, I used the Course Materials for one of the explicitly stated purposes for which Dr. Wilder had provided them.

123.     I did not specifically ask Dr. Wilder for permission to use the Course Materials as visual aids in the Presentation because I already had her consent; it is implied from the circumstances set forth above.  As a Principal Investigator and co-Director of the *NICE Project*, I was authorized to use the Course Materials of the *NICE Project* for uses related to the *NICE Project* without asking for Dr. Wilder's permission.

124.     Indeed, although I was respectful of Dr. Wilder's seniority as a professor and status as the driving force behind the NICE Project, I was her co-equal on the NICE Project – a status she agreed to in order to get NSF funding – and I did not have to get her permission to use materials that, in the non-legal sense of the word, *belonged* to the NICE Project for project-related purposes.

**The Copyright Notice Does Not State that
Dr. Wilder is the Owner of the Course Materials**

125.     Dr. Wilder states in her declaration that the NICHE instructional materials stated that "they were subject to copyright and not to be used without [her] express authorization."  Dr.

Wilder also states in her declaration that the NICHE instructional materials were "incorporated whole into NICE unchanged, except that references to NICHE were changed to NICE." **(**Wilder Decl. ¶ 56.).

126.    Dr. Wilder has not provided any documents supporting her characterization of the statement regarding copyright notices, and I do not recall seeing copyright notices as described by Dr. Wilder.  But assuming such notices existed, what Dr. Wilder is describing are notices directed toward Faculty Participants and others who have access to the materials.  I was a Principal Investigator and co-Director of the NICE Project itself, and, accordingly these outward-facing copyright notices (to the extent they existed and have been accurately described) were not directed to me – and were not applicable to me.

127.    Furthermore, the one copyright notice Dr. Wilder has provided (the "Copyright Notice" – a screenshot from an unidentified video – is different from what Dr. Wilder describes. A copy of the Copyright Notice is attached to the Cohen Decl. at Exhibit 3.

128.    The Copyright Notice states as follows:

© Copyright 2013.  This presentation is owned by CUNY NICHE.  Unauthorized use of any of the material in this presentation or any supplementary course material from NICHE is strictly prohibited. . . Any questions regarding the authorization for use of materials from NICHE should be directed to Esther Isabelle Wilder."

129.    Assuming, as Dr. Wilder states, that the references to "NICHE" were changed to "NICE," the Copyright Notice is generally consistent with how I viewed the Course Materials in early 2019.  I was not (and am not) an expert on copyright law, but I would have thought (as Dr. Wilder seems to have thought) that the Course Materials were owned by the NICE Project itself.

130.    And as a Principal Investigator on the NICE Project, I had authority to determine how to use the Course Materials for project-related purposes.

131.    Moreover, the Copyright Notice does not state that materials are not to be used without Dr. Wilder's "express authorization"; it states that "questions regarding the authorization" for use of materials should be directed to Dr. Wilder.  There were no questions concering my authorization to use the Course Materials as a co-equal Principal Investigator and co-Director of the NICE Project.

**Dr. Wilder Did Not Place Any Restrictions on My Use of**
**The Course Materials in Presentations about the NICE Project**

132.    Prior to our email communications in August 2019, Dr. Wilder and I did not have any communications relating to restrictions or limitations, or potential restrictions or limitations, on the manner in which I was authorized to use the Course Materials when presenting at professional conferences about the NICE Project.

133.    Dr. Wilder and I never reached any agreements relating to restrictions or limitations on the manner in which I was authorized to use the Course Materials when presenting at professional conferences about the NICE Project.

134.    Prior to our email communications in August 2019, Dr. Wilder never informed me that I could not use the Course Materials when presenting at professional conferences about the NICE Project unless I identified her as a co-author on the written materials relating to the presentation.

135.    Prior to our email communications in August 2019, Dr. Wilder never informed me that I could not use the Course Materials when presenting at professional conferences about the NICE Project unless I provided a specific citation or other written credit each time I referenced or quoted from a portion of the Course Materials that she had authored in the written materials relating to the presentation.

136.    I never agreed that I would identify Dr. Wilder as a co-author or co-presenter of any presentations I made at professional conferences about the NICE Project.

137.    I never agreed that I would provide specific citations or other written credit to Dr. Wilder each time I referenced or quoted from a portion of the Course Materials in written materials relating to presentations at professional conferences about the NICE Project.

