IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Esther Wilder,<br><br>                Plaintiff,<br><br>    v.<br><br>Sarah Hoiland,<br><br>                Defendant. | Civ. Action No. 1:22-cv-01254-PKC |

**SUPPLEMENTAL DECLARATION OF PROFESSOR ESTHER WILDER
IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

I, Esther Wilder, pursuant to 28 USC Section 1746, declare under penalties of perjury:

1.  I am the plaintiff in the above-referenced action and I have personal knowledge of the facts set forth below.

2.  I previously submitted a declaration in this matter (ECF No. 36), dated March 28, 2023, in support of my motion for summary judgment.

3.  I make this Supplemental Declaration in further support of my motion for summary judgment and in opposition to Defendant Sarah Hoiland's ("Defendant") motion for summary judgment.

4.  I am a tenured full professor in the Department of Sociology at Lehman College, City University of New York ("CUNY").

5.  From 2011 through 2016, I was the Principal Investigator on a NSF grant, Numeracy Infusion Course for Higher Education, NICHE. My leadership team for the NICHE program had extensive experience in teaching numeracy and creating faculty development programs.

1

6. The NICHE Project involved many different components including: (1) the creation of materials for an online faculty development program focused on QR; (2) the implementation of these materials in an online faculty development program to train CUNY faculty in best practices; (3) faculty development of instructional and assessment materials; and (4) research on the effectiveness of the NICHE program.

7. As part of my duties at NICHE, I authored the majority of the instructions and guidelines of the NICHE faculty development program. I am the owner of the copyright of most of these materials. Under NSF policy, the author of the materials produced under a grant retains the copyright in the materials.

8. The NICHE faculty development program was available to CUNY faculty enrolled in the program on a password protected platform, Blackboard.

9. The materials on Blackboard included eight units.

10. Unit 1 provided an overview of what quantitative reasoning entailed and focused on number sense and disciplinary numbers.

11. Unit 2 provided information on how to effectively create learning goals, including practice activities for doing this.

12. Unit 3 focused on QR and the brain, and discussed the distinction between slow thinking and fast thinking, information about cognitive loads, and included exercises designed to promote an understanding of fast and slow thinking.

13. Unit 4 included material on QR and writing, including required links to the public website, an assessment on QR and literature, and an activity reviewing student written work.

14. Unit 5 focused on discovery methods, which is an approach to teaching that uses constructivist methods. This was illustrated using engaged activities.

15. Unit 6 included materials designed to help faculty participants understand the applicability of graphs and other visual representations of data by graphing stories and using qualitative graphs.

16. Unit 7 provided an overview of learning assessment with engaged activities designed to give faculty practical experience assessing learning.

17. Unit 8 addressed inequalities in numeracy (by gender, race/ethnicity) and focused on helping faculty to understand ways to address stereotype threat and how one's experience impacts attitudes towards math and numeracy.

18. Unit 7H is the Copyrighted Work in this action, but the text included in Unit 7H also appeared elsewhere in the NICHE instructional materials, including (a) twice in the NICHE Tasks and Blogs section of Blackboard; (b) once in Unit 8G; and (c); and twice in the NICHE wrap-up folder (Units N2 and N3).

19. The three core tasks for the faculty under NICHE were developing learning goals, developing instructional materials, and developing assessment materials.

20. Certain materials relating to NICHE were made publicly available on the NICHE website which I maintained. The materials on the NICHE website included readings relating to the NICHE program, as well as the instructional and assessment materials the faculty created as they went through the program. By and large, the units and definitely none of the NICHE core assignments were available to the public on the NICHE website.

21. By and large, the materials in Blackboard—including the Copyrighted Work at issue in this action—were designed for use within a closed community (e.g., under the guidance of a well-trained instructor) and they did not lend themselves to public dissemination.

22. In 2016, I was approached by an NSF Program Officer (PO) about applying for a second grant for Hispanic Serving Institutions (HSIs) community colleges.

23. I reached out to two CUNY community college faculty about being a second PI with me on the grant: Professor Kate Wolfe, a professor at Bronx Community College with experience in QR faculty development, and Defendant, then working with Professor Wolfe on an article on QR literacy, While I knew Professor Wolfe, who was the lead author on the article, I had never met the Defendant before.

24. Defendant quickly responded to my solicitation before Professor Wolfe did, and suggested she was the better candidate. I agreed with Defendant to add her as the second PI on the NICE grant proposal.

25. I drafted the NICE grant proposal, and Defendant made minor editorial and typographical and grammatical suggestions/changes to the draft.

26. The proposal was presented as a collaborative proposal with two budgets but one project narrative. I recommended Defendant's institution, Hostos Community College, to be lead institution, in part for budgetary reasons.

27. Defendant and I were both PIs with equivalent, but different responsibilities. NSF does not infer any distinction in stature among multiple PIs.

28. Although the collaborative proposal included two budgets, my experience as a reviewer is that the NSF does not treat those grant proposals separately in determining whether to award the collaborative proposal.

