UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ESTHER WILDER,

<div style="margin-left:2em">Plaintiff,</div>

Case No. 1:22-cv-01254-PKC

<div style="margin-left:2em">-against-</div>

SARAH HOILAND,

<div style="margin-left:2em">Defendant.</div>

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF HER
MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

**DAVIS+GILBERT LLP**

Guy Cohen
1675 Broadway
New York, New York 10019
(212) 468-4800

*Attorneys for Defendant
Sarah Hoiland*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................................................1

FACTUAL BACKGROUND .................................................................................................4

    Dr. Wilder Recruits Dr. Hoiland as a Principal Investigator ................................4

    The NSF Proposal and the NICE Project...........................................................5

    The Broader Goal: Spreading the Word ............................................................7

    About the NICE Project and the Course Materials..........................................7

    The CCCLA Presentation ...................................................................................9

    The Bad-Faith Campaign .................................................................................11

ARGUMENT ......................................................................................................................14

    I. Legal Standard ..............................................................................................14

    II. Defendant's Motion for Summary Judgment Should Be Granted and
    Plaintiff's Motion for Summary Judgment Should Be Denied....................14

        A.Dr. Hoiland Possessed an Implied License to Use the Course Materials, Including
    the Subunit 7H Materials, in Presentations about the NICE Project. .............. 14

        B.Dr. Wilder's Arguments Against an Implied License are Meritless .................. 16

        C.Dr. Hoiland's Use of the Copyrighted Work Was a Fair Use............................ 20

CONCLUSION....................................................................................................................24

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)................................................................................14

*Baker v. Weber*,
   2021 U.S. Dist. LEXIS 188544 (S.D.N.Y. Sept. 30, 2021)..........................15

*Cariou v. Prince*,
   714 F.3d 694 (2d Cir. 2013)........................................................................23

*Castle Rock Entm't, Inc. v. Carol Publ'g Grp.*,
   150 F.3d 132 (2d Cir. 1998)........................................................................22

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)................................................................................14

*Graham v. James*,
   144 F.3d 229 (2d Cir. 1998)..........................................................14, 18, 19

*Grand Union Co. v. Cord Meyer Dev. Co.*,
   761 F.2d 141 (2d Cir. 1985)........................................................................19

*Greenfield v. Philles Records*,
   98 N.Y.2d 562 (N.Y. 2002) ......................................................................17

*Jacob Maxwell, Inc. v. Veeck*,
   110 F.3d 749 (11th Cir. 1997) ....................................................................19

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986)................................................................................14

*Scott v. Harris*,
   550 U.S. 372 (2007)................................................................................14

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
   464 U.S. 417 (1984)................................................................................22

*Swatch Grp. Mgmt. Servs. v. Bloomberg L.P.*,
   756 F.3d 73 (2d Cir. 2014 )........................................................................22

*TCA Television Corp. v. McCollum*,
   839 F.3d 168 (2d Cir. 2016)........................................................................22

*Whiddon v. Buzzfeed, Inc.*,
  2022 U.S. Dist. LEXIS 197694 (S.D.N.Y. Oct. 31, 2022) ......................................................21

**Statutes**

17 U.S.C. § 107 .........................................................................................................................21

**Other Authorities**

3 M. Nimmer, Nimmer on Copyright § 13.05[A][2][a] (1984) ..................................................22

Fed. R. Civ. P. 56 ..................................................................................................................1, 14

NICE website (www.teachqr.org) ................................................................................................9

Defendant Sarah Hoiland, by and through her attorneys, Davis+Gilbert LLP, submits this brief in support of Defendant's Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, and in opposition to Plaintiff's Motion for Summary Judgment.

## PRELIMINARY STATEMENT

This copyright-infringement action tells a sad tale of academic paranoia and professional jealousy run amok.  Dr. Esther Wilder provided educational instructional materials she wrote for Dr. Sarah Hoiland's use in a collaborative, federally funded faculty-development program, and Dr. Hoiland used those materials in a conference presentation *precisely* as Dr. Wilder intended. Nevertheless, Dr. Wilder somehow concluded incorrectly that Dr. Hoiland was "trying to take over" her project, and she then launched a malicious, multi-year smear campaign – replete with false allegations of "plagiarism" and "theft of intellectual property" – that was explicitly designed to challenge Dr. Hoiland's receipt of tenure, prevent her from being promoted, and otherwise destroy her career as an educator, researcher and social-justice advocate.  Dr. Wilder has failed at every turn.  But after a CUNY Research Integrity Officer rejected her misconduct allegations following an extensive inquiry, Dr. Wilder continued to torment Dr. Hoiland by filing this baseless lawsuit, thereby converting a minor academic squabble over "credit" into a proverbial federal case.

Dr. Wilder, a Lehman College professor, recruited Dr. Hoiland, now an associate professor at Hostos Community College, to serve as a Principal Investigator and co-Director of a program called Numeracy Infusion for College Educators (the "NICE Project").  Funded by National Science Foundation ("NSF") grants, the NICE Project was an online course that used materials Dr. Wilder wrote under a prior grant (the "Course Materials") to teach educators at community

1

colleges and so-called Hispanic-Serving Institutions ("HSIs") in the South Bronx to expand the use of quantitative-reasoning materials in their coursework.

But the NICE Project's goals extended beyond the participating CUNY institutions.  The funding proposal (the "NSF Proposal"), written primarily by Dr. Wilder, articulated the broader goal of making the invaluable training program and Course Materials that Dr. Wilder developed as widely available as possible by, among other means, making presentations at professional conferences.  Indeed, the Hostos budget proposal specifically earmarked funds for Dr. Hoiland to "present at professional conferences . . ., and participate in a variety of dissemination activities (e.g., community college and HSI conferences)."  Accordingly, after Hostos had received NSF funding and she had served for two years as Principal Investigator of the NICE Project at Hostos, Dr. Hoiland did what the NSF Proposal required: She gave a presentation at a community-college conference in Florida and sang the praises of the NICE Project to 12-20 conference attendees, using a set of Powerpoint slides as a visual aid (the "CCCLA Slides" and each, a "Slide").

