**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ESTHER WILDER, | 1:22-cv-01254-PKC |
| Plaintiff, | |
| -v- | **DEFENDANT'S** |
| | **RULE 56.1 STATEMENT OF** |
| SARAH HOILAND, | **MATERIAL FACTS** |
| Defendant. | |

Pursuant to Local Rule 56.1, Defendant Sarah Hoiland, by and through her attorneys and in support of Defendant's Motion for Summary Judgment, sets forth the following statement of material facts as to which Defendant contends there is no genuine issue to be tried.

**The Parties and Their Institutions**

1.      Dr. Sarah Hoiland is a professor at Hostos Community College ("Hostos"), a two-year community college located in the South Bronx.  From August 2013 to August 2020, Dr. Hoiland was an Assistant Professor at Hostos.  From August 2020 to the present, Dr. Hoiland has been an Associate Professor of Sociology at Hostos.  (Hoiland Decl. ¶¶ 5-6.)

2.      Hostos is part of the City University of New York ("CUNY"), and it serves a primarily Hispanic student body.  Hostos has been designated as an "Hispanic-Serving Institution" or an "HSI." (Hoiland Decl. ¶ 5.)

3.      Dr. Esther Wilder is a professor in the Department of Sociology at Lehman College ("Lehman"), a four-year college located in the South Bronx. (Hoiland Decl. ¶ 15.)

4.      Lehman is part of CUNY and it has been designated as an HSI.  (Hoiland Decl. ¶¶ 15, 35.)

**Dr. Wilder and the NICHE Project**

5.     From 2011 to 2016, Dr. Wilder served as Principal Investigator on a project titled "Numeracy Infusion Course for Higher Education" (the "NICHE Project"), which was funded by a grant from the National Science Foundation ("NSF").  (Hoiland Decl. ¶ 20.)

6.     On NSF-funded projects, the Principal Investigator is the person who leads and is in charge of the program that receives the funding.  (Hoiland Decl. ¶ 10.)

7.     Numeracy, which is sometimes referred to as quantitative literacy, can be defined as the ability to understand and use numbers and data in everyday life.  (Hoiland Decl. ¶ 12.)

8.     The NICHE Project consisted primarily of an online, faculty-development program designed to teach educators at CUNY schools throughout New York City to "infuse" numeracy or quantitative-reasoning ("QR") materials into their coursework (the "NICHE Course").  (Hoiland Decl. ¶ 21.)

9.     The NICHE Course consisted of eight instructional units ("Units"), and each Unit was supported by written materials, included readings, short exercises, assignments, and other pedagogical materials (the "Course Materials").  (Hoiland Decl. ¶ 23.)

10.     Dr. Wilder was the primary author of the Course Materials.  (Hoiland Decl. ¶ 20.)

11.     Dr. Hoiland did not have any role in or involvement with the NICHE Project, and she was not the author of any of the Course Materials.  (Hoiland Decl. ¶ 19.)

12.     One of the goals of the NICHE Project was to disseminate the Course Materials to institutions outside of CUNY that sought to improve the quantitative literacy and reasoning of their students. (Hoiland Decl. ¶¶ 12-13.)

13.     In the publicly available abstract for the NICHE Project, Dr. Wilder wrote:

The broader impacts of the project lie primarily in its demonstration of a model for engaging faculty throughout a large and diverse university system of campuses. . .

2

The project is also providing tested QR learning materials and disseminating the NICHE course materials to other institutions who are similarly committed to improving the quantitative literacy and reasoning of their students.  (Hoiland Decl. ¶¶ 12-13.)

**The NSF Proposal for the NICE Project**

14.　　In or around May 2016, Dr. Wilder believed that she could obtain NSF funding for a new project related to the NICHE Project if she submitted a proposal specifically targeting HSIs and two-year community colleges in the South Bronx.  (Hoiland Decl. ¶ 25.)

15.　　With that goal in mind, Dr. Wilder contacted Dr. Hoiland and asked whether she would be interested in serving as Principal Investigator at Hostos and co-Director of a collaborative project titled titled "Numeracy Infusion for College Educators" (the "NICE Project").  (Hoiland Decl. ¶ 26.)

16.　　Dr. Hoiland informed Dr. Wilder that she was interested in serving as Principal Investigator at Hostos and co-Director of the NICE Project.  (Hoiland Decl. ¶ 27.)

17.　　In May 2016, Dr. Wilder and Dr. Hoiland together submitted a grant proposal to the NSF for the NICE Project (the "NSF Proposal" or the "Proposal"). (Hoiland Decl. ¶¶ 27-28.)

