**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

Esther Wilder,

               Plaintiff,

     v.

Sarah Hoiland,

            Defendant.

Civ. Action No. 1:22-cv-01254-PKC

**PLAINTIFF'S RESPONSE TO**
**DEFENDANT'S LOCAL RULE 56.1 STATEMENT (ECF NO. 44)**

Pursuant to Local Civil Rule 56.1, Plaintiff Esther Wilder ("Plaintiff") respectfully submits the following responses to Defendant Sarah Hoiland's ("Defendant") Rule 56.1 Statement (ECF No. 44):

## GENERAL OBJECTIONS

Plaintiff objects to Defendant's Rule 56.1 Statement to the extent that it fails to comply with the requirements embodied in Local Rule 56.1—which mandates that the statement consist of a "short and concise" statement of the material facts (L.R., 56.1(a))—as many of the 137 paragraphs in Defendant's Statement include multiple alleged facts, are neither short nor concise, and/or are repetitive of prior paragraphs.

Plaintiff also objects to Defendant's Rule 56.1 Statement to the extent that it is unduly burdensome and harassing by including about 45 admittedly immaterial and irrelevant statements of fact (i.e., about one third of Defendant's Rule 56.1 Statement).  Defendant's Memorandum of Law (ECF Nos. 39 & 43, "MOL") only cites to ¶¶ 1–2, 5–40, 44–58, 62–75, 77–80, 82–83, 91–93, 100–106, 115–116, & 131–137 *infra.* Accordingly, at least the uncited statements—namely, ¶¶ 3–4, 41–43, 59–61, 76, 81, 84–90, 94–99, 107–114, & 117–130 *infra*—should be disregarded. *See, e.g.*, *Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000) ("Local Rule 56.1 is designed to place the responsibility on the parties to clarify the elements of the substantive law which remain at issue because they turn on contested facts.")

## RESPONSES TO SPECIFIC STATEMENTS[1]

1.      Dr. Sarah Hoiland is a professor at Hostos Community College ("Hostos"), a two-year community college located in the South Bronx. From August 2013 to August 2020, Dr. Hoiland was an Assistant Professor at Hostos. From August 2020 to the present, Dr. Hoiland has

---

[1] Plaintiff has not included the headings in Defendant's Rule 56.1 Statement as they are not "facts" supported by evidence requiring a response. To the extent they are deemed facts, disputed.

been an Associate Professor of Sociology at Hostos. (Hoiland Decl. ¶¶ 5-6.)

**RESPONSE**: Undisputed, but not material to the Motion.

2.      Hostos is part of the City University of New York ("CUNY"), and it serves a primarily Hispanic student body. Hostos has been designated as an "Hispanic-Serving Institution" or an "HSI." (Hoiland Decl. ¶ 5.)

**RESPONSE**: Undisputed.

3.      Dr. Esther Wilder is a professor in the Department of Sociology at Lehman College ("Lehman"), a four-year college located in the South Bronx. (Hoiland Decl. ¶ 15.)

**RESPONSE**: Disputed to the extent that Lehman is located in the North Bronx. Otherwise, undisputed.

4.      Lehman is part of CUNY and it has been designated as an HSI. (Hoiland Decl. ¶¶ 15, 35.)

**RESPONSE**: Undisputed.

5.      From 2011 to 2016, Dr. Wilder served as Principal Investigator on a project titled "Numeracy Infusion Course for Higher Education" (the "NICHE Project"), which was funded by a grant from the National Science Foundation ("NSF"). (Hoiland Decl. ¶ 20.)

**RESPONSE**: Undisputed.

6.      On NSF-funded projects, the Principal Investigator is the person who leads and is in charge of the program that receives the funding. (Hoiland Decl. ¶ 10.)

**RESPONSE**: Disputed, but not material to the Motion.  According to the National Science Foundation ("NSF"), "PRINCIPAL INVESTIGATOR/PROJECT DIRECTOR (PI/PD) means the individual(s) designated by the proposer, and approved by NSF, who will be responsible for the scientific or technical direction of the project. NSF does not infer any distinction in scientific

stature among multiple PIs, whether referred to as PI or co-PI." (*See* https://www.nsf.gov/pubs/policydocs/pappg19_1/index.jsp.)

     **7.**    Numeracy, which is sometimes referred to as quantitative literacy, can be defined as the ability to understand and use numbers and data in everyday life. (Hoiland Decl. ¶ 12.)

**RESPONSE**: Undisputed, but not material to the Motion.  This is an uncredited quote from Bernard Madison, which is quoted on the NICHE website authored by Plaintiff. (*See* https://serc.carleton.edu/NICHE/numeracy_qr.html).

     **8.**    The NICHE Project consisted primarily of an online, faculty-development program designed to teach educators at CUNY schools throughout New York City to "infuse" numeracy or quantitative-reasoning ("QR") materials into their coursework (the "NICHE Course"). (Hoiland Decl. ¶ 21.)

**RESPONSE**: Disputed, but not material to the Motion.  The NICHE Project involved many different components including: (1) the creation of materials for an online faculty development program focused on QR; (2) the implementation of these materials in an online faculty development material to train CUNY faculty in best practices; (3) faculty development of instructional and assessment materials; and (4) research on the effectiveness of the NICHE program. (Supplemental Declaration of Esther Wilder submitted herewith, "Suppl. Wilder Decl.," ¶ 6.)

     **9.**    The NICHE Course consisted of eight instructional units ("Units"), and each Unit was supported by written materials, included readings, short exercises, assignments, and other pedagogical materials (the "Course Materials"). (Hoiland Decl. ¶ 23.)

**RESPONSE**: Disputed, but not material to the Motion.  The NICHE Course consisted of: (1) NICHE Tasks/Blogs, (2) a Welcome to NICHE folder, (3) the NICHE Course Units; and (4) a

NICHE wrap-up folder. (ECF No. 46-6, Hoiland Ex. 6 at ECF pp. 5–11 of 11.) The Course also linked to materials from the NICHE public website that were also available for public use. (*Id.* at ECF pp. 5–6, 8–9 of 11.)

10. Dr. Wilder was the primary author of the Course Materials. (Hoiland Decl. ¶ 20.)

**RESPONSE**: Undisputed that Plaintiff authored Unit 7H of the NICHE Course which is the subject of this Action.  Also undisputed that Plaintiff authored most of the instructional materials and participant assignments for the NICHE Project.  Disputed to the extent that it is unclear what Defendant is referring to by "Course Materials" (*see supra* Resp. to ¶ 9).

11. Dr. Hoiland did not have any role in or involvement with the NICHE Project, and she was not the author of any of the Course Materials. (Hoiland Decl. ¶ 19.)

**RESPONSE**: Undisputed.

12. One of the goals of the NICHE Project was to disseminate the Course Materials to institutions outside of CUNY that sought to improve the quantitative literacy and reasoning of their students. (Hoiland Decl. ¶¶ 12-13.)

**RESPONSE**: This statement is not supported by evidence.  Undisputed that one of the goals of the NICHE Project was to "***offer training*** to faculty and administrators elsewhere to show how they can effectively run our online course and ***make institution-specific adaptations***, providing special support to six colleges and universities outside CUNY." (NICHE Proposal, pg. 21 (emphasis added).) Disputed to the extent that Defendant is suggesting that the NICHE Project involved disseminating ***all*** materials created for the NICHE Project without any restrictions.  The NICHE Project involved some materials that were distributed for public use (i.e., the materials made available on the NICHE website) and some materials designed for use within a closed community (i.e., the materials in the program's internal, password-protected "Blackboard").  By

and large, the materials in Blackboard—including the Copyrighted Work at issue in this action—were designed for use within a closed community and they did not lend themselves to public dissemination on the NICHE website (or at conferences). (Suppl. Wilder Decl. ¶ 21.)

13.    In the publicly available abstract for the NICHE Project, Dr. Wilder wrote:

The broader impacts of the project lie primarily in its demonstration of a model for engaging faculty throughout a large and diverse university system of campuses. . .

The project is also providing tested QR learning materials and disseminating the NICHE course materials to other institutions who are similarly committed to improving the quantitative literacy and reasoning of their students. (Hoiland Decl. ¶¶ 12-13.)

**RESPONSE**: The statement is not material to the Motion. Disputed to the extent that the quotation is merely an excerpt of the proposal and does not include the full text of the proposal, and to the extent that Defendant is suggesting that the NICHE Project involved disseminating **all** materials created for the NICHE Project without any restrictions. The materials that were available for public dissemination were limited to those on the NICHE (later NICHE/NICE) website, and the materials in Blackboard—including the Copyrighted Work at issue in this action—were never disseminated as they only worked within the confines of a closed system with a well-trained instructor. (Suppl. Wilder Decl. ¶ 21.)

14.    In or around May 2016, Dr. Wilder believed that she could obtain NSF funding for a new project related to the NICHE Project if she submitted a proposal specifically targeting HSIs and two-year community colleges in the South Bronx. (Hoiland Decl. ¶ 25.)

**RESPONSE**: The statement is not material to the motion, and relies on inadmissible hearsay, not admissible evidence.  Undisputed that, in 2016, when presenting on NICHE at an NSF Conference, Plaintiff was approached about doing an extension of her NICHE grant, adapted to be an in-person (and online) faculty development program to train faculty at the three Bronx-based Hispanic Serving Institutions (HSIs), specifically CUNY's Lehman College, Hostos Community College

and Bronx Community College, on QR literacy. (*See* ECF No. 35., "Pl's SOF," ¶ 17; ECF No. 36, "3/28 Wilder Decl.," ¶¶ 30–31; *see also* www.nsf.gov/pubs/2015/nsf15078/nsf15078.jsp.) Otherwise, disputed.

15.     With that goal in mind, Dr. Wilder contacted Dr. Hoiland and asked whether she would be interested in serving as Principal Investigator at Hostos and co-Director of a collaborative project titled titled [sic] "Numeracy Infusion for College Educators" (the "NICE Project"). (Hoiland Decl. ¶ 26.)

**RESPONSE**: Undisputed that Plaintiff contacted Defendant about being a PI on the NICE Project. Disputed to the extent that the reason Plaintiff sought out another PI for the NICE project was because it required that one of the PIs be from an HSI community college. (Pl's SOF ¶ 18; 3/28/23 Wilder Decl. ¶ 32), and to the extent that Plaintiff contacted both Defendant and another colleague about their possible interest in the project.  (Suppl. Wilder Decl. ¶ 23); *see also supra* Resp. to ¶ 14.

16.     Dr. Hoiland informed Dr. Wilder that she was interested in serving as Principal Investigator at Hostos and co-Director of the NICE Project. (Hoiland Decl. ¶ 27.)

**RESPONSE**: Undisputed.

17.     In May 2016, Dr. Wilder and Dr. Hoiland together submitted a grant proposal to the NSF for the NICE Project (the "NSF Proposal" or the "Proposal"). (Hoiland Decl. ¶¶ 27-28.)

**RESPONSE**: Undisputed, but not material to the motion.

18.     Dr. Wilder was the primary author of the NSF Proposal. (Hoiland Decl. ¶ 33.)

**RESPONSE**: Undisputed that Plaintiff authored the proposal.  Disputed to the extent that Defendant suggests that she contributed more than typographical or grammatical suggestions/changes. (Suppl. Wilder Decl. ¶ 25.)

19.     When investigators from two or more organizations wish to collaborate on a unified

research project with NSF funding, they submit a "collaborative" proposal or a proposal for

"collaborative research." (Hoiland Decl. ¶ 28.)

**RESPONSE**: The statement is not material to the Motion. Disputed to the extent that

"[c]ollaborative proposals may be submitted to NSF in one of two methods: as a single proposal,

in which a single award is being requested (with subawards administered by the lead organization);

or by simultaneous submission of proposals from different organizations, with each organization

requesting a separate award."

(https://www.nsf.gov/bfa/dias/policy/papp/pappg17_1/faqs17_1.pdf.)

20.     When two or more organizations submit a collaborative proposal, one organization

is designated as the "lead" organization, and each organization submits a separate grant proposal

with a separate funding request and budget justification. (*Id.*).

**RESPONSE**: The statement is not material to the Motion, and relies on inadmissible hearsay, not

evidence. Disputed to the extent that Defendant is suggesting that NSF treats separate grant

proposals in a collaborative proposal separately in determining whether to grant the award (Suppl.

Wilder Decl. ¶ 28), and to the extent that this statement contradicts ¶ 17 *supra*.

21.     The Proposal for the NICE Project was a collaborative proposal, and two different

organizations submitted proposals. (*Id.*).

**RESPONSE**: The statement is not material to the Motion, and does not rely on admissible

evidence. Disputed to the extent that Defendant is suggesting that NSF treats separate grant

proposals in a collaborative proposal separately in determining whether to grant the award (Suppl.

Wilder Decl. ¶ 28), and to the extent that this statement contradicts ¶ 17 *supra*.

22.     The first proposal identified: (a) "CUNY Hostos Community College" as the

organization to which the award should be made; (b) "CUNY Hostos Community College" as the primary place of performance; and (c) "Sarah L Hoiland" as the Principal Investigator and Project Director. (Hoiland Decl. ¶ 29.)

