**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Esther Wilder,<br><br>               Plaintiff,<br><br>    v.<br><br>Sarah Hoiland,<br><br>               Defendant. | Civ. Action No. 1:22-cv-01254-PKC |

<u>**REPLY MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION**</u>
<u>**FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANT'S CROSS**</u>
<u>**MOTION FOR SUMMARY JUDGMENT**</u>

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ........................................................................................................ 1

II.    STATEMENT OF FACTS ......................................................................................... 3

    A.  NICHE and the Copyrighted Work ................................................................... 3

    B.  Defendant becomes a second PI in the NICE project ........................................ 5

    C.  Defendant Fabricates a Role for Herself in a "Broader Goal" that Does Not Exist ........... 9

    D.  Defendant's Copyright Infringement ............................................................... 11

III.  ARGUMENT ........................................................................................................... 15

    A.  Legal Standard ................................................................................................. 15

    B.  Defendant Is Liable for Copyright Infringement ............................................ 16

    C.  Defendant Did Not Have an Implied License to Use Plaintiff's Copyrighted Work Without Authorization or Attribution. ............................................... 17

    D.  Defendant's Copyright Infringement Was Not a Fair Use of the Copyrighted Work ...... 21

IV.  CONCLUSION ........................................................................................................ 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*ABKCO Music, Inc. v. Sagan*,
  50 F.4th 309 (2d Cir. 2022) ...................................................................................18

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)...............................................................................................15

*Authors Guild, Inc. v. HathiTrust*,
  755 F.3d 87 (2d Cir. 2014).....................................................................................23

*Campbell v. Acuff-Rose Music, Inc.*,
  510 U.S. 569 (1994)...............................................................................................22

*Capitol Records, LLC v. Redigi, Inc.*,
  910 F.3d 649 (2d Cir. 2018)...................................................................................23

*Design Options, Inc. v. BellePointe, Inc.*,
  940 F. Supp. 86 (S.D.N.Y. 1996) ....................................................................18, 19

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
  499 U.S. 340 (1991)...............................................................................................16

*Gallo v. Prudential Residential Servs., Ltd. P'ship*,
  22 F.3d 1219 (2d Cir. 1994).............................................................................15, 16

*Golden v. Michael Grecco Prods., Inc.*,
  524 F. Supp. 3d 52 (E.D.N.Y. 2021) .....................................................................17

*Goodman v. Universal Beauty Prod. Inc.*,
  No. 17-CV-1716 (KBF), 2018 WL 1274855 (S.D.N.Y. Mar. 9, 2018)............17, 18

*Grahan v. James*,
  144 F.3d 229 (2d Cir. 1998)...................................................................................20

*Grand Union Co. v. Cord Meyer Dev. Co.*,
  761 F.2d 141 (2d Cir. 1985)...................................................................................21

*Grant Heilman Photography, Inc. v. McGraw-Hill Companies, Inc.*,
  28 F. Supp. 3d 399 (E.D. Pa. 2014) .......................................................................18

*Greenfield v. Phillies Recs., Inc.*,
  98 N.Y.2d 562 (NY 2002) ......................................................................................21

*Hachette Book Grp., Inc. v. Internet Archive*,
    2023 WL 2623787 (S.D.N.Y. Mar. 24, 2023) .......................................................................23

*Harper & Row Publishers, Inc. v. Nation Enterprises*,
    471 U.S. 539 (1985).............................................................................................................22, 25

*Hunley v. BuzzFeed, Inc.*,
    2021 WL 4482101 (S.D.N.Y. Sept. 30, 2021)...........................................................................22

*Jason Maxwell, Inc. v. Veeck*,
    110 F.3d 749 (11th Cir. 1997) .................................................................................................21

*LPD New York, LLC v. Adidas Am., Inc.*,
    No. 15-CV-6360 (MKB), 2022 WL 4450999 (E.D.N.Y. Sept. 24, 2022)..............................18

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)..................................................................................................................15

*Nicklen v. Sinclair Broad. Grp., Inc.*,
    551 F. Supp. 3d 188 (S.D.N.Y. 2021).......................................................................................22

*Roe v. City of Waterbury*,
    542 F.3d 31 (2d Cir. 2008)........................................................................................................15

*Tasini v. New York Times Co.*,
    206 F.3d 161 (2d Cir. 2000)......................................................................................................17

*Viacom Int'l Inc. v. Fanzine*,
    2000 WL 1854903 (S.D.N.Y. July 12, 2000) ...........................................................................20

*Weissmann v. Freeman*,
    868 F.2d 1313 (2d Cir. 1989)....................................................................................................24

**Statutes**

Fed. R. Civ. P. 56.................................................................................................................................15

Plaintiff Esther Wilder submits this Reply Memorandum of Law in Support of Plaintiff's Motion for Summary Judgement and in Opposition to the Cross Motion of Defendant Sarah Hoiland for Summary Judgment.

I.    INTRODUCTION

As detailed Plaintiff's motion for summary judgment, the uncontroverted facts establish Defendant's copyright infringement. In her opposition, Defendant has now abandoned her prior claim that Plaintiff is not the author of the copyrighted text or that Plaintiff's copyright is not valid. Nor does Defendant deny that she copied a large section of the copyrighted text from an encrypted CUNY faculty program into a presentation bearing her name that she publicly displayed to an audience at a national conference, and which she acknowledged would be displayed on the conference website. Beyond these infringing actions, Defendant also licensed the use of the copyrighted text to the conference. This is also not disputed.

Instead, Defendant's defense relies on remaking an NSF grant into an assignment to her of the Plaintiff's copyrighted text, authored by Plaintiff as part of her earlier NSF grant, and Defendant's rewriting the terms of the grant to imply an obligation by Defendant to infringe Plaintiff's Copyrighted Work. While Defendant claims that she had an implied license from Plaintiff to the Copyrighted Work, New York law requires a meeting of the minds of the parties on all essential terms of the license to imply the copyright owner's consent. Defendant ignores this necessary requirement and relies on her unilateral reading of the NSF grant as giving her an unfettered right to do whatever she wants with the copyrighted text and the rest of the program, including publishing it at a national conference without permission or attribution of the copyright owner. And if the lack of attribution of the work to its author would be an impediment to finding

implied consent based on academic norms, Defendant conveniently reinterprets those norms to add an undeclared exception for presentations like hers.

