UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

ESTHER WILDER,

                          Plaintiff,                          <u>OPINION AND ORDER</u>

                                                              22-cv-1254 (PKC)

          -against-


SARAH HOILAND,

                          Defendant.
-----------------------------------------------------------x

CASTEL, U.S.D.J.

> Plaintiff Esther Wilder, a faculty member at Lehman College of the City University of New York ("CUNY"), alleges that defendant Sarah Hoiland, a faculty member at CUNY's Hostos Community College, infringed her copyright during a presentation Hoiland made at an academic conference in February 2019. After the 2019 presentation, Wilder filed for and obtained a copyright registration on the material that she had originated in 2013. Wilder's claim of copyright infringement relates to Hoiland's one-time use of Wilder's material on 5 of 23 PowerPoint slides at a "breakout" session attended by 12 to 20 individuals who were participating in a larger conference of community college professors and administrators.

> The parties have cross-moved for summary judgment. The Court principally concludes that on the summary judgment record, no reasonable factfinder could find that the affirmative defense of fair use had not been established by Hoiland. Accordingly, the Court will grant summary judgment in favor of Hoiland.

Background

        Wilder moves for summary judgment in her favor on copyright infringement. Hoiland cross-moves for summary judgment dismissing Wilder's claim, arguing that Wilder is not the owner of a valid copyright and that Hoiland's use was authorized either under an implied license or as fair use. For each side's motion for summary judgment, the Court construes the facts in a light most favorable to the non-movant. Many of the core facts are undisputed and the Court notes material disputes where they exist.[1]

        Dr. Wilder is a tenured professor of sociology at CUNY's Lehman College, a four-year college located in the Bronx. (Pl. 56.1 ¶ 1 (ECF 35); Def. 56.1 Resp. ¶ 1 (ECF 78).) Dr. Hoiland is an associate professor of sociology at CUNY's Hostos Community College, a two-year community college also located in the Bronx. (Def. 56.1 ¶ 1 (ECF 77); Pl. 56.1 Resp. ¶ 1 (ECF 79).) The evolution of their working relationship and the relevant projects involved are outlined below.

1. NICHE (2011-2016)

        From 2011 to 2016, Wilder served as "Principal Investigator" ("PI") for a faculty development program entitled NICHE ("Numeracy Infusion Course for Higher Education"), which was funded by a National Science Foundation ("NSF") grant. (Pl. 56.1 ¶¶ 3-5; Def. 56.1 Resp. ¶¶ 3-5; Def. 56.1 ¶ 5; Pl. 56.1 Resp. ¶ 5.) The program was intended to help "teach faculty at CUNY best practices for infusing quantitative reasoning ['QR'] into their courses, and the assessment of that instruction." (Pl. 56.1 ¶ 4; Def. 56.1 Resp. ¶ 4.) The parties agree that Wilder "developed and created most of the instructional materials and guidelines used in NICHE." (Pl.

---

[1] Citations to the parties' Rule 56.1 statements are intended to reflect the evidence cited in those statements.

56.1 ¶ 7; Def. 56.1 Resp. ¶ 7.)  Wilder also asserts that she "authored the original instructional material for a key component of NICHE, Unit 7 (Unit 7H) on QR assessment."  (Pl. 56.1 ¶ 9.)  Unit 7H was first published as part of NICHE in 2013; Wilder did not, however, apply for a certificate of registration from the U.S. Copyright Office at that time.  (ECF 1-4; Pl. 56.1 ¶¶ 9, 13; Def. 56.1 Resp. ¶¶ 9, 13.)  Hoiland does not claim to have authored the NICHE materials.  (Def. 56.1 ¶ 11; Pl 56.1 Resp. ¶ 11.)  In fact, both parties agree that Hoiland was not involved at all with NICHE.  (Pl. 56.1 ¶ 21; Def. 56.1 Resp. ¶ 21.)  NICHE is not to be confused with NICE, a project discussed below that came into existence in 2016 and in which both Wilder and Hoiland were involved.

The NICHE course materials consisted of eight sub-units focusing on different areas.  Unit 7H—the sub-unit at issue here—focused on helping educators develop an "assessment plan and instruction" for measuring "learning goals," i.e., measuring success in infusing numeracy and QR into their classrooms.  (Pl. 56.1 ¶ 10; Def 56.1 Resp. ¶ 10.)

2.  NICE (2016-2019)

In 2016, Wilder became interested in an "extension" of her NSF NICHE grant to a new program designed to train faculty in QR literacy at three "Hispanic Serving Institutions (HSIs)" in the Bronx.  (Pl. 56.1 ¶¶ 17, 18; Def. 56.1 ¶ 14.)  Hostos Community College has been designated as an HSI.  (Def. 56.1 ¶ 2; Pl. 56.1 Resp. ¶ 2.)  This new project was entitled "Numeracy Infusion for College Educators" ("NICE").  (Pl. 56.1 ¶ 15; Def. 56.1 Resp. ¶ 15.)  Although there is some dispute as to when their working relationship officially began, Wilder eventually contacted Hoiland about serving as a PI on NICE.  (Def. 56.1 ¶ 15; Pl. 56.1 Resp. ¶ 15; Pl. 56.1 ¶ 19.)  Hoiland accepted the offer, and she and Wilder became co-PIs on the NICE project.  (Pl. 56.1 ¶ 22; Def. 56.1 Resp. ¶ 22.)  Due to the structures involved in an NSF

proposal, both Wilder and Hoiland submitted grant proposals to the NSF for funding for NICE as co-PIs for their respective campuses.  (Def. 56.1 ¶¶ 17-18, 21-22; Pl. 56.1 Resp. ¶¶ 17-18, 21-22.)  The proposal was successful, and the NICE program received funding from the NSF in 2017.  (Pl. 56.1 ¶ 36; Def. 56.1 Resp. ¶ 36.)

The parties agree that "[b]oth NICHE and NICE involved instructional materials created for the NICHE project."  (Pl. 56.1 ¶ 30; Def. 56.1 Resp. ¶ 30; Def. 56.1 ¶ 29; Pl. 56.1 Resp. ¶ 29.)  Although a goal of NICE was to "adapt" the NICHE materials for the new program, the parties agree that "the adaptation did not happen and the NICHE instructional materials were instead essentially incorporated whole into NICE unchanged other than the references changed from NICHE to NICE."  (Def. 56.1 ¶ 29; Pl. 56.1 Resp. ¶ 29; Pl. 56.1 ¶ 46; Def. 56.1 Resp. ¶ 46.)  The NICE program ran from January 2017 to December 2019, with several "cohorts" of CUNY faculty completing the course.  (Pl. 56.1 ¶¶ 36-37; Def. 56.1 Resp. ¶¶ 36-37; Def. 56.1 ¶ 43; Pl. 56.1 Resp. ¶ 43.)

Hoiland also "enrolled" in the NICHE course once she joined the NICE project.  (Pl. 56.1 ¶ 39; Def. 56.1 Resp. ¶ 39.)  The parties dispute the purpose of Wilder enrolling Hoiland in NICHE, but they agree that Hoiland did review the original NICHE materials at that time.  (Pl. 56.1 ¶¶ 38-39; Def. 56.1 Resp. ¶¶ 38-39.)  During the first year of NICE, Wilder also asked Hoiland to complete the NICE program as a "faculty participant"—i.e., as a student in the program—while also serving as the program's PI.  (Pl. 56.1 ¶ 41; Def. 56.1 Resp. ¶ 41.)

Prior to February 2019, Wilder and Hoiland gave two presentations together about NICE at professional conferences. (Pl. 56.1 ¶ 49; Def. 56.1 Resp. ¶ 49; see also ECF 37-1.)  Hoiland also gave a presentation about NICE with another colleague in which they "presented

the instructional and assessment materials they created as participants in NICE." (Pl. 56.1 ¶ 51; Def. 56.1 Resp. ¶ 51.)

   3.  <u>The CCCLA Presentation (2018-2019)</u>

      In June 2018, Hoiland submitted a proposal for a presentation she wished to make at the Community College Conference on Learning Assessment (the "CCCLA") at Valencia College in Orlando, Florida. (Def. 56.1 ¶ 62; Pl. 56.1 Resp. ¶ 62.) In July 2018, Hoiland learned via email that Valencia had accepted her proposal; the conference was scheduled to take place in February 2019. (Def. 56.1 ¶ 68; Pl. 56.1 Resp. ¶ 68.)

      On July 27, 2018, Hoiland forwarded the acceptance email she received from Valencia to Wilder and wrote, "I submitted a proposal to this conference and it was accepted. It's in Orlando in February. . . . Do you have any interest in co-presenting?" (ECF 46-8 at 2.) The email listed the title of the presentation as "Assessing Numeracy in a Faculty Development Program." (<u>Id.</u>) Hoiland's email to Wilder did not attach any slides or other excerpts of her planned presentation. The email did, however, forward a copy of an intellectual property license included by Valencia in its acceptance email for Hoiland to complete. (<u>Id.</u>)[2] As part of her proposal to CCCLA, Hoiland wrote in her abstract, "The presenter is one of two principal investigators of a National Science Foundation (NSF) faculty development program titled Numeracy Infusion for College Educators (NICE)." (ECF 46-7 at 2.) Hoiland also wrote in the abstract that "<u>we</u> will discuss both the challenges and successes <u>we</u> have encountered" and that "<u>we</u> see <u>our</u> faculty development program as a way to infuse numeracy. . . ." (<u>Id.</u> (emphasis added).)

---

[2] This license read as follows: "I am responsible for obtaining the written consent of the owner of the copyrighted material (if I am not the owner) . . . . I warrant that the materials for which I am providing a license do not violate the copyright, trade secret, trademark or other intellectual or proprietary rights of any third party or any applicable law . . . ." (ECF 46-13 at 2.) Hoiland executed this agreement on October 17, 2018. (<u>Id.</u>)

Upon receiving Hoiland's email, Wilder responded that she was not able to co-present, but the parties dispute whether Wilder had other commitments or whether she was not interested in presenting at a community college conference.  Hoiland asserts that Wilder responded that she was happy Hoiland was going to be presenting.  (Pl. 56.1 ¶¶ 63; Def. 56.1 Resp. ¶¶ 63.)  There is no email in the record reflecting Wilder's response, however, although Hoiland referred to it in later correspondence with Wilder.  (ECF 52 at 5 ("I asked you if you wanted to co-present and you said no, but you appreciate me asking you and that 'it's great that you're presenting' (email 7/27/18)."))