**I Never Claimed to be the Author of the Course Materials**

138.    I ███████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████ She is incorrect.

139.    I did not present myself as the author – much less the sole or first author – of the Course Materials.  As stated above, I identified myself on the first of the CCCLA Slides because I was the presenter – the person making the Presentation.  Moreover, throughout the Presentation, I made clear both that I was presenting in my capacity as Principal Investigator and co-Director of the NICE Project; and that the Course Materials originated from the NICHE Project, on which I played no role.  None of the Attendees would have gotten the impression that I was the author of the Course Materials.

140.    In September 2019, Dr. Wilder repeatedly insisted that she should be given co-authorship credit and that any written materials related to the CCCLA should be revised to identify her as a co-presenter of the Presentation.

141.    In August and September 2019, Dr. Wilder also insisted that Dr. Rodriguez should be given co-authorship credit and that any written materials related to the CCCLA should be revised to identify Dr. Rodriguez as a co-presenter of the Presentation.

142.    I did not and do not believe that Dr. Wilder should have been identified as a co-presenter of the Presentation because it isn't true; Dr. Wilder was not a presenter at the CCCLA. My view is the same regarding Dr. Rodriguez.

143.    Nevertheless, and in effort to placate Dr. Wilder and avoid escalation of the situation, I agreed to request that the CCCLA Slides and other conference-related materials (including the "Speaker" page) be revised to reflect that she was a co-presenter of the Presentation. The CCCLA materials were subsequently revised accordingly, and I revised my CV in the same way.

**I Did Not "Plagiarize" Anything and**
**Repeatedly Gave Dr. Wilder "Credit" for Her Work**

144.    Dr. Wilder references provisions in the American Sociological Association's Code of Ethics (the "ASA Code"), CUNY's Academic Integrity Policy (the "CUNY Policy"), and a syllabus from one of my courses to contend that I engaged in "plagiarism."  As a professor, researcher, and published author, I take academic integrity very seriously, and, in my view, any professor who engages in plagiarism should be held accountable.

145.    I did not engage in plagiarism.

146.    Dr. Wilder's allegations are malicious, vindictive and 100% wrong.

147.    As stated at the outset of the discussions of plagiarism in the CUNY Policy, plagiarism "is the act of presenting another person's ideas, research, or writing as your own."

148.    As stated in the first line of the ASA Code on plagiarism, "[s]ociologists do not present others' work as their own."

149.    I did not present Dr. Wilder's work as my own.

150.    Not only did I *not* present Dr. Wilder's work as my own, but I did *exactly* what I was *required* to do under a *grant proposal* that, to a substantial degree, *Dr. Wilder wrote.*

151.    As a Principal Investigator on the NICE Project, I was required to attend professional conferences and (to put it colloquially) sing the praises of the NICE Project – a praiseworthy project.  And that's what I did.

152.    I told the Attendees what the NICE Project was – an online faculty development program.

153.    I told the Attendees what my role on the NICE Project was – I was one of two Principal Investigators in charge of and responsible for their respective grants for the NICE Project.

154.    I told the Attendees what the NICHE Project was – that it was the original faculty development program, that the Course Materials were developed for the NICHE Project, and that the Course Materials were now being used for the NICE Project.

155.    I told the Attendees that I was not part of the NICHE Project, and that I had joined a fully developed project as a Principal Investigator.

156.    I repeatedly gave Dr. Wilder "credit" for her important work.  I told the Attendees – repeatedly – that Dr. Wilder created, developed and implemented the NICHE Project, and that Dr. Wilder was a Principal Investigator and co-Director of the NICE Project.

157.    Under these circumstances, no one could have concluded that I was "presenting another person's ideas, research, or writing" as my own.  The Attendees all knew that I was presenting the work of the NICE Project, and that Dr. Wilder had received credit as the creator, developer and driving force behind the Course Materials, the NICHE Project and the NICE Project.

**Written "Credit" Was Not Necessary**

158.    In academia, there are a number of circumstances in which it is critical to provide written citations to the work of others.  These circumstances include (but are not limited to) published or to-be-published academic articles and certain types of conference presentations.

34

Specifically, there are instances in which conference presentations are used as a means of presenting academic research articles or papers.  There are other instances in which conference presentations are published in journals or are otherwise publicly disseminated.   In those circumstances, written citations are likely to be necessary.