29. Because the NSF proposal for the NICE Project was a unified research project, both Defendant and I were collaboratively responsible for ensuring that we adhered to the tasks outlined in the NSF proposal. Nonetheless, that does not mean that we were equally expected to

do every single task. We each had separate responsibilities we were expected to undertake as outlined in the collaborative proposal. For example, as outlined in the proposal, Defendant was expected to direct all qualitative data gathering research activities, including the qualitative data gathering and research activities. Meanwhile, I was charged to direct research activities on the quantitative assessment data gathered. Although Defendant was expected to conduct research under the NSF proposal, for the most part, Defendant never carried out her research activities.

30. There were key differences between the NICHE Project and the NICE Project, including that (i) the NICE Project's research focus on comparing different instructional approaches, which was not a focus of the NICHE Project; (ii) the NICHE Project's leadership consisted of three CUNY faculty who had extensive experience either teaching numeracy or doing numeracy faculty development, whereas the NICE Project focused more on a mentoring relationship between myself and Defendant; and (iii) in the NICHE Project, the leadership team developed a set of instructional materials to train faculty in best practices for numeracy instruction, whereas, in the NICE Project, the intention was that Defendant would contribute materials (although she did not).

31. Because the NICE Project's research focused on comparing different instructional approaches, developing assessment materials was a key component of the Project.

32. As with NICHE, the NICE faculty development program for NICE was available to the faculty enrolled in the program on the password protected platform, Blackboard.

33. I was also responsible for maintaining the NICE website. As with NICHE, materials publicly available on the NICE website included readings relating to the NICE program, as well as the instructional and assessment materials the faculty created as they went

5

through the program. The units and definitely none of the NICE core assignments were available to the public on the NICE website.

34. I had enrolled Defendant in the NICHE program to help her understand the program. She was also enrolled in NICE. In addition to her other responsibilities as a PI on NICE, Defendant created her own instructional and assessment materials.

35. As a member of the faculty enrolled in NICE, Defendant was familiar with what was publicly available on the NICHE/NICE website. She knew that the NICE core assignments were not publicly accessible, and was only to accessible to CUNY faculty on a password protected Blackboard platform.

36. The NICE grant proposal made clear that only the publicly available material on the website, such as the instructional and assessment material created by the CUNY faculty enrolled in the program, and the research results on the effectiveness of the NICE program, would be shared with faculty at institutions outside of CUNY.

37. I drafted the NICE grant proposal. It was never my intent, and I would never have agreed, to Defendant making the NICE faculty development program, including the assessment guidelines that I authored and for which I have a copyright registration, "widely available" at national conferences.

38. The NICE grant proposal was not a transfer by me of a license of my intellectual property rights in my copyrighted texts to Defendant, and I never intended to license my rights to her to use anyway she wants. I would never have relinquished control of my copyrighted material to her.

39. The broader goal of the NICE project was to undertake research on the effectiveness of the program. To the extent that a goal of NICE was to help faculty beyond

CUNY, it would necessarily have been materials developed over the course of the NICE Project, namely the research results generated through the NICE Project.

40. Defendant was given access to the NICHE (NICE) instructional program, including my Copyrighted Work, for the purpose of guiding the faculty and preparing her own instructional materials, not to transfer my intellectual property rights.

41. Defendant's travel budget included funds to speak at conferences about the NICE program, not to reveal the actual units in the program accessible only to CUNY faculty.

42. Dr. Hoiland was expected to disseminate her own research results generated from the NICE Project.

43. Defendant notified me in about July 2018 that she intended to present at the CCLA Conference. I expected that Defendant would be presenting her own work at the CCLA Conference. In addition to my relationship and prior interactions with Defendant (including the copyright notice for the NICHE materials that I believed Defendant had viewed in her training on the NICHE Project), my assumption was based on academic norms and well-established policies. It is my understanding that there is a basic rule in academia: if you don't contribute, you must not distribute.

44. I declined Defendant's purported invitation to co-present at the CCLA Conference (which I did not view as a genuine invitation), for several reasons. Among other commitments, I had childcare responsibilities that would have interfered with attending the February 17–19 conference in Florida, since my children had school scheduled in New York on two of those days.

45. In 2019, I learned that the CCLA PowerPoint that Defendant presented at the CCLA Conference copied my Copyrighted Work.

46. In 2019, when I learned that Defendant had copied my Copyrighted Work without my permission and without attribution, and had also copied material of another colleague without her permission or attribution, I first attempted to resolve the issue with Defendant as amicably as possible, while still imparting the severity of the situation.

47. ████████████████████████████████████████████████████████████████████████████████

48. ████████████████████████████████████████████████████████████████████████████████

49. ████████████████████████████████████████████████████████████████████████████████

50. ████████████████████████████████████████████████████████████████████████████████

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: May 9, 2023 By: *Esther Wilder*
Esther Wilder