Dr. Wilder claims that Dr. Hoiland is liable for copyright infringement because Dr. Wilder supposedly did not consent to the use of portions of the Course Materials in the CCCLA Slides. This claim is, to state it bluntly, nonsense.  Dr. Wilder provided the Course Materials for use in the NICE Project, and Dr. Wilder wrote the proposal that required Dr. Hoiland to present at conferences about the NICE Project in order to make the Course Materials as widely available as possible.  Under these circumstances, common sense dictates that Dr. Wilder provided implied consent for Dr. Hoiland to use the Course Materials in conference presentations about the NICE Project.  And common sense is buttressed by copyright law, which holds that an implied license exists when a licensor delivers a copyrighted work with the intent that it be used for a certain purpose or in a certain manner; and the licensee then uses it for that purpose or in that manner.

If Dr. Wilder were being honest, she would concede that her real claim is *not* that Dr. Hoiland lacked authority to use the Course Materials in a conference presentation; rather, Dr. Wilder's complaint – repeated many times since 2019 – is that, in her view, Dr. Hoiland improperly characterized herself as the "sole author" of the CCCLA Slides and failed to provide written citations to Dr. Wilder where material she authored is referenced or quoted in the CCCLA Slides. Dr. Wilder's claim is factually inaccurate because Dr. Hoiland never claimed to be the author – much less the sole author – of the Course Materials; rather, she accurately characterized herself as one of two Principal Investigators on the NICE Project. Moreover, Dr. Wilder's claim about a supposed failure to provide "credit" cannot survive summary judgment as to *copyright infringement* for multiple reasons, including the following:

- The parties never agreed that Dr. Hoiland would provide "credit" to Dr. Wilder in connection with use of the Course Materials.

- Even if Dr. Hoiland had contracted to provide credit, a failure to do so would constitute breach of a covenant – not a condition – and would not support a copyright-infringement claim.

- Dr. Hoiland gave ample credit by describing at length to presentation attendees that Dr. Wilder was the creator, developer and driving force behind the NICE Project and the Course Materials.

- Dr. Hoiland did not violate the CUNY Academic Integrity Policy – Dr. Wilder's complaint was rejected – and, moreover, breach of CUNY's policy or any other ethical code does not create a private cause of action.

The Complaint should be dismissed for the additional reason that Dr. Hoiland's use of a small fraction of the Course Materials as a fleeting visual aid is a classic fair use. Dr. Hoiland did not get paid for making the presentation; her sole goal was to make the NICE Project's effective faculty-development course available to educators who could benefit from it; and she was carrying out a stated purpose of the NICE Project – making the Course Materials widely available – that did not impede Dr. Wilder's ability to disseminate the Course Materials. As discussed in greater detail below, Dr. Hoiland's use of the Course Materials constitutes fair use.

## FACTUAL BACKGROUND

### Dr. Wilder Recruits Dr. Hoiland as a Principal Investigator

In May 2016, Dr. Wilder contacted Dr. Hoiland about potentially serving as Principal Investigator at Hostos on the NICE Project, a research project that had not yet been funded by the NSF. (*See* SOF[1] ¶¶ 5-15, Hoiland Decl. ¶¶ 17-26.) At that time, Dr. Wilder had recently completed a faculty-development program through another NSF-funded project, titled "Numeracy Infusion Course for Higher Education." (the "NICHE Project"). (*Id.*) Numeracy can be defined as the ability to understand and use numbers and data in everyday life, and it is sometimes referred to as "quantitative literacy." (*See* SOF ¶ 7.) The NICHE Project was a faculty-development program designed to help educators at City University of New York ("CUNY") institutions "infuse" numeracy or quantitative reasoning ("QR") materials into their coursework. (*Id.* at ¶¶ 5-13.) The NICHE Project had utilized instructional materials – the Course Materials – consisting of eight units ("Units"), with each Unit supported by written materials, including a variety of readings, short exercises, activities/assignments, questions for interactive discussion, and other pedagogical materials. (*Id.*) Dr. Hoiland was not involved in the NICHE Project. (*Id.*)

The NICE Project was, in essence, a continuation of the NICHE Project. Whereas the NICHE Project was a CUNY-wide initiative that primarily targeted four-year colleges (such as Lehman), Dr. Wilder believed she could secure new funding by submitting a proposal targeting two-year community colleges and HSIs in the South Bronx. (*See* SOF ¶¶ 5-15, Hoiland Decl. ¶¶ 17-26.) Hostos is a two-year community college that serves an Hispanic student body, and Dr. Hoiland had substantial experience researching and writing about numeracy as applicable to minority students. (SOF ¶¶ 1-2, Hoiland Decl. ¶¶ 5-14.) Accordingly, Dr. Wilder asked Dr.

---

[1] "SOF" refers to Defendant's Rule 56.1 Statement of Material Facts.

Hoiland to serve as a co-equal leader on the NICE Project based, in part, on her need or perceived need to have the program focused on and headquartered at Hostos. (*See* SOF ¶¶ 5-15, Hoiland Decl. ¶¶ 17-26.)