18.　　Dr. Wilder was the primary author of the NSF Proposal.  (Hoiland Decl. ¶ 33.)

19.　　When investigators from two or more organizations wish to collaborate on a unified research project with NSF funding, they submit a "collaborative" proposal or a proposal for "collaborative research."  (Hoiland Decl. ¶ 28.)

20.　　When two or more organizations submit a collaborative proposal, one organization is designated as the "lead" organization, and each organization submits a separate grant proposal with a separate funding request and budget justification.  (*Id.*).

21.     The Proposal for the NICE Project was a collaborative proposal, and two different organizations submitted proposals.  (*Id.*).

22.     The first proposal identified: (a) "CUNY  Hostos Community College" as the organization to which the award should be made; (b) "CUNY Hostos Community College" as the primary place of performance; and (c) "Sarah L Hoiland" as the Principal Investigator and Project Director.  (Hoiland Decl. ¶ 29.)

23.     Hostos was the designated lead organization and "headquarters" for the NICE Project.  (Hoiland Decl. ¶ 32.)

24.     The second proposal identified: (a) "Research Foundation of CUNY on behalf of Lehman College" as the organization to which the award should be made; (b) "Hostos Community College" as the primary place of performance; and (c) Dr. Wilder as the Principal Investigator and Project Director.  (Hoiland Decl. ¶ 30.)

25.     As Principal Investigators on separate proposals, Dr. Wilder and Dr. Hoiland were, upon receipt of the awards, separately responsible for and in charge of the programs for the grants awarded to their respective instituions.  (Hoiland Decl. ¶ 31.)

26.     As co-Directors of the NICE Project, Dr. Wilder and Dr. Hoiland were, upon receipt of the awards, jointly and equally responsible for the NICE Project's collaborative work.  (Hoiland Decl. ¶ 31.)

**The Format and Goals of the NICE Project for HSIs in the Bronx**

27.     The NICE Project was, to a significant degree, an extension and continuation of the NICHE Project.  (Hoiland Decl. ¶ 34.)

28.     The NICE Project was a predominantly online, faculty-development program designed to help educators at higher-education institutions "infuse" numeracy materials into their coursework. (Hoiland Decl. ¶ 34.)

29.     The NICE Project used the same Course Materials as the NICHE Project, with only very minor and inconsequential changes.  (Hoiland Decl. ¶ 36.)

30.     The primary difference between the NICHE Project and the NICE Project was that the faculty members who participated in the NICHE Project were employed by CUNY schools throughout the five boroughs of New York City and were primarily from four-year institutions; the faculty participants in the NICE Project were from three HSIs in the South Bronx – Hostos, Bronx Community College ("BCC") and Lehman – two of which (Hostos and BCC) are two-year community colleges.  (Hoiland Decl. ¶ 35.)

31.     The faculty-development course for the NICE Project (the "NICE Course") was designed to: (a) provide participating faculty members ("Faculty Participants" or "Participants") with an overview of the importance of QR skills and the need to incorporate QR materials into higher-education courses; (b) help Participants develop and refine QR goals or outcomes for their classes – *i.e.*, determine what they want their students to learn; (c) help Participants develop and refine a lesson plan incorporating QR materials; (d) provide Participants with best practices for teaching quantitative reasoning in their classrooms; (e) provide Participants with guidance on developing tools to assess whether their numeracy-related efforts have been effective with their students; and (f) have Participants incorporate the lesson plan and assessment tool into their actual classes and report their students' assessment data.  (Hoiland Decl. ¶ 38.)

32.     One goal of the NICE Project was to train educators at three HSIs in the Bronx who could then work to improve the QR skills of their students and impart their knowledge on other educators at Hostos, Lehman and BCC.  (Hoiland Decl. ¶ 39.)

**The Broader Goal: Dissemination of the NICE Project Beyond CUNY**

33.     Beyond educating Faculty Participants from Hostos, BCC and Lehman, the broader goal of the NICE Project was to make the faculty-training program and Course Materials as broadly available as possible.  (Hoiland Decl. ¶ 41.)

34.     The NSF Proposal included a "Project Summary."  The "Broader Impacts" section of the Project Summary provided, in part, as follows:

> NICE will also help faculty beyond CUNY.  First, the project intervention and materials, including the NICE training program . . . will be made readily available on the NICE project website . . . To ensure that the NICE materials and evaluation results are widely available to educators, policymakers, administrators, and researchers, the results will be presented at conferences, published in journals and disseminated through other relevant outlets.  (Hoiland Decl. ¶ 42.)