**RESPONSE**: The statement is not material to the Motion. Denied to the extent that Defendant is suggesting that she had any seniority in the NICE Project, (Ex 25, https://www.nsf.gov/pubs/policydocs/pappg19_1/index.jsp ("NSF does not infer any distinction in scientific stature among multiple PIs, whether referred to as PI or co-PI."); ECF No. 53, Hoiland Ex. 11 at P000454 (Defendant stating: "My role from the beginning of this project was a Project Associate responsible for recruiting and ushering community college faculty to and through your NICHE/ NICE Program. The 'PI' was really in name alone . . . .")), and that the Proposal for the NICE Project included a "first proposal." *See supra* Resp. to ¶ 21.

23.    Hostos was the designated lead organization and "headquarters" for the NICE Project. (Hoiland Decl. ¶ 32.)

**RESPONSE**: The statement is not material to the Motion. Denied to the extent that Defendant is suggesting that she had any seniority in the NICE Project. (Ex 25, https://www.nsf.gov/pubs/policydocs/pappg19_1/index.jsp ("NSF does not infer any distinction in scientific stature among multiple PIs, whether referred to as PI or co-PI."); ECF No. 53, Hoiland Ex. 11 at P000454 (Defendant stating: "My role from the beginning of this project was a Project Associate responsible for recruiting and ushering community college faculty to and through your NICHE/ NICE Program. The 'PI' was really in name alone . . . .").) The designation of a Hostos as the "lead institution" was made, at Plaintiff's recommendation, for several reasons, including because the solicitation specifically suggested this approach. (*See* www.nsf.gov/pubs/2015/nsf15078/nsf15078.jsp ("[F]our-year institutions of higher education are

strongly encouraged to partner with a two-year HSI or have the two-year institution serve as the lead organization").)

24.     The second proposal identified: (a) "Research Foundation of CUNY on behalf of Lehman College" as the organization to which the award should be made; (b) "Hostos Community College" as the primary place of performance; and (c) Dr. Wilder as the Principal Investigator and Project Director. (Hoiland Decl. ¶ 30.)

**RESPONSE**: The statement is not material to the Motion. Denied to the extent that Defendant is suggesting that she had any seniority in the NICE Project, (Ex 25, https://www.nsf.gov/pubs/policydocs/pappg19_1/index.jsp ("NSF does not infer any distinction in scientific stature among multiple PIs, whether referred to as PI or co-PI."); ECF No. 53, Hoiland Ex. 11 at P000454 (Defendant stating: "My role from the beginning of this project was a Project Associate responsible for recruiting and ushering community college faculty to and through your NICHE/ NICE Program. The 'PI' was really in name alone . . . .")), and that the Proposal for the NICE Project included a "first proposal." *See supra* Resp. to ¶ 21.

25.     As Principal Investigators on separate proposals, Dr. Wilder and Dr. Hoiland were, upon receipt of the awards, separately responsible for and in charge of the programs for the grants awarded to their respective institutuions. [sic] (Hoiland Decl. ¶ 31.)

**RESPONSE**: The statement is not material to the Motion. Disputed to the extent that Defendant suggests that Plaintiff and Defendant were "separately responsible for and in charge of the programs for the grants awarded to their respective institut[ions]"; they were collaboratively responsible for ensuring that they adhered to the tasks outlined in the unified research project. (Suppl. Wilder Decl. ¶ 29.)

26.     As co-Directors of the NICE Project, Dr. Wilder and Dr. Hoiland were, upon receipt

of the awards, jointly and equally responsible for the NICE Project's collaborative work. (Hoiland Decl. ¶ 31.)

**RESPONSE**: The statement is not material to the Motion. Denied to the extent that this implies that Plaintiff and Defendant were equally expected to do every single task.  (Suppl. Wilder Decl. ¶ 29.) It was a collaborative proposal, but they each had separate responsibilities they were expected to undertake as outlined in the proposal. (*Id.*) Thus, for example, Defendant was expected to "direct all qualitative data gathering research activities, including the qualitative data gathering and research activities."  (*Id.*) Meanwhile, Dr. Wilder was charged to "direct research activities on the quantitative assessment data gathered," although Defendant never carried out her research activities. (*Id.*)

27.    The NICE Project was, to a significant degree, an extension and continuation of the NICHE Project. (Hoiland Decl. ¶ 34.)

**RESPONSE**: The statement is not material to the Motion. Undisputed that the NICE Project was, to some degree, an extension of the NICHE Project, adapted to be an in-person (and online) faculty development program to train faculty at the three Bronx-based Hispanic Serving Institutions (HSIs), specifically CUNY's Lehman College, Hostos Community College and Bronx Community College, on QR literacy. (ECF No. 37-5, Pl's Ex. 20, Hoiland Tr. 20:12–16; 3/28 Wilder Decl. ¶¶ 30–31.) Denied to the extent that there were also significant differences between the NICHE and NICE Projects, including the leadership teams and goals. (Suppl. Wilder Decl. ¶ 30.)

28.    The NICE Project was a predominantly online, faculty-development program designed to help educators at higher-education institutions "infuse" numeracy materials into their coursework. (Hoiland Decl. ¶ 34.)

**RESPONSE**: The statement is not material to the Motion, nor supported by admissible evidence.

Disputed to the extent that Defendant suggests that the NICE Project was "predominantly" an online, faculty-development program; it was also a research project designed to develop and evaluate the effectiveness of the faculty-developed program within the context of HSI institutions in the Bronx. (ECF No. 36-6, Pl's Ex. 6 at P000171 ("Faculty participants in NICE will be randomly assigned to one of two instructional modes: (1) an in-person QR workshop that meets monthly; or (2) an intensive online summer QR training program. Research will compare the effectiveness of each approach . . . .").)

29.    The NICE Project used the same Course Materials as the NICHE Project, with only very minor and inconsequential changes. (Hoiland Decl. ¶ 36.)

**RESPONSE**: Undisputed. (Pl's SOF ¶ 46.)

30.    The primary difference between the NICHE Project and the NICE Project was that the faculty members who participated in the NICHE Project were employed by CUNY schools throughout the five boroughs of New York City and were primarily from four-year institutions; the faculty participants in the NICE Project were from three HSIs in the South Bronx – Hostos, Bronx Community College ("BCC") and Lehman – two of which (Hostos and BCC) are two-year community colleges. (Hoiland Decl. ¶ 35.)

**RESPONSE**: The statement is not material to the Motion, nor supported by admissible evidence. Disputed to the extent that Defendant suggests that the "primary" difference was the affiliation of the participants; key differences included: (i) the NICE Project's research focus on comparing different instructional approaches (*see* ECF No. 36-6, Pl's Ex. 6 at P000171; *see also supra* Resp. to ¶ 28), which was not a focus of the NICHE Project; (ii) the NICHE Project's leadership consisted of three CUNY faculty who had extensive experiencing either teaching numeracy or doing numeracy faculty development, whereas the NICE Project focused more on a mentoring

relationship between Plaintiff and Defendant; and (iii) in the NICHE Project, the leadership team developed a set of instructional materials to train faculty in best practices for numeracy instruction, whereas, in the NICE Project, the intention was that Defendant would contribute materials, but she did not. (Suppl. Wilder Decl. ¶¶ 29–30; *see also* Pl's SOF ¶ 46.)

31.    The faculty-development course for the NICE Project (the "NICE Course") was designed to: (a) provide participating faculty members ("Faculty Participants" or "Participants") with an overview of the importance of QR skills and the need to incorporate QR materials into higher-education courses; (b) help Participants develop and refine QR goals or outcomes for their classes – i.e., determine what they want their students to learn; (c) help Participants develop and refine a lesson plan incorporating QR materials; (d) provide Participants with best practices for teaching quantitative reasoning in their classrooms; (e) provide Participants with guidance on developing tools to assess whether their numeracy-related efforts have been effective with their students; and (f) have Participants incorporate the lesson plan and assessment tool into their actual classes and report their students' assessment data. (Hoiland Decl. ¶ 38.)

**RESPONSE**: This statement does not comply with L.R. 56.1, at least because it includes multiple facts within a single numbered paragraph. The statement is not material to the Motion, nor supported by admissible evidence. Disputed to the extent that Defendant suggests that the above list is complete.  (*See, e.g.*, ECF No. 41-5, Hoiland Ex. 6 (listing other "NICE Goals," including "To establish a network of CUNY faculty who are committed to improving the QR skills among our students . . . .").)

32.    One goal of the NICE Project was to train educators at three HSIs in the Bronx who could then work to improve the QR skills of their students and impart their knowledge on other educators at Hostos, Lehman and BCC. (Hoiland Decl. ¶ 39.)

**RESPONSE**: Undisputed, but not material to the Motion.

33.     Beyond educating Faculty Participants from Hostos, BCC and Lehman, the broader goal of the NICE Project was to make the faculty-training program and Course Materials as broadly available as possible. (Hoiland Decl. ¶ 41.)

**RESPONSE**: Disputed to the extent that no reasonable fact finder could agree with this statement because it is not supported by evidence.  The broader goal of the NICE project was to undertake research on the effectiveness of the program. (Suppl. Wilder Decl. ¶ 39; ECF No. 36-6, Pl's Ex. 6 at P000171 ("Faculty participants in NICE will be randomly assigned to one of two instructional modes: (1) an in-person QR workshop that meets monthly; or (2) an intensive online summer QR training program. Research will compare the effectiveness of each approach . . . .").) To the extent that a goal of NICE was to help faculty beyond CUNY, it would necessarily have been materials developed over the course of the *NICE* Project, namely the *research* results generated through the NICE Project. (Suppl. Wilder Decl. ¶ 39; ECF No. 36-6, Pl's Ex. 6 at P000171, 180 (discussing that "the *results* will be presented" and dissemination of "*results* through other relevant outlets") (emphasis added).) There is a basic rule in academia: if you don't contribute, you must not distribute. (Suppl. Wilder Decl. ¶ 43.)

34.     The NSF Proposal included a "Project Summary." The "Broader Impacts" section of the Project Summary provided, in part, as follows:

> NICE will also help faculty beyond CUNY. First, the project intervention and materials, including the NICE training program . . . will be made readily available on the NICE project website . . . To ensure that the NICE materials and evaluation results are widely available to educators, policymakers, administrators, and researchers, the results will be presented at conferences, published in journals and disseminated through other relevant outlets. (Hoiland Decl. ¶ 42.)

**RESPONSE**: The statement is not material to the Motion. Disputed to the extent that the quotation is merely an excerpt and does not include the full document. Disputed to the extent that Defendant

is suggesting that she was expected to disseminate the NICHE materials; the quote states specifically that the [NICE research] *results* will be presented at conferences, published in journals, and disseminated through other relevant outlets." (emphasis added).  Indeed, the NICHE instructional materials were not "results" from the NICE program. (Pl's SOF ¶ 46.)  The only explicit mention of the dissemination of the NICE course materials in the proposal is on the "NICE Project website" which Plaintiff was in charge of. (Suppl. Wilder Decl. ¶¶ 20–33.)

35.    The NSF Proposal included a section titled "NICE at CUNY and Beyond," which provided, in part, as follows:

> We will also support QR instruction through the dissemination of our research results. With an increased emphasis on QR and accreditors' strong focus on assessment, there is high demand for programs and resources that can be used to promote and assess students' QR skills. To ensure that our materials and evaluation results are widely available to educators, policymakers, administrators, and researchers, we will present at conferences, publish in journals, and disseminste [sic] our results through other relevant outlets. (Hoiland Decl. ¶ 43.)

**RESPONSE**: The statement is not material to the Motion. Disputed to the extent that the quotation is merely an excerpt and does not include the full document. Disputed to the extent that Defendant is suggesting that she was expected to disseminate the NICHE materials; the quote states specifically that the [NICE research] *results* will be presented at conferences, published in journals, and disseminated through other relevant outlets." (emphasis added).  Indeed, the NICHE instructional materials were not "results" from the NICE program. (Pl's SOF ¶ 46.)  The reference to "our materials" in the above quote would necessarily refer to the materials *developed* during the NICE Project; Defendant could never claim that the NICHE materials were her materials as she has acknowledged she did not play any role in creating them (*see supra* ¶ 19).

36.    The Hostos-specific section of the NSF Proposal included a document titled "Budget Justification – PI Sarah Louise Hoiland" (the "Hostos Budget Justification"), which provided, in part, that Dr. Hoiland would, among other items, "present at professional conferences

[and] participate in a variety of dissemination activities (e.g., community college and HSI conferences)." (Hoiland Decl. ¶ 44.)

**RESPONSE**: The statement is not material to the Motion. Disputed to the extent that the quotation is merely an excerpt and does not include the full document. Disputed to the extent that Defendant is suggesting that she was expected to disseminate the NICHE materials at national conferences; Dr. Hoiland was expected to disseminate her own research *results* generated from the NICE Project. (Suppl. Wilder Decl. ¶ 42; *see also* ECF No. 36-6, Pl's Ex. 6 at P000181 (showing timeline for NICE Project that anticipates that first the "assessment data [would be] gathered from faculty participants in training program" and then there would be an "analy[sis of the] assessment data and prepar[ation of] papers [to] present at conferences").)

37. The Hostos Budget Justification provided, in part: "The budget includes $7,000 for PI Hoiland to attend conferences both for professional development, dissemination activities, and networking with faculty from similar institutions." (Hoiland Decl. ¶ 46.)