Defendant's fair use defense also fails. While Defendant argues her use was transformative, the essentially verbatim reproduction of copyrighted text with virtually no change, ostensibly being used for the same purpose as the original, is clearly not transformative. Ignoring the inherent contradiction, Defendant argues her use was simultaneously so important that it was "transformative" (when discussing the first fair use factor), and at the same time, so inconsequential that it was merely a "fleeting" visual aid (when arguing the third fair use factor). But it was neither transformative nor minor, and the fair use factors favor Plaintiff. The wholesale copying (including a typo) of the copyrighted text and its distribution and display at a national conference by Defendant was not fair use. Defendant's bad faith duplication of Plaintiff's copyrighted text, presented with Defendant as its author, is not a transformative fair use, but rather a simple and deliberate act of copyright infringement.

Defendant's opposition is primarily based on two fictions. The first is that she was compelled by her responsibilities as set forth in the NSF grant to present Plaintiff's Copyrighted Work as widely as possible. The second is that Plaintiff's infringement action is nothing more than a "minor academic squabble" brought for nefarious purposes.

Rather than address the facts or law establishing Plaintiff's claim for copyright infringement action, Defendant seeks to convert Plaintiff's effort to enforce her copyright into a conjured tale of Defendant as a tormented innocent victim of revenge and professional jealousy, and to downplay Defendant's copying of her colleagues' intellectual property as a minor argument over credit. Defendant would use her false claim of victimhood to excuse her infringement. Defendant has never been exonerated of copyright infringement and her career has

flourished, not been destroyed, by her involvement with the parties' NSF grant. This tale of a baseless, vengeful smear campaign is as false as it is irrelevant to the issues on the summary judgment motions. Since her infringing acts were uncovered, Defendant has presented this dispute as a clash of personalities and refused to acknowledge the obvious. Defendant infringed Plaintiff's copyright, and her defenses of implied consent and fair use lack merit. Accordingly, Plaintiff's motion for summary judgment should be granted and Defendant's cross motion for summary judgment should be denied.

II.    STATEMENT OF FACTS[1]

A.  NICHE and the Copyrighted Work

As outlined in Plaintiff's Motion for Summary Judgment, after years of developing expertise in quantitative reasoning learning through teaching and research, Plaintiff was awarded an NSF grant in 2011 to create a program for CUNY faculty, Numeracy Infusion Course for Higher Education ("NICHE") to train CUNY faculty. (PSOF ¶ 3; Ex. 6 at P156-230 at P181). From 2011 through 2016, Plaintiff was the Principal Investigator ("PI") on the grant and authored the majority of the faculty program's instructions and guidelines, including the Copyrighted Work, "QR Assessment Plan Instrument". (ECF No. 1, "Compl.," ¶ 8; *see also* PSOF ¶¶ 5, 7; Ex. 6 at P156–230 at P181.) Under the terms of NSF's grants, Plaintiff is the author of material created for the grant program and retains the copyright in that material (Ex.

---

[1] Plaintiff has previously introduced Exhibits 1-20 in her Motion for Summary Judgment (ECF 34) and such Exhibits are referenced herein. Exhibits 21–27 are attached to the Supplemental Declaration of Janet Linn submitted herewith. The Supplemental Declaration of Professor Esther Wilder in Support of Plaintiff's Motion for Summary Judgment, submitted herewith, is hereinafter referred to as "Supp. Wilder Decl." Plaintiff's Statement of Facts (ECF 44) is hereinafter referred to as "PSOF". Defendant's Memorandum of Law in Support of Her Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment (ECF 43) is hereinafter referred to as "DMOL". "Cohen Ex." 1 hereinafter refers to ECF 40-1. Plaintiff's Memorandum of Law in Support of Her Motion for Summary Judgment (ECF 34) is hereinafter referred to as "MOL". Defendant's Response to Plaintiff's Statement of Facts (ECF 38) is hereinafter referred to as "Def's Resp. to SOF".

21; Supp. Wilder Decl. ¶ 7.) Plaintiff and the rest of the leadership team of NICHE had extensive experience in teaching numeracy and/or creating faculty development programs. (PSOF ¶ 11; Supp. Wilder Decl. ¶ 30.)

Eligibility for enrollment in the NICHE program was limited to CUNY faculty, who accessed the program only on a password encrypted platform, Blackboard. (PSOF ¶ 15.) Other information about the NICHE program, certain reading, and the instructional and assessment materials the faculty created as they went through the program, was accessible to the public on the NICHE website. None of the program's units were posted on the website or otherwise publicly available. (Supp. Wilder Decl., ¶ 33.)

The goal of the NICHE program was "to increase the level of quantitative reasoning (QR) instruction and assessment in undergraduate courses across a broad range of disciplines throughout the CUNY system" including at both four-year and two-year institutions. (Cohen Ex. 1). Toward that goal, those enrolled in the program developed their own course materials targeted to the students in their discipline and assessed the effectiveness of the material they created through "active and collaborative learning". The three core tasks for NICHE enrollees were (1) developing learning goals ("articulate a set of QR learning goals, provide peer feedback on each other's learning goals, and develop revised learning goals in response to peer feedback"); (2) developing instructional materials ("create/adapt a QR lesson plan/exercise, provide peer feedback, and develop a revised lesson plan/exercise in response to peer feedback") and (3) develop assessment materials: "create/adapt a QR assessment plan/instrument, provide peer feedback, and develop a revised assessment plan/instrument in response to the feedback". (*Id.*).