In February 2019, Hoiland gave her presentation at CCCLA.  (Def. 56.1 ¶¶ 74-75; Pl. 56.1 Resp. ¶¶ 74-75.)  Hoiland asserts that the total number of attendees at this presentation was between 12 and 20 people.  (Def. 56.1 ¶¶ 78, 112; ECF 37-5, Tr. 119:2-11; ECF 76 ¶ 84.)  Wilder attacks Hoiland's recollection of the event and notes that over 200 people attended the CCCLA itself, although she offers no evidence as to the number of attendees who were present for the "breakout" session at which Hoiland made a presentation.  (Pl. 56.1 Resp. ¶¶ 111-12, 114.)

As part of her presentation, Hoiland displayed a PowerPoint slide deck (the "Presentation").  (ECF 1-5; ECF 41-9.)  The first slide in the Presentation bears the title, "Assessing Numeracy in a Faculty Development Program."  Underneath that, this first slide reads, "Sarah L. Hoiland, Ph.D.  Assistant Professor of Sociology, City University of New York, Hostos Community College."  (Id. at 2.)  No other names or copyright credits are listed anywhere else in the Presentation.  The Presentation was also made available by CCCLA for attendees to download.  (ECF 36-13 at 4.)[3]

---

[3] By September 2019, however, the Presentation was no longer available online for attendees to download, according to Valencia.  (Id.)

The Presentation consisted of 23 slides.  The parties do not dispute that five of these slides contained "portions of the actual text" of Unit 7H.  (Def. 56.1 ¶¶ 91, 93; Pl. 56.1 Resp. ¶¶ 91, 93; see also Pl. 56.1 ¶ 69; Def. 56.1 Resp. ¶ 69 (Hoiland "admits that she included text directly from Subunit 7H of the Course Materials in Slides 9 through 13 of the CCCLA Slides").)  The Complaint attaches an exhibit comparing the text on each of these slides to the copyrighted Unit 7H Text.  (ECF 1-6.)  The other slides consisted of photos of Wilder, Hoiland, and their various faculty cohorts, as well as other slides discussing the program and its results, though it did not contain any other uses of or quotations from the other NICHE/NICE subunits themselves.  (ECF 1-5.)

On slides 14 to 19, Hoiland also included materials created by one of the NICE faculty participants, Dr. Crystal Rodriguez, to "showcase a faculty participant's instructional materials" created in the course of the program.[4]  (ECF 37-5, Tr. 196:12-18; see also ECF 1-5 at 15-20.)  Hoiland stated that she wanted to showcase someone else's work rather than her own and that she gave Rodriguez full oral credit during the Presentation, including naming her institution, department, and the course she taught.  (ECF 36-14 at 2.)

---

[4] As the record shows, Wilder eventually became aware that Hoiland's Presentation featured Rodriguez's assessment materials, and in September 2019, Wilder made Rodriguez aware of this and requested that Valencia add Rodriguez as a co-author of the Presentation as well.  (ECF 36-13 at 2-6.)  Rodriguez had signed an "IRB form" as a NICE participant, checking "Yes" on a consent form that read, "I would like my identity to be used on the NICE web site for any specific materials (e.g., . . . assignments, assessment instruments . . .) I produce as a result of my involvement in the NICE project."  (ECF 36-7 at 4.)  Hoiland eventually responded by asking Rodriguez to meet in February 2020; Rodriguez first appeared willing to meet, then responded with an email, more formal in tone, accusing her of a "lack of professional courtesy" and a "lack of professionalism and dishonesty."  (ECF 36-14 at 3-6.)  Hoiland acknowledged to Rodriguez that she should have asked permission to "showcase" her materials during the Presentation.  (Id. at 2.)  She also noted that she had "expressed concern last summer when I learned [Wilder] contacted you without telling me and concern with you being added as a co-author; however, I was advised to let it go and not to contact you directly."  (Id.)  Rodriguez then forwarded Hoiland's response to Wilder.  (Id.)  Rodriguez, however, is not a party to this action, and Wilder, of course, does not have standing to bring a copyright infringement claim as to Rodriguez's work.  The role of Rodriguez's work in Hoiland's Presentation is thus discussed only insofar as it is relevant in this case, including any issue of intent.

Hoiland asserts that, as she showed these slides as a "fleeting visual aid" or a "quick visual," she gave her oral presentation about the NICHE and NICE programs and then answered many questions from the participants—for about half an hour—that were "almost wholly unrelated to the slides themselves." (ECF 75 at 3; ECF 37-5, Tr. 137:2-138:3; id., Tr. 201:8-9; Def. 56.1 ¶¶ 82-83; Pl. 56.1 Resp. ¶¶ 82-83.)  While she concedes that Wilder's name did not appear on the slides, Hoiland testified at deposition that she "did more than discuss" Wilder and her role during her presentation: "Dr. Wilder's name came up many, many, many times during the presentation.  In fact, when I left the presentation I thought that if she was there, she would be embarrassed at how much I spoke about her." (ECF 37-5, Tr. 115:3-8.)  Hoiland also pointed Wilder out in photos on the slides and explained the differences between NICHE and NICE.  (Id., Tr. 115:8-15.)  She testified that her Presentation included links to the NICHE/NICE website, which had "Dr. Wilder's name all over it," and that she clicked on the link and opened the page to show the audience during the Presentation.  (Id., Tr. 92:3-21.)[5]

Hoiland emphasized that "significant time and attention [was] given to Dr. Wilder throughout my oral part of the presentation," but admitted that she did not recall whether she specifically identified Wilder as the "author" of the materials, although she "likely said something that [sic] she created the materials with a team of people that were part of a project called NICHE."  (Id., Tr. 115:13-116:6.)  She also testified that she gave Wilder "credit for the NICHE project, which is where those materials came from," but that for her to say during the presentation that "Dr. Wilder authored the NICHE materials" would have been "ridiculous,"

---

[5] The Presentation does appear to contain several blue hyperlinks, but the versions posted to ECF do not contain "live" hyperlinks that would allow the Court to view any websites to which they were linked.  (See ECF 1-5 at 9; ECF 41-9 at 9; ECF 46-9 at 9.)

explaining, "[T]hat's not something that I would have said.  Because there was a much larger story that I was telling.  The slides were not the focus of the presentation."  (Id., Tr. 136:7-20.)

On August 2, 2019, Hoiland emailed Wilder asking for "comments or suggestions" on a presentation that she was planning to submit for another conference that fall.  (ECF 52 at 7.)  While the attachment Hoiland sent to Wilder in this email was not produced, the parties do not dispute that the attachment was the CCCLA PowerPoint, i.e., the Presentation.  (Def. 56.1 ¶ 115; Pl. 56.1 Resp. ¶ 115.)  Wilder asserts that it was at this point that she first learned of Hoiland's allegedly infringing use of the Unit 7H Text in the Presentation.  While Wilder's initial reply on August 2 and Hoiland's response on August 5 regarding her own research ideas were collegial in tone, the correspondence soon escalated into a dispute.

On August 6, Wilder responded to the chain with a request that Hoiland "cite" any NICE or NICHE documents used in her future projects, "since so much of that material comes straight from the work I did earlier."  (ECF 52 at 4.)  Wilder continued, "When you sent me the slides you'd presented at the community college conference with you as sole author—and no mention of me—I was shocked at first and did not know quite how to respond.  Many of your slides were taken verbatim from what I had written either in the proposal or in Blackboard, and I felt bad that you had not even acknowledged me."  (Id.)

Wilder then broke down each of the 23 slides in Hoiland's Presentation, objecting not just that slides 8 to 13[6] were "taken verbatim from the text I wrote for the Blackboard course," but also complaining about the use of slides in which Hoiland had referred to the "goals of NICE," which "consists entirely of text I had written," data[7] Wilder had emailed to Hoiland,

---

[6] Slide 8 consists of the list of Blackboard Modules but does not include any Unit 7H Text.
[7] To the extent that Wilder argued to Hoiland that she was also entitled to "first dibs" on the data generated by the NICE program (ECF 52 at 2), the Court notes that data is generally not copyrightable, although compilations of data that display some originality in their composition and selection may be.  See Feist Publications, Inc. v. Rural

summaries of the NICHE units, and descriptions of project workshops (which Wilder did not accuse Hoiland of taking verbatim).  (Id.)  Wilder concluded, ". . . I feel as if you are trying to take over a project that is mine. . . . I was genuinely surprised by the extent to which my NICHE and NICE work was used but not acknowledged in your presentation.  I think the norm in this situation would be to include me as a co-author.  I'm also disappointed that you're presenting on the data that were collected in response to my course design, and that I also have plans to present."  (Id. at 4-5.)

Hoiland replied later that day, "I will respond to the issue of plagiarism raised in your email."  (Id. at 3.)  Hoiland explained that while the names and biographies of "people that were not present" were not included on the "Speakers" page for the conference, Hoiland acknowledged that she was one of two PIs in her own speaker biography, had described NICHE during the Presentation, and had explained that she had entered into a project that Wilder had already developed.  (Id.)  She concluded: "While I realize none of what I said is in the PowerPoint and I acknowledge that I should have put this in writing in the slideshow, the slideshow is not published and I can assure you no one in the room thought that NICE was my project and each individual would have known your name and institutional affiliation.  Clearly, I would not have sent the PowerPoint to you if my intention was to steal your work or take credit without acknowledging your work."  (Id.)

Hoiland also acknowledged that she should have "included" the names of two other collaborators to the NICHE project, including a professor who had "created Unit 3" and another professor who created other unidentified units of NICHE.  (Id.)  Wilder herself had mentioned one of these professors' roles in creating those NICHE units in her email.  (Id. at 4.)

---

Telephone Service Company, Inc., 499 U.S. 340, 347-48 (1991).  Regardless, Wilder's copyright infringement claim here is based solely on the Unit 7H Text, not any NICHE/NICE data.

Hoiland continued, "My understanding of co-authorship is that it is for publications, and in the case of a presentation, published proceedings." (<u>Id.</u> at 3.)  Hoiland concluded, "I asked you if you wanted to co-present [at CCCLA] and you said no, but you appreciate me asking you and that 'it's great that you're presenting' (email 7/27/18).[8]  I believe I even sent the abstract to you when I submitted it last summer." (<u>Id.</u> at 4.)