159.    But context matters.  In the case of the CCCLA, I was not presenting a paper; the conference presentations were not going to be publicly disseminated; the Presentation was simply a show-and-tell demonstation and discusion of a grant-funded project for community college members; the CCCLA Slides were intended solely as visual aids for the benefit of the 12-20 Attendees; I was presenting about the Course Materials for the course on which I was a Principal Investigator; and I gave effusive verbal praise and credit to Dr. Wilder during the presentation. Accordingly, in my view, written citations on the visual aids were not necessary.

160.    As noted, I do not know whether the CCCLA Slides were actually made available for conference attendees to download.  If they were made available, I would be surprised if anyone other than Attendees of the Presentation downloaded the CCCLA Slides because they were intended as visual aids for the Presentation and are not useful as stand-alone materials.

161.    To the extent that anyone other than an Attendee happened to review the CCCLA Slides, what they reviewed was 100% consistent with my professional obligations as the *sole* Principal Investigator on the NSF grant to Hostos, and did not violate any of Dr. Wilder's rights. The CCCLA Slides identify me as the sole presenter, and I was also the sole Principal Investigator on Hostos's grant.  The CCCLA Slides plainly discuss the NICE Project: what it is, what its goals were, what its research questions were, how to access the Website and Course Materials, etc.  And to the extent that there are quotes from the Course Materials, those are the written materials of the

NICE Project.  Consistent with the NSF Proposal that led to the Hostos grant, everything contained in the CCCLA Slides was appropriately included.

**Dr. Rodriguez's Assessment Instrument**

162.    As stated above, I wanted to show the Attendees of the Presentation a sample of an assessment instrument created by a Faculty Participant, and I chose to show the instrument created by Dr. Crystal Rodriguez – Slides 14-19 .  When I did so, I specifically identified Dr. Rodriguez by name, and I also identified her institution (BCC) and department (Criminal Justice), and I identified her in one of the photos on Slide 23.

163.    In conjunction with her participation in the NICE Project, Dr. Rodriguez signed a Faculty Consent Form.  A true and correct copy of the Faculty Consent Form is attached to this declaration as Exhibit 12.

164.    The Faculty Consent Form authorized the NICE Project team to use and disseminate all of the data and work product created by the Faculty Participants, provided that such information would be treated confidentially in presentations and/or publications arising from the NICE Project.  The one exception was that with respect to instructional materials – such as the assessment instrument I showed the Attendees – the Faculty Participant was given the "option of indicating if you want your identity to be used."  Dr. Rodriguez checked "Yes" on a box that said "I would like my identity to be used on the NICE web site for any specific materials (e.g., QR plans of action, assiggnments, assessment instruments, assessment data/results, etc.) I produce as a result of my involvment in the NICE project."  Although the box Dr. Rodriguez checked only related to use on the NICE website, it is reasonable to assume that she would have wanted to be identified in any public use of the assessment instrument.

165.     During the Presentation, I met the obligations under the Faculty Consent Form by identifying Dr. Rodriguez in several different ways.  Nevertheless, because Dr. Rodriguez had asked for her name to be attached to her materials on the NICE website, my view in hindsight is that, although I wasn't obligated to do so, I should have included her name on the CCCLA Slides and, as a professional courtesy, I should have asked her if she was okay with the planned use.

**The CCCLA Consent Form**

166.     In advance of the CCCLA, I completed and submitted an "Intellectual Property License and Photo Release" (the "IP License").  The IP License provided, in relevant part: "I am responsible for obtaining the written consent of the owner of copyright material (if I am not the owner); and am responsible for the costs and fees of such consents."  A true and correct copy of the IP License is attached to this declaration as Exhibit 13.

167.      The purpose of that portion of the IP License was to ensure that I, as a presenter, was only presenting materials that I was authorized to present.  As discussed in detail above, I had authority, permission and consent to use the Course Materials in conference presentations about the NICE Project.  Accordingly, I did not breach any obligations I committed to under the IP License.

**Dr. Wilder Was Not Damaged by Inclusion**
**Of the Subunit 7H Materials in the CCCLA Slides**

168.     Dr. Wilder has not been damaged in any way by the inclusion of the Subunit 7H Materials in the CCCLA Slides.

169.     The Subunit 7H Materials constituted just one of several dozen Subunits that comprised the Course Materials.

170.     The Subunit 7H Materials related to assessment – determining whether an educator's QR-related materials had actually improved their students' numeracy skills.  Although

assessment is important, it is not the core or key part of the NICE Project.  The core – the main purpose – of the NICE Project was to help educators develop QR goals and QR lesson plans to "infuse" into their coursework.  Assessment tools are not useful without the underlying QR-related Units.