**The NSF Proposal and the NICE Project**

Dr. Hoiland agreed to participate, and in May 2016, Dr. Hoiland and Dr. Wilder together submitted a grant proposal – the NSF Proposal – for the NICE Project. (*See* SOF ¶¶ 14-40, Hoiland Decl. ¶¶ 25-51.) The NSF Proposal was submitted as a collaborative proposal, meaning that two organizations wished to collaborate on a unified research project. (*Id.*) But the NSF Proposal actually was two related proposals with two different submitting organizations. (*Id.*) The first proposal identified Hostos as the organization to which the award should be made, and Dr. Hoiland was identified as the Principal Investigator. (*Id.*) The second proposal identified Lehman (through CUNY's Research Foundation) as the award recipient and Dr. Wilder as the Principal Investigator. (*Id.*) As Principal Investigators on separate proposals, Dr. Hoiland and Dr. Wilder would, upon receipt of the awards, be separately responsible for and in charge of the programs for their respective organizations. (*Id.*)

As co-Directors of the NICE Project, Dr. Hoiland and Dr. Wilder would be jointly and equally responsible for the NICE Project's collaborative work, though Hostos was identified as the project's headquarters, and the NSF Proposal was intentionally framed in a way that emphasized Dr. Hoiland's role and the role of Hostos as the lead organization. (*Id.*) The NICE Project was essentially a continuation of the NICHE Project, with the primary difference being

that, unlike the CUNY-wide focus of the NICHE Project, the NICE Project specifically targeted three HSIs in the South Bronx – Hostos, Bronx Community College ("BCC"), and Lehman.  (*Id.*)

Like the NICHE Project before it, the NICE Project consisted of an online faculty-development course (the "NICE Course") supported by the same eight Units of Course Materials. The Units were titled as follows: (1) QR and Making Numbers Meaningful; (2) QR Learning Outcomes; (3) The Brain, Cognition, and QR; (4) QR and Writing; (5) Discovery Methods; (6) Representation of Data; (7) QR Assessment; (8) Math Anxiety and QR Stereotypes and Culture. Each of the Units was divided into 5-10 subunits ("Subunits").  (SOF ¶¶ 44-58, Hoiland Decl. 56-67.).

The NICE Course was designed primarily to: (a) provide participating faculty members ("Faculty Participants" or "Participants") with an overview of the importance of quantitative reasoning skills and the need to incorporate QR materials into college courses; (b) help Participants develop and refine QR goals – *i.e.*, determine what they want their students to learn; (c) help Participants develop a lesson plan incorporating QR materials; (d) provide Participants with best practices for teaching QR; (e) help Participants develop tools to assess whether their numeracy-related efforts have been effective with their students; and (f) have participants incorporate the lesson plan and assessment in their actual classes.  (SOF ¶¶ 31-32, Hoiland Decl. ¶¶ 38-39.).

One goal of the NICE Project was to train a cadre of educators at three HSIs in the Bronx who could then: (a) improve the QR skills of the many students who enroll in their classes; and

(b) impart their knowledge on other educators at Hostos, Lehman and BCC, who could then make efforts to improve the QR skills of their own students.  (*Id.*)

**The Broader Goal: Spreading the Word**
**About the NICE Project and the Course Materials**

The NICE Project's goals also extended beyond CUNY.  Dr. Wilder and her collaborators on the NICHE Project had produced invaluable faculty-development and training materials that could potentially benefit educators and administrators around the country.  Accordingly, the NSF Proposal stated that the NICE Project's goals extended beyond the three CUNY institutions whose faculty would participate in the program; the broader goal was to make the faculty-training program and the Course Materials as broadly available as possible.  (SOF ¶¶ 33-40, Hoiland Decl. 41-51.).

This broader goal was articulated in the "Broader Impacts" section of the "Project Summary."  That section of the NSF Proposal states as follows:

NICE will also help faculty beyond CUNY.  First, the project intervention and materials, including the NICE training program . . . will be made readily available on the NICE project website . . . To ensure that the NICE materials and evaluation results are widely available to educators, policymakers, administrators, and researchers, the results will be presented at conferences, published in journals and disseminated through other relevant outlets.
(*Id.*; *see also* Hoiland Decl. Ex. 3, at P000171.)

This broader goal was reiterated in a section of the NSF Proposal titled "NICE at CUNY and Beyond."  That section states as follows:

We will also support QR instruction through the dissemination of our research results.  With an increased emphasis on QR and accreditors' strong focus on assessment, there is high demand for programs and resources that can be used to promote and assess students' QR skills.  To ensure that our materials and evaluation results are widely available to educators, policymakers,

administrators, and researchers, we will present at conferences, publish in journals, and disseminate our results through other relevant outlets.
(*Id.*; *see also* Hoiland Decl. Ex. 3 at P000180.)

This broader goal was also articulated in the budget justification section of the NSF Proposal on Dr. Hoiland's role as Principal Investigator on the Hostos grant and co-Director of the NICE Project. That section – titled "Budget Justification – PI Sarah Louise Hoiland" – sets forth Dr. Hoiland's duties and responsibilities and indicates that Dr. Hoiland will, among other duties, work collaboratively with Dr. Wilder to direct the faculty-development program; recruit Hostos faculty to participate in the NICE Project; ensure that the faculty-development program "meets the needs of faculty at HSI community colleges"; coordinate all in-person activities at Hostos; and direct all of the research-related data gathering. (SOF ¶¶ 36-38, Hoiland Decl. 44-46.).

Beyond educating Faculty Participants, the Budget Justification made clear that Dr. Hoiland would be making presentations about the NICE Project at professional conferences, including community college and HSI conferences. (*Id.*) Specifically, it provided that she would: "present at professional conferences [and] participate in a variety of dissemination activities (e.g., community college and HSI conferences)." (*Id.*) Moreover, the NICE Project's proposed budget specifically contemplated Dr. Hoiland's traveling to various conferences. (*Id.*) The NSF Proposal provided as follows: "The budget includes $7,000 for PI Hoiland to attend conferences both for professional development, dissemination activities, and networking with faculty from similar institutions." (*Id.*)

The primary purpose of attending these conferences, paid for with NSF funding, was to disseminate information about the NICE Project and the Course Materials to higher-education

faculty members, administrators and others outside the CUNY system, and to community colleges and HSIs in particular.  (SOF ¶ 38, Hoiland Decl. ¶ 49).