35.     The NSF Proposal included a section titled "NICE at CUNY and Beyond," which provided, in part, as follows:

> We will also support QR instruction through the dissemination of our research results.  With an increased emphasis on QR and accreditors' strong focus on assessment, there is high demand for programs and resources that can be used to promote and assess students' QR skills.  To ensure that our materials and evaluation results are widely available to educators, policymakers, administrators, and researchers, we will present at conferences, publish in journals, and disseminste our results through other relevant outlets.  (Hoiland Decl. ¶ 43.)

36.     The Hostos-specific section of the NSF Proposal included a document titled "Budget Justification – PI Sarah Louise Hoiland" (the "Hostos Budget Justification"), which provided, in part, that Dr. Hoiland would, among other items, "present at professional conferences [and] participate in a variety of dissemination activities (e.g., community college and HSI conferences)."  (Hoiland Decl. ¶ 44.)

6

37.     The Hostos Budget Justification provided, in part: "The budget includes $7,000 for PI Hoiland to attend conferences both for professional development, dissemination activities, and networking with faculty from similar institutions."  (Hoiland Decl. ¶ 46.)

38.     The primary purpose for Dr. Hoiland's attending these conferences, with the expenses paid by the NSF award, was to disseminate information about the NICE Project and the Course Materials to higher-education faculty members, administrators and others outside the CUNY system, with an emphasis on faculty members and administrators from community colleges and HSIs.  (Hoiland Decl. ¶ 49.)

39.     Upon completion of the NICE Project, Dr. Wilder wrote, in part, as follows in the Project Outcomes Report for NICE:

> NICE has also helped faculty beyond CUNY as a result of our dissemination activities.  The instructional materials from the project are readily available on the NICE website (www.teachqr.org), which also includes resources on best practices and tools for engaging students in data analysis.  Moreover, our research on NICE—both existing publications/presentations and those in progress—contributes to our understanding of best practices for faculty development.  Finally, we have worked to ensure that the NICE materials and evaluation results are widely available to educators, policymakers, administrators, and researchers.  These efforts have included more than a dozen presentations, workshops, and scholarly papers.  (Hoiland Decl. ¶ 50.)

40.     By email to Dr. Hoiland in late 2019, Dr. Wilder wrote: "I am fine with other people using the materials from the NICE/NICHE faculty development program – and indeed, I'm flattered when they do – because faculty development has always been important to me and I want to disseminate the materials as widely as possible."  (Hoiland Decl. ¶ 51.)

**The NICE Project, the Eight Units and the Course Materials**

41.     In 2016, the NSF granted the requested awards and funded the NICE Project. (Hoiland Decl. ¶¶ 52.)

7

42.     The primary tool of the NICE Project was the NICE Course, which was primarily online and instructed Faculty Participants on how to: (a) apply QR within their respective disciplines; (b) implement best practices for teaching quantitative literacy; and (c) assess the effectiveness of the Faculty Participant's QR initiatives in order to further improve instruction. (Hoiland Decl. ¶ 52.)

43.     Over the course of three years – including groups (or cohorts) who took the NICE Course during the summer of 2017 and the 2017-2018 academic school year – 26 Faculty Participants from Hostos, Lehman and BCC took the NICE Course, and 21 completed it.  (Hoiland Decl. ¶¶ 52-55.)

44.      The NICE Course consisted of the same eight Units and used substantially identical Course Materials as the NICHE Course. Each of the eight Units was supported by the Course Materials.  (Hoiland Decl. ¶ 56.)

45.     The eight Units were titled as follows: (1) QR and Making Numbers Meaningful; (2) QR Learning Outcomes; (3) The Brain, Cognition, and QR; (4) QR and Writing; (5) Discovery Methods; (6) Representation of Data; (7) QR Assessment; (8) Math Anxiety and QR Stereotypes and Culture.  (Hoiland Decl. ¶ 58.)

46.     Each Unit was broken down into approximately five to ten subunits ("Subunits"). (Hoiland Decl. ¶ 58.)

47.     Unit One provided background on what quantitative reasoning is and why it's an important skill to be taught in college classrooms.  (Hoiland Decl. ¶ 59.)

48.     Unit Two provided background on creating learning outcomes or goals specific to quantitative reasoning to improve students' comprehension of visual representations of data. (Hoiland Decl. ¶ 60.)

49.     Unit Three discussed quantitative reasoning and how thinking processes are "fast," thereby sometimes leading indivduals to jump to conclusions or misinterpret test results, statistics, or other numerical information.  (Hoiland Decl. ¶ 61.)

50.     Unit Four focused on the importance of being able to write about numbers accurately and clearly across curricular disciplines.  (Hoiland Decl. ¶ 62.)