**RESPONSE**: The statement is not material to the Motion. Disputed to the extent that the quotation is merely an excerpt and does not include the full document. Disputed to the extent that Defendant is suggesting that she was expected to disseminate the NICHE materials at national conferences; Dr. Hoiland was expected to disseminate her own research *results* generated from the NICE Project. *See supra* Resp. to ¶¶ 33–36.

38. The primary purpose for Dr. Hoiland's attending these conferences, with the expenses paid by the NSF award, was to disseminate information about the NICE Project and the Course Materials to higher-education faculty members, administrators and others outside the CUNY system, with an emphasis on faculty members and administrators from community colleges and HSIs. (Hoiland Decl. ¶ 49.)

**RESPONSE**: The statement is not material to the Motion and is not supported by admissible evidence. Disputed to the extent that Defendant is suggesting that she was expected to disseminate the NICHE materials at national conferences; Dr. Hoiland was expected to disseminate her own research **results** generated from the NICE Project. *See supra* Resp. to ¶¶ 33–36.

39.     Upon completion of the NICE Project, Dr. Wilder wrote, in part, as follows in the Project Outcomes Report for NICE:

> NICE has also helped faculty beyond CUNY as a result of our dissemination activities. The instructional materials from the project are readily available on the NICE website (www.teachqr.org), which also includes resources on best practices and tools for engaging students in data analysis. Moreover, our research on NICE— both existing publications/presentations and those in progress— contributes to our understanding of best practices for faculty development. Finally, we have worked to ensure that the NICE materials and evaluation results are widely available to educators, policymakers, administrators, and researchers. These efforts have included more than a dozen presentations, workshops, and scholarly papers. (Hoiland Decl. ¶ 50.)

**RESPONSE**: The statement is not material to the Motion. Disputed to the extent that the quotation is merely an excerpt and does not include the full document. Disputed to the extent that Defendant is suggesting that the materials hosted in Blackboard were ever publicly distributed. (*See* Pl's SOF ¶ 15.) The public materials were and always have been available on the public website (https://serc.carleton.edu/NICHE/index.html) and Dr. Wilder worked to ensure that the public NICE materials were widely distributed by providing links to the NICHE website whenever she presented her research at national conferences. (Suppl. Wilder Decl. ¶¶ 20, 33.) The only materials she ever presented were those materials that were available publicly on the NICHE/NICE website and that were suitable for public use; the core assignments (each referred to as a "key task" in Blackboard) were never publicly disseminated as they were only suitable for the closed community where faculty were working collaboratively. (Suppl. Wilder Decl. ¶ 21;)

40.     By email to Dr. Hoiland in late 2019, Dr. Wilder wrote: "I am fine with other people

using the materials from the NICE/NICHE faculty development program – and indeed, I'm flattered when they do – because faculty development has always been important to me and I want to disseminate the materials as widely as possible."  (Hoiland Decl. ¶ 51.)

**RESPONSE**: The statement is not material to the Motion. Disputed to the extent that the quotation is merely an excerpt and does not include the full email. Disputed to the extent that Defendant is suggesting that Plaintiff wanted or expected Hoiland to distribute her materials without asking for permission.  (Pl's SOF ¶¶ 107–121.)  Indeed, it is generally understood that scholars want their work to be widely consumed; but not without limitation—academic and professional norms also require authorization and the crediting of other's work of authorship when duplicated in a publication or presentation. (Pl's SOF ¶¶ 107–121; ECF No. 37-5, Pl's Ex. 20, Hoiland Tr. 180:2– 181:8, 183:20–184:9, 184:12–185:16, 185:22–186:16; ECF No. 36-10, Pl's Ex. 10, P649–654 at P649–650; ECF No. 36-11, Pl's Ex. 11, P294–298 at P297; ECF No. 36-9, Pl's Ex. 9, P273–293 at P288–289; 3/28 Wilder Decl. ¶¶ 88, 95.)  Here, Plaintiff made some materials available online on the NICHE website; but the Copyrighted Text at issue was only available on a password-protected organization available only to users that viewed copyright statements explicitly requiring Plaintiff's approval for their use. (*See* Pl's SOF ¶¶ 8, 15, 38–40; 3/28 Wilder Decl. ¶¶ 16, 54; ECF No. 36-5, Pl's Ex. 5, P665 ("Unauthorized use of any of the material in this presentation or any supplementary course materials from NICHE is strictly prohibited. . . Any questions regarding the authorization for use of material from NICHE should be directed to Esther Isabelle Wilder (ewilder@gc.cuny.edu)."); ECF No. 37-5, Pl's Ex. 20, Hoiland Tr. 37:13–39:6, 106:6–14; *see also* Suppl. Wilder Decl. ¶ 43; Ex. 25,[2] P000789 (Defendant stating in June 2017: "I watched [the videos that were linked to Units 1 and Unit 2 that are from NICHE] last week")).) The materials

---

[2] Exhibits 21–27 are attached to the Supplemental Declaration of Janet Linn submitted herewith.

Defendant distributed were not appropriate to disseminate as they were decontextualized and painted a confusing picture of the NICE program. (Pl's SOF ¶¶ 120; 3/28 Wilder Decl. ¶ 99.)

41.     In 2016, the NSF granted the requested awards and funded the NICE Project. (Hoiland Decl. ¶¶ 52.)

**RESPONSE**: Undisputed.

42.     The primary tool of the NICE Project was the NICE Course, which was primarily online and instructed Faculty Participants on how to: (a) apply QR within their respective disciplines; (b) implement best practices for teaching quantitative literacy; and (c) assess the effectiveness of the Faculty Participant's QR initiatives in order to further improve instruction. (Hoiland Decl. ¶ 52.)

**RESPONSE**: This statement does not comply with L.R. 56.1, at least because it includes multiple facts within a single numbered paragraph. The statement is not material to the Motion; indeed, Defendant does not cite to this statement in her MOL. Disputed to the extent that Defendant suggests that there is a "primary tool" of the NICE Project since the project involved some many different components (e.g., quantitative and qualitative research, faculty development, etc.). *See supra* Resp. to ¶¶ 28, 33. Indeed, one of the goals stated in the NICE proposal was to "refine and update NICHE in accordance to the assessment data gathered for the project." (ECF No. 36-6, Pl's Ex. 6 at P000176.) However, as Defendant admits, the instructional materials used in the NICE Project were largely the NICHE Project materials, *see supra* ¶ 29, since the adaptation did not happen. *See* Pl's SOF ¶ 46.

43.     Over the course of three years – including groups (or cohorts) who took the NICE Course during the summer of 2017 and the 2017-2018 academic school year – 26 Faculty Participants from Hostos, Lehman and BCC took the NICE Course, and 21 completed it. (Hoiland

Decl. ¶¶ 52-55.)

**RESPONSE**: Undisputed, but not material to the Motion. Indeed, Defendant does not cite to this statement in her MOL.

44.     The NICE Course consisted of the same eight Units and used substantially identical Course Materials as the NICHE Course. Each of the eight Units was supported by the Course Materials. (Hoiland Decl. ¶ 56.)

**RESPONSE**: Disputed to the extent that Defendant is suggesting that the NICE course only involved 8 units.  *See supra* Resp. to ¶ 9. Undisputed that the instructional materials for the NICE course were substantially identical to the instructional materials for the NICHE course.

45.     The eight Units were titled as follows: (1) QR and Making Numbers Meaningful; (2) QR Learning Outcomes; (3) The Brain, Cognition, and QR; (4) QR and Writing; (5) Discovery Methods; (6) Representation of Data; (7) QR Assessment; (8) Math Anxiety and QR Stereotypes and Culture. (Hoiland Decl. ¶ 58.)

**RESPONSE**: Undisputed, but not material to the Motion.

46.     Each Unit was broken down into approximately five to ten subunits ("Subunits"). (Hoiland Decl. ¶ 58.)

**RESPONSE**: Undisputed, but not material to the Motion.

47.     Unit One provided background on what quantitative reasoning is and why it's an important skill to be taught in college classrooms. (Hoiland Decl. ¶ 59.)

**RESPONSE**: Disputed and not material to the Motion.  Unit 1 provided an overview of what quantitative reasoning entailed and focused on number sense and disciplinary numbers. (Suppl. Wilder Decl. ¶ 10.)

48.     Unit Two provided background on creating learning outcomes or goals specific to

quantitative reasoning to improve students' comprehension of visual representations of data. (Hoiland Decl. ¶ 60.)

**RESPONSE**: Disputed and not material to the Motion.  The learning goals had nothing to do with "visual representations of data."  Unit 2 provided information on how to effectively create learning goals, including practice activities for doing this. (Suppl. Wilder Decl. ¶ 11.)

49.     Unit Three discussed quantitative reasoning and how thinking processes are "fast," thereby sometimes leading indivduals to jump to conclusions or misinterpret test results, statistics, or other numerical information. (Hoiland Decl. ¶ 61.)

**RESPONSE**: Disputed and not material to the Motion.  Unit 3 focused on QR and the brain, and discussed the distinction between slow thinking and fast thinking, information about cognitive loads, and included exercises designed to promote an understanding of fast and slow thinking. (Suppl. Wilder Decl. ¶ 12.)

50.     Unit Four focused on the importance of being able to write about numbers accurately and clearly across curricular disciplines. (Hoiland Decl. ¶ 62.)

**RESPONSE**: Disputed and not material to the Motion.  Unit 4 included material on QR and writing, including required links to the public website, an assessment on QR and literature, and an activity reviewing student written work.  (Suppl. Wilder Decl. ¶ 13.)

51.     Unit Five emphasized ways in which to engage students using numbers in ways that make those numbers meaningful. (Hoiland Decl. ¶ 63.)

**RESPONSE**: Disputed and not material to the Motion.  Unit 5 focused on discovery methods, which is an approach to teaching that uses constructivist methods. This was illustrated using engaged activities. (Suppl. Wilder Decl. ¶ 14.)

52.     Unit Six contained materials designed to help Faculty Participants understand

graphs, charts, and other visual representations of data and integrate them into their QR materials. (Hoiland Decl. ¶ 64.)

**RESPONSE**: Disputed and not material to the Motion.  Unit 6 included materials designed to help faculty participants understand the applicability of graphs and other visual representations of data by graphing stories and using qualitative graphs.  (Suppl. Wilder Decl. ¶ 15.)

53.     Unit Seven provided an overview of assessment and evaluation, with a specific focus on how to measure whether students are reaching QR learning goals. (Hoiland Decl. ¶ 65.)

**RESPONSE**: Disputed and not material to the Motion.  Unit 7 provided an overview of learning assessment with engaged activities designed to give faculty practical experience assessing learning. (Suppl. Wilder Decl. ¶ 16.)

54.     Unit Seven was broken down into eight or more Subunits, and the Course Materials at issue in this action concern one of the Subunits of Unit 7 – Subunit 7H. The Course Materials for Subunit 7H will be referred to as the "Subunit 7H Materials." (Hoiland Decl. ¶¶ 66-67.)

**RESPONSE**: Undisputed that the Copyrighted Text at issue in this action is Unit 7H of the instructional materials from the NICHE Project.  (*See* Pl's SOF ¶¶ 9–13.) Disputed to the extent that Defendant suggests that this text only appeared in Unit 7H; the text appeared five other times in the materials for the NICHE Project: (a) twice in the NICHE Tasks and Blogs section of Blackboard; (b) once in Unit 8G; and (c); and twice in the NICHE wrap-up folder (Units N2 and N3).  (Suppl. Wilder Decl. ¶ 18.)

55.     The first six Units of the Course Materials contain the core or key materials for the NICE Project. (Hoiland Decl. ¶ 170.)

**RESPONSE**: The statement is not material to the Motion, and is not supported by admissible evidence.  Disputed; the assessment unit was a key unit (and arguably the most critical unit) of the

NICE Program.  (Suppl. Wilder Decl. ¶ 31.)  Indeed, the assessment assignment was characterized

as one of the 3 "key tasks."  (ECF No. 41-5, Hoiland Ex. 6 at ECF p. 3 of 11 ("The key tasks are

as follows: 1. Articulate a set of QR learning goals for a lesson . . . 2. Create/adapt a QR lesson

plan and exercise  . . . 3. Create/adapt a QR assessment plan and instrument . . .").)  In many ways,

the assessment assignment was even more important than the other two "key tasks" since it was

responsible for generating "the assessment data that faculty gather in their QR-infused courses"

that could then be used to "evaluate the effectiveness of the program."  (ECF No. 36-6, Pl's Ex. 6

at P000179; Suppl. Wilder Decl. ¶ 31); *see also infra* Resp. to ¶ 57.

     **56.**     The first six Units of the Course Materials contain the key or core materials because

those Units relate to the main purpose of the NICE Project – teaching educators how to develop

QR goals, QR lesson plans and best-practices for teaching numeracy in their classes. (Hoiland

Decl. ¶ 170.)

**RESPONSE**: The statement is not material to the Motion, and is not supported by admissible

evidence.  Disputed to the extent that Defendant is suggesting that "teaching educators how to

develop QR goals, QR lesson plans and best-practices for teaching numeracy in their classes" is

any more important than how to develop assessment materials.  (Suppl. Wilder Decl. ¶ 31; ECF

No. 36-6, Pl's Ex. 6 at P000178 (explaining that "[c]reat[ing]/adapt[ing] a QR assessment

plan/instrument" is one of the key parts of "The Learning/Assessment Cycle").)  *See also infra*

Resp. to ¶ 57.