The Copyrighted Work was one of the last units in the faculty program, providing the faculty guidelines on creating a QR assessment plan. Plaintiff developed the guidelines based on the strategies she had found effective in educating an audience of non-specialists about assessing QR instruction. Plaintiff's copyrighted text was registered with the Copyright Office and is the subject of United States Copyright Registration No. TX 8-963-226, naming Plaintiff as sole author. (Ex. 2).

B.  Defendant becomes a second PI in the NICE project

In 2016, shortly after the NICHE program ended, Plaintiff was contacted about applying for a second grant for a QR literacy project adapted to focus on CUNY's Hispanic Serving Institutions ("HSI"s) community colleges, Numeracy for College Education ("NICE"). (PSOF ¶ 17; Ex. 20, Hoiland Tr. 20:12-16) Plaintiff then contacted two CUNY community college faculty about being a second PI with her on the grant: Professor Kate Wolfe, a professor at Bronx Community College with experience in QR instruction, and Defendant, then working with Professor Wolfe on an article on QR literacy. (PSOF ¶ 19; Ex. 20, Hoiland Tr. 19:12-20:16, 25:10-13) While Plaintiff knew Prof. Wolfe, Plaintiff had never met the Defendant before. (PSOF ¶ 20) At that time, Defendant had an interest in QR instruction but had limited credentials in the area, with few publications or presentations on the subject. She eagerly responded to Plaintiff's solicitation before Prof. Wolf did, and Defendant argued she was the better candidate. (Hoiland Ex. 2; Supp. Wilder Decl. ¶¶ 23-24). Plaintiff then agreed to add Defendant as the second PI on the grant proposal. (PSOF ¶ 22)

Defendant had had no involvement and knew nothing about the NICHE program and lacked experience with NSF grant proposals. Accordingly, Plaintiff drafted the grant proposal and prepared the other documents for the application, with Defendant providing some editorial

comments. (PSOF ¶ 23; Ex. 20, Hoiland Tr. 25:10-26:2, 88:6-10) The proposal was presented as a collaborative proposal, with two budgets (one for Plaintiff's institution and one for Defendant's) but with one project narrative. (Supp. Wilder Decl. ¶ 26.)

In the proposal, Plaintiff recommended that Hostos Community College be the lead organization, partially for budgetary reasons. (Supp. Wilder Decl. ¶ 26.) Plaintiff and Defendant were each to be Principal Investigators on NICE. Contrary to Defendant's suggestion that she was to have the dominant role in NICE based on the assignment of Hostos as the lead institution and her name appearing first on the list of faculty (Hoiland Decl. ¶ 5; DMOL, p. 5), Plaintiff and Defendant each had equivalent, albeit different, responsibilities. "NSF does not infer any distinction in scientific stature among multiple PIs, whether referred to as PIs or co-PIs". (Ex. 22; Supp. Wilder Decl. ¶ 28.)

NICE was to "build on the strength" of NICHE and refine and update the NICHE with HSI specific adaptations. (Ex 6, P176). Among the objectives of NICE were to provide instruction in best practices for teaching QR", "foster the development of instructional materials that make use of the effective strategies for teaching QR" as well as "establish a network of Bronx CUNY faculty who are committed to improving students' QR abilities". (Ex 6, P177). Like NICHE, NICE included the same three key tasks for the faculty enrolled in the NICE program: developing their own learning goals, developing their own instructional materials and developing their own assessment materials ("articulate a set of QR learning goals, provide peer feedback on each other's learning goals, and develop revised learning goals in response to peer feedback";  "create/adapt a QR lesson plan/exercise, provide peer feedback, and develop a revised lesson plan/exercise in response to peer feedback" and "create/adapt a QR assessment plan/instrument, provide peer feedback, and a revised assessment plan/instrument in response to

the feedback". (Ex. 6, P178). The section "Research on NICE", explained the research results the project would produce on effective teaching strategies. The effectiveness of the NICE program was to be evaluated by examining the assessment data the faculty gather in their QR infused courses. (Ex. 6, P179-180).

The proposal divided Defendant's proposed responsibilities into nine categories: 1) work collaboratively with Plaintiff to develop and refine NICE as well as the NICE assessment instruments and together direct the faculty development program, 2) recruit Hostos faculty for the program, 3) ensure the program meets the needs of the faculty at HSI community colleges 4) coordinate the in-person activities at Hostos, 5) direct all of the qualitative data gathering and research activities, including the qualitative assessment questions and focus groups at the NICE capstone conference, 6) work closely with the CUNY QR fellows, 7) consult regularly with the team of external consultants, 8) actively promote the NICE project at Hostos and other CUNY schools in the Bronx, and 9) present at professional conferences, prepare annual reports, write papers for publication, and participate in a variety of dissemination activities (e.g. community college and HSI conferences) (Ex. 6, P199).

In 2016, the NSF grant for NICE was approved. (PSOF ¶ 36; Ex. 20, Hoiland Tr. 25:25-28:3) The NICE faculty program ran from about January 2017 through December 2019. (PSOF ¶ 37; Ex. 19; Ex. 6, P156-230 at P201, 207) The faculty enrolled in NICE were drawn from the Bronx HSI institutions, Lehman College, Bronx Community College, and Hostos Community College. (PSOF ¶ 17.) Despite Defendant's primary responsibility to adapt the NICHE faculty program specifically for HSI institutions, the units of the NICE faculty program remained essentially the same other than changing the references to NICE. (PSOF ¶ 46; Ex. 20, Hoiland

Tr. 78:25-79:19) As Defendant readily admits, she contributed nothing to the NICE faculty program. (Hoiland Decl. ¶¶ 88, 94)

Like NICHE, the NICE program was available to the enrolled faculty only on the password encrypted platform, Blackboard. (PSOF ¶ 44; Ex. 20, Hoiland Tr. 78:19-24.) While information about the program was accessible to the public on the NICE website, none of the program's units were posted on the website or otherwise publicly available. (PSOF ¶ 47) Faculty posted the instructional material and assessment materials that they created on the NICE website. In their IRB forms, participants in the NICE program had the option to post their instructional and assessment materials anonymously or to require credit whenever their materials were quoted. (See Ex. 7). Along with the rest of the NICE enrollees, Defendant accessed the program on Blackboard, and created her own instructional and assessment materials which were publicly available on the website. (PSOF ¶ 48.)