Wilder replied, "I invited you to be a co-author on the NICHE/NICE paper because you have been instrumental in giving feedback and ushering faculty through . . . . Honestly, I was trying to be generous.  Now, however, you've indicated that you're planning a sole-authored paper that builds on slides that I wrote and data that I was responsible for generating.  You've also said that you're planning an extension of the NICE project based on the grant proposal that I conceived and wrote.  You never once suggested that the extension of the grant might include me.  I think it is time to wrap up this project and go our separate ways." (<u>Id.</u> at 3.)  Hoiland replied that Wilder had misstated her future research plans and that she was "insulting my integrity based on misinformation and that goes beyond the grant or any presentations. . . . I am honest and ethical.  When I make a mistake, I admit it (and I did), and owned up to not including citations and acknowledging that I should have included you as a co-author in the presentation.  Again, you didn't mention it when I sent you my list of presentations so I was taken aback at your reaction this summer." (<u>Id.</u> at 2.)

Wilder replied, "But from my perspective, you have wrongfully asserted control of what rightfully belongs to me, and you have inaccurately portrayed what transpired.  While you have apologized for the problems with the presentation, I think you should take some action to remedy this situation (such as writing to the organizers and requesting that they include my

---

[8] As noted, this email is not in the record.  Accordingly, the Court does not consider its content in deciding the summary judgment motions.

name as a coauthor in their records, for example).”  (Id. at 1.)  Wilder also wrote that it appeared

Hoiland was “now strongly motivated to maximize the use of the data that I was responsible for

generating from the NICE project . . . (From my perspective, because I conceived and planned

this research, I feel I should have first dibs on the data.)  I am fine with other people using the

materials from the NICE/NICHE faculty development program—and indeed, I’m flattered when

they do—because faculty development has always been important to me and I want to

disseminate the materials as widely as possible.  However, this shift in focus in your proposed

‘expansion,’ coupled with your presentation at the community college, has left me feeling

worried and distrustful.”  (Id.)

Wilder and Hoiland continued to correspond about wrapping up their working

relationship on the NICE project.  Hoiland wrote to Wilder, “At this point, I don’t feel

comfortable saying anything about this program.  I want no part of any publications,

presentations, or extension funding. . . . I have no intentions of doing anything with NICE other

than do my part to complete the Final Report and finish the project. . . . If you want the website

for the community [college] assessment conference changed, I can inquire.”  (ECF 53 at 5.)

Wilder responded, “In terms of the community college presentation, I am just asking for

recognition that I co-authored the presentation and for it to be part of the official record. . . . I

could tell from your last email that you are very upset about the email exchanges we’ve had this

past week, but I have also been reeling because of the terrible and helpless feeling that I haven’t

been given proper credit for my intellectual work.  I, too, am very sorry things worked out this

way and I hope we can go our separate ways in peace.”  (Id.)

Two days later, Hoiland replied that she had reached out to CCCLA with Wilder’s

photo and biography and asked that Wilder be added to the “official agenda” of the conference.

(Id. at 2.)  Wilder responded, "I appreciate that you are trying to correct this mistake.  It is the right thing to do, and I am grateful."  (Id.)  In the same email, however, Wilder also accused Hoiland of not making any "unique intellectual contribution" to the NICHE/NICE program and wrote: ". . . I was frustrated and hurt because you had included so many of my slides without providing any authorship credit.  I am not just concerned about getting credit for my role in the project, although that is important.  My main concern is more specific: approximately half the text slides that you presented were my work.  How would you feel if you encountered a presentation/paper that included such a large proportion of your work, taken nearly verbatim, without attribution or permission?"  (Id. at 2.)  Wilder concluded, "I think your actions constitute a form of plagiarism.  I have been hesitant to use that word because it is so loaded in the academic world, but that's what happened, and that's why it's so important that it be corrected. . . . In presenting yourself as sole author or first author, you have been presenting my intellectual contribution and asserting control over it. . . . I don't think I'm overreacting, since this is not just my personal opinion.  Based on the content of your PowerPoint presentation, it's a matter of fact."  (Id. at 2-3.)

Hoiland had, in fact, reached out to the organizers of the CCCLA on August 8, asking them to add Wilder's name to the online version of the conference agenda and explaining, "My co-PI, Esther Wilder, could not make it to the conference in February and pointed out that she should have been listed as a co-author.  Would it be possible to add her?"  She included Wilder's biography and photo.  (ECF 36-13 at 6.)  Wilder also followed up directly with the organizers in early September 2019, explaining that she was "inadvertently not given authorship credit for my role in this presentation."  (Id. at 5.)  She also explained "another significant problem with the presentation": the inclusion of Rodriguez's sample assessment instrument.

Wilder attached "a revised slideshow that properly credits Dr. Rodriguez's contribution to this presentation . . . and indicates myself as co-author. . . . In the absence of crediting Dr. Rodriguez in the slideshow, she should also be considered a co-author in this presentation."  (Id.)  The next day, the organizers explained that they had no record of the attendees who had attended Hoiland's session in order to circulate the updated PowerPoint to them; however, they did add Wilder's photo and bio to the conference's website.  (Id. at 4.)  Wilder then asked if they could add Rodriguez's name as an additional co-author but noted that she needed to "reach out to [Rodriguez]" first.  (Id. at 4.)  Three days later, Wilder wrote to Rodriguez—apparently their first communication on the subject—explaining the background surrounding Hoiland's Presentation, as well as Wilder's correspondence with Hoiland and with CCCLA.  Wilder added, "I don't know if [Hoiland] reached out to you, but in my communication with her it seems that all of this was some big oversight."  (Id. at 2-3.)

On September 10, 2019, when Hoiland asked Wilder to forward her communications with Valencia, Wilder responded, "I spoke on the phone with [Valencia] to explain why I felt it was important to remedy this problem—to grant authorship credit to both Crystal and myself. . . . As [Valencia] explained to me, it is really too late to revise the PowerPoint document. . . . However, the authorship issue has been resolved on Valencia's website, and I am very glad that both Crystal and I are getting the credit we deserve, albeit belatedly.  (I have changed the citation on the NICHE/NICE website to reflect this.)  Today I consulted with the chair of my department about this matter, as I thought it was appropriate that he be informed. . . . My chair thought it would be appropriate for me to consult with legal counsel, but I have not yet decided how to proceed."  (ECF 36-15 at 2.)

4. <u>CUNY Internal Investigation</u>

Wilder ultimately filed formal complaints with CUNY officials, accusing Hoiland of academic misconduct and plagiarism and urging the committee to deny Hoiland both an upcoming promotion and tenure.  (ECF 54, 55.)  Wilder also sent an email documenting her complaint to John Tsapogas, identified as a "Director" at the Research Foundation of the City University of New York ("RF-CUNY") in his email signature.  (ECF 55 at 1.)  She "respectfully request[ed] that a letter documenting Sarah's plagiarism and her unwillingness to accept responsibility and apologize for her actions be included in Sarah's dossier. . . . If Hostos/CUNY does nothing about this, then I feel you are condoning unethical behavior and giving Sarah a free license to continue to advance her career making misuse of the intellectual work of others."  (<u>Id.</u> at 4.)  Tsapogas replied that he was busy coordinating the CUNY response to the COVID-19 pandemic (the date of the email is March 12, 2020) and that he was deferring to others to respond to her email, but no further response was produced.  (<u>Id.</u> at 1.)  In April 2020, Wilder wrote another email bringing her complaint to the Research Integrity Officer at Hostos College.  (ECF 54.)  She also accused Hoiland of "defam[ing]" her.  (<u>Id.</u> at 4.)

A preliminary Inquiry was eventually undertaken by Dr. Yoel Rodriguez, the Research Integrity Officer at Hostos Community College.  This Inquiry included separate interviews with Wilder and Hoiland and with the Research Integrity Officer at Lehman College.  (ECF 81-4 at 3.)  On September 10, 2020, Rodriguez emailed Wilder to inform her that, "[a]fter review, it has been determined that a[] [formal] Investigation is not warranted.  Therefore, this matter will be closed . . . ."  (ECF 57 at 2.)  Wilder replied, "Thank you for the information.  I will proceed through other avenues as the evidence clearly indicates that plagiarism has occurred."  (<u>Id.</u>)

The accompanying report about the Inquiry characterized the matter as "more of an authorship dispute than plagiarism."  (ECF 81-4 at 5.)  Rodriguez concluded, "While it was not an easy decision, I did not find sufficient evidence to support an investigation into plagiarism. . . . It seems there was no previous agreement on what to disseminate / publish as a result of the NSF grant."  (Id.)  He also noted that Hoiland had been "forthcoming" and made no attempt to "hide" from Wilder what she had presented at CCCLA, instead sending her the exact Presentation she had given without changes.  (Id.)  He recommended that Hoiland sign a "Letter of Understanding" about being "mindful" and "aware" of intellectual property issues, not using Wilder's materials from other programs, providing citations and attribution where necessary, and attending further training.  (Id.)  Wilder asserts that Hoiland has never signed any such Letter of Understanding.  (ECF 67 ¶ 50.)  Hoiland, for her part, asserts that she would sign a Letter of Understanding if Wilder also signed it and if it included statements agreeing, among other things, that "[t]here is no evidence of plagiarism in my 2019 CCLA presentation and/or presentation materials" and that "[a]uthorship issues with respect to the 2019 CCLA presentation have been resolved and are sufficient."  (ECF 70 at 3.)[9]

Finally, in September 2020—more than a year and a half after Hoiland's Presentation took place—Wilder wrote again to Valencia, asking if they could circulate the revised PowerPoint to all 200+ attendees of the entire conference.  Valencia advised Wilder that this would not be possible.  (ECF 69-7 at 2-3.)  Wilder replied that she was concerned about attendees that might have downloaded the slides without attending Hoiland's presentation, adding, "I really want to ensure that everyone who saw that presentation knows it was mostly the work of Crystal and myself."  (Id. at 2.)

---

[9] Hoiland also testified that in 2022, she emailed personnel from the ASA regarding whether Hoiland should make an ethics complaint ("COPE") against Wilder for pursuing the instant litigation.  (ECF 37-5, Tr. 266:8-274:21.)

5.   The Instant Action

In April 2021, Wilder registered a copyright in the Unit 7H materials that appeared in Hoiland's Presentation (the "Unit 7H Text").  (ECF 1-4.)  Wilder did not register a copyright in any of the other sub-units or other NICHE/NICE materials.  The two-page deposit copy that she submitted along with her copyright registration application was attached as an exhibit to her Complaint.  (See ECF 1-3; ECF 36 ¶¶ 20-21.)[10]  The date of first publication of the materials is listed as 2013.