171.    To the best of my knowledge, only the Attendees – 12-20 community college faculty members and administrators – viewed the CCCLA Slides.

172.    I do not have personal knowledge that anyone who attended the CCCLA viewed the CCCLA Slides on a conference website, downloaded the CCCLA Slides form a conference website, or otherwise possessed a copy of the CCCLA Slides, either digitally or in hard copy.

173.    A specific goal of the NSF-funded NICE Project was to make the Course Materials as widely available as possible, even if such dissemination somehow made it more difficult for Dr. Wilder to "commercialize" the Course Materials.

174.    During the three-year term of the NICE Project, I never once heard Dr. Wilder express an interest or intent to commercialize the Course Materials.

**The Presentation Has Had No Impact on My Career**

175.    For the last fifteen years, I have regularly attended professional conferences, both as a presenter and as a non-presenting attendee.  Some conferences focus on the presentation of scholarly articles and research results; others are geared toward general continuing education for those in the applicable field.  I estimate that I attend between five and ten professional conferences each year.

176.    In addition to my education and work experience, I typically list on my CV, among other things: academic and professional honors I have received; scholarly and/or creative works I have authored or co-authored; and grants I have received.  After all of these items, I list conference

presentations and lectures I have given.  My CV lists (beginning on page 6) more than 30 such presentations and lectures.  Conference presentations have minimal impact on decisions like tenure and promotion or funding opportunities.

177.    For several months before and several months after the CCCLA, I included an entry on my CV identifying my presentation at the CCCLA and listing me as the sole presenter.  As noted, I *was* the sole presenter.

178.    In or around late 2019, and following Dr. Wilder's complaints about alleged misconduct and her request to revise the CCCLA program, I revised my CV so that it now identifies Dr. Wilder, Dr. Rodriguez and me as co-presenters at the CCCLA.  I revised my CV in this fashion to placate Dr. Wilder, not because Dr. Rodriguez or Dr. Wilder actually served as co-presenters.  The inclusion of the CCCLA presentation on my CV has had no impact on my career.

179.    Furthermore, I was, in fact, the sole presenter at the CCCLA and had every right to present there as I did.  Therefore, if the inclusion of my status as a sole presenter had somehow benefitted my career, it would have no bearing on the issues in this case.

180.    As for the the inclusion of the Subunit 7H Materials in the CCCLA Slides, such inclusion plainly did not provide any career benefits.  To the best of my knowledge, only the 12-20 Attendees viewed the CCCLA Slides, and I have not knowingly had any communications with the Attendees since the CCCLA ended.

**Dr. Wilder's  Malicious and Vindictive Allegations of Misconduct Were Rejected**

181.    Since late 2019, Dr. Wilder has relentlessly, maliciously and _explicitly_ tried to ruin my career.  In late 2019, I attempted to have the differences between Dr. Wilder and me addressed through mediation through the American Sociological Association's Committee on Professional Ethics.  Dr. Wilder refused to participate in mediation.

182.  O █████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████

183.  ██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████

184.  ██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

185.  ██████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
█████████████

186. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

187.     Dr. Wilder was unable to ruin my career, but she nevertheless caused damage; my promotion was delayed for months while her meritless academic misconduct claim was addressed.

188. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████

189.     Following Dr. Wilder's formal complaint, both Dr. Wilder and I provided information to the Research Integrity Officer concerning Dr. Wilder's allegations of plagiarism and other misconduct.  This was an immensely time consuming process, involving the provision of hundreds of pages of documents.  The Research Integrity Officer also conducted a zoom interview with me lasting over three hours, and also conducted a lengthy interview of Dr. Wilder.

190. ████████████████████████████████████████

█████████████████████████████  ██████████████████



191.    A copy of the Research Integrity Officer's email to Dr. Wilder, dated September 10, 2020, is attached to the Cohen Decl. as Exhibit 6.

192.    Despite this finding, Dr. Wilder has continued her campaign to ruin my career, including by filing this lawsuit.   I believe she leveraged her institution, her status as full professor, and her personal finances to intimidate me; at each stage, when she did not get what she thought I deserved (i.e. losing my job, being denied promotion, a permanent record in my Human Resources file), she unrelentingly proceeded. This could have been efficiently resolved with our ASA Committee on Professional Ethics (COPE), the CUNY informal mediation, or with the formal CUNY Ethics Inquiry.

193.    It is my hope that I can finally put this behind me and fully devote my time and energy to my family, my students, and my community.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: April 18, 2023

**Dr. Sarah Hoiland**