Upon completion of the NICE Project, Dr. Wilder reported that it had met its goals with respect to dissemination of the Course Materials and information about the NICE Project.  In Dr. Wilder's publicly available Project Outcomes Report for NICE, she wrote:

NICE has also helped faculty beyond CUNY as a result of our dissemination activities.  The instructional materials from the project are readily available on the NICE website (www.teachqr.org), which also includes resources on best practices and tools for engaging students in data analysis.  Moreover, our research on NICE—both existing publications/presentations and those in progress—contributes to our understanding of best practices for faculty development. Finally, we have worked to ensure that the NICE materials and evaluation results are widely available to educators, policymakers, administrators, and researchers.  These efforts have included more than a dozen presentations, workshops, and scholarly papers. (SOF ¶ 39, Hoiland Decl. ¶50.)

**The CCCLA Presentation**

On July 26, 2018, Dr. Hoiland was informed that she had been accepted to present on the NICE Project at the CCCLA – a community-college conference on learning assessment – which was scheduled to proceed in February 2019.  Dr. Hoiland forwarded the acceptance to Dr. Wilder and asked whether she was interested in co-presenting.  Dr. Wilder declined.  (SOF ¶¶ 62-73, Hoiland Decl. ¶¶ 73-82.)   Dr. Hoiland's proposal to present at the CCCLA made clear that she was one of two Principal Investigators on the NICE Project.  (SOF ¶¶ 65-67, Hoiland Decl. ¶¶ 76-78.)

From on or around February 17 to February 19, 2019, after Dr. Hoiland had already been working on the NICE Project for two years, she attended the CCCLA in Florida.  At the CCCLA, Dr. Hoiland gave a presentation on "Assessing Numeracy in a Faculty Development Program" during a breakout session (the "CCLA Presentation").  (SOF ¶¶ 74-75, Hoiland Decl. ¶ 83.)  Dr. Hoiland did not get paid for speaking at the CCCLA.  The CCCLA did not reimburse Dr. Hoiland

for her travel expenses, which were covered under the budget for the NSF grant.  (SOF ¶ 77; Hoiland Decl. ¶ 83.)

The CCCLA Presentation was informal and attended by around 12-20 conference participants (the "Attendees").  The CCCLA Presentation, in its entirety, related to the NICE Project.  All of the Attendees were faculty instructors from community colleges, along with a few administrators.  (SOF ¶¶ 78-80, Hoiland Decl. ¶ 84.)

During the CCCLA Presentation, Dr. Hoiland used a PowerPoint slide deck of 23 slides that she had prepared in advance as a visual aid (the "CCCLA Slides" and each, a "Slide").  Dr. Hoiland did not hand out or otherwise provide the CCCLA Slides to the Attendees; the CCCLA Slides were shown, one at a time, on a screen.  (SOF ¶¶ 82-83, Hoiland Decl. ¶ 85.)

During the introductory portion of the CCCLA Presentation, Dr. Hoiland introduced the NICE Project and stated that it was an offshoot and continuation of the NICHE Project.  She discussed that the NICE Project relied on the same Course Materials that were developed and used in connection with the NICHE Project.  She explained that she had not worked on the NICHE Project, and that she had joined a program in which the faculty-development course and the supporting Course Materials were already in place.  (SOF ¶¶ 100-106, Hoiland Decl. ¶¶ 88-95.)

Dr. Hoiland pointed to Dr. Wilder in photos in the Slides, identified her status as a professor at Lehman College, and discussed Dr. Wilder's leading and instrumental role in both creating the NICHE Project as a faculty-development course and applying for a grant for the NICE Project using the same Course Materials.  (*Id.*)  Dr. Hoiland also discussed her role as a Principal Investigator on the NICE Project.  (*Id.*)  Because community college faculty and administrators are often interested in understanding the process by which one can become a Principal Investigator on an NSF-funded program, Dr. Hoiland specifically showed the Attendees abstracts for the NICE

Project, and she also explained the type of grant it had obtained (a collaborative proposal) and provided some basic information about NSF grants, such as how to search for NSF grants online. (Hoiland Decl. ¶ 90.)

Throughout the CCCLA Presentation and in discussions at the CCCLA afterwards, Dr. Hoiland repeatedly referenced Dr. Wilder and her leadership role in developing and implementing both the NICHE Project and the NICE Project.  (SOF ¶¶ 100-106, Hoiland Decl. ¶¶ 88-95.)  In fact, Dr. Hoiland mentioned Dr. Wilder so frequently and glowingly that Dr. Hoiland is confident Dr. Wilder would have been embarrassed had she been in attendance.  (Hoiland Decl. ¶ 91.)  Based on the CCCLA Presentation, all of the Attendees knew and understood that Dr. Wilder was the driving force behind the NICHE Project and the NICE Project, and the associated Course Materials.  Dr. Hoiland did not at any point in time state, imply or suggest that she was the author of the Course Materials.  (SOF ¶¶ 100-106, Hoiland Decl. ¶¶ 88-95.)

Five of the Slides in the CCLA Presentation, Slides 9-13, were actual excerpts of the Course Materials.  Specifically, Slides 9-13 were excerpts from Subunit 7H – a Subunit of the Unit on learning assessment (the "Subunit 7H Materials").  (SOF ¶¶ 91-93, Hoiland Decl. ¶¶ 100-103.) Dr. Hoiland moved quickly through Slides 9-13, which she had included to show Attendees what the Course Materials looked like and the types of questions Faculty Participants were asked to answer in preparing their assessment materials.  (Hoiland Decl. ¶ 103.)

**The Bad-Faith Campaign**

On August 5, 2019, Dr. Hoiland willingly and without any concerns shared the CCCLA Slides with Dr. Wilder in the context of a broader email chain discussing a different presentation

proposal.  From August 6 to August 10, Dr. Wilder and Dr. Hoiland exchanged emails regarding the CCCLA Slides (the "August Emails").  (SOF ¶¶ 115-116, Hoiland Decl. ¶¶ 114-116.)