51.     Unit Five emphasized ways in which to engage students using numbers in ways that make those numbers meaningful.  (Hoiland Decl. ¶ 63.)

52.     Unit Six contained materials designed to help Faculty Participants understand graphs, charts, and other visual representations of data and integrate them into their QR materials. (Hoiland Decl. ¶ 64.)

53.     Unit Seven provided an overview of assessment and evaluation, with a specific focus on how to measure whether students are reaching QR learning goals.  (Hoiland Decl. ¶ 65.)

54.     Unit Seven was broken down into eight or more Subunits, and the Course Materials at issue in this action concern one of the Subunits of Unit 7 – Subunit 7H.  The Course Materials for Subunit 7H will be referred to as the "Subunit 7H Materials."  (Hoiland Decl. ¶¶ 66-67.)

55.     The first six Units of the Course Materials contain the core or key materials for the NICE Project.  (Hoiland Decl. ¶ 170.)

56.     The first six Units of the Course Materials contain the key or core materials because those Units relate to the main purpose of the NICE Project – teaching educators how to develop QR goals, QR lesson plans and best-practices for teaching numeracy in their classes.  (Hoiland Decl. ¶ 170.)

57.     Unit Seven and the Subunit 7H Materials related to assessment – determining whether an educator's QR-related materials and lessons had actually improved their students'

numeracy skills.  Although assessment is important, it is not the core or key part of the NICE Project.  (Hoiland Decl. ¶ 170.)

58.     Unit Eight focused on culture, gender, and race in an effort to better understand from a social-science perspective disparities in mathematics performance and factors that fuel these disparities.  (Hoiland Decl. ¶ 67.)

**Dr. Hoiland's Duties and Responsibilities**

59.     As Principal Investigator at Hostos and co-Director of the NICE Project, Dr. Hoiland's duties and responsibilities included: (a) recruiting Faculty Participants; (b) co-supervising and managing the in-person aspects of the NICE Course; (c) reviewing and commenting on all tasks and assignments submitted by Faculty Participants; (d) addressing questions and issues relating to Faculty Participants; (e) collecting data; (f) analyzing and reporting on collected data; and (g) presenting at professional conferences about the NICE Project.  (Hoiland Decl. ¶ 68.)

60.     As Principal Insvestigator at Hostos and co-Director of the NICE Project, Dr. Hoiland was obligated to present at professional conferences about the NICE Project in order to inform higher-education educators, administrators and others about the NICE Course and the Course Materials and make the training program and Course Materials as widely available as possible.  (Hoiland Decl. ¶¶ 68-69.)

61.     As Principal Investigator at Hostos and co-Director of the NICE Project, Dr. Hoiland considered it to be important for her to make presentations at professional conferences about the NICE Project because (a) she was obligated to do so under the NSF grant, and (b) she considered the NICE Course (and the associated Course Materials) to be an effective faculty-

development program that could have a positive impact on faculty and students at HSIs and community colleges.  (Hoiland Decl. ¶ 72.)

**Dr. Hoiland's Proposal for the Community**
**College Conference on Learning Assessment**

62.    On or around June 1, 2018, Dr. Hoiland submitted a presentation proposal (the "CCCLA Proposal") to the Community College Conference on Learning Assessment (the "CCCLA").  (Hoiland Decl. ¶ 73.)

63.    The CCCLA was not intended as a forum for presenting professional research and scholarly papers; it was primarily offered as an opportunity for community-college educators and administrators to improve their pedagogical skills and network with colleagues.  (Hoiland Decl. ¶ 74.)

64.    Because the CCCLA was a community-college conference and it concerned learning assessment – a topic covered in Unit 7 of the Course Materials – Dr. Hoiland determined that the CCCLA provided an excellent opportunity to: (a) comply with her obligation to speak about the NICE Project at professional conferences; and (b) impart information about the NICE Project and the Course Materials that could have a positive impact on faculty and students at community colleges.  (Hoiland Decl. ¶ 75.)

65.    In the CCCLA Proposal, Dr. Hoiland titled her planned session "Assessing Numeracy in a Faculty Development Program," and she identified the target audience as "Teaching Faculty."  (Hoiland Decl. ¶ 76.)

66.    The CCLA Proposal stated, in part, as follows:

This section will focus attention on strategies for assessing quantitative reasoning (QR) at community colleges.  The presenter is one of two principal investigators of a National Science Foundation (NSF) faculty development program titled Numeracy Infusion for College Educators (NICE).