     **57.**     Unit Seven and the Subunit 7H Materials related to assessment – determining

whether an educator's QR-related materials and lessons had actually improved their students'

numeracy skills. Although assessment is important, it is not the core or key part of the NICE

Project. (Hoiland Decl. ¶ 170.)

**RESPONSE**: The statement is not material to the Motion, and is not supported by admissible evidence. Disputed to the extent that Defendant states that "assessment is important, it is not the core or key part of the NICE Project." Indeed, the assessment assignment was characterized as one of the 3 "key tasks." (ECF No. 41-5, Hoiland Ex. 6 at ECF p. 3 of 11 ("The key tasks are as follows: 1. Articulate a set of QR learning goals for a lesson . . . 2. Create/adapt a QR lesson plan and exercise  . . . 3. Create/adapt a QR assessment plan and instrument . . ."); Suppl. Wilder Decl. ¶ 31; ECF No. 36-6, Pl's Ex. 6 at P000178 (explaining that "[c]reat[ing]/adapt[ing] a QR assessment plan/instrument" is one of the key parts of "The Learning/Assessment Cycle").) In many ways, the assessment assignment was even more important than the other two "key tasks" since it was responsible for generating "the assessment data that faculty gather in their QR-infused courses" that could then be used to "evaluate the effectiveness of the program." (ECF No. 36-6, Pl's Ex. 6 at P000179; Suppl. Wilder Decl. ¶ 31.)

58.     Unit Eight focused on culture, gender, and race in an effort to better understand from a social-science perspective disparities in mathematics performance and factors that fuel these disparities. (Hoiland Decl. ¶ 67.)

**RESPONSE**: The statement is not material to the Motion. Disputed to the extent that the statement is incomplete; Unit 8 also focused on helping faculty to understand ways to address stereotype threat and how one's experience impacts attitudes towards math and numeracy. (Suppl. Wilder Decl. ¶ 17.)

59.     As Principal Investigator at Hostos and co-Director of the NICE Project, Dr. Hoiland's duties and responsibilities included: (a) recruiting Faculty Participants; (b) co-supervising and managing the in-person aspects of the NICE Course; (c) reviewing and commenting on all tasks and assignments submitted by Faculty Participants; (d) addressing

questions and issues relating to Faculty Participants; (e) collecting data; (f) analyzing and reporting on collected data; and (g) presenting at professional conferences about the NICE Project. (Hoiland Decl. ¶ 68.)

**RESPONSE**: The statement is not material to the Motion; indeed, Defendant does not cite to this statement in her MOL. Disputed to the extent that the statement is incomplete, and to the extent that Defendant is suggesting that she was expected to disseminate the NICHE materials at national conferences; Dr. Hoiland was expected to disseminate her own research ***results*** generated from the NICE Project.  *See supra* Resp. to ¶¶ 33–40; (*see also* ECF No. 36-6, Pl's Ex. 6 at P000181, 199).

60.     As Principal Insvestigator [sic] at Hostos and co-Director of the NICE Project, Dr. Hoiland was obligated to present at professional conferences about the NICE Project in order to inform higher-education educators, administrators and others about the NICE Course and the Course Materials and make the training program and Course Materials as widely available as possible. (Hoiland Decl. ¶¶ 68-69.)

**RESPONSE**: The statement is not material to the Motion; indeed, Defendant does not cite to this statement in her MOL. Disputed to the extent that Defendant is suggesting that she was expected to disseminate the NICHE materials at national conferences; Dr. Hoiland was expected to disseminate her own research ***results*** generated from the NICE Project.  *See supra* Resp. to ¶¶ 33–40.

61.     As Principal Investigator at Hostos and co-Director of the NICE Project, Dr. Hoiland considered it to be important for her to make presentations at professional conferences about the NICE Project because (a) she was obligated to do so under the NSF grant, and (b) she considered the NICE Course (and the associated Course Materials) to be an effective faculty-

development program that could have a positive impact on faculty and students at HSIs and community colleges. (Hoiland Decl. ¶ 72.)

**RESPONSE**: The statement is not material to the Motion; indeed, Defendant does not cite to this statement in her MOL. Disputed to the extent that Defendant is suggesting that she was expected to disseminate the NICHE materials at national conferences; Dr. Hoiland was expected to disseminate her own research ***results*** generated from the NICE Project. *See supra* Resp. to ¶¶ 33–40.

62.    On or around June 1, 2018, Dr. Hoiland submitted a presentation proposal (the "CCCLA Proposal") to the Community College Conference on Learning Assessment (the "CCCLA"). (Hoiland Decl. ¶ 73.)

**RESPONSE**: Undisputed.

63.    The CCCLA was not intended as a forum for presenting professional research and scholarly papers; it was primarily offered as an opportunity for community-college educators and administrators to improve their pedagogical skills and network with colleagues. (Hoiland Decl. ¶ 74.)

**RESPONSE**: The statement is not material to the motion, and relies on inadmissible hearsay, not admissible evidence. Disputed to the extent that Defendant's proposal stated that Defendant would be "presenting preliminary assessment results," which was used in the NICE program for the PIs for research purposes. (ECF No. 37-2, Pl's Ex. 17 at D0001.)

64.    Because the CCCLA was a community-college conference and it concerned learning assessment – a topic covered in Unit 7 of the Course Materials – Dr. Hoiland determined that the CCCLA provided an excellent opportunity to: (a) comply with her obligation to speak about the NICE Project at professional conferences; and (b) impart information about the NICE

Project and the Course Materials that could have a positive impact on faculty and students at community colleges. (Hoiland Decl. ¶ 75.)

**RESPONSE**: The statement is not material to the Motion. Disputed to the extent that Defendant is suggesting that presenting the NICHE materials complied "with her obligation to speak about the NICE project at professional conferences"—Dr. Hoiland was expected to disseminate her own research *results* generated from the NICE Project, not NICHE instructional materials she did not author. *See supra* ¶ 11 ("Dr. Hoiland did not have any role in or involvement with the NICHE Project, and she was not the author of any of the Course Materials."); *see also supra* Resp. to ¶¶ 33–40.

65.   In the CCCLA Proposal, Dr. Hoiland titled her planned session "Assessing Numeracy in a Faculty Development Program," and she identified the target audience as "Teaching Faculty." (Hoiland Decl. ¶ 76.)

**RESPONSE**: The statement is not material to the Motion. Disputed to the extent that the statement is incomplete; Defendant's proposal identified her target audience as "Academic Affairs Professionals[;] Institutional Effectiveness Professionals[; and] Teaching Faculty." (ECF No. 37-2, Pl's Ex. 17 at D0001.)

66.   The CCLA Proposal stated, in part, as follows:

This section will focus attention on strategies for assessing quantitative reasoning (QR) at community colleges. The presenter is one of two principal investigators of a National Science Foundation (NSF) faculty development program titled Numeracy Infusion for College Educators (NICE).

The CCLA Proposal further stated:

In promoting the infusion of numeracy across the curriculum at CUNY, with specific attention to assessment, we will discuss both the challenges and successes we have encountered. Numeracy is tied to upward social mobility and we see our faculty development program as a way to infuse numeracy, using high impact practices and clear assessment tools, and help create more numerate students and citizens. (Hoiland Decl. ¶ 77.)

**RESPONSE**: The statement is not material to the Motion. Disputed to the extent that the quotations are merely excerpts of the proposal and do not include the full text of the proposal. Disputed to the extent that Defendant is suggesting that mentioning she was "one of two principal investigators" was giving Plaintiff authorship credit.  (*See, e.g.*, ECF No. 37-2, Pl's Ex. 17 at D0003 ("Will You Have Any Co-Presenters . . . No"); *see also* Pl's SOF ¶ 54.)

67.     The CCCLA Proposal listed the following three primary learning objectives for Dr. Hoiland's presentation: (1) "To share best practices in faculty development related to assessment"; (2) "To disseminate assessment results of our QR/QL faculty development program"; and (3) "To discuss the challenges and successes related to assessment in the community college context." (Hoiland Decl. ¶ 78.)

**RESPONSE**: Undisputed but not material to the Motion.

68.     On July 26, 2018, Hoiland was informed that she had been accepted to present at the CCCLA, which was scheduled to proceed in February 2019. (Hoiland Decl. ¶ 79.)

**RESPONSE**: Undisputed, but not material to the Motion.

69.     On July 27, 2018, Dr. Hoiland forwarded the correspondence concerning the CCCLA acceptance, which included the presentation title "Assessing Numeracy in a Faculty Development Program," to Dr. Wilder. Dr. Hoiland asked Dr. Wilder if she wanted to co-present with Dr. Hoiland. (Hoiland Decl. ¶ 80.)

**RESPONSE**: Disputed to the extent that the statement implies that Defendant's forwarding of the correspondence constituted a genuine "invitation" to co-present. Defendant asked if Plaintiff "had any interest in co-presenting" only after she had forwarded her acceptance letter to the conference with her name alone on it, and stated her intention to attend.  (ECF No. 36-6, Pl's Ex. 6 at P000428; *see also* Pl's SOF ¶ 61.) At that point in time, Defendant had already submitted her proposal for

the conference and had indicated "No" in response to the question, "Will You Have Any Co-Presenters" (ECF No. 37-2, Pl's Ex. 17 at D0003; *see also* Pl's SOF ¶ 54.)  Defendant did not provide Plaintiff with an abstract or a copy of her CCLA PowerPoint at that time. (ECF No. 37-5, Pl's Ex. 20, Hoiland Tr. 189:18–20; *see also* Pl's SOF ¶ 62.)

**70.**     The CCCLA is not a prestigious conference. (Hoiland Decl. ¶ 81.)

**RESPONSE**: Disputed and not material to the Motion.  Defendant herself described the CCLA Conference as a "great conference" with a "semi-competitive proposal selection process." (ECF No. 36-12, Pl's Ex. 12 at P000428.)   In addition, CCLA Conference in 2019 featured two nationally-renowned keynote speakers, including Claude Steele (Professor of Psychology at Stanford University) and Deborah A. Santiago (CEO, Excelencia in Education). (https://web.archive.org/web/20190128202556/https://conferences.valenciacollege.edu/learning-assessment/ (CCLA Conference webpage as of January 28, 2019 per the Wayback Machine).)

**71.**     Dr. Wilder has never presented at a community-college conference. (Hoiland Decl. ¶ 82.)

**RESPONSE**: Disputed and not material to the Motion. Plaintiff has a longstanding commitment to collaborating with community college faculty, and has presented at several community college events, including: (1) giving the keynote talk for a virtual workshop on quantitative reasoning at Treasure Valley Community College in 2020; (2) participating as a panelist at an NSF-sponsored workshop entitled, "Lessons Learned – Insights from HSI Awardees" at the Borough of Manhattan Community College in 2019; and (3) co-presenting with her colleague, Frank Wang, at a conference sponsored by Science Education for New Civic Responsibilities and Engagement (SENCER) at LaGuardia Community College in 2014. (https://www.lehman.edu/academics/sociology/documents/2022-CV-Esther-Wilder.pdf.)

**72.**     Dr. Wilder declined to co-present with Dr. Hoiland at the CCCLA. (Hoiland Decl. ¶ 81.)

**RESPONSE**: Undisputed that Plaintiff declined Defendant's invitation to co-present, having had no input into the submission and having other commitments. (Pl's SOF ¶ 63; 3/28 Wilder Decl. ¶ 69.)  Disputed to the extent that Defendant is suggesting that Plaintiff expected Defendant to present NICHE materials at the CCLA Conference; Plaintiff expected that Defendant would be presenting her own work.  (Suppl. Wilder Decl. ¶ 43.)

**73.**     Dr. Wilder had no interest in presenting at the CCCLA. (Hoiland Decl. ¶ 81.)

**RESPONSE**: The statement is not material to the Motion.  Undisputed that Plaintiff declined Defendant's invitation to co-present, having had no input into the submission and having other commitments. (Pl's SOF ¶ 63; 3/28 Wilder Decl. ¶ 69.) Among other commitments, Plaintiff had childcare responsibilities that interfered with her attending the February 17–19 conference in Florida, since her children needed to attend school in New York on two of those days. (Suppl. Wilder Decl. ¶ 44.)  Disputed to the extent that Defendant is suggesting that Plaintiff had "no interest," under any circumstances, in presenting at the CCLA Conference; the email cited by Defendant does not support that conclusion.

**74.**     From February 17 to February 19, 2019, Dr. Hoiland attended the CCCLA in Florida. (Hoiland Decl. ¶ 83.)

**RESPONSE**: Undisputed, but not material to the Motion.

**75.**     At the CCCLA, Dr. Hoiland gave a presentation on "Assessing Numeracy in a Faculty Development Program" during a breakout session (the "Presentation"). (Hoiland Decl. ¶ 83.)