Before Defendant enrolled as a faculty participant in NICE, Plaintiff had enrolled Defendant in the NICHE program to familiarize her with it. (PSOF ¶ 38; Ex. 20, Hoiland Tr. 37:13-39:6) Each of the NICHE videos included a legend at the end that stated that they were protected by copyright and that no one was allowed to use any of the NICHE materials without Plaintiff's explicit permission. (PSOF ¶ 40; Ex. 5, P665.) The same legend appeared on the NICE materials. (PSOF ¶ 42) From her participation in both the NICHE and NICE programs, Defendant was well aware of the difference between what was publicly available on the NICHE and NICE websites, and what materials (the faculty development program materials) were subject to restricted access on Blackboard. (Supp. Wilder Decl. ¶ 21.) She was also aware from reviewing the NICHE and NICE videos that use of the faculty development program other than as part of the development program required Plaintiff's permission.

C.  Defendant Fabricates a Role for Herself in a "Broader Goal" that Does Not Exist

Among Defendant's responsibilities identified in the NICE proposal were a) actively promoting the NICE project at Hostos and other CUNY schools in the Bronx, and b) presenting at professional conferences, preparing annual reports, writing papers for publication, and participating in a variety of dissemination activities (e.g. community colleges and HSI conferences). (Ex. 6, P199; supra at 7). Included in the NICE proposal was a budget of $7,000 for Defendant to attend conferences with certain specified purposes: "for professional development, dissemination activities, and networking with faculty form similar institutions". (Ex. 6, P200). Specifically mentioned were "present[ing] the NICE project" at a Bronx conference hosted at a CUNY HSI in the Bronx and at another CUNY conference on Undergraduate Education ("CUE"). *Id.*

Inaccurately defining her role, Defendant claims the NICE project "obligated" her to fulfill a "broader goal", make the "Course Materials" "as broadly available as possible" to educators and administrators around the country. (DMOL, pp. 7-8, 15-16). The term "Course Materials", repeated innumerable times by Defendant throughout her pleadings, is variously defined by Defendant as materials used in the NICE project that Plaintiff wrote for her prior (NICHE) grant (DMOL, p. 1), and "written instructional materials" supporting the eight instructional units in NICHE. (Hoiland Decl. ¶ 23.) But no such "broader goal" exists in NICE or is articulated in the NICE proposal. Further, the term "Course Materials" is not a term used anywhere in NICE to define what would be made publicly available or publicly discussed at conferences outside of CUNY. Instead of the units of the faculty development program accessible only on Blackboard, what was "readily available" on the website and what was to be

disseminated outside CUNY were the "instructional materials", the materials the faculty had created based on the program, and the research results. (Ex. 6, P171.)

Defendant uses her manufactured term "Course Materials" to conflate the materials available to the public on the NICE website with the written materials in the Units comprising the faculty development program accessible only to NICE enrollees on Blackboard. Thus, Defendant selectively and misleadingly quotes from the NICE proposal (Ex. 6), and the Project Outcomes Report (Cohen Ex. 1) about what was to be, and what had been, presented at conferences and in publications.

Defendant's truncated quote (DMOL, p.7) from the "Broader Impact" section of the NICE project tellingly omits the language defining what was to be made "widely available" and publicly available on the NICE website, i.e., the "instructional material" and the "research results". The full quote, with the omitted language italicized and in bold, is:

> "NICE will also help faculty beyond CUNY. First the project intervention and materials including the NICE training program ***and the instructional materials that faculty develop*** will be made readily available on the project website. ***Second, the research on the effectiveness of NICE, especially the analyses of different modes of delivery (online vs. in-person) will contribute to our understanding of best practices for faculty development.*** To ensure that the NICE materials and evaluation materials are widely available to educators, policymakers, administrators, and researchers, the results will be presented at conferences, published in journals and disseminated through other relevant outlets." (Ex. 6, P171.)

The full discussion under the heading "NICE at CUNY and Beyond", again quoted by Defendant from the proposal out of context, similarly explains what would be disseminated and where. ("we will also support QR instruction through the dissemination of our research results"). *Id.* at P180.

In each discussion of the dissemination of information outside CUNY, what is readily and publicly available is the instructional material created by the faculty, and what is being disseminated at conferences, presentations, workshops, and in scholarly papers are the research results. Nowhere does it state that units on Blackboard would be widely disseminated or ever

made available to the public. Nothing in Defendant's travel allowance for "professional development, dissemination activities and networking" suggests that Defendant could or should widely disseminate anything else from the NICE project beyond those identified. (Supp. Wilder Decl. ¶ 41.)

Defendant thus conjures up an imaginative directive to expose the months long faculty program to unrestricted distribution in whole or in decontextualized part(s) at national conferences, and to do so without authorization from the copyright owners or accreditation to the authors of the program. Not only is there no such directive in the proposal, but such directive belies common sense.

D. Defendant's Copyright Infringement

In June 2018, Defendant applied to present at a community college conference in Valencia, Florida (the CCLA conference) scheduled to take place eight months later in February 2019. (PSOF ¶ 53; Ex. 17, D2). Defendant was eager to get her presentation accepted at this "great" conference. Her previous attempt to present there had been denied. (Ex. 12.)

In her application, Defendant's presentation, "Assessing Numeracy in a Faculty Development Program", was described as focusing on "strategies for assessing quantitative reasoning (QR) at community colleges." (Ex. 17, D1). She made it clear that she would be making the presentation alone. ("Will you have co-presenters (up to 3 allowed?" "No") (Ex. 17, D3).[2] Unlike her usual practice with Plaintiff regarding prior conference presentations, Defendant kept her application secret from Plaintiff. (PSOF ¶ 61.)