In February 2022, Wilder filed this action against Hoiland for copyright infringement in the Eastern District of New York, and it was subsequently transferred to this District.  Following the close of fact discovery and an unsuccessful reference to mediation, the parties filed cross-motions for summary judgment.  Wilder also sought to seal or redact certain exhibits to declarations in support of Hoiland's summary judgment motion.  (ECF 50, 64.)  The Court denied Wilder's motion to seal or redact, with two exceptions, unopposed by Hoiland, to "exclude stray and irrelevant mentions of non-parties."  (ECF 74 at 5.)

Summary Judgment Standard

On a motion for summary judgment, the movant must show "that there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law."  Rule 56(a), Fed. R. Civ. P.  In the case where both parties have moved for summary judgment, "a court need not enter judgment for either party.  Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the

---

[10] At her deposition, however, Hoiland identified the deposit copy as a document "given to me in this form as what Dr. Wilder had submitted for copyright," but noted that it appeared to be "bits and pieces of the assessment module" as it originally appeared in Blackboard, and she could not confirm whether it was the "full text of unit 7H" as it appeared in the original Blackboard modules.  (ECF 37-5, Tr. 191:6-192:8.)

party whose motion is under consideration." Morales v. Quintel Entertainment, Inc., 249 F.3d 115, 121 (2d Cir. 2001) (citations omitted).  "Even where both parties have moved for summary judgment, 'neither motion may be granted unless one party is entitled to it as a matter of law upon genuinely undisputed facts.'" Safeway Environmental Corporation v. American Safety Insurance Company, 2010 WL 331693, at *2 (S.D.N.Y. Jan. 28, 2010) (Pauley, J.) (quoting Rhoads v. McFerran, 517 F.2d 66, 67–68 (2d Cir. 1975) (per curiam) (citations omitted)). "Summary judgment is appropriate '[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" Williams v. New York City Housing Authority, 572 F. App'x 23, 24 (2d Cir. 2014) (summary order) (quoting Matsushita Electric Industrial Co. v. Zenith Radio Corporation, 475 U.S. 574, 587 (1986)).

Courts may decide copyright infringement claims at the summary judgment stage, finding either that copyright infringement occurred or could not have occurred as a matter of law. See, e.g., Acuff-Rose Music, Inc. v. Jostens, Inc., 155 F.3d 140, 143 (2d Cir. 1998) (affirming district court's bench trial on summary judgment record that copyright infringement claim failed as a matter of law because the work at issue "lacks originality and was therefore not protected by [plaintiff's] copyright"); Island Software & Computer Service, Inc. v. Microsoft Corporation, 413 F.3d 257, 262 (2d Cir. 2005) (affirming grant of summary judgment establishing copyright infringement); Boone v. Jackson, 206 F. App'x 30, 33–34 (2d Cir. 2006) (summary order) (affirming grant of summary judgment for defendants because "plaintiff could not establish as a matter of law the elements required to prove an infringement claim").  But if there are outstanding issues of material fact in the record as to the validity, ownership, authorship, or infringement of the copyright, then summary judgment must be denied.  See, e.g., Urbont v. Sony Music Entertainment, 831 F.3d 80, 93 (2d Cir. 2016) (reversing grant of summary

18

judgment to defendants where plaintiff had established genuine issue of material fact about his ownership of copyright).

Courts have also decided affirmative defenses to copyright infringement, such as fair use, at the summary judgment stage: the Second Circuit has observed that the "mere fact that a determination of the fair use question requires an examination of the specific facts of each case does not necessarily mean that in each case involving fair use there are factual issues to be tried," and that while the "fact-driven nature of the fair use determination suggests that a district court should be cautious in granting Rule 56 motions in this area," the analysis "does not protect the copyright holder from summary disposition of her claims where there are no material factual disputes." Wright v. Warner Books, Inc., 953 F.2d 731, 735 (2d Cir 1991) (citations omitted). See, e.g., Authors Guild v. Google, Inc., 804 F.3d 202, 229 (2d Cir. 2015) (affirming district court's grant of summary judgment to defendants, finding fair use was established); Swatch Group Management Services Ltd. v. Bloomberg L.P., 756 F.3d 73, 77 (2d Cir. 2014), as amended (affirming district court's sua sponte grant of summary judgment to defendants, finding fair use).

DISCUSSION

Although the parties make various arguments in support of their claims and defenses in their cross-motions for summary judgment, the Court need only reach two of the parties' contentions: (1) Hoiland's argument that Wilder does not own a valid copyright in the Unit 7H Text, a necessary element of Wilder's copyright infringement claim; and (2) assuming that Wilder does own a valid copyright, Hoiland's affirmative defense that her use was a fair use.

As noted, the Court will grant Hoiland's motion for summary judgment and deny Wilder's motion.

I.      Copyright Infringement

To make out a claim of copyright infringement, a plaintiff must establish (1) ownership of a valid copyright and (2) copying of the constituent elements of the work that are original. Urbont, 831 F.3d at 88 (citing Boisson v. Banian, Ltd., 273 F.3d 262, 267 (2d Cir. 2001)). The Court assumes without deciding that Wilder can demonstrate that there is no material issue of fact as to originality of the Unit 7H Text, but her motion nevertheless fails because there is a genuine issue of material fact regarding her ownership of a valid copyright in that text. The Court will therefore deny Wilder's motion for summary judgment.

A.  Registration

To establish ownership of a valid copyright, a plaintiff may submit a certificate of copyright registration from the United States Copyright Office. "Production of a certificate of registration made before or within five years after first publication of the work constitutes prima facie evidence of the validity of the copyright." Id. at 88–89 (citing 17 U.S.C. § 410(c)). But "a certificate of registration creates no irrebuttable presumption of copyright validity," and if "other evidence in the record casts doubt on the question, validity will not be assumed." Id. at 89 (quoting Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc., 342 F.3d 149, 166 (2d Cir. 2003)). See also Liebowitz v. Bandshell Artist Management, 858 F. App'x 457, 459 (2d Cir. 2021) (summary order) (first citing Urbont, 831 F.3d at 88–89, and then Carol Barnhart Inc. v. Economy Cover Corporation, 73 F.2d 411, 414 (2d Cir. 1985)) ("Although the party challenging

20

the validity of a copyright registration bears the burden of proof, that burden attaches only for presumptively valid copyrights; plaintiffs bear the burden of establishing that presumption.").[11]

As evidence of her ownership of a valid copyright, Wilder has produced a certificate of registration from the United States Copyright Office dated April 15, 2021.  (ECF 1-4; ECF 36-2.)  The certificate names Wilder as both the "author" and the "copyright claimant," and the "certification" names Wilder's attorney in this litigation.  The answer to the inquiry "Work made for hire" reads "No."  The deposit copy of the text—referred to on the certificate as "NICHE Unit 7H: QR Assessment Plan/Instrument"—is attached to the Complaint.  (ECF 1-3; ECF 36 ¶¶ 20-21.)

Wilder asserts, and her certificate reflects, that the Unit 7H Text was completed in 2013 and that its first publication was on March 22, 2013.  But she did not register her copyright in the work until April 2021.  (ECF 36-2.)  This is, of course, a span of more than five years, and so this certificate does not entitle Wilder's copyright to a presumption of validity.  This does not mean, however, that the Court disregards the certificate or that the copyright is invalid.  The copyright statute allows the Court to use its discretion in evaluating the evidentiary weight to be assigned to such a certificate.  Troll Company v. Uneeda Doll Company, 483 F.3d 150, 154 n.5 (2d Cir. 2007) (quoting 17 U.S.C. § 410(c)) ("We recognize that the registration is not prima facie evidence of ownership because it was made more than five years after the first publication.  Nevertheless, it may carry some evidentiary weight. . . . 'The evidentiary weight to be accorded the certificate of a registration made thereafter shall be within the discretion of the court.'").

---

[11] Additionally, a district court itself may decide how the copyright laws apply to the material being considered.  See Carol Barnhart, 773 F.2d at 414 (citation omitted) (holding that the district court "properly exercised the discretion conferred on him by 17 U.S.C. § 410(c).  Once defendant's response to plaintiff's claim put in issue whether the [materials] were copyrightable, [the Court] correctly reasoned that the 'mute testimony' of the [materials] put him in as good a position as the Copyright Office to decide the issue," and noting that "it is permissible for the district court itself to consider how the copyright law applies to the articles under consideration").

Here, the Court accords only minor evidentiary weight to Wilder's certificate of copyright registration, given that Wilder did not register the text until two years after the alleged infringement and well into her dispute with Hoiland—far longer than five years after its first publication in 2013.

### B.  Evidence of Ownership

Because the copyright registration certificate produced by Wilder does not enjoy a presumption of validity, Wilder must still establish her ownership of a valid copyright over the Unit 7H Text.  And evidence in the record, including evidence submitted by Wilder herself, indicates that she may not, in fact, be the valid owner of the copyright in that text.  The summary judgment record evidence includes materials identifying the recipient of the NSF NICHE and NICE grants as RF-CUNY, as well as portions of NSF policies purporting to show that the "grantee" retains the copyright of works created under the NSF grant.  Finally, "copyright notices" purportedly attached to the NICHE/NICE materials raise additional questions about who owns the copyright to these materials.

First, the NICHE and NICE abstracts in the record unambiguously state that the Research Foundation of the City University of New York is the awardee or recipient of the NSF grants (not Wilder and/or Hoiland individually).  (ECF 37-4 at 2; ECF 46-4 at 2; ECF 46-10 at 2, 5.)  Yet, despite this evidence, Wilder asserts, "Under the terms of NSF's grants, Plaintiff is the author of material created for the grant program and retains the copyright in that material (Ex. 21; Supp. Wilder Decl. ¶ 7.)."  (ECF 82 at 3-4.)  The paragraph of her supplemental declaration that Wilder cites in support of this assertion reads: ". . . I authored the majority of the instructions and guidelines of the NICHE faculty development program.  I am the owner of the copyright of

most of these materials.  Under NSF policy, the author of the materials produced under a grant retains the copyright in the materials."  (ECF 80 ¶ 7.)