In the August Emails, Dr. Wilder accused Dr. Hoiland of engaging in misconduct.  Dr. Wilder: expressed concern that Dr. Hoiland was somehow "trying to take over" her project; included a discussion of each of the 23 CCCLA Slides, noting that many contain language from the NSF Proposal or the Course Materials; complained that Dr. Hoiland had supposedly presented at the CCCLA as the "sole author"; and alleged that certain of the Slides "were taken verbatim from what [she] had written," and she "felt bad that [Dr. Hoiland] had not even acknowledged [her]."  (*Id.*; *see also* Hoiland Decl. Exs. 5, 11.)

In the August Emails, Dr. Wilder expressed her view that Dr. Hoiland had not given her proper "credit" – that is, she believed that Dr. Hoiland should have provided a citation on each Slide that contained or referenced text that she had authored.  Dr. Wilder also claimed that she should have been given "co-authorship" status on the CCCLA Slides and on the CCCLA speaker program.  Because, in her view, Dr. Hoiland had not given her proper "credit" or co-authorship status, the CCCLA Slides constituted, in her estimation, "a form of plagiarism." (*Id.*)

Although Dr. Hoiland attempted to placate Dr. Wilder by contacting the CCCLA to have its records updated to identify Dr. Wilder as a co-presenter, and although Dr. Hoiland updated her curriculum vitae to reflect the same, Dr. Wilder embarked on a vendetta against Dr. Hoiland, and attempted to ruin her career.  (Hoiland Decl. ¶ 143.)

On March 12, 2020, Dr. Wilder sent a multipage email to John Tsapogas, a senior executive with the Research Foundation of the City University of New York, in which she accused Dr. Hoiland of plagiarism.  Her missive was then shared with Alan Kluger, the Research Integrity

Officer at Lehman, and Felix Cardona, then the Research Integrity Officer at Hostos.  (Hoiland Decl. ¶¶ 182-183, Cohen Decl. Ex. 4)

In her email to Mr. Tsapogas, Dr. Wilder stated – twice – that Dr. Hoiland should be denied tenure.  She also informed Mr. Tsapogas that Dr. Hoiland was scheduled to come up for promotion to Associate Professor and that a decision would be made by April 21, 2020.  Therefore, she told Mr. Tsapogas, actions against Dr. Hoiland needed to "happen immediately."  Dr. Wilder then wrote: "I feel strongly that there is no way Sarah Hoiland merits promotion."  (*Id.*)

Dr. Wilder tried to make sure that action was taken against Dr. Hoiland in advance of April 21.  On April 7, 2020, while the rest of the world was grappling with the onslaught of the COVID-19 pandemic, Dr. Wilder submitted a formal complaint of research misconduct (the "CUNY Complaint") to Eugene Sohn and Bridget Barbera, who are lawyers for Hostos and Lehman, respectively.  (SOF ¶¶ 131-133, Hoiland Decl. ¶¶ 184-186.)   In the CUNY Complaint, Dr. Wilder repeatedly accused Dr. Hoiland of "plagiarism," "research misconduct," and "theft" of intellectual property.  (*Id.*)

By letter dated June 23, 2020, Hostos' Research Integrity Officer informed Dr. Wilder that, in accordance with CUNY's formal polices regarding allegations of research misconduct, "an Inquiry will be conducted."  The Research Integrity Officer stated further as follows: "The purpose of an Inquiry is preliminary information gathering and preliminary fact-finding to determine whether the allegations warrant a formal Investigation."  (Hoiland Decl. ¶ 188, Cohen Decl. Ex. 5.)

Following Dr. Wilder's formal complaint, both Dr. Wilder and Dr. Hoiland provided extensive information to the Research Integrity Officer concerning Dr. Wilder's allegations of plagiarism and other misconduct, and each sat for lengthy interviews. (Hoiland Decl. ¶ 189.)   The

Research Integrity Officer ultimately rejected Dr. Wilder's allegations and determined that they did not warrant further investigation.  (SOF ¶¶ 134-137, Hoiland Decl. ¶¶ 188-191.)

Following this rejection, Dr. Wilder filed the instant lawsuit.

## ARGUMENT

### I.     Legal Standard

Under Rule 56 of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986), and "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  Summary judgment is proper where the party that bears the burden of proof at trial fails to make a showing sufficient to establish an essential element of that party's claim.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### II.    Defendant's Motion for Summary Judgment Should Be Granted and Plaintiff's Motion for Summary Judgment Should Be Denied

#### A.     Dr. Hoiland Possessed an Implied License to Use the Course Materials, Including the Subunit 7H Materials, in Presentations about the NICE Project.

It is well-established that "nonexclusive licenses may be granted orally, or may even be implied from conduct."  *Graham v. James*, 144 F.3d 229, 235 (2d Cir. 1998).  "A copyright owner who grants a nonexclusive license to use his copyrighted material waives his right to sue the licensee for copyright infringement."  *Id.* at 236.  Although the Second Circuit has not developed

14

a test for determining when a copyright owner has granted an implied license, courts in this district look to whether there was a "meeting of the minds between the parties to permit the particular usage at issue." *See, e.g., Baker v. Weber*, 2021 U.S. Dist. LEXIS 188544, at *25 (S.D.N.Y. Sept. 30, 2021).  In applying this test, courts look to whether "the totality of the parties' conduct indicates an intent to grant permission to use the copyrighted work."  "When an owner's conduct clearly manifests a consent to use of copyright material, the owner impliedly grants a nonexclusive license." *Id.* at *27.

The undisputed facts plainly establish that Dr. Wilder consented and granted Dr. Hoiland an implied license to use the Course Materials, including the Subunit 7H Materials, in conference presentations about the NICE Project.  Indeed, Dr. Wilder *recruited* Dr. Hoiland to serve as Principal Investigator at Hostos on the NICE Project.  Dr. Wilder made the Course Materials available as *the* instructional materials for use in the NICE Project.  Dr. Wilder was the primary author of the NSF Proposal, which: (a) stated an intent to make the Course Materials widely available to educators and administrators by making presentations at professional conferences, and (b) specifically stated that Dr. Hoiland would be making presentations – funded by the NSF grant – about the NICE Project and the Course Materials at conferences, including community-college conferences.