The CCLA Proposal further stated:

> In promoting the infusion of numeracy across the curriculum at CUNY, with specific attention to assessment, we will discuss both the challenges and successes we have encountered.  Numeracy is tied to upward social mobility and we see our faculty development program as a way to infuse numeracy, using high impact practices and clear assessment tools, and help create more numerate students and citizens. (Hoiland Decl. ¶ 77.)

67.     The CCCLA Proposal listed the following three primary learning objectives for Dr. Hoiland's presentation: (1) "To share best practices in faculty development related to assessment"; (2) "To disseminate assessment results of our QR/QL faculty development program"; and (3) "To discuss the challenges and successes related to assessment in the community college context." (Hoiland Decl. ¶ 78.)

## Dr. Wilder Had No Interest in Co-Presenting at the CCCLA

68.     On July 26, 2018, Hoiland was informed that she had been accepted to present at the CCCLA, which was scheduled to proceed in February 2019.  (Hoiland Decl. ¶ 79.)

69.     On July 27, 2018, Dr. Hoiland forwarded the correspondence concerning the CCCLA acceptance, which included the presentation title "Assessing Numeracy in a Faculty Development Program," to Dr. Wilder.  Dr. Hoiland asked Dr. Wilder if she wanted to co-present with Dr. Hoiland. (Hoiland Decl. ¶ 80.)

70.     The CCCLA is not a prestigious conference.  (Hoiland Decl. ¶ 81.)

71.     Dr. Wilder has never presented at a community-college conference.  (Hoiland Decl. ¶ 82.)

72.     Dr. Wilder declined to co-present with Dr. Hoiland at the CCCLA.  (Hoiland Decl. ¶ 81.)

73.     Dr. Wilder had no interest in presenting at the CCCLA.  (Hoiland Decl. ¶ 81.)

## The CCCLA Presentation and the CCCLA Slides

74.     From February 17 to February 19, 2019, Dr. Hoiland attended the CCCLA in Florida.  (Hoiland Decl. ¶ 83.)

75.     At the CCCLA, Dr. Hoiland gave a presentation on "Assessing Numeracy in a Faculty Development Program" during a breakout session (the "Presentation").  (Hoiland Decl. ¶ 83.)

76.     Dr. Hoiland was the sole presenter at the Presentation.  (Hoiland Decl. ¶ 83.)

77.     The CCCLA did not pay Dr. Hoiland for giving the Presentation or reimburse her for travel expenses.  (Hoiland Decl. ¶ 83.)

78.     The Presentation was informal and was attended by 12-20 conference attendees (the "Attendees").  (Hoiland Decl. ¶ 84.)

79.     The Presentation concerned, in its entirety, the NICE Project.  (Hoiland Decl. ¶ 84.)

80.     Dr. Hoiland did not focus the Presentation on the first six Units of the NICE Course, which concerned the core parts of the course: developing QR learning goals, developing QR lessons, and learning best practices for teaching QR.  (Hoiland Decl. ¶¶ 85-107.)

81.     Dr. Hoiland focused the Presentation on assessment – Unit 7 of the Course Materials – which involved developing assessment tools to determine whether and to what extent QR goals have actually been met.  (Hoiland Decl. ¶¶85-107.)

82.     During the Presentation, Dr. Hoiland used a PowerPoint slide deck that she had prepared in advance as a visual aid (the "CCCLA Slides" and each, a "Slide").  (Hoiland Decl. ¶ 85.)

83.     During the Presentation, the CCCLA Slides were shown, one at a time, on a screen. (Hoiland Decl. ¶ 85.)

84.     Slides 1-4 were introductory Slides.  On Slide 1, Hoiland identified the title of the Presentation and listed herself, her title and her employer.  (Hoiland Decl. ¶ 86.)

85.     Slide 2 contains a brief summary of the NICE Project and identifies research questions Dr. Wilder and Dr. Hoiland had been addressing. (Hoiland Decl. ¶ 87.)

86.     Slides 3 and 4 each contain a photograph showing Faculty Participants in the NICE Project and members of the NICE Project team.  Dr. Wilder appears and is seated on the far left in the photo in Slide 3, and she is standing and on the far left in the photo in Slide 4. (Hoiland Decl. ¶ 87-89.)

87.     Slides 5-6 relate to a workshop conducted with Faculty Participants as part of the NICE Project.  (Hoiland Decl. ¶¶ 96.)

88.     Slide 7 contains a summary of the eight Units of the NICE Project that are available online through Blackboard, an online educational platform. (Hoiland Decl. ¶ 97.)

89.     Slide 8 is titled "How to Develop a QR Assessment Instrument."  (Hoiland Decl. ¶ 98.)

90.     Slide 8 contains a link to the "NICE/NICHE Teach QR" website (the "Website"). The Website clearly identified Dr. Wilder as the director and main contact person on the NICE Project.  (Hoiland Decl. ¶ 99.)