**RESPONSE**: Undisputed.

**76.**     Dr. Hoiland was the sole presenter at the Presentation. (Hoiland Decl. ¶ 83.)

**RESPONSE**: The statement is not material to the Motion; indeed, Defendant does not cite to this statement in her MOL. Undisputed that, at the time Defendant gave the presentation, she was the sole presenter attending the Conference and represented herself as the sole presenter to the audience and to the attendees of the Conference who were provided copies of the CCLA PowerPoint. Disputed to the extent that both Plaintiff and Dr. Crystal Rodriguez were later (belatedly) recognized as co-presenters in absentia due to their (unknowing and unauthorized) contributions to the presentation. (*See, e.g.*, 3/28 Wilder Decl. ¶¶ 83–84; ECF No. 36-15, Pl's Ex. 15 at P000475.)

**77.**     The CCCLA did not pay Dr. Hoiland for giving the Presentation or reimburse her for travel expenses. (Hoiland Decl. ¶ 83.)

**RESPONSE**: Undisputed that Defendant did not receive monetary compensation from Valencia College or the organizers of the CCLA Conference in exchange for giving the presentation. Disputed to the extent that Defendant did receive compensation in the form of scholarly recognition for her presentation, which has significant value in academia. (Pl's SOF ¶ 100; 3/28 Wilder Decl. ¶ 101.)

**78.**     The Presentation was informal and was attended by 12-20 conference attendees (the "Attendees"). (Hoiland Decl. ¶ 84.)

**RESPONSE**: The statement is not material to the Motion. Disputed to the extent that the CCLA Conference was a formal professional conference, and Defendant's presentation was not "informal"; indeed, Defendant included it on Defendant's presentation at the CCLA Conference added such an authorship credit to her resume. (Pl's SOF ¶ 101; ECF No. 37-5, Pl's Ex. 20, Hoiland Tr. at 27; 81:9–12, 234:18–235:24, 236:19–237:6; *see also id.* at 169:20–170:3; ECF No.

36-18, Pl's Ex. 18, D88–103 at D0094.)  The statement is not supported by admissible evidence. Disputed to the extent that Defendant has admitted that her recollection of the event is lacking. (*See, e.g.*, ECF No. 37-5, Pl's Ex. 20, Hoiland Tr., 119:2–11 (Defendant testifying that she "can't say for certain" how many people attended her presentation at the CCLA Conference); *compare id.* at 119:12–15 (Defendant testifying that she did not know any of the attendees of her presentation), *with* Hoiland Decl. ¶ 84 (Defendant testifying that "all of the Attendees were faculty instructors from community colleges, along with a few administrators").)

**79.**     The Presentation concerned, in its entirety, the NICE Project. (Hoiland Decl. ¶ 84.)

**RESPONSE**: This statement contradicts other statements herein, including ¶ 100 *infra*, in which Defendant claims that she discussed the NICHE Project. Otherwise, undisputed.

**80.**     Dr. Hoiland did not focus the Presentation on the first six Units of the NICE Course, which concerned the core parts of the course: developing QR learning goals, developing QR lessons, and learning best practices for teaching QR. (Hoiland Decl. ¶¶ 85-107.)

**RESPONSE**: The statement is not supported by admissible evidence.  Disputed as to the characterization of the "the first six Units of the NICE Course" as "the core parts of the course." *See supra* Resp. to ¶¶ 55–56.) Disputed to the extent that Defendant stated in her proposal for her presentation at the CCLA Conference that she would "discuss how faculty develop QR learning goals, QR assignments, and QR assessments." (ECF No. 37-2, Pl's Ex. 17 at D0002.)  Slide 7 of the CCLA PowerPoint includes the titles of the each of the units.  (ECF No. 36-3, Pl's Ex. 3 at D0240.)

**81.**     Dr. Hoiland focused the Presentation on assessment – Unit 7 of the Course Materials – which involved developing assessment tools to determine whether and to what extent QR goals have actually been met. (Hoiland Decl. ¶¶85-107.)

**RESPONSE**: The statement is not material to the Motion; indeed, Defendant does not cite to this statement in her MOL. The statement is not supported by admissible evidence.  Disputed to the extent that the CCLA PowerPoint mentions the two other core tasks of NICE. (ECF No.36-3, Pl's Ex.3 at D0240 ("NICE Tasks (QR Learning Goals, QR Assignment, QR Assessment.)").)

82.     During the Presentation, Dr. Hoiland used a PowerPoint slide deck that she had prepared in advance as a visual aid (the "CCCLA Slides" and each, a "Slide"). (Hoiland Decl. ¶ 85.)

**RESPONSE**: Undisputed.

83.     During the Presentation, the CCCLA Slides were shown, one at a time, on a screen. (Hoiland Decl. ¶ 85.)

**RESPONSE**: Undisputed.

84.     Slides 1-4 were introductory Slides. On Slide 1, Hoiland identified the title of the Presentation and listed herself, her title and her employer. (Hoiland Decl. ¶ 86.)

**RESPONSE**: The statement is not material to the Motion; indeed, Defendant does not cite to this statement in her MOL. Otherwise, undisputed.

85.     Slide 2 contains a brief summary of the NICE Project and identifies research questions Dr. Wilder and Dr. Hoiland had been addressing. (Hoiland Decl. ¶ 87.)

**RESPONSE**: The statement is not material to the Motion; indeed, Defendant does not cite to this statement in her MOL. Disputed to the extent that Defendant is suggesting that she authored text on Slide 2; the "research questions" had been written by Plaintiff for the NICE proposal and did not include any edits from Defendant. (*Compare* ECF No. 36-3, Pl's Ex. 3 at D0235, *with* ECF No. 36-6, Pl's Ex. 6 at P000171; ECF No. 37-5, Pl's Ex. 20, Hoiland Tr. 87:11–89:8.)  Also disputed to the extent that the statement's description of Slide 2 is incomplete; for example, Slide

2 included a link specifying "What is NICE?" that linked only to Dr. Hoiland's NSF award, and did not reference Plaintiff. (ECF No. 37-5, Pl's Ex. 20, Hoiland Tr. 84:20–87:10.)

86.     Slides 3 and 4 each contain a photograph showing Faculty Participants in the NICE Project and members of the NICE Project team. Dr. Wilder appears and is seated on the far left in the photo in Slide 3, and she is standing and on the far left in the photo in Slide 4. (Hoiland Decl. ¶ 87-89.)

**RESPONSE**: The statement is not material to the Motion; indeed, Defendant does not cite to this statement in her MOL. Disputed to the extent that Defendant is suggesting that inclusion of Plaintiff in a group photograph amounts to a form of citation. Otherwise, undisputed.

87.     Slides 5-6 relate to a workshop conducted with Faculty Participants as part of the NICE Project. (Hoiland Decl. ¶¶ 96.)

**RESPONSE**: The statement is not material to the Motion; indeed, Defendant does not cite to this statement in her MOL. Disputed to the extent that Defendant is suggesting that the content on these slides reflects Defendant's original work; Slide 5 describes a workshop conceived and planned by the NICHE team and Slide 6 includes data from the Critical thinking Assessment Test, some of which Plaintiff had sent to Defendant prior to Defendant's inclusion of the data in the CCLA PowerPoint.

88.     Slide 7 contains a summary of the eight Units of the NICE Project that are available online through Blackboard, an online educational platform. (Hoiland Decl. ¶ 97.)

**RESPONSE**: The statement is not material to the Motion; indeed, Defendant does not cite to this statement in her MOL. Disputed to the extent that Defendant is suggesting that the content on these slides reflects Defendant's original work; the names of all the units were created by Plaintiff and her NICHE collaborators.

89.     Slide 8 is titled "How to Develop a QR Assessment Instrument." (Hoiland Decl. ¶ 98.)

**RESPONSE**: The statement is not material to the Motion; indeed, Defendant does not cite to this statement in her MOL.  Disputed to the extent that Defendant is suggesting that the content on these slides reflects Defendant's original work; the content of this slide was copied verbatim from a webpage authored by Plaintiff before she had ever met Defendant. (https://web.archive.org/web/20151001022938/https://serc.carleton.edu/NICHE/assessing_qr.html (webpage as of October 1, 2015 per the Wayback Machine).)

90.     Slide 8 contains a link to the "NICE/NICHE Teach QR" website (the "Website"). The Website clearly identified Dr. Wilder as the director and main contact person on the NICE Project. (Hoiland Decl. ¶ 99.)

**RESPONSE**: The statement is not material to the Motion; indeed, Defendant does not cite to this statement in her MOL. Disputed.  The website does not (and did not as of February 2019) identify Plaintiff as the director, as the main contact person, or at all. (https://web.archive.org/web/20191214180228/https://serc.carleton.edu/NICHE/index.html (website as of December 14, 2019 per the Wayback Machine), https://web.archive.org/web/20170716214252/http://serc.carleton.edu/NICHE/index.html (website as of July 16, 2017 per the Wayback Machine).)

91.     Slides 9-10 contain portions of the actual text on assessment from the Course Materials for Unit 7 – the Subunit 7H Materials. (Hoiland Decl. ¶ 100.)

**RESPONSE**: Undisputed. *See also* Resp. to ¶ 54 *supra* (explaining that these materials also appeared in other areas of the NICHE/NICE instructional materials); (Pl's SOF ¶¶ 75–76 (identifying the text on Slides 9 and 10 that was copied from Plaintiff's Copyrighted Work)).

92.     Slide 10 includes advice Dr. Hoiland added for purposes of the Presentation: "Keep it simple: pre/post, three questions, and a scoring rubric." (Hoiland Decl. ¶ 100.)

**RESPONSE**: Disputed to the extent that Defendant is suggesting that quoted sentence reflects Defendant's original work rather than an attempt to summarize the content on Slides 9–10 in a few words. (*See, e.g.*, ECF No. 36-1, Pl's Ex. 1 (under the "QR Assessment Instrument" heading, Plaintiff's Copyrighted Work discusses a "pre-test/post-test" and stressed "KEEP YOUR ASSESSMENT INSTRUMENT SIMPLE and include only 3 questions/scoring rubrics"); *accord* ECF No. 36-3, Pl's Ex. 3 at D0242 (Slide 9).)

93.     Slides 11-13 contain portions of the actual text on assessment from the Subunit 7H Materials. (Hoiland Decl. ¶ 101.)

**RESPONSE**: Undisputed. *See also* Resp. to ¶ 54 *supra* (explaining that these materials also appeared in other areas of the NICHE/NICE instructional materials); (Pl's SOF ¶¶ 77–79 (identifying the text on Slides 11–13 that was copied from Plaintiff's Copyrighted Work)).

94.     Slide 13 includes advice Dr. Hoiland added for purposes of the Presentation: "Clarity, alignment, generalizability, validity, and soundness." (Hoiland Decl. ¶ 101.)

**RESPONSE**: The statement is not material to the Motion; indeed, Defendant does not cite to this statement in her MOL. Disputed to the extent that Defendant is suggesting that quoted sentence reflects Defendant's original work rather than an attempt to summarize the content on Slides 11–13 in a few words. (*See, e.g.*, ECF No. 36-1, Pl's Ex. 1 (under the "Guidelines for Developing and Providing Feedback on QR Assessment Instrument" heading, Plaintiff's Copyrighted Work recommends assessing whether "the assessment instrument . . . clear . . . How do the skills assessed in the instrument correspond to the QR learning goals . . . Does the QR assessment instrument extend beyond just being a math skills test . . . Is the assessment instrument valid . . . Is the

instrument sound?"); *accord* ECF No. 36-3, Pl's Ex. 3 at D0244–245 (Slides 11–12).)

95.    Dr. Wilder told the Attendees that Slides 9-13 contained actual excerpts of the Course Materials. (Hoiland Decl. ¶ 103.)

**RESPONSE**: The statement is not material to the Motion; indeed, Defendant does not cite to this statement in her MOL. The statement is not supported by admissible evidence.  Disputed to the extent that Defendant has admitted that her recollection of the event is lacking.  (*See, e.g.*, ECF No. 37-5, Pl's Ex. 20, Hoiland Tr., 119:2–11 (Defendant testifying that she "can't say for certain" how many people attended her presentation at the CCLA Conference); *compare id.* at 119:12–15 (Defendant testifying that she did not know any of the attendees of her presentation), *with* Hoiland Decl. ¶ 84 (Defendant testifying that "all of the Attendees were faculty instructors from community colleges, along with a few administrators").)

96.    Slides 14-19 show a sample assessment exercise created by Dr. Crystal Rodriguez, one of the Faculty Participants, as part of the NICE Course. (Hoiland Decl. ¶ 104.)

**RESPONSE**: The statement is not material to the Motion; indeed, Defendant does not cite to this statement in her MOL. Undisputed.

97.    In addition to serving as Principal Investigator and co-Director of the NICE Project, Dr. Hoiland took the course herself and incorporated her QR lesson plan and assessment materials into her Sociology 101 course at Hostos. (Hoiland Decl. ¶ 106.)

**RESPONSE**: The statement is not material to the Motion; indeed, Defendant does not cite to this statement in her MOL. Undisputed.

98.    Slides 20-21 relate to Dr. Hoiland's development of these QR plans and assessment materials, and the responses of certain of her students to assessment questions. (Hoiland Decl. ¶ 106.)

**RESPONSE**: The statement is not material to the Motion; indeed, Defendant does not cite to this statement in her MOL. Undisputed.