---

[2] The full application is Ex.17. Defendant's version of the application (Hoiland Decl. ¶ 6) omits this page indicating that she would be the sole speaker, and Defendant inaccurately denies the statement in her response to Plaintiff's 56.1 Statement. (Def's Resp. to SOF ¶ 54.)

The application required the presentation to be submitted in advance of the conference, and Defendant explicitly acknowledged that the presentation materials would be "available on a private website for attendees to download". (Ex 17, D2). To avoid an issue of copyright infringement or other violation of intellectual property rights, the Conference required the applicants to submit an intellectual property license granting the "District Board of Trustees of Valencia College" and "its designees and assignees" "a non-exclusive license to use, copy, and distribute, by whatever means appropriate and convenient, outlines, PowerPoint and other presentations, and other hard copy or electronic materials identified or created by me" in connection with the Conference. (Ex. 8.) As stated in the license, the rights granted "*specifically include[d],* but [were] not limited to, *Valencia posting these materials online for downloading on the Conference website and mobile application for Conference participants.*"  (Ex. 8) (emphasis added). The applicant was responsible for obtaining the "written consent" of the copyright owner if the applicant was not the owner, as well as warranting that the licensed materials "do not violate the copyright, trade secret, trademark or other intellectual property rights of any third party". Defendant signed the license, which included a space for the license to be witnessed, thus representing that she owned the copyright and had the right to grant a license to use, copy and distribute the Copyrighted Work incorporated into the presentation. (Ex. 8.)

Defendant waited until her application was accepted (and after she told the conference she would be presenting alone), to ask Plaintiff if she "had any interest in co-presenting". (Ex. 12, P428). Asked by Defendant to co-present at a date that she was unavailable and presented with the presentation topic as a fait accompli, Plaintiff declined. (PSOF ¶ 62; Supp. Wilder Decl. ¶¶ 43-44.) Knowing no more than the title of the presentation, Plaintiff assumed Defendant would be presenting the materials that she had developed. (PSOF ¶ 64.) Nothing in their prior

practice or the design or operation of the NICE project suggested to Plaintiff that Defendant intended to duplicate the text of Plaintiff's Copyrighted Work and publish it outside CUNY. At no time did Defendant alert Plaintiff to Defendant's intention to use segments of the NICHE/NICE faculty program in her presentation, or ask if she could use Plaintiff's Copyrighted Work, with or without attribution. MOL, p. 12.

In February 2019, Defendant made her presentation at the CCLA conference. (PSOF ¶ 65.) During the presentation, Defendant displayed her PowerPoint presentation to the attendees. (Hoiland Decl. 84-85). The only record available of the content of the presentation is a copy of Defendants' PowerPoint presentation. (PSOF ¶ 89.) The presentation had been sent out to all of the attendees, but there was no recording of the verbal part of the presentation. (Ex. 22).

Fully aware of Plaintiff's rights in the material she developed for NICHE, including the Copyrighted Work, and without Plaintiff's prior knowledge or permission, Defendant reproduced a large segment of Plaintiff's Copyrighted Work in the PowerPoint presentation. Defendant's PowerPoint slides admittedly incorporated slides that were essentially verbatim copies of the Copyrighted Work. (DMOL, p. 11) (*See* discussion in MOL, p 7-8, Hoiland Decl. ¶¶ 91-94, Ex.4.)

Although Defendant knew that she was not the author of those slides (Hoiland Decl. ¶¶ 88, 94), her name appears alone on the cover page of the presentation, and hers was the only name appearing anywhere on the PowerPoint slides. (PSOF ¶ 68.) Defendant had already identified herself as the owner of any copyrighted material in her presentation in the Intellectual Property license she was required to sign for the conference. (PSOF ¶ 58.) While Defendant claims that the PowerPoint cover only indicated that she was the person presenting at the conference (Hoiland Decl. ¶¶ 86, 142), there is no other attribution of source anywhere on the

slides. Contrary to all academic guidelines, Defendant failed to identify the source of any of the materials she copied from Plaintiff and from Professor Rodriguez. (Hoiland Decl. ¶¶ 104, 142.)

It is also clear that whatever Defendant may have said about Plaintiff's role in NICHE and NICE, Defendant never identified Plaintiff as the author of the Copyrighted Work. Indeed, Defendant has never stated that she did.  (PSOF ¶¶ 71-72.) Each of Defendant's statements about the credit she gave Plaintiff' were general statements about Plaintiff's work on NICHE and NICE (e.g., Plaintiff was the "driving force" of the projects". (Hoiland Dec. 89.) That is not the "credit" that academics rightly expect will be given when they are the source of quoted material in an academic presentation.

A few of the slides in the presentation included the assessment materials that Defendant developed as well as a number of slides of assessment materials produced by a colleague enrolled in NICE, Professor Crystal Rodriguez.  Defendant also failed to credit Professor Rodriguez as well, violating the terms of the IRB that Professor Rodriguez signed when she enrolled in NICE. (Ex. 7).

Once Plaintiff learned of Defendant's infringing actions six months later, when Plaintiff finally sought to review information about Defendant's prior presentation, Plaintiff immediately notified Defendant that Plaintiff did not agree to Defendant's use of Plaintiff's Copyrighted Work without her consent and without attribution.[3] She asked Defendant to contact the Conference to mitigate the damage by adding proper credit for Plaintiff's work. Then, learning of the use of Professor Rodriguez' work in violation of her IRB, Plaintiff asked Defendant to have the Conference give Professor Rodriguez proper credit as well. Apparently, Defendant neither

---

[3] In an email to Defendant a few days later, Plaintiff wrote "how would you feel if you encountered a presentation/paper that included such a large proportion of your work, taken nearly verbatim, without attribution or permission?" Hoiland Ex. 11, P453.

wanted to, nor felt obligated to make that correction, so she made a minimal, half-hearted, effort to add Plaintiff's name to "placate" her. (DMOL, p. 12).