But the NSF policy produced by Wilder herself does not support this assertion. Wilder's attorney submitted a declaration stating that Exhibit 21, also referenced in Wilder's declaration, consists of a "true and correct copy of a printout of sections from the National Science Foundation 2019, Proposal & Award Policies and Procedures Guide . . . and a printout from a section from the National Science Foundation 2004 Chapter Four Grant Administration Highlights NSF 4-23."  (ECF 81 ¶ 4; see also ECF 81-1.)  Both of the hyperlinks to these pages contained in the declaration, however, result in a "Page Not Found" error when visited.[12]  The first "printout" of the NSF Proposal & Award Policies and Procedures Guide is dated February 2019.  The first page consists of the banner of the NSF website, the title "Proposal & Award Policies & Procedures Guide," the date "February 25, 2019," and the beginning of the Table of Contents.[13]  The second page of the printout consists of a paragraph defining the term "Principal Investigator/Project Director (PI/PD)" and explaining the relationship between multiple PIs. There is then a heading, "2. NSF-Grantee Relationships," with nothing below it.  (ECF 81-1 at 2-3.)

The third page of the printout reads, "Intellectual Property Rights.  The National Science Foundation claims no rights to any inventions or writings that might result from its

---

[12] The Court notes, however, that the URL in the title of the last page of the printout (ECF 81-1 at 5), https://www.nsf.gov/pubs/gpg/nsf04_23/6.jsp, does work; it directs the user to the NSF's "Document Library," containing a policy dated September 2004, titled "Chapter VI - Grant Administration Highlights," which includes the text on page 5 of ECF 81-1.

[13] It is unclear why the policy dated February 2019 was produced here; while the infringement is alleged to have taken place during Hoiland's Presentation in February 2019, the other evidence in the record indicates that the NICHE grant under which the Unit 7H Text was written was issued in 2011 and would therefore likely be controlled by an earlier version of NSF policy, which the parties have not produced.  Similarly, it is not clear why Wilder produced a 2004 version of the "Grant Administration Highlights," as noted below, or whether this 2004 policy was still in effect at the time that the NICHE grant was issued by the NSF or when the Unit 7H text was written.

fellowship or traineeship grants.  However, fellows and trainees should be aware that the NSF, another Federal agency, or some private party may acquire such rights through other support for particular research.  Also, fellows and trainees should note their obligation to include an Acknowledgement and Disclaimer in any publication.  [END OF PROVISION.]"  (<u>Id.</u> at 4.) There is no evidence in the record, however, that the NICHE or NICE grants are "fellowship or trainee grants"—the abstracts provided by the parties refer to each as a "Standard Grant" (<u>see</u>, <u>e.g.</u>, ECF 37-4 at 2)—and so it is not at all clear that this policy would even apply to the NICHE and NICE grants.

Finally, the fourth page of the printout bears the title: "Source: National Science Foundation.  2004.  Chapter IV – Grant Administration Highlights.  NSF 04-23.  September 2004.  Source: https://www.nsf.gov/pubs/gpg/nsf04_23/6.jsp."  (ECF 81-1 at 5.)  Following the title on the fourth page of the printout is a paragraph with the heading, "L. Legal Rights to Intellectual Property," which reads: "NSF normally allows grantees to retain principal legal rights to intellectual property developed under its grants.  This policy provides incentive for development and dissemination of inventions, software and publications that can enhance their usefulness, accessibility and upkeep.  It does not, however, reduce the responsibility of researchers and organizations to make results, data and collections available to the research community."  (<u>Id.</u>)  There are then two footnotes about "grant transfer requests" and a link to "NSF Grant Conditions."

The quoted text merely supports the proposition that the NSF "normally allows grantees" to retain intellectual property rights for work created under its grants.  There is no evidence in the record showing that this was the case for the NICHE/NICE grants.  And even assuming that RF-CUNY, as the grantee, <u>did</u> retain its intellectual property rights to work created

24

under its NSF grant, this does not answer the question of whether <u>Wilder</u> (a CUNY employee, not an RF-CUNY employee),[14] is the owner of the copyright in the original portions of the Unit 7H Text.

Wilder does not explain by what path copyright ownership would pass, under this scenario, from RF-CUNY as the NSF grantee to her as the "author" of the work.  Nor did the parties submit evidence that could answer this question—such as Wilder's employment contract with CUNY, which might clarify, for example, whether the Unit 7H Text would be considered a work for hire owned by CUNY or RF-CUNY;[15] any correspondence or agreements between RF-CUNY and NSF regarding the grants; the final award documents and agreements between RF-CUNY and NSF regarding the grants (the parties submitted only the NSF <u>proposals</u> for NICE); or the correspondence that Hoiland testified she had with RF-CUNY and NSF employees regarding the instant dispute.  (ECF 37-5, Tr. 256:17-260:2.)  Because the parties have not submitted any such documents—and because the documents that they <u>have</u> submitted raise more questions than they resolve on this issue—on the record before the Court, there remain questions about this material, threshold fact.

Finally, Wilder asserts repeatedly that the NICHE materials were "protected by copyright" and bore a copyright notice to that effect, giving her exclusive "authorization" over, or requiring her "permission" for, use of the materials.  (<u>See</u> ECF 82 at 8 (internal citations omitted); ECF 36 ¶¶ 16-17; <u>id.</u> ¶ 59 ("Like the NICHE instructional materials, the videos in each unit of the NICE materials on Blackboard included a specific statement that they were subject to

---

[14] <u>See</u> Pl. 56.1 ¶ 1, Def. 56.1 Resp. ¶ 1 ("Plaintiff Esther Wilder ('Plaintiff') is a tenured professor in the Department of Sociology at Lehman College, City University of New York ('CUNY').").

[15] While the Copyright Act states that ownership of a copyright "vests initially in the author or authors of the work," the statute makes an "important exception" for "works made for hire."  <u>Community for Creative Non-Violence v. Reid</u>, 490 U.S. 730, 737 (1989) (quoting 17 U.S.C. § 201(a)) (footnote omitted).  "If the work is for hire, 'the employer or other person for whom the work was prepared is considered the author' and owns the copyright, unless there is a written agreement to the contrary."  <u>Id.</u> (quoting 17 U.S.C. § 201(b)).

copyright and were not to be used without my [Wilder's] express authorization.").)  In support of this assertion, Wilder produced a purported screenshot from the NICHE instructional videos on Blackboard.  (ECF 36 ¶¶ 16-17; ECF 36-5.)  Hoiland produced a slide deck for a presentation given by Wilder and Hoiland prior to her February 2019 Presentation, the final slide of which bears a nearly identical copyright notice.  (ECF 37 ¶ 3; ECF 37-1 at 27.)

While Wilder asserts that each unit of the NICHE materials was protected by such a notice, there is no record evidence confirming that either of these notices were actually attached to the Unit 7H Text, and thus, whether the notices are even applicable or relevant here: the notice produced by Wilder consists of a single page or screenshot, while the notice produced by Hoiland is part of a NICHE/NICE slideshow not containing the Unit 7H Text.[16]  But assuming that they were attached to Unit 7H—or that the Unit 7H Text is encompassed by the notices' reference to the "supplementary course material from NICHE" (ECF 45-3)—these notices do not identify Wilder as the owner of the copyright in those materials.  Wilder's assertion that the notice states the materials are "protected by copyright" is accurate—but the notices do not state that the materials were protected by <u>Wilder's</u> copyright.  The NICHE copyright notice reads:

> A CUNY Numeracy Infusion Course for Higher Education (NICHE) Presentation. . . . © Copyright 2013.  This presentation is owned by CUNY NICHE.  Unauthorized use of any of the material in this presentation or any supplementary course material from NICHE is strictly prohibited.  Please note that all sources referenced in this presentation are indicated on our NICHE web site (www.teachqr.org).  Any questions regarding the authorization for use of materials from NICHE should be directed to Esther Isabelle Wilder [Wilder's email address].  (ECF 36-5; ECF 45-3.)

---

[16] Hoiland also asserts that she does not recall seeing the copyright notices "as described by Dr. Wilder."  (ECF 46 ¶ 126.)

The version produced by Hoiland is nearly identical, except that the title reads, "A CUNY NICHE/NICE Presentation," the first line of the notice reads, "© Copyright 2016.  This presentation is owned by CUNY NICHE and CUNY NICE," and the final reference to "NICHE" in the last sentence has been updated to "NICHE/NICE."  (ECF 37-1 at 27.)

These notices do not establish Wilder's ownership of the copyright in the material.  Both notices explicitly identify CUNY NICHE and/or CUNY NICE as the owner of the "presentation."  And assuming that the Unit 7H Text did bear such a copyright notice, these statements would contradict Wilder's own assertion that she owns the copyright.  Hoiland concludes that this notice "is generally consistent with how I viewed the Course Materials in early 2019.  I was not (and am not) an expert on copyright law, but I would have thought (as Dr. Wilder seems to have thought) that the Course Materials were owned by the NICE Project itself."  (ECF 76 ¶ 129.)[17]

This record does not permit the Court to rule as a matter of law that Wilder is the owner of a valid copyright in the materials.  Accordingly, the Court will deny Wilder's motion for summary judgment.


II.   <u>Fair Use</u>

Regardless of whether Wilder is the owner of a valid copyright in the material covered by the registration, Hoiland has established the affirmative defense of fair use as a matter of law.

The fair use doctrine provides "important limits to an author's rights to control original and derivative works."  <u>Authors Guild, Inc. v. HathiTrust</u>, 755 F.3d 87, 95 (2d Cir.

---

[17] In addition, as Hoiland notes, the notices do not go so far as to give Wilder "express authorization" over the materials—they merely forbid "unauthorized use" and direct questions about that use to Wilder.  (<u>Id.</u> ¶ 131.)

2014).  The doctrine "allows the public to draw upon copyrighted materials without the permission of the copyright holder in certain circumstances."  <u>Id.</u>  The four non-exclusive factors considered by courts in evaluating whether a use is fair include: "(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work."  <u>Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith</u>, 598 U.S. 508, 527 (2023) (quoting 17 U.S.C. § 107).  Fair use is an affirmative defense, and as such, Hoiland bears the burden of proof in establishing it.  <u>Campbell v. Acuff-Rose Music, Inc.</u>, 510 U.S. 569, 590 (1994); <u>Authors Guild v. Google</u>, 804 F.3d at 213 (citations omitted).  The doctrine is a "flexible" one whose "application may well vary depending on context" and that "requires judicial balancing, depending on relevant circumstances."  <u>Andy Warhol Foundation</u>, 598 U.S. at 527 (citation omitted).  The Court will evaluate each factor in turn.