Under these circumstances, Dr. Wilder consented to Dr. Hoiland's use of the Course Materials.  In fact, Dr. Hoiland had both the discretion and the obligation to speak at professional conferences about the NICE Project and the Course Materials.  As Principal Investigator at Hostos on the *NICE Project*, Dr. Hoiland had discretion to use the instructional materials for the *NICE Project,* namely, the Course Materials, as she saw fit in professional conferences about the *NICE Project* without asking for Dr. Wilder's permission.  As Principal Investigator, Dr. Hoiland was

also *obligated* to make presentations at professional conferences about the NICE Project and the Course Materials because Hostos received NSF-funding specifically earmarked for that purpose.

Dr. Hoiland made a presentation at the CCCLA and she used certain of the Course Materials, including the Subunit 7H Materials, as visual aids.  The CCCLA was a community-college conference, and the entirety of Dr. Hoiland's presentation was devoted to the NICE Project. Indeed, each of the 23 Slides used as visual aids specifically related to one or more apsects of the NICE Project.  In other words, Dr. Hoiland used the Course Materials for one of the explicitly stated purposes for which Dr. Wilder had provided them.  Separate and apart from her *obligations* as a Principal Investigator, Dr. Hoiland considered the CCCLA to be an excellent opportunity to impart knowledge about the faculty-development program on community-college educators who could benefit from its Course Materials.  (Hoiland Decl. ¶ 75.)  As Principal Investigator, Dr Hoiland had discretion to use the instructional materials of the NICE Project for that important purpose, and she was not obligated to specifically obtain Dr. Wilder's permission to use the Course Materials as visual aids at the presentation; such consent was implied from the circumstances.

B.      Dr. Wilder's Arguments Against an Implied License are Meritless

In her motion, Dr. Wilder contends that the parties did not reach a meeting of the minds on the usage at issue because she disagrees with the manner in which Dr. Hoiland presented the Course Materials.  Dr. Hoiland's presentation did not focus on the heart of the NICE Project – the Units of the Course Materials that instruct educators on how to incorporate QR-related materials into their coursework; instead, consistent with the aims of the CCCLA, Dr. Hoiland focused on *assessment* – determining whether an educator's QR-related coursework was effective.  Dr. Wilder states that she (a) "would not consent to the dissemination of one section of the NICHE/NICE

materials out of context"; and (b) "would not have agreed to her Copyrighted Work being presented without crediting her as the source."  Pl. Br. 16.[2]

But these arguments miss the point.  By providing the Course Materials as the instructional materials for the NICE Project, Dr. Wilder authorized any and all uses reasonably within the scope of the project, and she did not place any restrictions on the use.  *See, e.g., Greenfield v. Philles Records*, 98 N.Y.2d 562, 571 (N.Y. 2002)  (licensee permitted to use materials in manner which could "reasonably be said to fall" within license).

Dr. Hoiland was Principal Investigator at Hostos with authority to use the Course Materials as she saw fit.  Dr. Wilder was Principal Investigator at Lehman, and they were co-Directors of the collaborative project, but Dr. Wilder did not have authority in those roles to tell Dr. Hoiland how to disseminate the Course Materials.  As the primary author of the Course Materials, Dr. Wilder could potentially have placed restrictions on use of the materials within the scope of the project, but she did not do so.  Undisputed evidence establishes that Dr. Wilder and Dr. Hoiland never reached any agreements relating to restrictions or limitations on the manner in which Dr. Hoiland was authorized to use the Course Materials in presentations at professional conferences about the NICE Project.  More specifically, Dr. Hoiland did not agree that she would provide specific citations or other written credit to Dr. Wilder when referencing the Course Materials at professional conferences.  Indeed, prior to August 2019 – six months after the CCCLA – the subject never even came up.  (Hoiland Decl. ¶¶ 135-137.)  Dr. Wilder cannot place after-the-fact restrictions on Dr. Hoiland's authorized use of the Course Materials.

---

[2] Dr. Wilder halfheartedly claims that a copyright notice on certain of the Course Materials required Dr. Hoiland to obtain Dr. Wilder's authorization to use the Course Materials in the CCCLA Slides.  For the reasons set forth in Dr. Hoiland's Declaration and Defendant's Response to Plaintiff's Rule 56.1 Statement ("Rule 56.1 Response"), this claim is plainly without merit.  (Hoiland Decl. ¶¶ 125-131; Rule 56.1 Response ¶ 9.)

Furthermore, even if Dr. Hoiland had agreed to provide "credit" to Dr. Wilder – she did not – undisputed evidence shows that she did just that.  The record evidence on this motion establishes that there was just a single use of the CCCLA Slides – they were shown to the 12-20 attendees of the CCCLA Presentation. (Hoiland Decl. ¶¶ 84-95.)  And Dr. Hoiland repeatedly and effusively gave Dr. Wilder credit and praise for her work during the CCCLA Presentation.  Dr. Hoiland identified Dr. Wilder by name; identified her institution and department; and even pointed her out in photos.  Dr. Hoiland also told the attendees about Dr. Wilder's leading and instrumental role on both the NICHE Project and the NICE Project.  She explained that Dr. Wilder had created, developed and was the driving force behind the NICHE Project; that the NICE Project used the same Course Materials as the NICHE Project; and that Dr. Wilder was also the driving force behind the NICE Project.  (SOF ¶¶ 100-106, Hoiland Decl. ¶¶ 88-95.)  Accordingly, Dr. Wilder received ample "credit."