91.     Slides 9-10 contain portions of the actual text on assessment from the Course Materials for Unit 7 – the Subunit 7H Materials.  (Hoiland Decl. ¶ 100.)

92.      Slide 10 includes advice Dr. Hoiland added for purposes of the Presentation: "Keep it simple: pre/post, three questions, and a scoring rubric."  (Hoiland Decl. ¶ 100.)

93.     Slides 11-13 contain portions of the actual text on assessment from the Subunit 7H Materials.  (Hoiland Decl. ¶ 101.)

94.     Slide 13 includes advice Dr. Hoiland added for purposes of the Presentation: "Clarity, alignment, generalizability, validity, and soundness."  (Hoiland Decl. ¶ 101.)

95.     Dr. Wilder told the Attendees that Slides 9-13 contained actual excerpts of the Course Materials.  (Hoiland Decl. ¶ 103.)

96.     Slides 14-19 show a sample assessment exercise created by Dr. Crystal Rodriguez, one of the Faculty Participants, as part of the NICE Course.  (Hoiland Decl. ¶ 104.)

97.      In addition to serving as Principal Investigator and co-Director of the NICE Project, Dr. Hoiland took the course herself and incorporated her QR lesson plan and assessment materials into her Sociology 101 course at Hostos. (Hoiland Decl. ¶ 106.)

98.     Slides 20-21 relate to Dr. Hoiland's development of these QR plans and assessment materials, and the responses of certain of her students to assessment questions.  (Hoiland Decl. ¶ 106.)

99.     Slide 22-23 contain photos from the "capstone" conference held after most of the Faculty Participants had completed the NICE Course.  Dr. Wilder appears in the group photo on Slide 22; Dr. Wilder and Dr. Hoiland are behind the dais in the photo in the lower right corner on Slide 23.  (Hoiland Decl. ¶ 107.)

**Dr. Hoiland's Gave Dr. Wilder Ample "Credit" for Her Work**

100.     During the Presentation, Dr. Hoiland described for the Attendees what the NICE Project was and explained that it was an offshoot and continuation of the NICHE Project.  (Hoiland Decl. ¶¶ 85-107, 152-157.)

101.     During the Presentation, Dr. Hoiland told the Attendees that the NICE Project used the same Course Materials that were developed and used in connection with the NICHE Project. (Hoiland Decl. ¶¶ 85-107, 152-157.)

102.    During the Presentation, Dr. Hoiland introduced herself and described her role as Principal Investigator on the Hostos grant and co-Director of the NICE Project.  (Hoiland Decl. ¶¶ 85-107, 152-157.)

103.    During the Presentation, Dr. Hoiland told the Attendees that she had not worked on or been involved in the NICHE Project and that she had joined a program in which the faculty development course and Course Materials were already in place.  (Hoiland Decl. ¶¶ 85-107, 152-157.)

104.    During and after the Presentation, Dr. Hoiland spoke at length to Attendees about Dr. Wilder.  (Hoiland Decl. ¶¶ 85-107, 152-157.)

105.    During the Presentation, Dr. Hoiland identifed Dr. Wilder by name, identified her status as a professor at Lehman College, and pointed her out in photos in the CCCLA Slides. (Hoiland Decl. ¶¶ 85-107, 152-157.)

106.    During and after the Presentation, Dr. Hoiland told Attendees about Dr. Wilder's leading and instrumental role on both the NICHE Project and the NICE Project.  Dr. Hoiland explained that Dr. Wilder had created, developed and was the driving force behind the NICHE Project; and that Dr. Wilder was also the driving force behind the NICE Project, which used the same Course Materials.  (Hoiland Decl. ¶¶ 85-107, 152-157.)

**Distribution of the CCCLA Slides**

107.    Dr. Hoiland provided the CCCLA Slides to the organizers of the CCCLA in advance of the conference.  (Hoiland Decl. ¶ 108.)

108.    Dr. Hoiland received correspondence from the CCCLA organizers indicating that the CCCLA Slides would be made available on a password-protected website for conference attendees to access.  (Hoiland Decl. ¶ 108.)

109.    Dr. Hoiland did not look at the CCCLA website, and she did not access the CCCLA Slides through the CCCLA website.  (Hoiland Decl. ¶ 110.)

110.    Dr. Hoiland does not have personal knowledge as to whether the CCCLA Slides were actually made available on a conference website or distributed to conference attendees in any other manner.  (Hoiland Decl. ¶ 111.)