99.     Slide 22-23 contain photos from the "capstone" conference held after most of the Faculty Participants had completed the NICE Course. Dr. Wilder appears in the group photo on Slide 22; Dr. Wilder and Dr. Hoiland are behind the dais in the photo in the lower right corner on Slide 23. (Hoiland Decl. ¶ 107.)

**RESPONSE**: The statement is not material to the Motion; indeed, Defendant does not cite to this statement in her MOL. Disputed to the extent that Defendant is suggesting that inclusion of Plaintiff in a group photograph amounts to a form of citation. Otherwise, undisputed.

100.     During the Presentation, Dr. Hoiland described for the Attendees what the NICE Project was and explained that it was an offshoot and continuation of the NICHE Project. (Hoiland Decl. ¶¶ 85-107, 152-157.)

**RESPONSE**: This statement is not material to the Motion and is not supported by admissible evidence.  Disputed to the extent that Defendant has admitted that her recollection of the event is lacking.  (*See, e.g.*, ECF No. 37-5, Pl's Ex. 20, Hoiland Tr., 119:2–11 (Defendant testifying that she "can't say for certain" how many people attended her presentation at the CCLA Conference); *compare id.* at 119:12–15 (Defendant testifying that she did not know any of the attendees of her presentation), *with* Hoiland Decl. ¶ 84 (Defendant testifying that "all of the Attendees were faculty instructors from community colleges, along with a few administrators").)

101.     During the Presentation, Dr. Hoiland told the Attendees that the NICE Project used the same Course Materials that were developed and used in connection with the NICHE Project. (Hoiland Decl. ¶¶ 85-107, 152-157.)

**RESPONSE**: This statement is not material to the Motion and is not supported by admissible

evidence. Disputed to the extent that Defendant has admitted that her recollection of the event is lacking. (*See, e.g.*, ECF No. 37-5, Pl's Ex. 20, Hoiland Tr., 119:2–11 (Defendant testifying that she "can't say for certain" how many people attended her presentation at the CCLA Conference); *compare id.* at 119:12–15 (Defendant testifying that she did not know any of the attendees of her presentation), *with* Hoiland Decl. ¶ 84 (Defendant testifying that "all of the Attendees were faculty instructors from community colleges, along with a few administrators").)

102.    During the Presentation, Dr. Hoiland introduced herself and described her role as Principal Investigator on the Hostos grant and co-Director of the NICE Project. (Hoiland Decl. ¶¶ 85-107, 152-157.)

**RESPONSE**: This statement is not material to the Motion and is not supported by admissible evidence. Disputed to the extent that Defendant has admitted that her recollection of the event is lacking. (*See, e.g.*, ECF No. 37-5, Pl's Ex. 20, Hoiland Tr., 119:2–11 (Defendant testifying that she "can't say for certain" how many people attended her presentation at the CCLA Conference); *compare id.* at 119:12–15 (Defendant testifying that she did not know any of the attendees of her presentation), *with* Hoiland Decl. ¶ 84 (Defendant testifying that "all of the Attendees were faculty instructors from community colleges, along with a few administrators").)

103.    During the Presentation, Dr. Hoiland told the Attendees that she had not worked on or been involved in the NICHE Project and that she had joined a program in which the faculty development course and Course Materials were already in place. (Hoiland Decl. ¶¶ 85-107, 152-157.)

**RESPONSE**: This statement is not material to the Motion and is not supported by admissible evidence. Disputed to the extent that Defendant has admitted that her recollection of the event is lacking. (*See, e.g.*, ECF No. 37-5, Pl's Ex. 20, Hoiland Tr., 119:2–11 (Defendant testifying that

she "can't say for certain" how many people attended her presentation at the CCLA Conference); *compare id.* at 119:12–15 (Defendant testifying that she did not know any of the attendees of her presentation), *with* Hoiland Decl. ¶ 84 (Defendant testifying that "all of the Attendees were faculty instructors from community colleges, along with a few administrators").)

104.    During and after the Presentation, Dr. Hoiland spoke at length to Attendees about Dr. Wilder. (Hoiland Decl. ¶¶ 85-107, 152-157.)

**RESPONSE**: This statement is not material to the Motion and is not supported by admissible evidence.  Disputed to the extent that Defendant has admitted that her recollection of the event is lacking.  (*See, e.g.*, ECF No. 37-5, Pl's Ex. 20, Hoiland Tr., 119:2–11 (Defendant testifying that she "can't say for certain" how many people attended her presentation at the CCLA Conference); *compare id.* at 119:12–15 (Defendant testifying that she did not know any of the attendees of her presentation), *with* Hoiland Decl. ¶ 84 (Defendant testifying that "all of the Attendees were faculty instructors from community colleges, along with a few administrators").)

105.    During the Presentation, Dr. Hoiland identified [sic] Dr. Wilder by name, identified her status as a professor at Lehman College, and pointed her out in photos in the CCCLA Slides. (Hoiland Decl. ¶¶ 85-107, 152-157.)

**RESPONSE**: This statement is not material to the Motion and is not supported by admissible evidence.  Disputed to the extent that Defendant has admitted that her recollection of the event is lacking.  (*See, e.g.*, ECF No. 37-5, Pl's Ex. 20, Hoiland Tr., 119:2–11 (Defendant testifying that she "can't say for certain" how many people attended her presentation at the CCLA Conference); *compare id.* at 119:12–15 (Defendant testifying that she did not know any of the attendees of her presentation), *with* Hoiland Decl. ¶ 84 (Defendant testifying that "all of the Attendees were faculty instructors from community colleges, along with a few administrators").)

**106.** During and after the Presentation, Dr. Hoiland told Attendees about Dr. Wilder's leading and instrumental role on both the NICHE Project and the NICE Project. Dr. Hoiland explained that Dr. Wilder had created, developed and was the driving force behind the NICHE Project; and that Dr. Wilder was also the driving force behind the NICE Project, which used the same Course Materials. (Hoiland Decl. ¶¶ 85-107, 152-157.)

**RESPONSE**: This statement is not material to the Motion and is not supported by admissible evidence. Disputed to the extent that Defendant has admitted that her recollection of the event is lacking. (*See, e.g.*, ECF No. 37-5, Pl's Ex. 20, Hoiland Tr., 119:2–11 (Defendant testifying that she "can't say for certain" how many people attended her presentation at the CCLA Conference); *compare id.* at 119:12–15 (Defendant testifying that she did not know any of the attendees of her presentation), *with* Hoiland Decl. ¶ 84 (Defendant testifying that "all of the Attendees were faculty instructors from community colleges, along with a few administrators").)

**107.** Dr. Hoiland provided the CCCLA Slides to the organizers of the CCCLA in advance of the conference. (Hoiland Decl. ¶ 108.)

**RESPONSE**: Undisputed, but not material to the Motion; indeed, Defendant does not cite to this statement in her MOL.

**108.** Dr. Hoiland received correspondence from the CCCLA organizers indicating that the CCCLA Slides would be made available on a password-protected website for conference attendees to access. (Hoiland Decl. ¶ 108.)

**RESPONSE**: Undisputed. *See also* Pl's SOF ¶ 55 (Defendant acknowledged that her presentation materials would be available on a private website for attendees to download); (Ex. 26, Def's Resp. to Pl's RFA No. 3 ("Dr. Hoiland admits that the Slides were available to registered attendees of the CCCLA Conference")).

**109.** Dr. Hoiland did not look at the CCCLA website, and she did not access the CCCLA Slides through the CCCLA website. (Hoiland Decl. ¶ 110.)

**RESPONSE**: The statement is not material to the Motion; indeed, Defendant does not cite to this statement in her MOL. Otherwise, undisputed. (*Cf.* Ex. 26, Def's Resp. to Pl's RFA No. 3 ("Dr. Hoiland admits that the Slides were available to registered attendees of the CCCLA Conference")).

**110.** Dr. Hoiland does not have personal knowledge as to whether the CCCLA Slides were actually made available on a conference website or distributed to conference attendees in any other manner. (Hoiland Decl. ¶ 111.)

**RESPONSE**: The statement is not material to the Motion; indeed, Defendant does not cite to this statement in her MOL. Despite Defendant's purported lack of "personal knowledge," Defendant acknowledged that her presentation materials would be available on a private website for attendees to download (Pl's SOF ¶ 55; ECF No. 37-2, Pl's Ex. 17, D01–03 at D02; ECF No. 37-5, Pl's Ex. 20, Hoiland Tr. 108:10–110:6)); contractually agreed that the organizers of the CCLA Conference could "post[] [the CCLA PowerPoint] online for downloading on the Conference website and mobile application for Conference participants (ECF No. 36-8, Pl's Ex. 8); and admitted for purposes of this action that "that the Slides were available to registered attendees of the CCCLA Conference" (Ex. 26, Def's Resp. to Pl's RFA No. 3).

**111.** Dr. Hoiland does not recall seeing any of the Attendees of the Presentation: (a) with printed copies of the CCCLA Slides; or (b) using laptops during the Presentation. (Hoiland Decl. ¶ 112.)

**RESPONSE**: The statement is not material to the Motion; indeed, Defendant does not cite to this statement in her MOL. The statement is not supported by admissible evidence. Disputed to the extent that Defendant has admitted that her recollection of the event is lacking. (*See, e.g.*, ECF

No. 37-5, Pl's Ex. 20, Hoiland Tr., 119:2–11 (Defendant testifying that she "can't say for certain" how many people attended her presentation at the CCLA Conference); *compare id.* at 119:12–15 (Defendant testifying that she did not know any of the attendees of her presentation), *with* Hoiland Decl. ¶ 84 (Defendant testifying that "all of the Attendees were faculty instructors from community colleges, along with a few administrators").)

112.    Dr. Hoiland has personal knowledge of only one public use of the CCCLA Slides – as visual aids that were shown on a screen to 12-20 Attendees during the Presentation. (Hoiland Decl. ¶ 113.)

**RESPONSE**: The statement is not material to the Motion; indeed, Defendant does not cite to this statement in her MOL. Undisputed that Defendant publicly displayed the CCLA PowerPoint at the CCLA Conference.  Otherwise, denied to the extent that Defendant is suggesting that the CCLA PowerPoint were not otherwise distributed.  *See supra* Resp. to ¶ 110; (*see also, e.g.*, ECF No. 36-13, Pl's Ex. 13 at P000482 ("[A]ttendees were given access to the drive at the conference, where Sarah's original PowerPoint was available"); Ex. 27 at P000603 (CCLA Conference organizer explaining that there were 237 attendees at the Conference)).

113.    There is no non-hearsay evidence in the record of this litigation that the CCCLA Slides were actually made available to conference attendees on a website or in any other way. (Hoiland Decl. ¶¶ 111-113.)

**RESPONSE**: The statement is not a "fact" supported by evidence.  The statement is not material to the Motion; indeed, Defendant does not cite to this statement in her MOL.  Disputed to the extent that no reasonable fact finder could agree that the CCLA PowerPoint was not made available to conference attendees: Defendant acknowledged that her presentation materials would be available on a private website for attendees to download (Pl's SOF ¶ 55; ECF No. 37-2, Pl's Ex.

17, D01–03 at D02; ECF No. 37-5, Pl's Ex. 20, Hoiland Tr. 108:10–110:6)); contractually agreed that the organizers of the CCLA Conference could "post[] [the CCLA PowerPoint] online for downloading on the Conference website and mobile application for Conference participants (ECF No. 36-8, Pl's Ex. 8); and admitted for purposes of this action that "that the Slides were available to registered attendees of the CCCLA Conference" (Ex. 26, Def's Resp. to Pl's RFA No. 3); (*see also, e.g.*, ECF No. 36-13, Pl's Ex. 13 at P000482 ("[A]ttendees were given access to the drive at the conference, where Sarah's original PowerPoint was available"); Ex. 27 at P000603 (CCLA Conference organizer explaining that there were 237 attendees at the Conference)).

**114.**     There is no evidence of any kind in the record of this litigation that any attendees of the CCCLA saw the CCCLA Slides in any fashion, except as they were shown on a screen during the Presentation. (Hoiland Decl. ¶¶ 111-113.)

**RESPONSE**: The statement is not a "fact" supported by evidence.  The statement is not material to the Motion; indeed, Defendant does not cite to this statement in her MOL. Undisputed that the CCLA PowerPoint were shown on a screen by Defendant during her presentation at the CCLA Conference, and undisputed that no party conducted a forensic analysis of how many attendees of the CCLA Conference independently downloaded a copy of the CCLA PowerPoint that was made available to them through the CCLA Conference's website.  Disputed to the extent that no reasonable fact finder could agree that, out of the approximately 237 attendees that were given access to the CCLA PowerPoint, none of them accessed the PowerPoint: Defendant acknowledged that her presentation materials would be available on a private website for attendees to download (Pl's SOF ¶ 55; ECF No. 37-2, Pl's Ex. 17, D01–03 at D02; ECF No. 37-5, Pl's Ex. 20, Hoiland Tr. 108:10–110:6)); contractually agreed that the organizers of the CCLA Conference could "post[] [the CCLA PowerPoint] online for downloading on the Conference website and mobile application for Conference participants (ECF No. 36-8, Pl's Ex. 8); and admitted for purposes of this action that

"that the Slides were available to registered attendees of the CCCLA Conference" (Ex. 26, Def's Resp. to Pl's RFA No. 3); (*see also, e.g.*, ECF No. 36-13, Pl's Ex. 13 at P000482 ("[A]ttendees were given access to the drive at the conference, where Sarah's original PowerPoint was available"); Ex. 27 at P000603 (CCLA Conference organizer explaining that there were 237 attendees at the Conference)).