Concerned about Defendant's belief that she was entitled to use of a colleague's work without permission or attribution, Plaintiff pursued informal and formal resolution through the CUNY processes with the Lehman and Hostos ethics officers. At the end of each effort, the ethics officers recommended that Defendant sign a memorandum of understanding concerning copyright and credit. (Supp. Wilder Decl. ¶¶ 49-50; Ex. 23.) Each time, Defendant refused. (Supp. Wilder Decl. ¶¶ 48-50, Ex. 24.). Unable to reach a resolution at CUNY, Plaintiff then brought this action for copyright infringement.

III.  ARGUMENT

A.  Legal Standard

Under Rule 56, Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Only genuine disputes regarding material facts can defeat summary judgment. A fact is material if it "might affect the outcome of the suit under the governing law". *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008).

Once the moving party has met its burden, the nonmoving party must do more than cast doubt on the evidence; "the nonmoving party must come forward with 'specific facts showing there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56 (e)). Summary judgment is appropriate when the moving party can show that "little or no evidence may be found in support of the nonmoving party's case." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223-24 (2d Cir.

1994). "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo*, 22 F.3d at 1224.

    B.  Defendant Is Liable for Copyright Infringement

    To establish copyright infringement, "two elements must be proven, (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).  In her moving papers, Plaintiff presented undisputed evidence of the elements of Defendant's copyright infringement: Plaintiff's ownership of a valid copyright registered in her name with the Copyright Office (Ex. 2), and the copying of Plaintiff's Copyrighted Work by Defendant. *See* MOL 10-12. Defendant now concedes each element. Defendant no longer argues that Plaintiff does not own a valid copyright, and Defendant does not contest she copied a significant section of the Copyrighted Work into her presentation, and publicly displayed and electronically distributed it without Plaintiff's prior consent.

    Given the incontrovertible evidence of her verbatim duplication of Plaintiff's Copyrighted Work in her slides (including reproducing a typo in the original), Defendant readily admits that she copied the Copyrighted Work from the materials on Blackboard (Hoiland Decl. 100-101, 103), and that she displayed it publicly. She does not contend that the text she copied was unoriginal or undeserving of copyright protection. Nor does she claim that she discussed and received Plaintiff's consent to duplicate and distribute the Copyrighted Work. Instead, Defendant quibbles about details: the nature of the conference ("informal"), the extent of the distribution (only to a small group of attendees), and the minimal amount of time she spent discussing the

slides. (DMOL, pp. 10, 11, 23). None of these are material facts defeating Plaintiff's entitlement

for summary judgment that Defendant is liable for copyright infringement.[4]

C.  Defendant Did Not Have an Implied License to Use Plaintiff's Copyrighted Work
    Without Authorization or Attribution.

Having abandoned her affirmative defense that Plaintiff's copyright was not valid, and

having never contested that she reproduced Plaintiff's Copyrighted Work in a PowerPoint

presentation, Defendant seeks to escape liability for copyright infringement based on Plaintiff's

alleged implied consent to Defendant's infringing acts. Defendant's affirmative defense of

implied license relies on an unsupported and illogical interpretation of the NSF grant and, more

importantly, a fundamental misreading of the law of implied license.

A nonexclusive license to use a copyrighted work may be based on an oral agreement or

can be implied from the conduct of the parties. Viacom.  Here Defendant ostensibly alleges the

latter, an implied license based on the parties' conduct, asserting that Plaintiff's conduct "clearly

manifests a consent to the use" of her Copyrighted Work. DMOL, pp. 14-15. The burden is on

Defendant to prove the existence of the alleged implied license. *Tasini v. New York Times Co.*,

206 F.3d 161, 171 (2d Cir. 2000); *Golden v. Michael Grecco Prods., Inc.*, 524 F. Supp. 3d 52,

64-66 (E.D.N.Y. 2021) (granting summary judgment of copyright infringement where, inter alia,

defendant "failed to meet his burden on this defense"); *Goodman v. Universal Beauty Prod. Inc.*,

No. 17-CV-1716 (KBF), 2018 WL 1274855, at *6 (S.D.N.Y. Mar. 9, 2018).

While the Second Circuit has avoided choosing between two tests for the existence of an

implied license, a strict test finding an implied license only in the narrow circumstances where

---

[4] Unable to refute these facts, a large part of Defendant's strategy to defeat summary judgment of copyright
infringement consists of her *ad hominem* attacks on Plaintiff and Plaintiff's motives. To address Defendant's
diatribes would give them relevance and credence that they do not merit. In short, as Plaintiff's motion for summary
judgment demonstrates, Plaintiff has pursued a meritorious claim of copyright infringement against Defendant.

one party created a work at another's request and handed it over intending that the other copy and distribute it, and a second, more permissive, test based on Plaintiff's conduct, the one critical requirement under either test is the meeting of the minds on the particular usage at issue. *ABKCO Music, Inc. v. Sagan*, 50 F.4th 309, 320 (2d Cir. 2022). "[A]n implied license to use a copyrighted work 'cannot arise out of the unilateral expectations of one party.'" *Design Options, Inc. v. BellePointe, Inc.*, 940 F. Supp. 86, 92 (S.D.N.Y. 1996) (internal citation omitted). "[W]hichever test is applied, the question comes down to whether there was a 'meeting of the minds' between the parties to permit the particular usage at issue." *Goodman*, 2018 WL 1274855 at *3 (internal citation omitted). "To establish a 'meeting of the minds,' [for an implied agreement] there must be an 'agreement on all essential terms'". *LPD New York, LLC v. Adidas Am., Inc.*, No. 15-CV-6360 (MKB), 2022 WL 4450999, at *14 (E.D.N.Y. Sept. 24, 2022); *see Barcroft Media Ltd. V. Coed Media* ("There can be no meeting of the minds … where essential material terms are missing") (internal citation omitted); *see also Grant Heilman Photography, Inc. v. McGraw-Hill Companies, Inc.*, 28 F. Supp. 3d 399, 410 (E.D. Pa. 2014) ("Furthermore, the question is not merely what the Defendants believed they had permission to use, but whether Plaintiff intended Defendants to use the images without limitation").