A.  <u>The Purpose and Character of the Use</u>

The first factor in the fair use analysis is "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." <u>Id.</u> at 527 (quoting 17 U.S.C. § 107(1)).  "This factor considers the reasons for, and nature of, the copier's use of an original work.  The 'central' question it asks is 'whether the new work merely "supersede[s] the objects" of the original creation . . . ("supplanting" the original), or instead adds something new, with a further purpose or different character.'"  <u>Id.</u> at 527-28 (citations omitted).  "The use of an original work to achieve a purpose that is the same as, or highly similar to, that of the original work is more likely to substitute for, or 'supplan[t],' the work."  <u>Id.</u>

28

(citations omitted).  "[T]he critical inquiry is whether the new work uses the copyrighted material itself for a purpose, or imbues it with a character, different from that for which it was created."  <u>TCA Television Corporation v. McCollum</u>, 839 F.3d 168, 180 (2d Cir. 2016) (citing <u>Campbell</u>, 510 U.S. at 579), <u>cert. denied</u>, 581 U.S. 994 (2017).

   "An important focus of the first factor is whether the use is 'transformative.'" <u>HathiTrust</u>, 755 F.3d at 96.  <u>See also</u> <u>Authors Guild v. Google</u>, 804 F.3d at 214 ("[T]ransformative uses tend to favor a fair use finding because a transformative use is one that communicates something new and different from the original or expands its utility, thus serving copyright's overall objective of contributing to public knowledge.").[18]  Academic, non-commercial uses are more likely to be found to be fair uses than commercial uses: "[C]ourts are more willing to find a secondary use fair when it produces a value that benefits the broader public interest.  The greater the private economic rewards reaped by the secondary user (to the exclusion of broader public benefits), the more likely the first factor will favor the copyright holder and the less likely the use will be considered fair."  <u>American Geophysical Union v. Texaco Inc.</u>, 60 F.3d 913, 922 (2d Cir. 1994) (citations omitted).

    Here, the purpose and character of Hoiland's use of the Unit 7H Text was distinctly different from Wilder's stated original intent and purpose in creating the text.  It was also a non-commercial, educational use that benefitted the public interest.

   Wilder asserts that the Unit 7H Text was originally "designed to teach faculty at CUNY about the best practices for infusing quantitative reasoning into their courses, and the assessment of that instruction," (Pl. 56.1 ¶ 4), and that "Unit 7H provided instructions to faculty

---

[18] The Second Circuit has explained that "[w]hat is critical" to this inquiry is "how the work in question appears to the reasonable observer" and that courts must "examine how the [purported fair use] may 'reasonably be perceived' in order to assess [its] transformative nature."  <u>Cariou v. Prince</u>, 714 F.3d 694, 707 (2d Cir. 2013) (citations omitted).

on preparing a QR assessment plan and instruction in accordance with the learning goals," (id. ¶
10). (See also id.  ¶ 31 ("Upon completion of the instructional units, the faculty participating in
NICE (like in NICHE) were required to develop instructional and assessment materials to
incorporate into their teaching.").)  In other words, the original purpose of the Unit 7H Text,
according to Wilder herself, was to provide instruction and guidance to the CUNY faculty
participants on composing their own assessment instruments as an assignment for the course, as
well as explaining best practices for teaching and assessing QR.

   In contrast, in the abstract she submitted to Valencia, Hoiland described the
objectives of her Presentation as not just "[t]o share best practices in faculty development related
to assessment," but also "[t]o disseminate assessment results of our QR/QL faculty development
program" and "[t]o discuss the challenges and successes related to assessment in the community
college context."  (ECF 46-7 at 2.)  She also wrote that she would "discuss how faculty develop
QR learning goals, QR assignments, and QR assessments in this 8-week program and will
present preliminary assessment results . . . in addition to the external assessment of the program
that took place."  (Id.)  In accordance with this objective, Hoiland testified that the slides
themselves, including the slides that contained the Unit 7H Text, were merely visual aids for her
overall presentation: "there was a much larger story that I was telling.  The slides were not the
focus of the presentation."  (ECF 37-5, Tr. 136:17-20.)  Hoiland also testified that the audience
members asked questions "almost wholly unrelated to the slides themselves" during a lengthy
question-and-answer session during the presentation.  (Id., Tr. 138:2-3.)

   Hoiland recalled that the audience's questions reflected that they "were not
interested in the particularities of the NICE program.  They had different kinds of questions.  So
the audience was predominantly community college faculty and their questions were more

related to things like how did you recruit faculty?  How much did you pay them?  How did you get faculty to complete work when they're teaching four or five classes.  Like what are some best practices related to, you know, working with a four year institution."  (Id., Tr. 137:14-25.)  She also testified that she "did not plan to read the slides, stay on the slides, get into the nitty-gritty of the assessment unit but rather provide an overview of how the faculty development program approaches assessment."  (Id., Tr. 200:7-19.)[19]  The internal Inquiry undertaken by CUNY also reported that Hoiland said she had "talked more about Dr. Wilder than the assessment topic itself" during the Presentation, and that "much of the discussion in the presentation was about how to recruit and keep faculty motivated in professional development."  (ECF 81-4 at 4.)

Wilder, in fact, reinforces the different character and purpose of Hoiland's use when she repeatedly argues that she "never would have agreed" to the use Hoiland made of the materials because they were for a different audience, "context," and purpose than what she had originally intended.  (See, e.g., Pl 56.1 ¶ 120 ("Plaintiff would not have consented to the duplication of the Copyrighted Work, a unit of the NICHE and NICE programs out of context, leading to a misleading impression of the programs.").)  In fact, Wilder cites to Hoiland's own deposition testimony to argue this very point: "The attendees of the CCLA Conference were interested in the procedures for recruiting faculty and interactions between the institutions, not the instructional materials comprising the Copyrighted Work."  (Id. ¶ 82 (citing ECF 37-5, Tr. 137:14-138:12).)

This therefore was a use that was transformative rather than a "usurping" infringement of the original work.  Both the audience and the nature of Hoiland's use were

---

[19] Hoiland also testified that originally, she had placed all the text onto two slides, knowing that they would only be used as a "quick visual" by the audience—indeed, she stated that she used "a lot of text specifically because [she] didn't plan to spend very much time on those slides"—but that the Valencia organizers asked her to break the text into additional slides.  (Id. at 200:7-201:21.)

different than Wilder's original use and purpose of the Text.  Indeed, Wilder's argument that

Hoiland presented the work in a context or to an audience different than the one she initially

intended is a key factor in determining that a use is transformative.  See Cariou, 714 F.3d at 709

(emphasis added) ("an accused infringer has usurped the market for copyrighted works . . . where

the infringer's target audience and the nature of the infringing content is the same as the

original"); id. (concluding that fair use was established where the defendant's "audience" was

"very different" from plaintiff's, did not affect the markets for plaintiff's work, and consisted of

an "entirely different sort of [purchaser]" than plaintiff's); Arica Institute, Inc. v. Palmer, 970

F.2d 1067, 1076 (2d Cir. 1992) (affirming summary judgment finding establishment of fair use

where defendant's secondary work, quoting from the plaintiff's work, "introduce[d] the

historical and theoretical underpinnings" of plaintiff's theory, but also discussed defendant's own

experiences and research, "build[ing] upon [plaintiff's] work to further develop our store of

knowledge in this area").

        Hoiland's use of most of the Unit 7H Text verbatim does not control the question

of whether her use was transformative.  In some cases, reproduction of an entire work has been

found to be transformative.  Authors Guild v. Google, 804 F.3d at 221 (footnote omitted)

("Complete unchanged copying has repeatedly been found justified as fair use when the copying

was reasonably appropriate to achieve the copier's transformative purpose and was done in such

a manner that it did not offer a competing substitute for the original."); see also Bill Graham

Archives v. Dorling Kindersley Ltd., 448 F.3d 605, 613, 615 (2d Cir. 2006) (concluding that

reproduction of entire image by secondary user, albeit at a reduced size, was "tailored to further

its transformative purpose" and did not weigh against fair use, and ultimately concluding use was

fair).

The portions of the two-page Unit 7H Text that Hoiland did not use in the Presentation bear on the transformative use of the Presentation. The most significant change Hoiland made was to delete the first third of the Text, more than half of its first page—all instructional material for the Blackboard attendees of the course (such as deadlines and instructions for peer review). None of this would have been relevant for the audience of Hoiland's Presentation, who were not enrollees in the course and were not submitting assignments; the deletion of these portions accords with Hoiland's distinct purpose in showing them the text.

Hoiland also made several other minor changes throughout the text, such as replacing a short parenthetical explanation with a longer one citing specific examples on slide 9; changing "lesson/assignment" to "learning goals" on slide 10; and adding emphasis to the font on certain portions of slides 12 and 13. (Compare ECF 1-3 at 1, 2 with ECF 1-5 at 10-14.) Hoiland testified that she added the words that appear in color on slides 10 and 13 alongside the Unit 7H Text—her own commentary and takeaways on the course material for the audience to whom she was presenting. (ECF 37-5, Tr. 93:13-15, 94:21-23; see ECF 1-5, 41-9 at 11 ("Keep it simple: pre/post, three questions, and a scoring rubric"); id. at 14 ("Clarity, alignment, generalizability, validity, and soundness")). Although Wilder argues, correctly, that "[a]dded value or utility is not the test" (ECF 82 at 23), but rather that the use "serves a new and different function" that is not a "substitute" for the original work, that new and different function was present in Hoiland's Presentation of the materials to a totally different audience. HathiTrust, 755 F.3d at 96. For example, the Second Circuit ultimately concluded that this first factor favored fair use where, although information "disseminated by [defendant] was identical to what [plaintiff] had disseminated, the two works had different messages and purposes," and where

defendant's purpose was to disseminate the work to a different audience than plaintiff had intended.  Swatch, 756 F.3d at 84-85.

Finally, considering Hoiland's Presentation as a whole, while the Unit 7H Text appears on 5 of 23 slides, there is other content in the Presentation that gives Hoiland's inclusion of the Unit 7H Text greater context.  For example, Hoiland's stated purpose in including Crystal Rodriguez's assessment instrument within the Presentation (slides 14-19) was to "showcase" a completed assignment by one of the NICE faculty participants.  This choice further differentiates her purpose from the original purpose of the Unit 7H Text, which, as noted, was to provide instruction for faculty participants to create their own assessment instruments.  Hoiland's Presentation also included "student reflections" from other faculty participants, an apparent summary of challenges she and Wilder faced during the project, and a summary of a two-day workshop.  (ECF 1-5.)[20]  The inclusion of these materials allows the Presentation to achieve its overall purpose of providing an overview of the NICHE/NICE project to an audience who was previously unfamiliar with it and gives context to Hoiland's reason for including the Unit 7H Text within that Presentation.