In addition, even if Dr. Hoiland had somehow been required to give Dr. Wilder credit in connection with the CCCLA Presentation, any failure to do so would not support a copyright-infringement claim.  Rather, it would only support a breach-of-contract claim.  The law distinguishes between "conditions and "covenants" – "if the licensee's improper conduct constitutes a breach of a covenant undertaken by the licensee, and if such covenant constitutes an enforceable contractual obligation, then the licensor will have a cause of action for breach of contract, not copyright infringement." *See Graham*, 144 F.3d at 236-37.  However, "if the nature of a licensee's violation consists of a failure to satisfy a condition to the license . . . . it follows that the rights dependent upon satisfaction of such condition have not been effectively licensed, and therefore, any use by the licensee is without authority from the licensor and may therefore,

constitute an infringement of copyright." *Id.* As a general matter, there is a "presumption that terms of a contract are covenants rather than conditions." *Id.*

Under these circumstances, to the extent that Dr. Hoiland was somehow contractually obligated to provide written credit, any such obligation was a covenant, as opposed to a condition to the license. The NICE Project had a clearly stated goal of disseminating the Course Materials, including through presentations by Dr. Hoiland at professional conferences, but the record is devoid of any evidence indicating that Dr. Hoiland's use of the Course Materials was conditioned on her providing Dr. Wilder with credit. Thus, the law is clear that any purported requirement of written credit would constitute a contractual covenant, and Dr. Wilder would be limited to a claim for breach of contract. *See, e.g., id.* at 237 (holding that "inclusion of a notice crediting . . . authorship" is a covenant, not condition); *Grand Union Co. v. Cord Meyer Dev. Co.*, 761 F.2d 141, 147 (2d Cir. 1985) ("In the absence of more compelling evidence that the parties intended to create a condition," the provision at issue "must be construed as a promise or covenant"); *see also Jacob Maxwell, Inc. v. Veeck*, 110 F.3d 749, 754 (11th Cir. 1997) (holding that "public recognition of authorship" was not a condition because author "granted . . . . permission to play the song before . . . recognition [was] received.").

Finally, Dr. Wilder contends that Dr. Hoiland "should not have expected" that use of the Course Materials "would be permitted by Plaintiff" under "academic norms and practice." Pl. Br. 17. Specifically, Dr. Wilder cites to policies and ethics codes that prohibit "academic dishonesty," require that credit be given to authors, and prohibit plagiarism, defined as presenting "someone else's work as your own." As an initial matter, academic rules and norms have no bearing on the issues in this case. Such rules and norms do not create a private right of action, and Dr. Wilder

does not – and cannot – allege that they reached any agreements concerning the application of such rules and norms to Dr. Hoiland's use of the Course Materials in conference presentations.

Moreover, and perhaps more importantly, Dr. Hoiland has not violated any ethical rule or norm; she has been honest and ethical throughout.  Dr. Hoiland did not present Dr. Wilder's work as her own.  Quite the opposite, Dr. Hoiland presented the Course Materials in her capacity as Principal Investigator and co-Director of the NICE Project.  She presented the Course Materials for what they were: the instructional materials for the NICE Project.  Dr. Hoiland never claimed to have written the Course Materials and made clear to the attendees that they were already in place (having been developed as part of the NICHE Project) when she took on her role on the NICE Project.  As a result, no one could have concluded that Dr. Hoiland presented Dr. Wilder's work as her own.  Furthermore, as discussed, Dr. Hoiland provided appropriate and sufficient credit under the circumstances.  Hoiland Decl. 158-159.

Dr. Wilder has already made her baseless allegations of plagiarism and academic misconduct in the forum in which they ought to be addressed.  She filed a formal complaint of misconduct against Dr. Hoiland within the CUNY system, and she included wild allegations of "plagiarism" and "theft of intellectual property."  After a thorough inquiry, a Research Integrity Officer rejected Dr. Wilder's allegations and exonerated Dr. Hoiland.  Dr. Hoiland feels very strongly about the importance of academic integrity and honesty and holds herself to high ethical standards.  Dr. Hoiland has not acted inappropriately or dishonestly – and the CUNY inquiry bore that out.  Although Dr. Wilder has a right to pursue her copyright claim in federal court, she has provided no legal or factual basis for citing academic norms in support of her case.

C.    Dr. Hoiland's Use of the Copyrighted Work Was a Fair Use

Even if Dr. Hoiland did not have an implied license to use the Course Materials – and plainly she did – Dr. Wilder's copyright-infringement claim nevertheless fails for the independent

reason that Dr. Hoiland's use of the materials in an academic presentation was a fair use under the Copyright Act.

A copyright-infringement claim must be dismissed if the allegedly infringing act constitutes a fair use.  To determine whether a particular use constitutes fair use, courts consider four non-exclusive factors: (1) the purpose and character of the use, including whether the use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work.  *See* 17 U.S.C. § 107; *Whiddon v. Buzzfeed, Inc.*, 2022 U.S. Dist. LEXIS 197694, at *11-12 (S.D.N.Y. Oct. 31, 2022).   An analysis of these four factors makes clear that Dr. Hoiland's use of the CCCLA Slides during the CCCLA Presentation constituted fair use of the Course Materials.

<u>First</u>, the purpose and character of the use favors a finding of fair use.  Dr. Hoiland used the Course Materials purely for non-commercial, academic purposes; she gave a presentation at a continuing-education conference geared toward educating community-college faculty members about a faculty-development program designed, ultimately, to improve the quantitative literacy of their financially strained students.  Dr. Hoiland was not paid for giving the CCCLA Presentation, and its purpose – to disseminate information about the NICE Project and the Course Materials – was 100% consistent with both the Project's goals, as stated in the NSF Proposal, and Dr. Wilder's separately stated desire to widely disseminate the Course Materials.  In fact, one of the use's purposes was to meet Dr. Hoiland's obligations as a Principal Investigator arising from a grant proposal that Dr. Wilder wrote.