111.    Dr. Hoiland does not recall seeing any of the Attendees of the Presentation: (a) with printed copies of the CCCLA Slides; or (b) using laptops during the Presentation.  (Hoiland Decl. ¶ 112.)

112.    Dr. Hoiland has personal knowledge of only one public use of the CCCLA Slides – as visual aids that were shown on a screen to 12-20 Attendees during the Presentation.  (Hoiland Decl. ¶ 113.)

113.    There is no non-hearsay evidence in the record of this litigation that the CCCLA Slides were actually made available to conference attendees on a website or in any other way. (Hoiland Decl. ¶¶ 111-113.)

114.    There is no evidence of any kind in the record of this litigation that any attendees of the CCCLA saw the CCCLA Slides in any fashion, except as they were shown on a screen during the Presentation.  (Hoiland Decl. ¶¶ 111-113.)

**Dr. Wilder's Allegations Regarding Credit and Co-Authorship**

115.    On August 5, 2019, Hoiland willingly and without concerns shared the CCCLA Slides with Dr. Wilder in the context of an email chain discussing a different presentation proposal. (Hoiland Decl. ¶ 114.)

116.    From August 6 to August 10, Dr. Wilder and Dr. Hoiland exchanged emails regarding the CCCLA Slides (the "August 2019 Emails").  In the August 2019 Emails, Dr. Wilder

stated, among other things, that: (a) Dr. Hoiland was "trying to take over" the NICE Project; (b) Dr. Hoiland had presented at the CCCLA as the "sole author"; (c) certain of the CCCLA Slides had been "taken verbatim" from the NSF Proposal or the Course Materials; (d) Dr. Wilder "felt bad that [Dr. Hoiland] had not even acknowledged" Dr. Wilder; (e) Dr. Hoiland had not given Dr. Wilder proper "credit" and should have provided a written citation to Dr. Wilder on each Slide that contained or referenced text she had authored; (f) Dr. Wilder should have been given "co-authorship" status on the CCCLA Slides; and (g) the CCCLA Slides, in Dr. Wilder's estimation, constituted a "form of plagiarism."  (Hoiland Decl. ¶¶ 114-116.)

**Dr. Wilder Did Not Place Restrictions on Dr. Hoiland's Use of
The Course Materials in Presentations about the NICE Project**

117.    Prior to the August 2019 Emails, Dr. Wilder and Dr. Hoiland did not have any communications relating to restrictions or limitations, or potential restrictions or limitations, on the manner in which Dr. Hoiland was authorized to use the Course Materials in presentations at professional conferences about the NICE Project.  (Hoiland Decl. ¶¶ 117-124, 132- 137.)

118.    Dr. Wilder and Dr. Hoiland never reached any agreements relating to restrictions or limitations on the manner in which Dr. Hoiland was authorized to use the Course Materials in presentations at professional conferences about the NICE Project.  (Hoiland Decl. ¶¶ 117-124, 132-137.)

119.    Prior to the August 2019 Emails, Dr. Wilder never informed Dr. Hoiland that she could not use the Course Materials in presentations at professional conferences about the NICE Project unless Dr. Hoiland identified Dr. Wilder as a co-author on the written materials relating to the presentation.  (Hoiland Decl. ¶¶ 117-124, 132-137.)

120.    Prior to the August 2019 Emails, Dr. Wilder never informed Dr. Hoiland that she could not use the Course Materials in presentations at professional conferences about the NICE

Project unless Dr. Hoiland provided a specific citation or other written credit each time Dr. Hoiland referenced or quoted from a portion of the Course Materials that Dr. Wilder had authored in the written materials relating to the presentation. (Hoiland Decl. ¶¶ 117-124, 132-137.)

121.    Dr. Hoiland never agreed that she would identify Dr. Wilder as a co-author or co-presenter of any presentations she made at professional conferences about the NICE Project. (Hoiland Decl. ¶¶ 117-124, 132-137.)

122.    Dr. Hoiland never agreed that she would provide specific citations or other written credit to Dr. Wilder each time she referenced or quoted from a portion of the Course Materials in written materials relating to presentations at professional conferences about the NICE Project. (Hoiland Decl. ¶¶ 117-124, 132-137.)

123.    Dr. Hoiland never claimed to be the author of any of the Course Materials.  (Hoiland Decl. ¶¶ 138-143.)

124.    Dr. Hoiland identified herself on the first page of the CCCLA Slides as the presenter of the Presentation – not the author of any of the Course Materials. (Hoiland Decl. ¶¶ 138-143.)

125.    Dr. Hoiland did not present Dr. Wilder's ideas, research, writing or anything else as her own.  (Hoiland Decl. ¶¶ 117-124, 132-143.)