115.    On August 5, 2019, Hoiland willingly and without concerns shared the CCCLA Slides with Dr. Wilder in the context of an email chain discussing a different presentation proposal. (Hoiland Decl. ¶ 114.)

**RESPONSE**: This statement is not material to the Motion. Undisputed that Defendant sent the CCLA PowerPoint to Plaintiff as an attachment to an email dated August 5, 2019.  Otherwise, disputed as not supported by admissible evidence.

116.    From August 6 to August 10, Dr. Wilder and Dr. Hoiland exchanged emails regarding the CCCLA Slides (the "August 2019 Emails"). In the August 2019 Emails, Dr. Wilder stated, among other things, that: (a) Dr. Hoiland was "trying to take over" the NICE Project; (b)  Dr. Hoiland had presented at the CCCLA as the "sole author"; (c) certain of the CCCLA Slides had been "taken verbatim" from the NSF Proposal or the Course Materials; (d) Dr. Wilder "felt bad that [Dr. Hoiland] had not even acknowledged" Dr. Wilder; (e) Dr. Hoiland had not given Dr. Wilder proper "credit" and should have provided a written citation to Dr. Wilder on each Slide that contained or referenced text she had authored; (f) Dr. Wilder should have been given "co-authorship" status on the CCCLA Slides; and (g) the CCCLA Slides, in Dr. Wilder's estimation, constituted a "form of plagiarism."  (Hoiland Decl. ¶¶ 114-116.)

**RESPONSE**: This statement does not comply with L.R. 56.1, at least because it includes multiple facts within a single numbered paragraph.  The statements are not material to the Motion. Disputed

to the extent that the quotations are merely snippets of emails and do not include the full email chain.

With respect to statement (a), disputed—the quoted statement relates to Plaintiff's response to Defendant's indication that she wished to apply for an extension of the NICE project that did not include Plaintiff.  (ECF No. 52, Hoiland Ex. 5 at P000448–449 (Plaintiff "I would prefer that you submit your own separate application to NSF rather than apply for an extension of the NICE project. An extension of the NICE project is really an extension of the NICHE project, which I developed. As it stands, I feel as if you are trying to take over a project that is mine.").)

With respect to statement (b), undisputed.

With respect to statement (c), disputed to the extent that the statement does not accurately reflect the quoted email; undisputed that many of the slides were taken "verbatim" from text that Plaintiff had written.  (*Id.* at P000448.)

With respect to statement (d), disputed to the extent that Defendant is suggesting that the text of this email represented Plaintiff's full response to Dr. Hoiland's actions, but rather was a moderated response in an attempt to avoid escalating the situation.  (Suppl. Wilder Decl. ¶ 46.)

With respect to statements (e) and (f), disputed to the extent that Defendant is suggesting that Defendant did not need to obtain Plaintiff's permission to use such a large portion of Plaintiff's work.  (*See, e.g.*, ECF No. 52, Hoiland Ex. 5 at P000448–449 ("I was genuinely surprised by the extent to which my NICHE and NICE work was used but not acknowledged in your presentation. I think the norm in this situation would be to include me as a co-author. I'm also disappointed that you're presenting on the data that were collected in response to my course design, and that I also have plans to present."); ECF No. 53, Hoiland Ex. 11 at P000453 ("I am not just concerned about getting credit for my role in the project, although that is important. My main concern is more

specific: approximately half the text slides that you presented were my work. How would you feel if you encountered a presentation/paper that included such a large proportion of your work, taken nearly verbatim, without attribution or permission? You seem not to understand why that would bother me—and rather than being apologetic, you have been mostly defensive and even somewhat aggressive in you response. I think your actions constitute a form of plagiarism.").)

With respect to statement (g), disputed to the extent that Defendant is suggesting Plaintiff was the first to use this term "plagiarism."  (ECF No. 52, Hoiland Ex. 5 at P000447 ("I will respond to the issue of plagiarism raised in your email.").)

**117.**    Prior to the August 2019 Emails, Dr. Wilder and Dr. Hoiland did not have any communications relating to restrictions or limitations, or potential restrictions or limitations, on the manner in which Dr. Hoiland was authorized to use the Course Materials in presentations at professional conferences about the NICE Project. (Hoiland Decl. ¶¶ 117-124, 132- 137.)

**RESPONSE**: The statement is not material to the Motion; indeed, Defendant does not cite to this statement in her MOL. Disputed to the extent that no reasonable fact finder could agree with this statement because it is not supported by evidence.  To help train Defendant for her duties on the NICE project, Plaintiff enrolled Defendant as a faculty participant in NICHE, and Plaintiff reviewed the NICHE instructional materials—including the videos for each unit that specifically stated that they were subject to copyright and not to be used without Plaintiff's express authorization. (*See* Pl's SOF ¶¶ 8, 38–40; 3/28 Wilder Decl. ¶¶ 16, 54; ECF No. 36-5, Pl's Ex. 5, P665 ("Unauthorized use of any of the material in this presentation or any supplementary course materials from NICHE is strictly prohibited. . . Any questions regarding the authorization for use of material from NICHE should be directed to Esther Isabelle Wilder (ewilder@gc.cuny.edu)."); ECF No. 37-5, Pl's Ex. 20, Hoiland Tr. 37:13–39:6, 106:6–14; *see also* Suppl. Wilder Decl. ¶ 43;

46

Ex. 25, P000789 (Defendant stating in June 2017: "I watched [the videos that were linked to Units 1 and Unit 2 that are from NICHE] last week").) Of course, academic and professional norms also require authorization and the crediting of other's work of authorship when duplicated in a publication or presentation. (Pl's SOF ¶¶ 107–121; ECF No. 37-5, Pl's Ex. 20, Hoiland Tr. 180:2–181:8, 183:20–184:9, 184:12–185:16, 185:22–186:16; ECF No. 36-10, Pl's Ex. 10, P649–654 at P649–650; ECF No. 36-11, Pl's Ex. 11, P294–298 at P297; ECF No. 36-9, Pl's Ex. 9, P273–293 at P288–289; 3/28 Wilder Decl. ¶¶ 88, 95.)

**118.**    Dr. Wilder and Dr. Hoiland never reached any agreements relating to restrictions or limitations on the manner in which Dr. Hoiland was authorized to use the Course Materials in presentations at professional conferences about the NICE Project. (Hoiland Decl. ¶¶ 117-124, 132-137.)

**RESPONSE**: The statement is not material to the Motion; indeed, Defendant does not cite to this statement in her MOL. Disputed to the extent that no reasonable fact finder could agree with this statement because it is not supported by evidence.  To help train Defendant for her duties on the NICE project, Plaintiff enrolled Defendant as a faculty participant in NICHE, and Plaintiff reviewed the NICHE instructional materials—including the videos for each unit that specifically stated that they were subject to copyright and not to be used without Plaintiff's express authorization. (*See* Pl's SOF ¶¶ 8, 38–40; 3/28 Wilder Decl. ¶¶ 16, 54; ECF No. 36-5, Pl's Ex. 5, P665 ("Unauthorized use of any of the material in this presentation or any supplementary course materials from NICHE is strictly prohibited. . . Any questions regarding the authorization for use of material from NICHE should be directed to Esther Isabelle Wilder (ewilder@gc.cuny.edu)."); ECF No. 37-5, Pl's Ex. 20, Hoiland Tr. 37:13–39:6, 106:6–14; *see also* Suppl. Wilder Decl. ¶ 43; Ex. 25, P000789 (Defendant stating in June 2017: "I watched [the videos that were linked to Units

1 and Unit 2 that are from NICHE] last week)").) Of course, academic and professional norms also require authorization and the crediting of other's work of authorship when duplicated in a publication or presentation. (Pl's SOF ¶¶ 107–121; ECF No. 37-5, Pl's Ex. 20, Hoiland Tr. 180:2–181:8, 183:20–184:9, 184:12–185:16, 185:22–186:16; ECF No. 36-10, Pl's Ex. 10, P649–654 at P649–650; ECF No. 36-11, Pl's Ex. 11, P294–298 at P297; ECF No. 36-9, Pl's Ex. 9, P273–293 at P288–289; 3/28 Wilder Decl. ¶¶ 88, 95.)

119.    Prior to the August 2019 Emails, Dr. Wilder never informed Dr. Hoiland that she could not use the Course Materials in presentations at professional conferences about the NICE Project unless Dr. Hoiland identified Dr. Wilder as a co-author on the written materials relating to the presentation. (Hoiland Decl. ¶¶ 117-124, 132-137.)

**RESPONSE**: The statement is not material to the Motion; indeed, Defendant does not cite to this statement in her MOL. Disputed to the extent that Defendant is suggesting that Plaintiff told Defendant that she "could not use the Course Materials in presentations at professional conferences about the NICE Project unless Dr. Hoiland identified Dr. Wilder as a co-author on the written materials relating to her presentation"; Defendant was required to get authorization from Plaintiff to use any of the NICHE materials—as stated elsewhere, the NICHE materials, used in the NICE Project, made it explicit that unauthorized use of the materials is "strictly prohibited" and academic and professional norms also require authorization and the crediting of other's work of authorship when duplicated in a publication or presentation. (Pl's SOF ¶¶ 8, 38–40, 107–121; *see also* Resp. to ¶¶ 117–118 *supra*.)

120.    Prior to the August 2019 Emails, Dr. Wilder never informed Dr. Hoiland that she could not use the Course Materials in presentations at professional conferences about the NICE Project unless Dr. Hoiland provided a specific citation or other written credit each time Dr. Hoiland

referenced or quoted from a portion of the Course Materials that Dr. Wilder had authored in the written materials relating to the presentation. (Hoiland Decl. ¶¶ 117-124, 132-137.)

**RESPONSE**: The statement is not material to the Motion; indeed, Defendant does not cite to this statement in her MOL. Disputed to the extent that Defendant is suggesting that Plaintiff told Defendant that she "could not use the Course Materials in presentations at professional conferences about the NICE Project unless Dr. Hoiland provided a specific citation or other written credit"; Defendant was required to get authorization from Plaintiff to use any of the NICHE materials—as stated elsewhere, the NICHE materials, used in the NICE Project, made it explicit that unauthorized use of the materials is "strictly prohibited" and academic and professional norms also require authorization and the crediting of other's work of authorship when duplicated in a publication or presentation. (Pl's SOF ¶¶ 8, 38–40, 107–121; *see also* Resp. to ¶¶ 117–118 *supra*.)

121.    Dr. Hoiland never agreed that she would identify Dr. Wilder as a co-author or co-presenter of any presentations she made at professional conferences about the NICE Project. (Hoiland Decl. ¶¶ 117-124, 132-137.)

**RESPONSE**: The statement is not material to the Motion; indeed, Defendant does not cite to this statement in her MOL. Disputed to the extent that Defendant is suggesting that Plaintiff told Defendant that she must "identify Dr. Wilder as a co-author or co-presenter of any presentations she made at professional conferences about the NICE Project"; Defendant was required to get authorization from Plaintiff to use any of the NICHE materials—as stated elsewhere, the NICHE materials, used in the NICE Project, made it explicit that unauthorized use of the materials is "strictly prohibited" and academic and professional norms also require authorization and the crediting of other's work of authorship when duplicated in a publication or presentation. (Pl's SOF ¶¶ 8, 38–40, 107–121; *see also* Resp. to ¶¶ 117–118 *supra*.)  Defendant could have claimed sole

49

authorship to work for which she was an actual "author." (*See, e.g.*, ECF No. 53, Hoiland Ex. 11 at P000454 (Plaintiff explaining to Defendant that "[she] could have done some analyses that [she] would have owned and [Plaintiff] would never begrudge [Defendant] authorship (including sole authorship) for something that belonged to [Defendant].").)

122.    Dr. Hoiland never agreed that she would provide specific citations or other written credit to Dr. Wilder each time she referenced or quoted from a portion of the Course Materials in written materials relating to presentations at professional conferences about the NICE Project. (Hoiland Decl. ¶¶ 117-124, 132-137.)

**RESPONSE**: The statement is not material to the Motion; indeed, Defendant does not cite to this statement in her MOL. Disputed to the extent that Defendant is suggesting that Plaintiff told Defendant that must "provide specific citations or other written credit to Dr. Wilder each time she referenced or quoted from a portion of the Course Materials in written materials relating to presentations at professional conferences about the NICE Project"; Defendant was required to get authorization from Plaintiff to use any of the NICHE materials—as stated elsewhere, the NICHE materials, used in the NICE Project, made it explicit that unauthorized use of the materials is "strictly prohibited" and academic and professional norms also require authorization and the crediting of other's work of authorship when duplicated in a publication or presentation. (Pl's SOF ¶¶ 8, 38–40, 107–121; *see also* Resp. to ¶¶ 117–118 *supra*.)  Defendant could have claimed sole authorship to work for which she was an actual "author." (*See, e.g.*, ECF No. 53, Hoiland Ex. 11 at P000454 (Plaintiff explaining to Defendant that "[she] could have done some analyses that [she] would have owned and [Plaintiff] would never begrudge [Defendant] authorship (including sole authorship) for something that belonged to [Defendant].").)