Defendant's suggestion that an implied license exists under the stricter test (DMOL, p. 1) is flatly wrong. That test requires the copyrighted work to have been created at the licensee's request and intended by the author for the licensee to copy and distribute. The Copyrighted Work was not created by Plaintiff for Defendant at Defendant's request, but as part of the earlier NSF grant and for the purpose of educating CUNY faculty not for Defendant to copy and distribute.

After briefly noting the need to demonstrate a meeting of the minds to establish an implied license, nowhere does Defendant actually offer facts establishing anything more than

Defendant's unilateral view of what she was permitted to do under the NSF grant. *See Design Options, Inc.*, 940 F. Supp. at 92. In fact, Defendant acknowledges that, had Plaintiff known of Defendant's proposed use, Plaintiff would not have consented to it, as Plaintiff made clear in her correspondence with Defendant as soon as Plaintiff learned what Defendant did. Instead, Defendant contends that, given her access to the Copyrighted Work under the terms of the NSF grant, she was entitled to use the Copyrighted Work anyway she wanted and ignore Plaintiff's wishes, (DMOL, p. 15) Defendant's implied license argument devolves from a license implied by the meeting of the minds of the parties to interpreting the grant as if it were an actual express and unrestricted license to Defendant to use Plaintiff's work. But an NSF grant is a grant, not a copyright license, and nothing in the grant renders the grant a copyright license.

Defendant points to her position as a PI on the NSF grant and her access to the Copyrighted Work as the source of the board implied license she claims. Acting as a PI on the project and an enrollee, Defendant had access to the Copyrighted Work to guide through the program and to develop her own instructional and assessment materials, not to be the recipient of rights in Copyrighted Work that gave Defendant unrestricted use of Plaintiff's Work. The fact that the grant provided funds for travel to promote NICE does not imply a license from Plaintiff for any and all uses of the faculty development program, including the Copyrighted Work. As detailed supra at 9, Defendant's contention that she was "obligated" to promote the "gospel of NICE" by spreading Plaintiff's Copyrighted Work as widely as possible through national conferences is based on a misreading of the grant and misquoting of its language.

Plaintiff certainly did not consider that, by adding Defendant as a PI on the NSF grant, she was giving Defendant a license to Defendant of the copyright in the work Plaintiff authored under the prior grant for which she owned the copyright. Nor would Plaintiff have consented to

the use made by Defendant and purportedly allowed by the implied license, exposing an audience unfamiliar with the NICHE or NICE faculty development program, to a section of the program out of context. The program was restricted to CUNY faculty, who went through all of the sections in order and under the guidance of the PIs.

Defendant's argument that Plaintiff could have restricted Defendant's use, but did not, has the burden backwards. With an implied license, the terms are those based on the parties' meeting of the minds on the essential terms, and the implied license is strictly limited to those terms. It was not Plaintiff's obligation to impose restrictions, and Defendant could not infer that what was not granted was included, and in fact what had actually been expressly forbidden. *Viacom Int'l Inc. v. Fanzine*, 2000 WL 1854903 at *5 (S.D.N.Y. July 12, 2000).

Defendant acknowledges that she had viewed the NICHE program on Blackboard (Hoiland Decl. ¶ 52), and Plaintiff specifically stated on those materials that anyone using them needed to obtain her permission. Defendant does not, and could not claim, that Plaintiff would have agreed to the presentation of her Copyrighted Work without crediting her as the author and, beyond that, misleadingly representing or implying that Defendant, not Plaintiff, its sole author. In her portrayal of Plaintiff as protective of getting credit for her work, Defendant admits that Plaintiff would never agree to use of her work without consent and attribution, and that they never reached an agreement on such use. (DMOL, pp. 3, 18.)

Defendant's implied license defense ignores the required meeting of the minds on all essential terms as a condition to implying the existence of a license.  Defendant treats the grant as a conveyance of broad rights to her and applies the rules of construction given to actual express written or oral licenses, not licenses implied from conduct. *See Grahan v. James*, 144 F.3d 229, 237 (2d Cir. 1998) (the existence of an oral license agreement between the parties was

uncontested and there was partial performance so disputed terms were covenants not conditions); *Greenfield v. Phillies Recs., Inc.*, 98 N.Y.2d 562, 572 (NY 2002) (Court interpreted a broad provision in a two page contract providing for the unconditional transfer of ownership rights to include the right to use the work in any manner); *Grand Union Co. v. Cord Meyer Dev. Co.*, 761 F.2d 141, 143 (2d Cir. 1985) (construction of an ambiguous contract provision in a written real estate lease); *Jason Maxwell, Inc. v. Veeck*, 110 F.3d 749, 753 (11th Cir. 1997) (Copyright owner gave a nonexclusive license authorizing the use of his song. Because the owner continued to encourage and permit the use despite the lack of royalties and public recognition of authorship, the payment of royalties and public recognition were not conditions precedent to the playing of the song).

The failure to give Plaintiff credit was not a breach of contract. There was no contract. Giving Plaintiff credit was one of the terms that would have been required in any agreement by Plaintiff permitting Defendant to use Plaintiff's Copyrighted Work. Plaintiff explicitly required permission before her work could be used, and Plaintiff also expected that Defendant would follow the norms of academic presentations.[5] Plaintiff did not grant Defendant a written license to do whatever she wanted in her sole discretion, nor could one be implied by Plaintiff's conduct. Defendant has not met her burden to prove she had an implied license excusing her infringement of Plaintiff's Copyrighted Work.

D.  Defendant's Copyright Infringement Was Not a Fair Use of the Copyrighted Work

Alternatively, Defendant seeks summary judgment dismissing Plaintiff's copyright infringement claim on the basis that the use Defendant made of Plaintiff's Copyrighted Work was a fair use. The burden is on Defendant to establish her use was fair as a matter of law.

---

[5] Defendant's own convenient interpretation of the norms to exclude crediting the source in certain presentations (Hoiland Decl. ¶¶ 158-159) lacks any basis in fact.

*Nicklen v. Sinclair Broad. Grp., Inc.*, 551 F. Supp. 3d 188, 196 (S.D.N.Y. 2021). Defendant cannot meet that burden.