This difference in purpose and the editorial changes made by Hoiland for this purpose thus distinguish the facts here from cases such as Weissman, in which the scholarly article in question was prepared for the same type of audience and had the "same intrinsic purpose"—and where the infringer only changed the author's name and some words in the title of the article before distributing it without any additional changes.  Weissmann v. Freeman, 868 F.2d 1313, 1316, 1324 (2d Cir. 1989) (citations omitted) (observing that infringer's use of

---

[20] As noted, Wilder initially also claimed that much of this content was also "hers," such as text she had written describing the goals of NICE, but also, for example, the workshop she had "planned" (while not claiming that she had written the text about the workshop).  (ECF 52 at 5.)  Again, however, her copyright infringement claim is limited here to the Unit 7H Text.

professor colleague's work for the exact "same intrinsic purpose" "seriously weakens a claimed fair use"); cf. Iowa State University Research Foundation, Inc. v. American Broadcasting Companies, Inc., 621 F.2d 57, 61 (2d Cir. 1980) (quoting 3 Nimmer on Copyright § 13.05(B), at 13-58) (footnote omitted) (emphasis added) ("'(W)here the two works in issue fulfill the same function,' we are instructed by Professor Nimmer, the 'scope of fair use is . . . constricted.'").

Hoiland's purpose thus was educational—to share the experience of the NICE and NICHE programs with an audience of community college professors and to explain how to set up such a faculty development program.  And it was also non-commercial—Hoiland testified that attendees generally pay, rather than receive payment, to attend conferences of this type, and that she received no payment for speaking at CCCLA.  (See ECF 37-5, Tr. 80:8-11; id., Tr. 178:15-25; ECF 76 ¶ 83.).  Although, as discussed further in the Court's analysis of the fourth factor, in the academic context, professional benefits should be taken into consideration as well as monetary gain, here, there is little record evidence that would directly connect any professional achievements by Hoiland that occurred post-CCCLA with this sparsely attended Presentation in 2019.  (See, e.g., ECF 37-5, Tr. 81:9-82:11 (Hoiland testifying at deposition that she did not get contact information or have follow-up conversations with any of the attendees of the Presentation and that she has a "few dozen" similar presentations on her CV).)  The Court concludes that Hoiland's use was transformative and that the educational, non-commercial purpose for which she used the work weighs heavily in favor of fair use.[21]

---

[21] The parties also argue that the fair use analysis should consider "the propriety of the defendant's conduct." Harper & Row Publishers, Inc. v. Nation Enterprises, 471 U.S. 539, 562 (1985) (citation omitted).  Wilder argues that by "[o]mitting Plaintiff's authorship credit and substituting her own name, Defendant's copying raises the inference of bad faith," (ECF 34 at 19), while Hoiland argues that Wilder herself has "engaged in a multi-year, bad-faith campaign designed to destroy Dr. Hoiland's career," (ECF 43 at 24).  Despite the parties' emphasis on the issue, however, the Supreme Court has cast doubt on "whether bad faith has any role in a fair use analysis" and noted it was "not determinative" in that case.  Google LLC v. Oracle America, Inc., 141 S.Ct. 1183, 1204 (2021) (citations omitted).  To the extent that it does play a role, the Court notes that the report resulting from CUNY's internal investigation emphasized that Hoiland was "forthcoming" and did not "hide what was presented" at the

B.  The Nature of the Copyrighted Work

The second factor asks whether the copyrighted work is, essentially, factual or fictional in nature, with greater copyright protection generally given to fictional works.  See Harper & Row, 471 U.S. at 563 ("The law generally recognizes a greater need to disseminate factual works than works of fiction or fantasy.").  To the extent that the Unit 7H Text is not a work of fiction, this factor weighs in Hoiland's favor; however, "courts have hardly ever found that the second factor in isolation played a large role in explaining a fair use decision."  Authors Guild v. Google, 804 F.3d at 220.  Still, however, Wilder failed to address this factor at all in her initial summary judgment motion and acknowledges in her reply that the Unit 7H Text is "not a work of fiction," although it is also "not a collection of facts."  (ECF 82 at 23).  Although Wilder also notes, correctly, that this second factor rarely is independently significant to the fair use analysis, this factor also weighs in favor of Hoiland, given the nonfictional character of the work.[22]

C.  The Amount and Substantiality of the Portion Used

The third factor asks how much of the original work was used and how substantial or significant these portions were.  Analysis of this factor "will harken back to the first of the

---

CCCLA from Wilder.  (ECF 81-4 at 5.)  Hoiland also took steps to add Wilder's name to the CCCLA website within days of Wilder's request for her to do so.  (ECF 36-13 at 6.)  Hoiland's response on August 8, 2019, to Wilder's allegations was to explicitly state that she wanted "no part of any publications, presentations, or extension funding" for the program.  (ECF 53 at 5.)  Finally, while Hoiland calls attention to Wilder's requests to have her tenure and promotion denied, Wilder's behavior is not relevant here.  See Harper & Row, 471 U.S.at 562-63.

[22] This factor may also consider whether the original work was "unpublished."  See Harper & Row, 471 U.S. at 564 (explaining "the scope of fair use is narrower with respect to unpublished works").  Wilder does note, as part of her argument on the third factor, that "[u]ntil Defendant's presentation, [Unit 7H] was accessible only to faculty enrolled in the program."  (ECF 34 at 18; see also ECF 82 at 23.)  However, Wilder also states on her certificate of copyright registration that the work was "first published" on March 22, 2013.  (ECF 1-4.)  And the fact that the Unit 7H Text was made available to several "cohorts" of NICHE and NICE participants from 2013 to 2019 differentiates this case from Harper & Row, in which an unpublished, confidential manuscript was copied and published in a magazine.  471 U.S. at 543.  Finally, the Copyright Act provides that the "fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the [] factors."  17 U.S.C. § 107.

statutory factors, for . . . we recognize that the extent of permissible copying varies with the purpose and character of the use." <u>Campbell</u>, 510 U.S. at 586-87 (citations omitted).  The analysis must consider "not only . . . the quantity of the materials used, but . . .  their quality and importance, too." <u>Id.</u> at 587.  For example, "even a small amount of copying may fall outside of the scope of fair use where the excerpt copied consists of the 'heart' of the original work's creative expression.  On the other hand, copying a larger amount of material can fall within the scope of fair use where the material copied captures little of the material's creative expression or is central to a copier's valid purpose." <u>Oracle</u>, 141 S.Ct. at 1205 (citations omitted).  "[W]hether 'a substantial portion of the infringing work was copied verbatim' from the copyrighted work is a relevant question, for it may reveal a dearth of transformative character or purpose under the first factor, or a greater likelihood of market harm under the fourth; a work composed primarily of an original, particularly its heart, with little added or changed, is more likely to be a merely superseding use, fulfilling demand for the original." <u>Campbell</u>, 510 U.S. at 587–88 (quoting <u>Harper & Row</u>, 471 U.S. at 565).  But this "'substantiality' factor will generally weigh in favor of fair use where . . . the amount of copying was tethered to a valid, and transformative, purpose." <u>Oracle</u>, 141 S.Ct. at 1205.

As a threshold matter, here, both parties misapply their analyses of this factor by focusing on (1) the percentage of Hoiland's Presentation that used the Unit 7H Text (and the brevity with which it was displayed), and (2) the role of Unit 7H within the NICHE/NICE program as a whole.  First, Hoiland argues that she did not use the Unit 7H Text in "any substantial way" during her Presentation and that she only "fleetingly" showed the slides on screen.  (ECF 75 at 23.)  Wilder, too, incorrectly focuses on Hoiland's Presentation, arguing that Hoiland "dismissed the importance of copying the text" when she explained that she "used the

slides as a quick visual, [and] that she did not intend to, and did not, discuss the text on the slides beyond a passing reference to the slides." (ECF 34 at 19.) But the correct focus is on the portions of the <u>copyrighted text</u> used, not the percentage of Hoiland's Presentation that included the Unit 7H Text. <u>See</u> <u>NXIVM Corp. v. Ross Institute</u>, 364 F.3d 471, 480 (2d Cir. 2004) (quoting 17 U.S.C. § 107(3)) ("the statutory enumeration of the third factor plainly requires only an analysis 'in relation to the copyrighted work,' not the infringing work"); <u>see also</u> <u>Harper & Row</u>, 471 U.S. at 565 (citation omitted) ("As the statutory language indicates, a taking may not be excused merely because it is insubstantial with respect to the <u>infringing</u> work. As Judge Learned Hand cogently remarked, 'no plagiarist can excuse the wrong by showing how much of his work he did not pirate.'").

Second, Hoiland argues that Unit 7H itself was not the "heart" of the NICHE/NICE materials, that the topic of Unit 7H, assessment, is "not the core of the NICE Project" overall, and that Unit 7H itself comprises "between 1/40th and 1/80th of the Course Materials" (i.e., of all eight units of the NICHE/NICE materials)—and that she therefore used neither the "heart" of the materials nor a substantial amount of them. (ECF 75 at 23.) Wilder counters that the topic of assessment was indeed an important part of the NICE and NICHE programs overall. (ECF 82 at 23.) But the analysis under this factor may not take into account the relative significance of Unit 7H to the full eight-unit set of NICHE/NICE materials because Wilder has only copyrighted the Unit 7H Text—not the entirety of the NICHE/NICE course materials. (<u>See</u> ECF 1-3, 1-4.) Nor has Wilder claimed to have authored the entirety of all the units that comprise NICHE/NICE. (<u>See</u>, <u>e.g.</u>, ECF 80 ¶ 7 (emphasis added) ("As part of my duties at NICHE, <u>I authored the majority of</u> the instructions and guidelines of the NICHE faculty development program. I am the owner of the copyright of <u>most of these</u> materials.").)

The correct analysis focuses on the percentage and significance of the portion of the copyrighted Unit 7H Text that Hoiland used in her Presentation compared to the entirety of the Unit 7H Text itself.  Here, Hoiland used about two-thirds of the text in the deposit copy, excising portions such as the instructions for submitting assignments and other changes, as discussed above.  Utilizing such a large percentage of the work, however, is not dispositive, as courts in some instances have found copying of an entire work to constitute a fair use.  See, e.g., Bill Graham, 448 F.3d at 613 (citations omitted) (noting that "courts have concluded that such copying does not necessarily weigh against fair use because copying the entirety of a work is sometimes necessary to make a fair use . . ." and concluding that "the third-factor inquiry must take into account that . . . 'the extent of permissible copying varies with the purpose and character of the use'").