Dr. Wilder argues that this factor does not weigh in favor of fair use because the use allegedly was not "transformative."  But this argument entirely ignores the fact that Dr. Hoiland's

use was "nonprofit" and "educational" and entirely consistent with the goals of the NSF-funded NICE Project.  Furthermore, Dr. Wilder is incorrect: Dr. Hoiland's use of the CCCLA Slides, as one part of a larger educational presentation at the CCCLA, was indeed transformative.  *See, e.g., Castle Rock Entm't, Inc. v. Carol Publ'g Grp.*, 150 F.3d 132, 142 (2d Cir. 1998) ("If the secondary use adds value to the original – if [the original] is used as raw material, transformed in the creation of new information, new aesthetics, new insights and understandings – this is the very type of activity that the fair use doctrine intends to protect for the enrichment of society."); *see also Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 449-450 (1984) (noting a presumption of fair use when the material is used in "noncommercial, nonprofit activity"); *Swatch Grp. Mgmt. Servs. v. Bloomberg L.P.*, 756 F.3d 73, 81 (2d Cir. 2014 ) ("[T]he fair use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching . . . scholarship, or research, is not an infringement of copyright.").

Second, the nature of the CCCLA Slides favors a finding of fair use because they were "informational," as "opposed to "creative."  *See* 3 M. Nimmer, Nimmer on Copyright § 13.05[A][2][a] (1984); *TCA Television Corp. v. McCollum*, 839 F.3d 168, 184 (2d Cir. 2016) ("The secondary user of noncreative information can more readily claim fair use based on the law's recognition of a greater need to disseminate factual works than works of fiction or fantasy.").  The fair-use analysis recognizes a greater need to disseminate *factual* works (over fictional ones), and Dr. Hoiland's dissemination of the Course Materials was, as noted, consistent with both Dr. Wilder's expressed desire to have the Course Materials disseminated and utilized by other educational professionals, and the dissemination obligations that Dr. Hoiland undertook as a Principal Investigator under a grant from the NSF.  Notably, Dr. Wilder does not even address this factor, thereby conceding that it weighs in favor of fair use.

Third, the amount and substantiality of the portion used weighs in favor of fair use.  Though Dr. Hoiland has referred throughout this brief to the Course Materials, actually at issue here is a small portion of those materials, namely, the Subunit 7H Materials that are directly quoted in the CCCLA Slides.  The Course Materials consisted of eight Units, each of which was comprised of 5-10 Subunits.  Accordingly, the Subunit 7H Materials comprised between $1/40^{th}$ and $1/80^{th}$ of the Course Materials.  In addition, the core or "heart" of the Course Materials consists of those Units that address the main goal of the NICE Project – to teach higher-education faculty members how to improve their use of quantitative-reasoning materials in their coursework.  Subunit 7H concerns *assessment* – determining whether and to what extent an educator's quantitative-reasoning course materials were successful in improving their students' skills.  Although assessment is useful, it is not the core of the NICE Project.  Furthermore, the Subunit 7H Materials were not used in any substantial way; they were shown fleetingly on a screen during the CCCLA Presentation.  Under these circumstances, the amount and substantiality of the portion used favors a finding of fair use.

Fourth, Dr. Hoiland's use had no impact on the potential market or value of Dr. Wilder's work.  The Second Circuit has emphasized that this factor focuses on "whether the secondary use usurps the market of the original work."  *Cariou v. Prince*, 714 F.3d 694, 708 (2d Cir. 2013).  As an initial matter, Dr. Hoiland's use could not have usurped the market for the Course Materials because the stated goal of the NICE Project was to disseminate the Course Materials as widely as possible.  Unlike a commercial venture, the NSF-funded NICE Project was supposed to serve the public interest, and Dr. Hoiland's dissemination efforts were meant to further that goal.  Furthermore, it is, frankly, nonsensical for Dr. Wilder to suggest that the use of a handful of slides, fleetingly flashed on a screen at a sparsely attended academic conference, had any impact on the potential market or value of her work – or that use of the Slides somehow "usurped" the market

for her work.  Dr. Wilder – who has never licensed or otherwise commercialized the Course Materials – has certainly not presented any evidence of any supposed usurpation.

Dr. Wilder argues that the use "benefited [Dr. Hoiland's] academic resume" and "could inhibit [Dr. Wilder's] ability to publish and present about her work."  These arguments lack merit. First, the listing of the CCCLA Presentation on Dr. Hoiland's resume is irrelevant because what is at issue here is the CCCLA Slides – not the fact that Dr. Hoiland gave an authorized presentation relating to the NICE Project.  In addition, there is no record evidence that the lone reference to the CCCLA Presentation on her multi-page CV had any impact on Dr. Hoiland's career.  And Dr. Wilder's hypothetical and counter-intuitive stated concern that the use "could" inhibit her ability to publish and present about her work is unsupported conjecture entitled to no evidentiary weight.

Finally, Dr. Wilder states that a fair use inquiry considers the "propriety of the defendant's conduct," and she argues that Dr. Hoiland's conduct raises an inference of bad faith.  To the contrary, there is only one party to this lawsuit that has acted in bad faith: Dr. Wilder.  As set forth throughout Dr. Hoiland's submissions, Dr. Wilder has engaged in a multi-year, bad-faith campaign designed to destroy Dr. Hoiland's career.  To the extent that bad faith is considered, it weighs in Dr. Hoiland's favor.

Viewing the fair-use factors together mandates the conclusion that Dr. Hoiland's use of the Course Materials – and the Subunit 7H Materials in particular – was a fair use.

## **CONCLUSION**

For the foregoing reasons, Dr. Hoiland respectfully requests that the Court grant her Motion for Summary Judgment and deny Dr. Wilder's Motion for Summary Judgment.

Dated:   New York, New York       Respectfully submitted,
         April 18, 2023

**DAVIS+GILBERT LLP**

By:  */s/ Guy Cohen*
       Guy Cohen
1675 Broadway
New York, New York 10019
(212) 468-4800
gcohen@dglaw.com

*Attorneys for Defendant*
*Sarah Hoiland*