**Wilder Consented to Dr. Wilder's Use of the Course
Materials in Conference Presentations About the NICE**

126.    As of February 2019, Dr. Wilder and Dr. Hoiland were both aware of the following facts: (a) Dr. Wilder was the primary author of the NSF Proposal for the NICE Project; (b) Dr. Wilder asked Dr. Hoiland to serve – and Dr. Hoiland served – as Principal Investigator at Hostos and co-Director of the NICE Project; (c) the NICE Project was funded by NSF grants; (d) the Course Materials were the instructional materials for the NICE Project; (e) Dr. Wilder made the Course Materials, including the Subunit 7H Materials, available for use in the NICE Project; (e) a

goal of the NICE Project was to make the NICE Course and the Course Materials widely available to educators and administrators; (f) the NSF Proposal stated that Dr. Wilder and Dr. Hoiland would ensure that the NICE Course and the Course Materials were made widely available to educators and administrators by making presentations at conferences; and (g) the Budget Justification for the grant to Hostos specifically provided that Dr. Hoiland would be making presentations about the NICE Project and the Course Materials at professional conferences.  (Hoiland Decl. ¶¶ 117-124).

127.    Under the circumstances summarized in paragraph 126, Dr. Wilder consented to Dr. Hoiland's use of the Course Masterials, including the Subunit 7H Materials, in presentations at professional conferences about the NICE Project.  (Hoiland Decl. ¶¶ 117-124.)

128.    As Principal Investigator at Hostos and co-Director of the NICE Project, Dr. Hoiland was obligated to present at professional conferences about the NICE Project and the Course Materials.  (Hoiland Decl. ¶¶ 117-124.)

129.    As Principal Investigator at Hostos and co-Director of the NICE Project, Dr. Hoiland had discretion to use the Course Materials of the NICE Project as she saw fit in conference presentations about the NICE Project.  (Hoiland Decl. ¶¶ 117-124.)

130.    Dr. Wilder did not specifically ask Dr. Wilder for permission to use the Course Materials in the Presentation because Dr. Wilder had already provided her consent; it was implied from the circumstances summarized in paragraph 126.  (Hoiland Decl. ¶¶ 117-124.)

**Dr. Wilder's Formal Complaint of Research Misconduct was Rejected**

131.    On April 7, 2020, Dr. Wilder submitted a formal complaint of research misconduct against Dr. Hoiland (the "CUNY Complaint").  (Hoiland Decl. ¶¶ 184.)

132.   In the CUNY Complaint, Dr. Wilder accused Dr. Hoiland of, among other things: "plagiarism," "research misconduct," and "theft" of intellectual property.  (Hoiland Decl. ¶¶ 184-185.)

133.   In the CUNY Complaint, Dr. Wilder wrote, in part, as follows:

A record of Sarah's academic misconduct, including her plagiarism, needs to go into her permanent record at Hostos.  Sarah was recently awarded tenure, but now she is being considered for promotion to associate professor.  If she is given that promotion, CUNY will be sending the message that plagiarism is not only tolerated, it is rewarded.  (Hoiland Decl. ¶¶ 184-185.)

134.   After Dr. Wilder filed the CUNY Complaint, a CUNY Research Integrity Officer conducted an inquiry and both Dr. Wilder and Dr. Hoiland provided information to the Research Integrity Officer about Dr. Wilder's allegations (the "Inquiry").  (Hoiland Decl. ¶¶ 188-189.)

135.   The Inquiry included a review of hundreds of pages of documents and an interview of Dr. Hoiland that lasted more than three hours.  (Hoiland Decl. ¶¶ 188-189.)

136.    Following a detailed Inquiry, the Research Integrity Officer rejected Dr. Wilder's plagiarism allegations and determined that they did not warrant further investigation.  (Hoiland Decl. ¶ 190.)

137.   In a note to Dr. Wilder, the Research Integrity Officer wrote:

In accordance with the *CUNY Research Misconduct Policy*, an Inquiry was conducted into the allegations of plagiarism that you brought against a Hostos faculty member in April of this year.  After review, it has been determined that an Investigation is not warranted.  Therefore, this matter will be closed, with all records of the proceedings treated as confidential pursuant to Section 5 of the policy to respect the rights and protect the reputations of all parties involved.  (Hoiland Decl. ¶ 190.)

Dated: April 18, 2023                    By:      *s/ Guy R. Cohen*

Guy R. Cohen
Davis+Gilbert LLP
1675 Broadway
New York, NY 10019
Tel.: (212) 468-4800
Email: gcohen@dglaw.com

***Counsel for Defendant Sarah Hoiland***