123.    Dr. Hoiland never claimed to be the author of any of the Course Materials. (Hoiland

Decl. ¶¶ 138-143.)

**RESPONSE**: The statement is not material to the Motion; indeed, Defendant does not cite to this statement in her MOL. Disputed to the extent that no reasonable fact finder could agree with this statement because it is not supported by evidence. The CCLA PowerPoint that was electronically distributed to attendees of the CCLA Conference (Pl's SOF ¶ 67) listed only Defendant's name on the first page of the presentation, indicating that she was the sole author of the material included therein. (ECF No. 36-3, Pl's Ex. 3 at D0234.) Especially in the context of academia, which was the intended field of the CCLA Conference, written citations are expected when, *inter alia*, quoting verbatim the work of others. (Pl's SOF ¶¶ 107–121.)

124. Dr. Hoiland identified herself on the first page of the CCCLA Slides as the presenter of the Presentation – not the author of any of the Course Materials. (Hoiland Decl. ¶¶ 138-143.)

**RESPONSE**: The statement is not material to the Motion; indeed, Defendant does not cite to this statement in her MOL. Disputed to the extent that no reasonable fact finder could agree with this statement because it is not supported by evidence. The CCLA PowerPoint that was electronically distributed to attendees of the CCLA Conference (Pl's SOF ¶ 67) listed only Defendant's name on the first page of the presentation, indicating that she was the sole author of the material included therein. (ECF No. 36-3, Pl's Ex. 3 at D0234.) Especially in the context of academia, which was the intended field of the CCLA Conference, written citations are expected when, *inter alia*, quoting verbatim the work of others. (Pl's SOF ¶¶ 107–121.)

125. Dr. Hoiland did not present Dr. Wilder's ideas, research, writing or anything else as her own. (Hoiland Decl. ¶¶ 117-124, 132-143.)

**RESPONSE**: The statement is not material to the Motion; indeed, Defendant does not cite to this statement in her MOL. Disputed to the extent that no reasonable fact finder could agree with this

statement because it is not supported by evidence.  The CCLA PowerPoint that was electronically distributed to attendees of the CCLA Conference (Pl's SOF ¶ 67) listed only Defendant's name on the first page of the presentation, indicating that she was the sole author of the material included therein. (ECF No. 36-3, Pl's Ex. 3 at D0234.) Especially in the context of academia, which was the intended field of the CCLA Conference, written citations are expected when, *inter alia*, quoting verbatim the work of others. (Pl's SOF ¶¶ 107–121.)

126.    As of February 2019, Dr. Wilder and Dr. Hoiland were both aware of the following facts: (a) Dr. Wilder was the primary author of the NSF Proposal for the NICE Project; (b) Dr. Wilder asked Dr. Hoiland to serve – and Dr. Hoiland served – as Principal Investigator at Hostos and co-Director of the NICE Project; (c) the NICE Project was funded by NSF grants; (d) the Course Materials were the instructional materials for the NICE Project; (e) Dr. Wilder made the Course Materials, including the Subunit 7H Materials, available for use in the NICE Project; (e) a goal of the NICE Project was to make the NICE Course and the Course Materials widely available to educators and administrators; (f) the NSF Proposal stated that Dr. Wilder and Dr. Hoiland would ensure that the NICE Course and the Course Materials were made widely available to educators and administrators by making presentations at conferences; and (g) the Budget Justification for the grant to Hostos specifically provided that Dr. Hoiland would be making presentations about the NICE Project and the Course Materials at professional conferences. (Hoiland Decl. ¶¶ 117-124).

**RESPONSE**: This statement does not comply with L.R. 56.1, at least because it includes multiple facts within a single numbered paragraph. None of the statements are material to the Motion; indeed, Defendant does not cite to this statement in her MOL.

With respect to statement (a), undisputed that that Plaintiff authored the proposal.  Disputed to the extent that Defendant suggests that she contributed more than typographical or grammatical

suggestions/changes. (Suppl. Wilder Decl. ¶ 25); *see also supra* Resp. to ¶ 18.

With respect to statement (b), undisputed that Plaintiff contacted Defendant about being a PI on the NICE Project. Disputed to the extent that Plaintiff contacted both Defendant and another colleague about their possible interest in the project.  (Suppl. Wilder Decl. ¶ 23); *see also supra* Resp. to ¶ 15.

With respect to statement (c), undisputed that the NICE Project was funded by the NSF. Disputed to the extent that Defendant is suggesting that the NICE Project was two projects because it was "NICE Project was funded by NSF grants"; the NICE Project was a unified research project. (Suppl. Wilder Decl. ¶ 29); *see also supra* Resp. to ¶¶ 20–21.

With respect to statement (d), disputed to the extent that the definition of "Course Materials" is unclear.  *See supra* Resp. to ¶ 9.

With respect to statement (e), disputed to the extent that no reasonable fact finder could agree with this statement because it is not supported by evidence; material on the NICHE website was made available to the public and the Blackboard material was for designed for use within a closed community and kept on an internal, password-protected "Blackboard." *See supra* Resp. to ¶ 12.

With respect to statement (f), disputed to the extent that that the proposal anticipated that research ***results*** would be presented at professional conferences, not the NICHE materials.  *See supra* Resp. to ¶¶ 33–38.

With respect to statement (g), disputed to the extent that that the budget justification was intended for Dr. Hoiland to disseminate her research ***results*** at professional conferences, not the NICHE materials.  *See supra* Resp. to ¶¶ 33–38.

**127.**    Under the circumstances summarized in paragraph 126, Dr. Wilder consented to

Dr. Hoiland's use of the Course Masterials [sic], including the Subunit 7H Materials, in presentations at professional conferences about the NICE Project. (Hoiland Decl. ¶¶ 8, 40, 107-124.)

**RESPONSE**: Disputed to the extent that no reasonable fact finder could agree with this statement because it is not supported by evidence. *See supra* Resp. to ¶ 126; (*see also* Pl's SOF ¶¶ 8, 40, 107–121).

128.    As Principal Investigator at Hostos and co-Director of the NICE Project, Dr. Hoiland was obligated to present at professional conferences about the NICE Project and the Course Materials. (Hoiland Decl. ¶¶ 117-124.)

**RESPONSE**: Disputed to the extent that no reasonable fact finder could agree with this statement because it is not supported by evidence. *See supra* Resp. to ¶ 126; (*see also* Pl's SOF ¶¶ 8, 40, 107–121).

129.    As Principal Investigator at Hostos and co-Director of the NICE Project, Dr. Hoiland had discretion to use the Course Materials of the NICE Project as she saw fit in conference presentations about the NICE Project. (Hoiland Decl. ¶¶ 117-124.)

**RESPONSE**: Disputed to the extent that no reasonable fact finder could agree with this statement because it is not supported by evidence. *See supra* Resp. to ¶ 126; (*see also* Pl's SOF ¶¶ 8, 40, 107–121).

130.    Dr. Wilder [sic] did not specifically ask Dr. Wilder for permission to use the Course Materials in the Presentation because Dr. Wilder had already provided her consent; it was implied from the circumstances summarized in paragraph 126. (Hoiland Decl. ¶¶ 117-124.)

**RESPONSE**: Disputed to the extent that no reasonable fact finder could agree with this statement because it is not supported by evidence. *See supra* Resp. to ¶ 126; (*see also* Pl's SOF ¶¶ 8, 40,

107–121).

**131.**     On April 7, 2020, Dr. Wilder submitted a formal complaint of research misconduct against Dr. Hoiland (the "CUNY Complaint").  (Hoiland Decl. ¶¶ 184.)

**RESPONSE**: Undisputed, but not material to the Motion.

**132.**     In the CUNY Complaint, Dr. Wilder accused Dr. Hoiland of, among other things: "plagiarism," "research misconduct," and "theft" of intellectual property.  (Hoiland Decl. ¶¶ 184-185.)

**RESPONSE**: The statement is not material to the Motion. Disputed to the extent that the quotations reference mere excerpts of an email and does not include the full email or email chain, and to the extent that Defendant is attempting to equate an ethics complaint made to a university with copyright infringement under federal law.

**133.**     In the CUNY Complaint, Dr. Wilder wrote, in part, as follows:

> A record of Sarah's academic misconduct, including her plagiarism, needs to go into her permanent record at Hostos.  Sarah was recently awarded tenure, but now she is being considered for promotion to associate professor.  If she is given that promotion, CUNY will be sending the message that plagiarism is not only tolerated, it is rewarded.  (Hoiland Decl. ¶¶ 184-185.)

**RESPONSE**: The statement is not material to the Motion. Disputed to the extent that the quotation is merely an excerpt of an email and does not include the full email or email chain, and to the extent that Defendant is attempting to equate an ethics complaint made to a university with copyright infringement under federal law.

**134.**     After Dr. Wilder filed the CUNY Complaint, a CUNY Research Integrity Officer conducted an inquiry and both Dr. Wilder and Dr. Hoiland provided information to the Research Integrity Officer about Dr. Wilder's allegations (the "Inquiry"). (Hoiland Decl. ¶¶ 188-189.)

**RESPONSE**: The statement is not material to the Motion. Disputed to the extent that Defendant is suggesting that a "an inquiry" means a full investigation (*see, e.g.*, ECF No. 56, Cohen Ex. 5 at

P000595 ("An Inquiry is not a formal hearing requiring a full review of all research materials and evidence related to the allegation.")), and to the extent that Defendant is attempting to equate an ethics complaint made to a university with copyright infringement under federal law.  The statement's reference to "a CUNY Research Integrity Officer" is also misleading because the individual was the Research Integrity Officer at Hostos. (*Id.*)

135.    The Inquiry included a review of hundreds of pages of documents and an interview of Dr. Hoiland that lasted more than three hours. (Hoiland Decl. ¶¶ 188-189.)

**RESPONSE**: The statement is not material to the Motion, and is not supported by admissible evidence. Disputed to the extent that Defendant is suggesting that "[t]he Inquiry" means a full investigation (*see, e.g.*, ECF No. 56, Cohen Ex. 5 at P000595), and to the extent that Defendant is attempting to equate an ethics complaint made to a university with copyright infringement under federal law.

136.    Following a detailed Inquiry, the Research Integrity Officer rejected Dr. Wilder's plagiarism allegations and determined that they did not warrant further investigation. (Hoiland Decl. ¶ 190.)

**RESPONSE**: The statement is not material to the Motion. Disputed to the extent that Defendant is suggesting that a "detailed Inquiry" means a full investigation (*see, e.g.*, ECF No. 56, Cohen Ex. 5 at P000595), and to the extent that Defendant is attempting to equate an ethics complaint made to a university with copyright infringement under federal law.  Disputed that Plaintiff's plagiarism allegations were "rejected"; the Research Integrity Officer Dr. Yoel Rodriguez stated repeatedly that this was "not an easy decision" (Ex. 24 at D0071–72) and concluded his decision letter by stating:

> I would recommend asking Dr. Hoiland to sign a *Letter of Understanding* about
> 1) being mindful as she presents work of others/collaboration; 2) being aware of

intellectual property to avoid attribution issues; 3) being aware of not using Dr. Wilder intellectual property, including the materials from the Data Analysis Research Experience (DARE) Program nor the work of the NICE program participants without their proper authorization (https://serc.carleton.edu/NICHE/abouthtml); 4) being aware of including correct citation as needed; 5) being aware of acknowledging all co-authors, collaborators, funding agencies in writing when presenting using, for example, PowerPoint presentation; 6) attending a CUNY [Responsible Conduct of Research (RCR)] workshop; and 7) meeting with RIO at Hostos during the Fall 2020 semester to further discuss any RCR issue she might need to clarify.

(*Id.* at D0072.)  The decision by the RIO was also made under the threat of litigation by Defendant.

(ECF No. 54, Cohen Ex. 2 at P000590.)

   **137.**    In a note to Dr. Wilder, the Research Integrity Officer wrote:

In accordance with the CUNY Research Misconduct Policy, an Inquiry was conducted into the allegations of plagiarism that you brought against a Hostos faculty member in April of this year.  After review, it has been determined that an Investigation is not warranted.  Therefore, this matter will be closed, with all records of the proceedings treated as confidential pursuant to Section 5 of the policy to respect the rights and protect the reputations of all parties involved.  (Hoiland Decl. ¶ 190.)

**RESPONSE**: The statement is not material to the Motion. Disputed to the extent that the quotation is merely an excerpt of an email and does not include the full email chain, to the extent that Defendant is attempting to equate an ethics complaint made to a university with copyright infringement under federal law, and to the extent that Defendant suggests that this excerpt implies that CUNY made any express findings as to whether Defendant was liable for plagiarism.  *See also supra* Resp. to ¶ 136.

Respectfully submitted,

Dated: May 9, 2023                 By: *s/ Janet B. Linn*
                                           Janet B. Linn
                                           Sandra A. Hudak
                                           TARTER KRINSKY & DROGIN LLP
                                           1350 Broadway
                                           New York, NY 10018
                                           Tel.:    (212) 216-8000
                                           Fax:    (212) 216-8001
                                           E-mail: jlinn@tarterkrinsky.com
                                                           shudak@tarterkrinsky.com

                                           ***Attorneys for Plaintiff Esther Wilder***