To determine if a defendant's use is a fair one, courts weigh four factors (1) the purpose and character of the use, (2) the nature of the copyrighted work, (3) the amount and substantiality of the portion used and whether the amount used was reasonable in relation to the purpose of the copying, and (4) the effect of the use on the market for or value of the work in light of the purpose of the Copyright Act. Also considered in determining fair use is the propriety of defendant's conduct. *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 562 (1985).

The heart of the fair use inquiry is the purpose and character of the use. *Hunley v. BuzzFeed, Inc.*, 2021 WL 4482101, at *3 (S.D.N.Y. Sept. 30, 2021). But the commercial or nonprofit educational purpose of the work is only one aspect of the first factor inquiry. "[T]he mere fact that a use is educational and not for profit does not insulate it from a finding of infringement…". *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 584 (1994). The focus of the first factor is "whether and to what extent the use is transformative". Transformative works "lie at the heart of the fair use doctrine". *Id.* at 579. A transformative use is one that does something more than repackage or republish the original copyrighted work. The inquiry is whether the work "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message". *Id.*

Here, Defendant reproduced a large segment of the Copyrighted Work virtually verbatim, adding only a few words to the reproduced text of the Copyrighted Work. Misunderstanding the meaning of transformative, Defendant argues that her use served a broader educational purpose and was therefore "transformative". But a use is not transformative because it is educational.

"Added value or utility is not the test", but rather if it serves a new and different function. *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 96 (2d Cir. 2014). There was nothing "transformative" about Defendant's reproduction of Plaintiff's Copyrighted Work. *See, e.g., Capitol Records, LLC v. Redigi, Inc.*, 910 F.3d 649, 661 (2d Cir. 2018) (use was not transformative where defendant made no change to the copyrighted work, providing neither criticism, commentary or information about it, nor did it deliver the content in a more convenient and usable form). Defendant offered no transformative use of the Copyrighted Work, which "strongly suggests the first fair use factor favors" Plaintiff. *Hachette Book Grp., Inc. v. Internet Archive*, 2023 WL 2623787, at *9 (S.D.N.Y. Mar. 24, 2023).

Factor two is the nature of the work, here an important part of a faculty development program. While the Copyrighted Work is not a work of fiction, it is not a collection of facts. This factor "rarely, by itself, furnishes any substantial reasoning for favoring or disfavoring fair use." *Capital Records*, 910 F.3d at 662.

The third factor, the amount of the work used, and whether the quantity and value of the materials used" were "reasonable in relation to the purpose of the copying" and the importance of the material copied. Campbell. This factor also favors Plaintiff.

Before Defendant's disclosure of Plaintiff's Copyrighted Work training faculty on assessment of their instructional materials, it was accessible only on the password protected Blackboard platform to CUNY faculty. Defendant's argument that assessment was not an important part of NICE is directly contradicted by the NICE program, presenting assessment as one of the three core tasks of the NICHE and NICE programs. Ex. 6, 178; *see*, p. 6 supra. Further Defendant used far more than was reasonable for her purported purpose, promoting the NICE project. There was no reason to reproduce the bulk of the Copyrighted Work virtually

verbatim.  According to Defendant, the slides containing the Copyrighted Work were merely a "fleeting visual aid", "fleetingly flashed" on the screen without discussion. (DMOL, pp. 3, 23). If they were going to be no more than a backdrop, there was no reason to reproduce a large part of the Copyrighted Work in a slide show that was electronically distributed and available for download by the entire conference.[6]

The fourth factor, the effect of the use upon the market for and value of the work, also favors Plaintiff. As the Second Circuit explained, monetary considerations do not have the same weight in an academic setting; "[i]nstead, what is valuable is recognition, because it so often influences professional advancement and academic tenure." *Weissmann v. Freeman*, 868 F.2d 1313, 1324 (2d Cir. 1989). "The rewards that Congress planned for copyright holders of scientific works to reap arguably include promotion and advancement in academia", "recognition of one's scientific achievement is a vital part of one's professional life." *Id.* at 1326. In an academic setting, it is an error to focus on sales and dollars in considering the fourth factor, rather than the realities of promotion and tenure. *Id.* at 1325-26 (The fact that defendant was only paid $250 is not determinative of fair use. Defendant "stood to gain recognition among his peers in the profession and authorship credit with his attempted use of Weissman's article").

Similarly, Defendant's presentation, and representation of the Copyrighted Work benefited her resume, accredited as a sole author at an "important" conference. It also could impair the market in academia for Plaintiff's work, publications and presentations, now presented as Defendant's intellectual property.

---

[6] Defendant's discussion of the amount and substantiality of her use with respect to fair use factor three is directly contrary to her supposed purpose in reproducing the materials cited by her in Defendant's discussion of factor two, the effort to disseminate the materials "for their utilization by other educational professionals."

Further weighing against fair use is the propriety of Defendant's conduct. *Harper & Row Publishers, Inc.*, 471 U.S. at 562. Omitting any reference to Plaintiff as the author of the reproduced work, substituting her own name, and representing herself as the author and owner of the copyright to the Conference (which Defendant still maintains was perfectly proper), Defendant's copying raises the inference of bad faith. Considering all of the fair use, Defendant's conduct amounts to unlawful infringement, not fair use.

## IV. CONCLUSION

For the above reasons, summary judgment should be granted to Plaintiff and Defendant's motion for summary judgment should be denied.

Respectfully submitted,

Dated: May 9, 2023                    By: *s/ Janet B. Linn*
                                          Janet B. Linn
                                          Sandra A. Hudak
                                          TARTER KRINSKY & DROGIN LLP
                                          1350 Broadway
                                          New York, NY 10018
                                          Tel.:    (212) 216-8000
                                          Fax:    (212) 216-8001
                                          E-mail: jlinn@tarterkrinsky.com
                                                   shudak@tarterkrinsky.com

                                          ***Attorneys for Plaintiff Esther Wilder***