The key question, then, is what constitutes the "heart" of the Unit 7H Text.  The portions of the Unit 7H Text that Hoiland did not include in her Presentation are those targeted to the very audience Wilder intended—the NICHE/NICE faculty participants who were submitting their assignments for this unit.  This text includes the background for the later portions of the text, and includes step-by-step instructions for the faculty participants, including deadlines, submission instructions, and discussion of peer feedback.  (See, e.g., ECF 1-3 at 2.)  Hoiland's alteration of the original text therefore consisted of cutting out much of the Unit 7H Text that would have been "essential" or the "heart" of the work under Wilder's own view of the work's purpose—to guide CUNY faculty members enrolled in NICHE/NICE to draft their own assessment instruments.  (See, e.g., Pl. 56.1 St. ¶ 10 ("Unit 7H provided instructions to faculty on preparing a QR assessment plan and instruction in accordance with the learning goals."); id. ¶ 31 ("Upon completion of the instructional units, the faculty participating in NICE (like in

39

NICHE) were required to develop instructional and assessment materials to incorporate into their teaching.").)  This is not to say, however, that the portions of the Unit 7H Text that Hoiland did use are insignificant; they are, of course, important substantive guidelines the participants were to consider in crafting their own assessment instruments.  This third factor tends slightly in favor of Wilder.

> ### D.  Effect Upon the Market

The fourth factor examines the use's effect upon the market for the original work. "It requires courts to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also 'whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market' for the original." Campbell, 510 U.S. at 590 (citation omitted).  The Supreme Court has referred to this as "undoubtedly the single most important element of fair use." Harper & Row, 471 U.S. at 566 (footnote omitted).  "To defeat a claim of fair use, the copyright holder must point to market harm that results because the secondary use serves as a substitute for the original work." HathiTrust, 755 F.3d at 96.  However, "the market effect must be evaluated in light of whether the secondary use is transformative." On Davis v. The Gap, Inc., 246 F.3d 152, 176 (2d Cir. 2001) (citing Campbell, 510 U.S. at 591), as amended.  But "[e]ven if the purpose of the copying is for a valuably transformative purpose, such copying might nonetheless harm the value of the copyrighted original if done in a manner that results in widespread revelation of sufficiently significant portions of the original as to make available a significantly competing substitute." Authors Guild v. Google, 804 F.3d at 223–24.

The fact that Hoiland's use took place in an academic context adds an additional layer to this analysis.  Ordinarily, this factor is evaluated in terms of the commercial or financial impact on the market.  But the Second Circuit has specifically identified publication in the academic setting as a special context in which non-monetary rewards are perhaps more valuable than financial earnings, noting that it would be error to consider only "sales or dollars received, rather than . . . the realities of promotion and tenure in an academic setting" and how the secondary use of the work might damage the original author's academic career.  See Weissmann, 868 F.2d at 1326.  Wilder emphasizes this argument, alleging that "Defendant's presentation, and representation of the Copyrighted Work as her own, benefited her academic resume and could inhibit Plaintiff's ability to publish and present about her work, now presented to academia as Defendant's intellectual property."  (ECF 34 at 19.)

But according to Weissman, the correct focus here is not on Hoiland's promotion of her own career but on any detriment to Wilder's own publications, promotions, or incentives to continue her scholarly research.  See Weissman, 868 F.2d at 1326.  Wilder's claims of reputational or professional harm in the one-time use of the material in the 2019 Presentation to a "breakout" session within a community college conference is speculative at best.  Wilder claims that Hoiland's use could hinder her plans to "commercialize the NICHE materials" in a textbook, and that Hoiland's use may also result in confusion about the true author of the work.  (See ECF 36 ¶¶ 103-05.)  This potential harm, however, runs into a roadblock: the Unit 7H Text is the only portion of the NICHE materials for which Wilder currently owns a copyright.  (ECF 1-3, 1-4.)  To the extent that Wilder intends to publish the entire NICHE/NICE curriculum together as a textbook (which she describes as "including the Copyrighted [Unit 7H] Text," but not consisting entirely of the Unit 7H Text), she would first have to hold a valid copyright in each of the units

41

she intends to publish.  See Harper & Row, 471 U.S. at 546–47 (citing 17 U.S.C. § 106)

(footnote omitted) ("Under the Copyright Act, these [exclusive] rights—to publish, copy, and

distribute the author's work—vest in the author of an original work from the time of its

creation."); see also ABKCO Music, Inc. v. Harrisongs Music, Ltd., 944 F.2d 971, 980 (2d Cir.

1991) (citing 17 U.S.C. § 501(b)) ("The legal or beneficial owner of an exclusive right under a

copyright is entitled to bring actions for infringements of that right occurring during the period of

its ownership.").  And other evidence in the record, as discussed, indicates that Wilder did not

author every single Unit of the NICHE/NICE program.  (See, e.g., ECF 80 ¶ 7.)

   The potential market for the two-page Unit 7H Text, standing alone, would be

limited—Unit 7H would have little commercial or professional value without the other units.

(See ECF 36 ¶ 99 (Wilder stating that taking "the Copyrighted Work, one core instructional unit

of the NICHE and NICE programs, out of context" would "lead[] to a confusing and misleading

impression of the programs"); id. ¶¶ 102-04 (Wilder arguing that Hoiland's actions could

adversely affect her commercialization of the "NICHE materials")).  Still, to the extent that a

market for the Unit 7H Text alone could conceivably exist, the fact that 12 to 20 participants

briefly saw the words in a slideshow, and without any evidence that the text was further

disseminated, does not represent a potential for substantial market harm for the Text.  See

Authors Guild v. Google, 804 F.3d at 224 (quoting 17 U.S.C. § 107(4)) ("But the possibility, or

even the probability or certainty, of some loss of sales does not suffice to make the copy an

effectively competing substitute that would tilt the weighty fourth factor in favor of the rights

holder in the original.  There must be a meaningful or significant effect 'upon the potential

market for or value of the copyrighted work.'").  Moreover, the record reveals that, at Wilder's

request, the CCCLA and NICHE websites were updated with her name as co-author—as well as

Crystal Rodriguez's name—which further mitigates any confusion as to Hoiland being the "sole" author of the text.  (ECF 36-15 at 2; ECF 69-7 at 2.)

Also important to the analysis under this factor is that Hoiland's use, as discussed, was transformative.  "[T]he Factor Four analysis is concerned with only one type of economic injury to a copyright holder: the harm that results because the secondary use serves as a substitute for the original work.  In other words, under Factor Four, any economic 'harm' caused by transformative uses does not count because such uses, by definition, do not serve as substitutes for the original work."  HathiTrust, 755 F.3d at 99 (citations omitted).  The transformative nature of Hoiland's use—particularly the distinct audience for which her Presentation was made—thus weighs in her favor here.  See Maxtone-Graham v. Burtchaell, 803 F.2d 1253, 1264 (2d Cir. 1986) (concluding that plaintiff's "uncrystallized plans to publish a small second edition" of her work was not affected by defendant's fair use, including because "the two works served fundamentally different functions").  And while even a transformative use may harm the market if it consists of "widespread revelation of sufficiently significant portions" of the original that would "make available a significantly competing substitute," Authors Guild v. Google, 804 F.3d at 223–24, here there is no evidence of "widespread revelation" of the Unit 7H Text in any way that could compete with Wilder's original work.  There is no record evidence that the Presentation was actually downloaded or viewed, nor that it was disseminated outside the conference attendees.  (See Pl. 56.1 Resp. ¶ 114 (Wilder asserting it is "undisputed that no party conducted a forensic analysis of how many attendees of the CCLA Conference independently downloaded a copy of the CCLA PowerPoint that was made available to them through the CCLA Conference's website").)  The text was shown only briefly, and the total number of people who attended the Presentation itself was no greater than twenty.  Any

revelation of the Unit 7H Text was therefore not "widespread," and such revelation does not give rise to the possibility of a "significantly competing substitute" for any additional work planned by Wilder.

Finally, it is important to note that the statute provides that harm to any <u>potential</u> market for the original work be considered, even if the plaintiff has not yet exploited (or does not plan ever to exploit) the work in that market.  <u>See</u> <u>Salinger v. Random House, Inc.</u>, 811 F.2d 90, 99 (2d Cir. 1987).  So Wilder's right to publish any original material for which she holds a valid copyright must be considered under this factor, regardless of whether or not she has yet done so.  But as discussed, the potential market for that work is exceedingly limited and is not affected by Hoiland's Presentation.[23]  And Wilder has alleged no harm to that potential market other than speculation.  <u>See</u> <u>Maxtone-Graham</u>, 803 F.2d at 1264 (concluding plaintiff could not "credibly argue that the use of the quotations [from her work] has harmed potential markets for her work" where she was "unable to point to a single piece of evidence portending future harm" and where the secondary use was published "a full decade" after her book was first published, thus "mak[ing] any such claim far too speculative to sustain upon mere allegation").

Balancing these factors, the Court concludes that Hoiland's use of the Unit 7H Text was fair as a matter of law.  No reasonable factfinder could fail to find in favor of Hoiland on her fair use affirmative defense on this summary judgment record.  The use was transformative; it was educational and non-commercial; the work is nonfictional; and the use had little or no effect on the limited market for the work.  And while Hoiland did use large portions

---

[23] Additionally, given the limited audience that attended Hoiland's Presentation, the lack of any record evidence that the Presentation was downloaded at all (let alone widely disseminated), and Hoiland's immediate, voluntary cessation of involvement in the project, the Court concludes that this is not the "type" of use that presents a threat to Wilder's market nor that can be categorized as "harmful," as this factor also contemplates.  <u>Cf.</u> <u>Fox News Network, LLC v. TvEyes, Inc.</u>, 883 F.3d 169, 180 (2d Cir. 2018) (concluding fourth factor weighed against fair use because of harm to plaintiff's licensing revenues by defendant and by "similar service[s]" or "similar entities"), <u>cert. denied</u>, 139 S.Ct. 595 (2018).

of the Unit 7H Text verbatim, she did not use the entirety of the work, and edited the text in a way that was most relevant to her transformative purpose.

CONCLUSION

Wilder's motion for summary judgment is DENIED. Hoiland's cross-motion for summary judgment is GRANTED. The Clerk is respectfully directed to terminate the motions (ECF 33, 42), enter final judgment for the defendant, and close the case.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated:     New York, New York
           February 1, 2024